**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| HOMELAND INSURANCE COMPANY OF NEW YORK,<br><br>      Plaintiff,<br><br>v.<br><br>CLINICAL PATHOLOGY LABORATORIES, INC., SONIC HEALTHCARE USA, INC., MEDLAB PATHOLOGY, SONIC HEALTHCARE (IRELAND) LIMITED, AND SONIC HEALTHCARE LIMITED.<br><br>      Defendants. | CIVIL ACTION NO.: 1-20-cv-783<br><br><br><br><br><br><br><br>JURY TRIAL DEMANDED |

**ORIGINAL ANSWER AND COUNTERCLAIMS OF DEFENDANT CLINICAL PATHOLOGY LABORATORIES, INC. TO PLAINTIFF HOMELAND INSURANCE COMPANY OF NEW YORK'S COMPLAINT FOR DECLARATORY JUDGMENT**

COMES NOW **Clinical Pathology Laboratories, Inc. ("CPL")** and files this Original Answer and Counterclaims to Homeland Insurance Company of New York's Complaint for Declaratory Judgment. In support, CPL would respectfully show as follows:

**I.**

**PRELIMINARY PARAGRAPH**

CPL denies that Sonic Healthcare USA, Inc. ("Sonic USA"), MedLab Pathology ("MedLab"), Sonic Healthcare (Ireland) Limited ("Sonic Ireland"), and Sonic Healthcare Limited ("Sonic") (collectively "other Defendants") are proper parties to this declaratory judgment action.

## INTRODUCTION

1.      Admitted as to CPL but denied that this case concerns an insurance coverage dispute between Homeland Insurance Company of New York ("Homeland") and any other Defendants.

2.      Denied as worded.   Admitted that CPL and Sonic USA sought broadened worldwide coverage in 2016 and asked for an endorsement to the 2016-2017 policy.   Denied that Homeland conditioned the endorsement on any insureds other than CPL and Sonic USA (the insureds proposed for coverage under the endorsement) conducting a diligent inquiry and warranting they knew of no claims (or facts that may give rise to claims) with respect to the Irish cervical cancer screening service, other than claims or facts already reported to prior carrier(s).

3.      Denied as worded.  Admitted that CPL provided a letter, but denied that any other Defendants provided or were asked to provide a letter, and denied as an improper legal conclusion that this letter constituted a "warranty letter."   CPL is without sufficient information to form a belief as to the veracity of the allegation regarding Homeland's reliance on CPL's letter and therefore denies the same.   Denied that CPL was aware of at least 59 actual or potential claimants at the time of the 2016 letter.   Denied that CPL did not conduct a diligent inquiry. Denied that CPL was requested to conduct a diligent inquiry on behalf of any other Defendants who were not proposed for broadened coverage under the worldwide territory endorsement. Denied that there is no coverage for the claim now at issue, which is an improper legal conclusion.

## The Parties

4.      CPL is without sufficient information to form a belief as to the veracity of the allegations contained in paragraph 4.

5.      Admitted.

6.      Denied that Sonic USA is a proper defendant but otherwise admitted.

7.      Denied that MedLab is a proper defendant but otherwise admitted.

8.      Denied that Sonic Ireland is a proper defendant but otherwise admitted.

9.      Denied that Sonic is a proper defendant but otherwise admitted.

## Jurisdiction and Venue

10.     Admitted this is a diversity action for declaratory relief to declare the rights and other legal relations between Homeland and CPL.  Denied there is a justiciable controversy between Homeland and any other Defendants.

11.     Admitted this Court has subject matter jurisdiction over the dispute between Homeland and CPL.  Denied there is a justiciable controversy between Homeland and any other Defendants.

12.     Admitted as to CPL.  CPL is without sufficient information to form a belief as to the veracity of the allegations contained in paragraph 11 regarding other Defendants and therefore denies same.

## Nature of Action

13.     Admitted.

14.     Admitted that an actual controversy of a judicial nature exists between Homeland and CPL and may be determined by a judgment of the Court.  Denied as to all other Defendants.

## FACTUAL BACKGROUND

## Ireland's CervicalCheck Program

15.     Admitted.

16.     Admitted.

17.     Admitted.

18.     Admitted

19.     Admitted.  However, the written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

20.     The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

21.     Admitted that CervicalCheck initiated the development of a clinical audit process in 2010 as part of the quality assurance framework of the program, to try to assess if any areas of the screening pathway could be improved.  Denied that "among other benefits listed" at that time, Cancer Audit Reviews ("CARs") could "[p]rovide information to screened women about why their cancers were not detected or prevented."

22.     Denied as worded.  To the extent Homeland is referring to the NCSS site visit report, the document itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said document are expressly denied.

23.      CPL is without sufficient information to admit or deny because the referenced document is not sufficiently identified.   To the extent Homeland is referring to a document entitled NCSS Cytology Services Provided by MedLab Pathology and Clinical Pathology Laboratories, the document itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said document are expressly denied.

24.     Admitted that CARs of at least 22 slides were conducted by MedLab between November 2012 and February 2013, while CPL was still involved in the CervicalCheck program. Denied, however, that such CARs resulted in a finding of some level of misreading. The CARs resulted in differing interpretations based on, among other things, knowledge that the patients had developed cancer.

25.     Denied.

26.     Denied that the NSS provided notice of the protocol change to CPL, or that CPL had learned of the protocol change, by February 2016. Denied to the extent suggested that, as of February 2016, CARs were no longer "for educational purposes." Otherwise admitted.

27.     Denied as worded. Admitted that by February 2016, MedLab was on notice that differing interpretations in the CervicalCheck program could be disclosed to patients. CPL lacked such knowledge at that time. Otherwise denied.

## The Sonic Entities

28.     Admitted.

29.     Denied as worded. Sonic does not directly own CPL but has ownership interests in other entities that do own CPL, and this ownership has existed since 2007. In May 2007, Sonic USA was established. Denied that Sonic USA was given the authority and responsibility for planning, directing, and controlling all of Sonic's U.S. operations.

30.     The Risk Management Committee Charter is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said document are expressly denied. Otherwise admitted.

31.     Admitted.

32.     Admitted.

33. Admitted.

34 Admitted.

35. Admitted.

36. Denied as worded. Stephen Shumpert was Vice President or President of CPL from 1998 to 2016. Otherwise admitted.

37. Denied as worded. Sheridan Foster was Senior Vice President of Legal Affairs of Sonic USA from 2007 to 2019. Otherwise admitted.

38. Admitted that Sonic Ireland was formed in or around 2009, but denied that it was formed to direct and control all of Sonic's Irish operations.

39. Denied as worded. Sonic Ireland was awarded 50% of the NCSS CervicalCheck program in 2010. CPL is unable to admit or deny what is meant by "sister laboratory." CPL and MedLab are separate and independent business entities involved in providing laboratory services. Admitted as to the remainder of the allegations in paragraph 39.

**History of the Homeland Policy**

40. Admitted that CPL maintained Medical Facilities and Providers Professional Liability Insurance with Homeland from June 30, 2013 until June 30, 2018. However, the written contracts are themselves the best evidence of their contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contracts are expressly denied.

41. Denied as worded. Sonic contracted with AON Risk Services Australia Limited in connection with insurance purposes for Sonic related companies. However, based on information and belief, Defendants dealt with separate AON entities in placing insurance, and therefore CPL denies that Defendants had the "same broker."

6

**The Ms. O Claim**

42.     CPL is without sufficient information to admit or deny the factual allegation in paragraph 42 and therefore denies same.

43.     Admitted.   However, denied to the extent paragraph 43 suggests that CPL was aware of the policy change in 2016.

44.     Denied as worded.   CPL is a separate entity and laboratory from MedLab.   CPL is not aware of an entity named "MedLab Pathology Laboratories in Austin, Texas."

45.     Admitted that in or around September 2014, CPL's broker notified Homeland of a potential suit.    Further admitted that CPL tendered the Ms. O claim under the 2014-2015 Homeland policy.

46.     CPL is without sufficient information to admit or deny the factual allegations in paragraph 46 due to lack of specificity regarding the date of the coverage analysis referenced. However, to the extent Homeland is referring to its July 29, 2015 letter from Daniele Freaner, CPL admits that Homeland asserted in its July 29, 2015 letter that General Condition (E) limited coverage to a claim or suit made against an insured in the U.S., its territories, Puerto Rico, or Canada.   CPL denies that the letter stated "there was nothing for Homeland to do" until such time as a claim or suit was filed in the United States.   The letter itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said document are expressly denied.

47.     CPL is without sufficient information to admit or deny the factual allegations in paragraph 47 and therefore denies the same.

48.     CPL is without sufficient information to admit or deny the factual allegations in paragraph 48 and therefore denies same.

49.     Denied as worded.  CPL's understanding is that the survivors of Ms. O filed suit in Ireland in February 2015, but the lawsuit was not served on CPL until April 2016.  CPL is without sufficient information to admit or deny whether Homeland explained there was nothing for it to do unless and until a suit was filed in the United States and served on CPL, and CPL therefore denies the same.

50.     CPL is without sufficient information to admit or deny that it received a copy of the Ms. O lawsuit in September 2015 by mail and therefore denies same.  Admitted that CPL was not properly served until April 2016.

51.     CPL is without sufficient information to admit or deny whether Homeland discussed the Ms. O claim with "the broker" on April 27, 2016 and therefore denies the same.

52.     Denied as worded because Sheridan Foster was employed by Sonic USA. Admitted that on July 7, 2016, Sheridan Foster received an email from Homeland stating that a closed file is a good file, but CPL is without sufficient information to admit or deny when Homeland actually closed its file.  The referenced email from Sheridan Foster is itself the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said document are expressly denied.

### The Worldwide Territory Endorsement

53.     Admitted that after April 27, 2016, Sheridan Foster and/or CPL's broker approached Homeland seeking to ensure that CPL was covered for claims made outside the United States.  Admitted that CPL ceased providing services under the CervicalCheck program in 2013, but CPL is without information sufficient information to admit or deny Homeland's understanding of the facts.

8

54.     The referenced document itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said document are expressly denied.

55.     See response to paragraph 36.

56.     Denied as an improper legal conclusion that the referenced letter constituted a "warranty letter." Otherwise admitted.

57.     Admitted.

58.     CPL is without sufficient information to admit or deny the state of Homeland's understanding.   However, denied that Mr. Shumpert represented that he consulted with anyone from Sonic, Sonic Ireland, or MedLab prior to signing the July 27, 2016 letter.   Denied as an improper legal conclusion that the referenced letter constituted a "warranty letter."   The referenced document itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said document are expressly denied.

59.     Denied as worded.   CPL is without sufficient information to admit or deny whether and how Homeland relied on the July 27, 2016 letter and therefore denies the same. CPL denies that it made any representations on behalf of MedLab or Sonic Ireland, as those were not entities that were proposed to be covered by the Worldwide Territory Endorsement.   Denied as an improper legal conclusion that the referenced letter constituted a "warranty letter."

60.     CPL is without sufficient information to admit or deny what Homeland relied upon in issuing the 2017-2018 Primary and Excess Policy and therefore denies the same.

### MedLab's 2016 Tender of the Ms. C and Bulk Claim to Insurer Vero

61.     Denied.   CPL specifically denies that any representations in the July 27, 2016 letter were intended to deceive (or did deceive) Homeland.   CPL specifically denies that it or

Sonic USA (the insureds proposed for coverage under the Worldwide Territory Endorsement) were aware of any claims or circumstances that might give rise to a claim against Sonic Ireland, MedLab, or CPL.  CPL was not aware of any claims asserted against Sonic Ireland or MedLab in the U.S., which is the only circumstance under which those entities would be insureds under the Homeland policy.  CPL specifically denies that it was aware prior to the Shumpert letter that the Ms. C suit had been filed against other entities alleging the misreading of slides by CPL. CPL further denies that it was aware at that time that the names of 58 additional women had been provided by MedLab to its own insurer, Vero, as notices of circumstances.  CPL denies this information was kept hidden from Homeland.  At the relevant time period, CPL was not aware of such circumstances, and MedLab and Sonic Ireland were not insureds under the Homeland policy with respect to any such claims.   Denied as an improper legal conclusion that the referenced letter constituted a "warranty letter."

62.     Denied as worded.  Admitted that MedLab began conducting CARs in 2012 as part of a quality assurance/peer review program intended for educational purposes only, under which screening histories were reviewed to determine whether any slides were misread prior to a known cancer diagnosis.  Denied that "among other benefits listed" at that time, Cancer Audit Reviews ("CARs") could "[p]rovide information to screened women about why their cancers were not detected or prevented."

63.     Denied that the NSS provided notice of the protocol change to CPL in February 2016 or that CPL became aware of the protocol change at that time.  Denied to the extent suggested that, as of February 2016, CARs were no longer "for educational purposes." Otherwise admitted.

64.    Admitted that regardless of any policy of proactively reporting CAR results, any patient could potentially discover the interpretation of slides that are part of their medical records.   Denied that an original interpretation was "misread" simply because there was a different interpretation of the slide when it was read with knowledge that a patient had a cancer diagnosis.   Denied there were misreads of Ms. O's slides, but admitted that her survivors sued several defendants before the 2016 NSS policy change.   Admitted CPL tendered the Ms. O claim to Homeland and later withdrew the Ms. O claim.

### The Ms. C Claim

65.    Denied that simply because there is a different interpretation of a slide when it is read with knowledge a patient had a cancer diagnosis does not mean the original interpretation was a "misread."   Otherwise admitted.

66.    Denied as worded.   Admitted that MedLab tendered the Ms. C claim to its insurer, Vero, by March 23, 2016.   Admitted that CPL did not tender the Ms. C claim to any insurer at that time.   Admitted that CPL analyzed three of Ms. C's slides, but denied that Ms. C asserted a claim against CPL at that time.   Admitted that CPL is not insured under the Vero Policy for the Ms. C claim.

67.    Denied as worded because the Vero Policy did not provide liability insurance to CPL.   The referenced contracts are the best evidence of their contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said documents are expressly denied.

68.    CPL is without sufficient information to admit or deny when or why MedLab might have informed Ms. C's counsel that CPL was the lab that allegedly misread three of the four slides.   Otherwise, admitted.

69.     Denied as worded.   Although the Ms. C litigation was commenced against MedLab and others before Mr. Shumpert's letter, CPL had no knowledge of such.   CPL specifically denies that Mr. Shumpert failed to conduct a diligent inquiry, and CPL specifically denies that Mr. Shumpert represented he had conducted an inquiry "of," or was required to conduct an inquiry of, Sonic Ireland or MedLab.   Denied as an improper legal conclusion that the referenced letter constituted a "warranty letter."

70.     Denied as worded.   Admitted that in 2018, CPL tendered the Ms. C claim to Homeland under the 2017-2018 policy, which contained the Worldwide Territory Endorsement. Denied that CPL tendered the same claim to Homeland that MedLab tendered to Vero.   Admitted MedLab alleged in its Personal Injuries Defence that liability for interpretation of the three slides rested with CPL.   The best evidence of the positions taken in MedLab's Defence is the document itself.

### MedLab's 2016 Bulk Claim to Vero

71.   Based on information and belief, CPL denies that Defendants had the same broker. Admitted that in February 2016, MedLab provided a MedLab Pathology Incident Report to its broker concerning the change in process for cancer audits.

72.     CPL is without sufficient information to admit or deny the factual allegation in paragraph 72 and therefore denies same.

73.     Denied as worded.   CPL admits that in or around March 2016, MedLab provided to its broker notice of 58 patients whose management had changed from the original report. MedLab's broker provided this same information to Vero.   CPL denies that the list was provided to CPL at that time.   CPL admits that those slides were read by either CPL and/or MedLab. Otherwise denied.

74.     Admitted that Gordon Young was involved in the communication of information from MedLab to its broker for reporting to Vero notices of the 58 patients whose management had changed from the original report.  Other than the Ms. O claim, denied that Gordon Young or Dr. Goldschmidt were aware by March of 2016 that CPL faced potential liability for CervicalCheck claims for which it had no insurance.

75.     It is not appropriate for CPL to respond to allegations of what another party contends and therefore CPL denies the allegations in paragraph 75.

76.     Denied as worded because CPL lacked the same knowledge as MedLab. Admitted that MedLab submitted a list of 58 women to its broker in March 2016.  Admitted that CPL did not provide this information to Homeland, as it was not aware of the same information.

77.     Denied as worded.  CPL admits that Homeland requested board meeting minutes from CPL.   CPL is not aware of Homeland directly requesting records from any other Defendants and therefore is without sufficient information to admit or deny same.  CPL denies that all of Homeland's record requests were reasonable and further denies that CPL refused to comply with reasonable requests.  As to CPL's duties of assistance and cooperation under the Policy, the insurance contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

78.     Denied as worded.   Admitted that at the time of the July 2016 Shumpert letter, MedLab was aware of the Ms. C lawsuit and of circumstances regarding the change in management of 58 patients.   Denied that CPL was aware of such and denied that MedLab's awareness can be imputed to CPL.   Denied as an improper legal conclusion that the referenced letter constituted a "warranty letter."

79.     Denied that Mr. Shumpert did not conduct a diligent inquiry.    Denied that Mr. Shumpert represented he conducted an inquiry on behalf of MedLab or Sonic Ireland. Denied that MedLab or Sonic Ireland were insureds proposed for coverage under the Worldwide Territory Endorsement.    Denied that CPL was aware of any claims against MedLab, Sonic Ireland, or CPL at the time of the Shumpert letter, other than the O'Brien claim previously reported to Homeland.    Denied that CPL had any knowledge of claims or circumstances that might give rise to a claim against MedLab or Sonic Ireland in the US, the only circumstance under which those entities could be an insured proposed for coverage under the Policy. Admitted that at the time of the Shumpert letter, a lawsuit was already pending against MedLab, MedLab knew that on review during the cancer audit, the management of 58 patients had changed from the original report, and such information had been sent to MedLab's insurer, Vero. Denied that CPL had any knowledge of the information in the foregoing sentence.    Denied as an improper legal conclusion that the referenced letter constituted a "warranty letter."

### The Ms. Vicky Phelan Claim and Ireland's CervicalCheck Scandal

80.     CPL is without sufficient information to admit or deny whether MedLab anticipated it would face lawsuits by some 58 women because of errors.    CPL denies that the CARs resulted in a finding of error.    The CARs resulted in differing interpretations based on, among other things, knowledge that the patients had developed cancer.    Otherwise admitted.

81.     Admitted based upon information contained in the Scoping Inquiry Into the CervicalCheck Screening Programme by Dr. Gabriel Scally dated September 2018.

82.     Admitted based upon information contained in the Scoping Inquiry Into the CervicalCheck Screening Programme by Dr. Gabriel Scally dated September 2018.

83.     CPL is without sufficient information to admit or deny that a Limerick gynecologist who treated Ms. Vicky Phelan had been arguing with the director of CervicalCheck since the summer of 2016 that it was the responsibility of CervicalCheck, not the clinicians, to inform the women.  Admitted that Ms. Phelan alleged that near the end of September 2017, the clinician finally informed Ms. Phelan of the 2014 CAR results of a slide that had allegedly been misread in 2011.

84.     CPL is unable to admit or deny due to lack of specificity as to date and time. However, it is admitted that sometime after the *Phelan* case began receiving local media coverage in 2018, the public began to learn certain details of the issues associated with the Irish CervicalCheck program.

85.     CPL is without sufficient information to admit or deny when Ms. Phelan retained counsel and informed the HSE and MedLab that she intended to file suit.  Otherwise admitted.

86.     Denied as worded.  Admitted that Ms. Phelan's sole allegedly misread slide from 2011 was reviewed by CPL and was part of MedLab's bulk report to Vero in March 2016.

87.     Admitted that On February 12, 2018, MedLab provided an update to CPL with respect to the Ms. C. claim.  During that call, MedLab disclosed that the results of CARs might be made known to the patients and specific mention was made of Ms. Phelan.

88.     Admitted.

89.     Denied as worded.  CPL learned of the Ms. C claim in December 2017 and of the Ms. P claim in February 2018 and promptly reported them to Homeland on February 14, 2018. Denied that CPL previously tendered these claims to Vero in March 2016, nearly two years earlier.   Admitted that CPL's notice to Homeland was provided on Homeland's Incident

Reporting Form and that CPL checked the box indicating CPL had not reported the claim or incident to "previous carriers."

90.     Denied as worded because CPL did not report any potential claims to Vero in March 2016.  Admitted that MedLab reported to Vero differing slide interpretations based on, among other things, knowledge that the patients had developed cancer.  Admitted that CPL reported a list of slides to Homeland in May 2018 that could (but were far from certain to) arise in future claims against it.  Admitted that CPL's May 2018 report referred to Ms. C, Ms. Phelan, and Ms. S.

91.     Admitted that in February 2018, MedLab's counsel wrote to Ms. P's counsel advising that responsibility for processing and reporting on the slides rested with CPL.  Admitted Vero has alleged that counsel for MedLab told the court that MedLab and CPL were covered by the same insurance policy, and Vero has alleged it was not consulted with respect to this representation.  If, however, Vero is referring to the hearing on March 23, 2018, CPL denies that counsel for MedLab represented to the court that both MedLab and CPL were covered by the same insurance policy.

92.     Admitted that Vero contends it received an email from MedLab's broker dated February 14, 2018, enclosing correspondence from Ms. Phelan's counsel to MedLab and CervicalCheck.  The referenced documents themselves are the best evidence of their contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said documents are expressly denied.

93.     Admitted that Vero granted indemnity to MedLab under its policy on February 16, 2018 and asked where the testing of the slides was carried out.  CPL is without sufficient

information to admit or deny the remaining factual allegations in paragraph 93 and therefore denies same.

94.     Admitted.

95.     CPL is unable to admit or deny due to ambiguity in the term "immediately." Admitted that Homeland investigated coverage for the Ms. Phelan claim.

96.     Admitted that Homeland sought documents from CPL, but denied that a number of the requested documents were relevant to Homeland's investigation. CPL is not aware that Homeland sought documents directly from any other Defendants, and therefore is without sufficient information to admit or deny that allegation. CPL admits the remainder of the factual allegations in paragraph 96.

97.     Denied that CPL produced only a "small portion" of the documents requested by Homeland. Denied that all of Homeland's requests for documents were reasonable. Denied that CPL failed to produce the 2016 Vero bulk notice of circumstances. Denied that MedLab's 2016 bulk notice of circumstances sent to Vero is relevant or necessary for Homeland to determine CPL's claim for coverage under the Homeland Policy.

98.     CPL is without sufficient information to admit or deny whether Homeland was in the middle of its coverage investigation at the stated time. The referenced document itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said documents are expressly denied.

99.     CPL is without sufficient information to admit or deny whether and/or when Homeland closed its file for the Ms. Phelan claim.

100.    CPL is unable to admit or deny without further specificity regarding the date and manner in which the information was conveyed and by whom.  Admitted that Vero has sought reimbursement from CPL for the Ms. Phelan claim.

101.    Admitted that a letter dated October 2, 2018 from Vero was forwarded to Homeland.  Denied that the letter contains conflicting information as to whether CPL is covered under the Vero policy for the CervicalCheck claims.  The referenced letter itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said document are expressly denied.

102.    Denied as worded because CPL is unable to locate the quoted language in paragraph 102.  The referenced letter itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said document are expressly denied.

### The Ms. S Claim at Issue in This Action

103.    CPL denies that it is seeking coverage "against this backdrop" as alleged by Homeland.  There are important facts which Homeland has not alleged, facts they have alleged which are incorrect, and facts they have alleged that are not relevant to CPL's claim for coverage.  Otherwise admitted.

104.    Admitted that Ms. S's claim concerns only one allegedly misread slide, but denied that Ms. Phelan's claim is relevant to, or has any connection to, the Ms. S claim.

105.    Admitted the Ms. S Claim was tendered to Vero in March of 2016 by MedLab. Denied the Ms. S claim was tendered to Vero by CPL.  Denied that Ms. Phelan's claim and Ms. C's claim are relevant to, or have any connection to, the Ms. S claim.

106.     Denied as worded because slides were not tendered, a claim was.  Admitted that Ms. S's claim against MedLab was tendered to Vero by MedLab (and not CPL) in 2016. Admitted that Ms. S's claim against CPL was tendered to Homeland by CPL in 2018.

107.     Admitted that the Ms. S lawsuit named MedLab but not CPL when it was filed in August 2018.  The lawsuit also named the HSE as a defendant.

108.     Admitted that MedLab provided information in March 2019 to Ms. S's counsel that the slide was reviewed by CPL.  Denied that this information was not provided prior to that time.  Otherwise admitted.

109.     Denied.

110.     Admitted.

111.     The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

112.     Admitted.

113.     The referenced letter itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said document are expressly denied.   Denied that the legal arguments included in the May 26, 2020 letter are meritorious. Denied as an improper legal conclusion that the referenced letter constituted a "warranty letter."

114.     Denied as worded.  CPL has provided necessary information and documents for a coverage determination in CPL's favor.  CPL is not aware of Homeland requesting documents or information directly from any other Defendant and therefore is without sufficient information to admit or deny same.

115.   This is an improper legal conclusion which requires no response, but CPL nonetheless denies the same.

116.   Admitted that Homeland seeks a final declaration from the Court, but denied that there is no coverage for CPL for the Ms. S claim.   Denied that the facts "adduced" in Homeland's Complaint are representative of all the relevant facts necessary for a coverage determination.   Denied that there is a justiciable controversy between Homeland and the other Defendants (*i.e.*, the defendants besides CPL).

## THE INSURANCE POLICIES

### The Primary Policy

117.   Admitted.

118.   The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

119.   The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

120.   The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

121.   The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

122.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

123.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

124.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

125.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

126.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

127.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

128.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

129.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

130.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

131.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

132.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

133.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

134.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

135.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

136.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

137.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

138.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

139.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

140.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

141.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

142.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

143.     The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

## The Excess Policy

144.     Admitted.

145.     The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

146.     The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

147.     The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

148.     The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

149.     The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

150.     The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

151.    The written contract itself is the best evidence of its contents, and any allegations that tend to expand, modify, alter, or mischaracterize the contents of said contract are expressly denied.

## NATURE OF THE CONTROVERSY

152.    Admitted as to CPL but denied as to other Defendants.

153.    Admitted as to CPL but denied as to other Defendants.

154.    Admitted that Homeland has denied coverage for the Ms. S. claim, but denied as to the purported basis for Homeland's denial.

155.    Admitted that Homeland now seeks a declaration of no coverage, but denied as to the remainder of the factual allegations in paragraph 155.

156.    Admitted there is an actual controversy between Homeland and CPL, but denied there is an actual controversy between Homeland and the other Defendants.

## CLAIM FOR RELIEF

### (Declaratory Relief Against All Defendants)

157.    CPL incorporates its responses from the prior paragraphs.

158.    Admitted there is an actual controversy between Homeland and CPL, but denied that there is an actual controversy between Homeland and the other Defendants.

159.    Denied.

## HOMELAND'S PRAYER

Denied that Homeland is entitled to any of the relief requested.

## CPL'S AFFIRMATIVE DEFENSES

160.    CPL did not intend to deceive Homeland in connection with its application for the Worldwide Territory Endorsement.   At the time of the July 27, 2016 Shumpert letter, CPL had

not been involved in the CervicalCheck program for more than three years and had no knowledge of any Irish CervicalCheck claims, other than the O'Brien lawsuit that was previously reported to Homeland.

161.    The claims for relief asserted in the Complaint are barred by Homeland's material failure to comply with its obligations under the Policies.

162.    The claims for relief asserted in the Complaint fail to state a claim upon which relief may be granted.

163.    The claims for relief asserted in the Complaint are barred by the doctrine of accord and satisfaction.

164.    The claims for relief asserted in the Complaint are barred by the doctrine of unjust enrichment.

165.    The claims for relief asserted in the Complaint are barred by the doctrine of substantial compliance.

166.    CPL has performed any and all duties to Homeland that CPL owes under the Policies.

167.    The claims for relief asserted in the Complaint are barred by the doctrine of unclean hands.

168.    CPL avers that the Policies unambiguously provide coverage for CPL for the Ms. S Claim but, in the alternative, CPL alleges that the Policies are ambiguous and must be construed in favor of coverage.

169.    The claims for relief asserted in the Complaint are barred by the doctrine of waiver.

## RELIEF REQUESTED ON ANSWER

(i)     That Homeland takes nothing by way of its Complaint for Declaratory Judgment;

(ii)    That Homeland's Complaint be dismissed with prejudice;

(iii)   That CPL recover its attorney's fees and costs of court; and

(iv)    That CPL be granted such other and further relief, at law and in equity, to which CPL may show itself entitled and that the Court may deem just and proper.

## II.

## CPL's COUNTERCLAIMS

Pursuant to Federal Rule of Civil Procedure 13, Defendant Clinical Pathology Laboratories, Inc. ("CPL" or the "Company"), for its Counterclaims against Plaintiff Homeland Insurance Company of New York ("Homeland"), alleges as follows:

## PRELIMINARY STATEMENT

Through its Counterclaims, CPL brings causes of action against Homeland for breach of contract and violation of Texas Insurance Code Chapter 542.

This dispute arises out of two insurance policies that CPL purchased from Homeland to protect the Company from, among other things, third-party liability claims brought anywhere in the world.

In 2019, CPL was added as a defendant to the Ms. S Claim,[1] which was a pending medical negligence claim in Ireland.

CPL promptly tendered the Ms. S Claim to Homeland for coverage, which Homeland denied in breach of the subject insurance policies. CPL has since been forced to cover the defense and settlement costs associated with the Ms. S Claim without the insurance coverage for which it bargained. For those and other reasons, CPL brings these Counterclaims.

---

[1] The name of the claimant has been abbreviated and details omitted to preserve the privacy of the claimant.

## THE PARTIES

1.      Counter-Plaintiff CPL is a corporation organized and existing under the laws of Texas, with its principal place of business in Texas.

2.      Upon information and belief, Counter-Defendant Homeland is a corporation organized and existing under the laws of New York, with its principal place of business in Minnesota.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(a).  There is complete diversity of citizenship between CPL and Homeland.  The amount in controversy exceeds $75,000, exclusive of interest and other costs.

4.      The Court has personal jurisdiction over Homeland as described herein, and venue is proper in this District under 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

A.      **The Insurance Policies**

5.      Homeland's predecessor, OneBeacon Healthcare Group, issued a primary Medical Facilities and Providers Professional Liability Insurance Policy (No. MFL-004062-0617) (the "Primary Policy") and an Excess Medical Facilities Liability Insurance Policy (No. MFX-002013-0617) (the "Excess Policy," together whether the Primary Policy, the "Policies") to Sonic Healthcare Investments, G.P. and several additional named insureds, including CPL, for the policy period of June 30, 2017 to June 30, 2018.   The Primary Policy is attached hereto as Exhibit 1.  The Excess Policy is attached hereto as Exhibit 2.

6.      The Policies provide broad coverage for "Loss" and "Defense Expenses" arising out of "Claims" for, among other things, "Professional Services Wrongful Acts" occurring on or

after October 1, 2000, provided the Claim is first made during the policy period or during an extended reporting period of thirty-six months.   *See* Ex. 1, Primary Policy, at Declarations, § I(A).

7.     The Policies define "Loss" as, among other things, "settlements . . . an Insured is legally obligated to pay as a result of a Claim."   *See* Ex. 1, Primary Policy, at § II(X).

8.     The Policies define "Defense Expenses" as, among other things, "the reasonable fees of attorneys, experts and consultants and costs and expenses incurred in the investigation, adjustment, defense or appeal of a Claim."   *See* Ex. 1, Primary Policy, at § II(H).

9.     The Policies define "Claim" as "any written notice received by an Insured that any person or entity intends to hold an Insured responsible for a Wrongful Act or an Occurrence."   *See* Ex. 1, Primary Policy, at § II(F).

10.     The Policies define "Professional Services Wrongful Act" as, among other things, "any actual or alleged act, error or omission . . . in rendering, or failing to render, Medical Services."   *See* Ex. 1, Primary Policy, at § II(LL).

11.     The Primary Policy provides the aforementioned coverage subject to a $1,000,000 per claim limit and a $3,000,000 aggregate limit.   *See* Ex. 1, Primary Policy, at Declarations.

12.     The Excess Policy provides the aforementioned coverage subject to a $5,000,000 per claim limit and a $5,000,000 aggregate limit.   *See* Ex. 2, Excess Policy, at Declarations.

**B.     CPL is Engaged to Provide Cancer Screening Services for NCSS**

13.     CPL is a medical laboratory services provider that provides a broad range of services from cancer screening to facilitating COVID-19 testing.

14.     Between August 2010 and July 2013, CPL was engaged to provide cervical cancer screening services under Ireland's National Cancer Screening Service ("NCSS").

### C.    The *Ms. S* Litigation

15.    In February 2012, Ms. S underwent a cervical smear test as part of the NCSS program.  The cervical sample was sent to CPL for review, and CPL issued a cytology report finding no evidence of abnormalities.

16.    On April 23, 2013, Ms. S was diagnosed with invasive cervical cancer.  A subsequent Cancer Audit Review was conducted by MedLab Pathology ("MedLab") on September 1, 2014 and resulted in a conflicting interpretation of the slides reviewed by CPL.

17.    On or about August 7, 2018, Ms. S and her partner filed suit against other defendants (*i.e.*, not CPL) in Cause No. 2018/7164P in the High Court of Ireland, seeking personal injury damages for alleged medical negligence.  CPL was not initially named as a defendant in the lawsuit but was added by an amended pleading in May 2019.

18.    CPL vigorously defended the lawsuit and incurred no less than $812,103.62 in defense fees and costs.  CPL eventually settled the *Ms. S* litigation for $1,310,980.00, plus preliminary plaintiffs' costs of $278,100.00 (plaintiffs' additional costs are presently being negotiated).  CPL has paid the foregoing amounts.

### D.    CPL Tenders the *Ms. S* Litigation to Homeland

19.    CPL learned in or around April 2018 that Ms. S was one of several patients whose slides were reviewed as part of an Irish Cancer Audit Review ("CAR") program, resulting in interpretations that arguably conflicted with some of CPL's prior cytology reports.

20.    On May 15, 2018, CPL promptly notified Homeland of that development; Ms. S was identified in that notification.

21.    The *Ms. S* Litigation was subsequently filed on August 7, 2018.

22.     CPL and/or its broker provided updates to Homeland regarding the status of the Ms. S litigation, including updates on August 21, 2018, December 24, 2018, February 20, 2019, March 12, 2019, March 15, 2019, and April 17, 2019.

23.     On April 29, 2019, a motion was filed by one of the parties to join CPL as a defendant in the Ms. S litigation, and CPL promptly tendered notice to Homeland on May 1, 2019.

**E.      Homeland Denies CPL's Request for Coverage**

24.     On May 1, 2019, CPL requested a defense from Homeland, but Homeland declined to exercise its right to provide a defense. CPL therefore undertook its own defense but continued to provide Homeland with frequent litigation updates, including updates on August 5, 2019, September 18, 2019, and October 2, 2019.

25.     On October 13, 2019, CPL invited Homeland to participate in a mediation in hopes of resolving the *Ms. S* litigation. Homeland refused to participate.

26.     Prior to the mediation, on October 17, 2019, CPL requested Homeland's consent to settle the *Ms. S* litigation for an amount within a specified range. Homeland agreed that if CPL settled the *Ms. S* litigation within that range, Homeland would not raise lack of consent as a defense to any subsequent demand for coverage.

27.     On October 30, 2019, CPL settled the *Ms. S.* litigation within the agreed-upon range (for $1,310,980.00).

28.     CPL promptly provided notice of the settlement to Homeland on November 1, 2019 and requested coverage. Homeland refused to cover the settlement, asserting that the Policies are for reimbursement only.

29.     After the *Ms. S* settlement was funded, CPL presented its itemized claim for reimbursement to Homeland by letter dated May 13, 2020.  CPL demanded reimbursement for its fees, expenses, and indemnity.

30.     On or about July 10, 2010, Homeland denied CPL's claim for reimbursement.

31.     Homeland based its denial on the grounds set forth in Homeland's Complaint for Declaratory Relief at paragraph 155.  *See* Pl.'s Compl. ¶ 155 [Doc. No. 1].

32.     CPL asserts that Homeland's bases for its denial are meritless.

33.     By failing and refusing to indemnify CPL, Homeland has materially breached its contractual obligations under the Policies.  As a direct and proximate result, CPL has paid and incurred no less than $2,401,183.62 for the *Ms. S* litigation, which is rightfully Homeland's responsibility under the Policies.

34.     CPL has fully performed its obligations under the Policies, including payment of premiums, provision of notice and cooperation, save and except only those obligations (if any) excused by material breaches of the Policies by Homeland.

## CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT

35.     The foregoing allegations are incorporated herein by reference.

36.     The Policies are valid and enforceable contracts.

37.     CPL is an insured under the Policies.

38.     CPL has standing to assert claims under the Policies.

39.     CPL has satisfied all conditions precedent under the Policies.

40.     The terms of the Policies unambiguously provide coverage for the costs associated with the *Ms. S* litigation.

41.     Alternatively, the terms of the Policies are ambiguous with respect to coverage and should therefore be construed in favor of CPL, in accord with Texas law.

42.     Homeland has breached the Policies by refusing to reimburse CPL for the defense and settlement costs associated with the *Ms. S* litigation.

43.     Homeland's breach has caused CPL substantial damages no less than $2,401,183.62.

### COUNT II – CHAPTER 542 OF THE TEXAS INSURANCE CODE

44.     The foregoing allegations are incorporated herein by reference.

45.     CPL has made a claim under the Policies for costs associated with the *Ms. S* litigation, including defense costs.

46.     CPL has satisfied all conditions precedent under the Policies.

47.     Homeland has engaged in conduct that constitutes a violation of Chapter 542 of the Texas Insurance Code by delaying its handling of the claim and/or failing to timely pay CPL's outstanding costs that are connected with the *Ms. S* Litigation.

48.     Consequently, CPL is entitled to the damages set forth in § 542.060 of the Texas Insurance Code—specifically, in addition to the amount of CPL's outstanding costs associated with the *Ms. S* litigation, interest at the rate of eighteen percent (18%) per annum as well as any and all other relief provided therein.

### COUNT III – ATTORNEYS' FEES

49.     The foregoing allegations are incorporated herein by reference.

50.     Due to the actions of Homeland, CPL has been required to retain the services of the law firms of Haynes and Boone, LLP and Germer Beaman & Brown PLLC. CPL has agreed to pay those firms a reasonable fee for their services necessarily rendered and to be rendered in

this action. Pursuant to Section 38.001 of the Texas Civil Practice & Remedies Code and/or Section 542.060 of the Texas Insurance Code, CPL is entitled to an award of its reasonable attorneys' fees against Homeland in an amount to be established at trial.

## JURY DEMAND

CPL demands a jury trial on all issues contained in this Counterclaim that are so triable.

## COUNTERCLAIM PRAYER

WHEREFORE, Counter-Plaintiff CPL requests the following relief against Counter-Defendant Homeland:

(1) Judgment awarding CPL all damages caused by Homeland's breach of the Policies;

(2) Judgment awarding CPL all damages sustained as a result of Homeland's violations of Chapter 542 of the Texas Insurance Code;

(3) Judgment awarding CPL all reasonable and necessary attorneys' fees and expenses incurred in this matter under Chapter 38 of the Texas Civil Practice & Remedies Code and Chapter 542 of the Texas Insurance Code;

(4) Judgment awarding CPL pre-judgment and post-judgment interest in the amount allowed by law;

(5) Judgment awarding CPL all costs of court; and

(6) Such other and further relief to which CPL may be justly entitled.

Dated:  September 28, 2020

Respectfully  submitted,


By: /s/ Ernest Martin,  Jr.
_____
    Ernest Martin, Jr. [Bar No. 13063300]
    Greg Van Houten*
    HAYNES AND BOONE, LLP
    2323  Victory Avenue, Suite  700
    Dallas, TX 75219
    214-651-5651  Direct
    214-651-5000  Main
    214-200-0519  Fax
    ernest.martin@haynesboone.com
    greg.vanhouten@haynesboone.com
    *Pro Hac Vice Admission Pending

     -and-

    Mark T. Beaman [Bar No. 01955700]
    Ryan Bueche [Bar. No. 24064970]
    GERMER BEAMAN & BROWN PLLC
    One Barton Skyway
    1501  S Mopac Expy Suite A400
    Austin, TX 78746
    512-482-3504  Direct
    512-472-0288  Main
    512-472-0721  Fax
    mbeaman@germer-austin.com

    **ATTORNEYS FOR
    DEFENDANT/COUNTER-PLAINTIFF
    CLINICAL PATHOLOGY
    LABORATORIES, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of September 2020, a copy of the foregoing instrument was electronically filed and served on all known counsel of record pursuant to the Federal Rules of Civil Procedure:

/S/ ERNEST MARTIN, JR.
Ernest Martin, Jr.