**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| HOMELAND INSURANCE COMPANY OF NEW YORK, | CIVIL ACTION NO. 1:20-cv-783 |
| Plaintiff, | |
| v. | **JURY DEMAND** |
| CLINICAL PATHOLOGY LABORATORIES, INC. SONIC HEALTHCARE USA, INC., MEDLAB PATHOLOGY, SONIC HEALTHCARE (IRELAND) LIMITED, AND SONIC HEALTHCARE LIMITED. | |
| Defendants. | |

## HOMELAND INSURANCE COMPANY OF NEW YORK'S FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT, NEGLIGENT MISREPRESENTATION, BREACH OF WARRANTY, AND REFORMATION

Plaintiff Homeland Insurance Company of New York ("Homeland") brings this complaint for declaratory judgment against Clinical Pathology Laboratories, Inc. ("CPL"), Sonic Healthcare USA, Inc. ("Sonic USA"), MedLab Pathology ("MedLab"), Sonic Healthcare (Ireland) Limited ("Sonic Ireland"), and Sonic Healthcare Limited ("Sonic") (collectively with CPL, Sonic USA, MedLab, and Sonic Ireland, "Defendants").  Homeland accordingly alleges and seeks relief as follows:

## INTRODUCTION

1.     This case concerns an insurance coverage dispute with respect to a medical negligence lawsuit filed in Ireland.  Plaintiff Homeland provides Medical Facilities and Providers Professional Liability Insurance to Defendants, who provide cervical cytology laboratory (liquid based cytology) screening services to detect cervical cancer.  The policies at issue here provide coverage for lawsuits filed outside of the United States to insured entities domiciled in the United States (e.g., CPL and Sonic USA), as well as for lawsuits filed in the United States to certain insured foreign entities for (e.g., MedLab, Sonic Ireland, and Sonic), subject to their terms, conditions and exclusions.  But this worldwide coverage for CPL and Sonic USA, and coverage for MedLab and Sonic Ireland, were not always part of the coverage that Homeland offered.

2.     Defendants specifically sought this broadened worldwide coverage for CPL and Sonic USA, and limited U.S. coverage for MedLab and Sonic Ireland, in 2016 when Defendants realized they had a gap in their insurance coverage for claims made against CPL, Sonic USA, MedLab and Sonic Ireland related to an Irish contract for cervical cytology screening services.  Defendants therefore insisted on adding endorsements to the 2016-2017 policy to eliminate this coverage gap or it would be a "deal breaker."  Homeland agreed to issue these endorsements

significantly broadening potential coverage—but conditioned on the insureds "proposed for coverage" (i.e., CPL, Sonic USA, MedLab and Sonic Ireland) conducting a diligent inquiry and warranting that there were no known claims (or facts that may give rise to claims) with respect to the Irish cervical cancer screening services, other than claims or facts already reported to prior carrier(s), and thus excluded under the policies.

3.      Defendants provided a warranty letter as requested, and Homeland issued the 2016-2017 and 2017-2018 policies in reliance thereon.  But contrary to the warranties made in the letter, at least some (if not all) of the Defendants were aware of at least 59 actual or potential claimants at the time of the 2016 warranty letter.  Also contrary to the warranties made in the letter, CPL did not conduct a diligent inquiry on behalf of all of the insureds proposed for coverage before providing the warranty letter.  Therefore, there is no coverage for the claim now at issue pursuant to at least the Prior Notice to Another Insurer Exclusion and/or because the representations in the warranty letter have turned out to be false.  Additionally, Homeland has suffered damages including attorneys' fees, and will suffer damages to the extent it is held liable for the claim now at issue, pursuant to its justifiable reliance on Defendants' negligent misrepresentations made in the warranty letter, upon which it specifically decided to issue the additional coverage requested.  Homeland also asserts the policy is void with respect to all Defendants pursuant to their breach of the warranties and conditions precedent to coverage for all claims related to the Irish contract for cervical cytology screening services.  Finally, Homeland seeks reformation of the policy based on mutual and/or unilateral mistake of the parties.

**The Parties**

4.      Homeland is a corporation organized and existing under the laws of New York,

with its principal place of business in Plymouth, Minnesota. Homeland is permitted to issue insurance policies in the State of Texas.

5.      Upon information and belief, Defendant CPL is a corporation organized and existing under the laws of Texas with its principal place of business in Texas.

6.      Upon information and belief, Defendant Sonic USA is a corporation organized and existing under the laws of Delaware with its principal place of business in Texas.

7.      Upon information and belief, Defendant MedLab is a corporation organized and existing under the laws of Ireland with its principal place of business in Ireland.

8.      Upon information and belief, Defendant Sonic Ireland is a corporation organized and existing under the laws of Ireland with its principal place of business in Ireland.

9.      Upon information and belief, Defendant Sonic is a corporation organized and existing under the laws of Australia with its principal place of business in Australia.

## Jurisdiction and Venue

10.      This is a diversity action for declaratory relief under 28 U.S.C. § 2201 to declare the rights and other legal relations of the parties regarding insurance policies, negligent misrepresentation, breach of warranty, and reformation.

11.      The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(a). There is complete diversity of citizenship between Homeland, on the one hand, and Defendants, on the other. The amount in controversy exceeds $75,000, exclusive of interest and costs.

12.      The Court has personal jurisdiction over Defendants as described herein, and venue is proper in this District under 28 U.S.C. § 1391.

**Nature of the Action**

13.     Homeland brings this action under 28 U.S.C. § 2201, which provides that the Court may declare the rights and other legal relations of the parties.  An actual controversy of a judicial nature exists between Homeland, on the one hand, and Defendants, on the other, involving the parties' rights and liabilities under insurance policies.  The construction of these policies and the controversy existing between Homeland and Defendants may be determined by a judgment of the Court.

14.     This action also seeks: (1) damages for negligent misrepresentations made by Defendants, (2) a declaration that the policy is void with respect to coverage for the Defendants related to the Irish contract for cervical cytology screening services, and (3) reformation of the policy based on mutual and/or unilateral mistake.

## FACTUAL BACKGROUND

### Ireland's CervicalCheck Program

15.     In or around 2004, Ireland passed the Health Act of 2004 pursuant to which it established the Health Service Executive (the "HSE").

16.     The National Cancer Screening Service ("NCSS") was established by Ireland's Minister for Health and Children in January 2007.  The establishment followed the launch of a "Strategy for Cancer Control in Ireland 2006," which advocated a comprehensive cancer control policy program in Ireland.  The Strategy examined prevention, screening, detection, treatment and management of cancer in Ireland.  On April 1, 2010, the NCSS became part of the HSE within the National Cancer Control Programme ("NCCP").  On January 1, 2014, the NCSS became the National Screening Service ("NSS"), part of the Health and Wellbeing Division of the HSE.

17.     The HSE is thus responsible for, among other things, the NCSS (now NSS) program known as "CervicalCheck."   CervicalCheck was introduced in September 2008 to provide cervical screening of women between the ages of 25 and 60.  Its primary objective is to reduce mortality from cervical cancer by detecting and treating changes in the cells of the cervix before they become cancerous.

18.     In or around March 2010, the NCSS entered into a contract with Sonic Ireland for the supply of cervical cytology laboratory (liquid based cytology) screening services (the "NCSS Contract").  In or around June 2014, the NCSS also entered into a contract with MedLab for the provision of cervical cytology laboratory (liquid based cytology) screening and HPV testing services.   In or around August 2016, the NSS entered into a contract with MedLab for the provision of cervical cytology laboratory (liquid based cytology) screening and HPV testing services.

19.     CPL was identified in each of the above NCSS contracts under the "Laboratory(ies)"  schedule.  According to CPL, CPL provided cytology services only under the NCSS Contract from about August 2010 through July 2013.

20.     Pursuant to the NCSS Contract, Sonic Ireland was required to maintain certain levels of insurance, including:

> Professional indemnity insurance for an amount not less than €3,500,000 for any one claim to be maintained at all times during the Term and for a period of seven years following the expiration or termination of this Contract for whatever reason, (or in no less than equivalent amounts in another major currency at the annual renewal dates for each relevant policy)

21.     CervicalCheck initiated the development of a clinical cancer audit process in 2010 as part of the quality assurance framework of the program.  When screened women develop cancer it is of value to review their screening history to try to assess if any areas of the screening

pathway could be improved—i.e., whether any slides were misread in the screenings prior to a known cancer diagnosis. Among other benefits listed, these "Cancer Audit Reviews" ("CARs") can "[p]rovide information to screened women about why their cancers were not detected or prevented."[1]

22.      According to an NCSS site visit to CPL's facilities in or around May of 2011:

> CPL participates in a monthly slide review meeting with designated members of NCSS, colposcopists and MedLab Pathology. NCSS provides a list of cases for review and selected slides are then scanned using Aperio Scan Scope for demonstration during the video conference.

23.      Similarly, a document from September 2011 titled "NCSS Cytology Services provided by MedLab Pathology & Clinical Pathology Laboratories" and outlining responsibilities between MedLab and CPL states that CPL is responsible for amending results if a request is made to review a slide and a result is changed based on that review.

24.      CARs of at least 22 slides were conducted between November 2012 and February 2013 which resulted in a finding of some level of misreading. Such CARs were thus conducted while CPL was still involved in the CervicalCheck program.

25.      Upon information and belief, CPL was aware during 2012 to 2013 of at least 22 slides that it misread under the CervicalCheck program.

26.      Prior to 2016, the results of the CARs were considered to be for educational purposes and were not disclosed to patients. However, in or around February 2016, the NSS implemented a protocol change which resulted in CAR results being reported to the patients'

---

[1] https://data.oireachtas.ie/ie/oireachtas/committee/dail/32/committee_of_public_accounts/submissions/2018/2018-05-17_correspondence-health-service-executive-hse-v-q-and-a-12-jun-2016_en.pdf (HSE Q&A dated June 2016)

treating physicians.  The NSS provided notice of this change in protocol to at least MedLab by letter dated February 3, 2016.

27.     Therefore, by February 2016, at least MedLab was on notice that misreads in the CervicalCheck program discovered pursuant to CARs would potentially become the subject of lawsuits by women who were suffering from cervical cancer.

## The Sonic Entities

28.     Sonic is a global healthcare company headquartered in Sydney, Australia, and a publicly listed company on the Australian Securities Exchange.  Sonic is the world's third largest provider of pathology/clinical laboratory services.  Sonic is the parent company of several healthcare practices around the world that make up the Sonic Healthcare group.  Sonic holds a 100% interest in subsidiaries Sonic Healthcare Investments G.P., and defendants Sonic Ireland, Sonic USA, MedLab and CPL.

29.     Sonic has owned a 100% interest in CPL since 2007, at which time Sonic USA was established as Sonic's head office in the United States.  Sonic USA was given the authority and responsibility for planning, directing and controlling Sonic's U.S. operations.[2]

30.     Dr. Colin Goldschmidt is the CEO and Managing Director of Sonic.  Dr. Goldschmidt became CEO of Sonic in 1993.  He was also appointed as an Executive Director of Sonic in 1993 and is a member of Sonic's Risk Management Committee and has been since at least 2010.  The Risk Management Committee's principal role, as set out in the identification and Risk Management Committee Charter, is to assist the Board in its oversight responsibilities by monitoring and advising on the identification and management of all risks, including business, operational and hazard risks; the internal controls and treatments for identified risks, including

---

[2] https://investors.sonichealthcare.com/about/?page=history

SMRH:4851-5634-2990.5

the Company's insurance program; and the Company's overall risk management program.

31.    Dr. Goldschmidt is also a member of the Board of Directors of Sonic USA and CPL and has been since at least 2009.

32.    Christopher Wilks is the Finance Director and Chief Financial Officer of Sonic and has been since 1993.

33.    Mr. Wilks is also a member of the Board of Directors of Sonic USA and CPL and has been since at least 2009.

34.    Dr. Goldschmidt and Mr. Wilks were two of four directors on CPL's Board who provided Unanimous Written Consent to execute the NCSS Contract on CPL's behalf on or about March 29, 2010.

35.    Gordon Young is the Risk Manager of Sonic and has been since November 2007. Mr. Young is responsible for, among other things, management of Sonic's global insurance program.

36.    Stephen R. Shumpert was Vice President or President of CPL from 1998 to at least November 2018 and a member of the Board of Directors from at least 2014 to 2018.  Mr. Shumpert was also Chief Executive Officer of Sonic USA from June 2016 to December 2018 and a member of the Board of Directors from 2013 to 2016.

37.    Sheridan Foster was Secretary of CPL from 2010 to at least December 2019.  Ms. Foster was also Senior Vice President of Legal Affairs of Sonic USA from 2007 to 2019 and Secretary from 2010 to at least December 2019.

38.    Upon information and belief, Sonic Ireland was formed in or around 2009 by Sonic to direct and control Sonic's Irish operations.

39.    MedLab was established in May 2010 as Sonic's Irish laboratory facility.

MedLab was awarded the contract for 50% of the NCSS CervicalCheck program in 2010, but one of the requirements for MedLab to perform the processing and screening of cervical smears was to hold ISO 15189 accreditation for the scope of cytology analysis. While MedLab prepared for the accreditation assessments and award, MedLab's sister laboratory CPL was designated by Sonic to provide cytology services.

## History of the Homeland Policy

40.     Homeland provided Medical Facilities and Providers Professional Liability Insurance to defendants CPL, Sonic USA and Sonic since at least the June 30, 2014 to June 30, 2015 policy period. The 2014-2015 and 2015-2016 policies both covered certain claims made against the insureds, but only if made in the U.S., including its territories or possessions, Puerto Rico, or Canada. Those policies did not cover claims made anywhere else, including Ireland.

41.     Upon information and belief, Defendants purchased insurance for international claims through the same broker since at least 2014.

### The Ms. O Claim

42.     Upon information and belief, the first known CervicalCheck claim was made in 2014 by the survivors of Ms. O. [3]

43.     CPL became aware of the Ms. O claim in 2014—over a year before the NSS policy change with respect to disclosure of CARs in 2016.

44.     In or around July 2014, the survivors of Ms. O, through counsel, wrote to MedLab asking that MedLab and "MedLab Pathology Laboratories in Austin, Texas" (i.e., CPL)

---

[3] The name of the deceased claimant has been abbreviated and details omitted to ensure privacy as Homeland is unsure whether this matter was made public in Ireland.

SMRH:4851-5634-2990.5

nominate solicitors to accept service of proceedings in Ireland.  Understandably, Irish citizens were not originally aware of the exact names or roles of non-Irish laboratories.

45.     In or around September 2014, Defendants' broker notified Homeland of the potential suit to be filed in the near future, tendering the Ms. O claim under the 2014-2015 Homeland policy, even though CPL was not yet named in the lawsuit.

46.     In or around July 2015, Homeland provided a preliminary analysis of coverage for the Ms. O claim reserving rights under the applicable 2014-2015 policy.  Among other things, Homeland notified CPL that General Condition (E) Territory limited coverage to a claim or suit made against an insured *in the U.S., its territories, Puerto Rico, or Canada*.  But because Ms. O's solicitors had not yet provided written notice of an intent to hold CPL liable, no "Claim" had yet been technically made for the 2014-2015 Homeland policy to respond to.  Until such time as a claim or suit was filed in the United States, there was nothing for Homeland to do.

47.     When Homeland spoke with CPL about this coverage issue, Sheridan Foster, Sonic USA's Senior Vice President of Legal Affairs and Risk Management at that time, informed Homeland that she would contact Gordon Young, Sonic's Risk Manager, to confirm whether there was a separate policy in place to cover any exposure related to the CervicalCheck program separate and apart from the 2014-2015 Homeland policy.

48.     Homeland then spoke with Defendants' broker who confirmed there was no global insurance program in place that would cover CPL for the CervicalCheck claims under a different policy.  Homeland again advised that there was nothing for Homeland to do until a lawsuit was filed in the U.S. and served on CPL.

49.     In or around August 2015, the survivors of Ms. O made an unequivocal "Claim" by filing suit in Ireland against the HSE, CPL, MedLab, Sonic Ireland, Sonic USA, Sonic and

Quest Diagnostics, Inc., based on the alleged misreading of several of her slides prior to her cancer diagnosis.  Homeland again explained that there was nothing for Homeland to do unless and until a suit was filed in the United States and served on CPL.

50.     CPL received a copy of the Ms. O lawsuit in September 2015 by mail, but apparently was not properly served until April 2016.

51.     On or about April 27, 2016, Homeland discussed the Ms. O claim with the broker and explained that under the policy then in effect, there was no coverage for claims made outside of the U.S. or Canada, as discussed in Homeland's July 2015 reservation of rights.

52.     On or about July 7, 2016, Homeland closed its file for the Ms. O claim following receipt of the following message from Sheridan Foster:

> I believe that [Homeland] can close its file on this matter.  Our ultimate parent company, also name[d] in the action, has arranged for representation of all Sonic affiliated entities under their coverage so we will not be looking to [Homeland] for defense on this matter.  We are also aware of the limitation on coverage under the [Homeland] policy in place which provides defense only if the legal action is brought within the USA, which was not the case here.

**The Worldwide Territory and Additional Named Insured Endorsements**

53.     Shortly after the April 27, 2016 conversation, the broker—on behalf of Defendants and at the direction of Sonic—approached Homeland seeking to expand coverage to: (1) include claims made outside the U.S. against existing U.S. insureds (i.e., CPL and Sonic USA), and (2) include MedLab and Sonic Ireland as additional named insureds limited to coverage for cervical cytology screening services provided under the Irish contract from August 2010 to June 2013 for claims made in the U.S.  Upon information and belief, Sonic insisted on coverage for Sonic Ireland and MedLab for liability these entities might face in the United States in connection with work performed by CPL in Texas related to the Irish contract.  Sonic considered any refusal to add MedLab or Sonic Ireland to the policy as a "deal breaker."  At that

time, Homeland understood that CPL had ceased providing services under Ireland's CervicalCheck program at some point in 2013.

54.     Homeland agreed to the requested expansion of coverage, beginning with the June 30, 2016 to June 30, 2017 policy period, conditioned upon the veracity of the following warranties set forth on behalf of CPL, Sonic USA, MedLab, and Sonic Ireland, in a letter dated July 27, 2016 provided by CPL's then-President and Director, and Sonic USA's then-Chief Executive Officer and Director, Stephen R. Shumpert (the "Warranty Letter"):

> The undersigned [Stephen R. Shumpert], on behalf of Sonic and any person proposed for coverage (the insureds) does hereby represent to OneBeacon Insurance and its writing company [Homeland] that:
>
> The insureds, after diligent inquiry, are not aware of any claims against the insured(s) or any fact, circumstance, situation, transaction, event, act, error, or omission that may give rise to a claim against the insured(s) Sonic Healthcare (Ireland) Limited, Medlab Pathology, and CPL of Austin as respect the cervical cytology laboratory screening services conducted between 8/1/2010 to 6/30/2013 and all claims and facts, circumstances, situations, transactions, events, acts, errors, or omissions against the insured(s) that may result in a claim have been reported to prior insurance carrier(s).
>
> OneBeacon Insurance and its writing company will be issuing its policy in reliance upon the conditions and statements made in this letter and the application both of which will be deemed to be a part of the policy.

The July 27, 2016 Warranty Letter is attached hereto as **Exhibit 1**.  It was perfectly reasonable for Homeland to seek warranties that none of the insureds proposed for coverage, i.e., CPL, Sonic USA, MedLab and Sonic Ireland, were aware of any actual or potential claims against any of these entities (without reference to where such claim was or could be brought) because originally many of the CervicalCheck claimants failed to recognize or otherwise include all potentially liable defendants, especially entities not domiciled in Ireland.

55.     Upon information and belief, Sonic was directly involved in, and coordinated the provision to Homeland of, the warranties described above, made on behalf of the insureds

proposed for coverage, i.e., CPL and Sonic USA (for claims made outside the U.S.) and MedLab and Sonic Ireland (for claims made in the U.S. related to the Irish contract).

56.     Years after providing Homeland the Warranty Letter, CPL disclosed for the first time that Mr. Shumpert only consulted with Nancy Stratton, who was Vice President of Quality Assurance of CPL, and with Sheridan Foster, who was Sonic USA's Senior Vice President of Legal Affairs and Risk Management prior to signing the July 27, 2016 Warranty Letter.

57.     CPL also then disclosed to Homeland for the first time that the warranty that "all claims and facts, circumstances, situations, transactions, events, acts, errors, or omissions against the insured(s) that may result in a claim have been reported to prior insurance carrier(s)" referred to the Ms. O claim, and only the Ms. O claim.

58.     Unbeknownst to Homeland—and contrary to the warranties in his letter—Mr. Shumpert did not consult with anyone from Sonic Ireland or MedLab prior to signing the July 27, 2016 Warranty Letter.

59.     In reliance on the truth of the warranties in the July 27, 2016 Warranty Letter, which were explicitly made on behalf of the insureds proposed for coverage, including defendants CPL, Sonic USA, MedLab and Sonic Ireland, Homeland added the Worldwide Territory Endorsement (No. 13) and the Additional Named Insured Endorsement (Nos. 3 and 22) to the 2016-2017 policy, which respectively provided coverage for certain claims made outside of the United States to entities domiciled in the United States (i.e., Sonic USA and CPL), and coverage for Sonic Ireland and MedLab for cervical cytology screening services provided under the Irish contract from August 2010 to June 2013 for claims made in the U.S.

60.     In continued reliance on the truth of these representations, Homeland issued the 2017-2018 Primary Policy and Excess Policy at issue here.

**MedLab's 2016 Tender of the Ms. C and Bulk Claim to Insurer Vero**

61.     Contrary to the warranties in the Warranty Letter, at least some (if not all) of the insureds proposed for coverage were aware of claims or facts that might give rise to a claim against Sonic Ireland, MedLab, Sonic USA and/or CPL aside from the Ms. O claim.  In fact, one lawsuit had already been filed concerning the alleged misreading of three slides by CPL and one slide by MedLab, and the names of 58 additional women had been provided to a different insurer as known potential claims against one or more of the Defendants, particularly MedLab and CPL. This information was kept hidden from Homeland until after it agreed to provide the Worldwide Territory Endorsement and add Sonic Ireland and MedLab to the policy.

62.     MedLab began conducting CARs in 2012 as part of a quality assurance/peer review program.  Pursuant to these audits, when women screened through the CervicalCheck program develop cancer, their screening history was reviewed to determine whether any slides were misread in the screenings prior to a known cancer diagnosis.  Among other benefits listed, these CARs can "[p]rovide information to screened women about why their cancers were not detected or prevented."[4]

63.     Prior to 2016, the results of the CARs were considered to be for educational purposes and were not disclosed to patients.  However, in or around February 2016, the NSS implemented a protocol change which resulted in CAR results being reported to the patients' treating physicians.  The NSS provided notice of this change in protocol to at least MedLab by letter dated February 3, 2016.

---

[4]https://data.oireachtas.ie/ie/oireachtas/committee/dail/32/committee_of_public_accounts/submissions/2018/2018-05-17_correspondence-health-service-executive-hse-v-q-and-a-12-jun-2016_en.pdf (HSE Q&A dated June 2016)

64.    Notably, just because there was no policy of proactively reporting CAR results to patients or their physicians, this did not mean that misread slides would never be discovered by patients.  For example, the survivors of Ms. O were privy to misreads by at least 2014 and sued several of the Defendants well before the 2016 NSS policy change.  CPL tendered this claim to its insurer, Homeland.   As discussed, CPL withdrew the Ms. O claim, acknowledging the applicable policy did not provide coverage for lawsuits filed in Ireland.

### The Ms. C Claim

65.    Upon information and belief, a second claimant became aware of a history of misread slides separate and apart from the 2016 NSS policy change.  By March 1, 2016, Ms. C[5] had retained counsel and requested that the CervicalCheck program provide her with all of her medical records including, but not limited to, all of her gynecological cytology reports, confirmation as to which laboratory completed each report, a copy of all such reports resulting from the re-testing of all pap smears, and a copy of all correspondence on file including correspondence with testing laboratories.

66.    By March 23, 2016, MedLab tendered the Ms. C claim to MedLab's insurer, Vero.[6]  The tender of the Ms. C claim included at least three slides that were analyzed at CPL between 2010 and 2011, and not at MedLab.  CPL did not tender the Ms. C claim to any insurer at this time.  CPL also contends that it has no coverage for the Ms. C claim under any insurance policy with Vero.

67.    Vero provided liability insurance for professional services (specifically to providers of facilities and services to medical and allied health professionals) to named insured

---

[5]The name of the deceased claimant has been abbreviated and details omitted to ensure privacy as Homeland is unsure whether this matter was made public in Ireland.

[6]"Vero" refers to AAI Limited ABN 48 005 297 807 trading as Vero Insurance.

SMRH:4851-5634-2990.5

Sonic and its subsidiaries pursuant to its terms and conditions.  The Vero policy thus provided medical facilities professional liability insurance similar to the various Homeland policies.  Upon information and belief, Vero's policy period was from March 31 to March 31 each year.

68.     In April 2016, Ms. C sued the HSE and MedLab based on the alleged misreading of four slides, three of which were slides read by CPL, not MedLab.  As with the Ms. O claim, Ms. C also did not originally name any non-Irish entities.  Ms. C died during the pendency of her claim.  Her lawsuit continues in her husband's name.  MedLab apparently failed to inform Ms. C's counsel until 2018 that CPL was the lab that allegedly misread three of the four slides, despite knowing this information at the time Ms. C specifically requested confirmation of the involved laboratories in her March 2016 letter, and at the time she filed suit against MedLab in April 2016.

69.     The Ms. C litigation was thus commenced months in advance of Mr. Shumpert's purported "diligent inquiry" of the Defendants referenced in the Warranty Letter (i.e., CPL, Sonic USA, MedLab and Sonic Ireland).

70.     Later in 2018, CPL tendered potential claims based on the same three slides related to Ms. C to Homeland under the 2017-2018 policy, which by that time contained the Worldwide Territory Endorsement.  In MedLab's Personal Injuries Defence filed in April 2019, MedLab made clear that its position was that liability for these three slides rests with CPL.

**MedLab's 2016 Bulk Claim to Vero**

71.     On or about February 26, 2016, MedLab provided a "MedLab Pathology Incident Report" to at least Defendants' broker.  The report concerned "the change in process for cancer audits."

72.     Following that report, MedLab reviewed all patients involved in the cancer audits to date.

73.     Following that review, on March 17, 2016, MedLab provided a list of 58 women (and related information) whose slides might have been misread and who thus might make a claim to the broker.  Many of those claims included women whose slides were reviewed by CPL—and CPL alone—in addition to women whose slides were reviewed by both MedLab and CPL, and women whose slides were reviewed by MedLab alone.

74.     Sonic's Risk Manager, Gordon Young, was involved in the communication of this information from MedLab.  Mr. Young was thus aware by March of 2016 that CPL and Sonic USA faced potential liability for CervicalCheck claims for which they had no insurance coverage in Ireland.  Upon information and belief, at least Dr. Goldschmidt, who sat on the Risk Committee of Sonic and was concurrently a member of the Board of Directors of CPL and Sonic USA from at least 2010 until this time, was also aware of CPL's and Sonic USA's gap in coverage.  Upon information and belief, Mr. Young and Mr. Goldschmidt were also aware by this time that MedLab and Sonic Ireland would not be covered for CervicalCheck claims brought in the U.S.

75.     CPL and Sonic USA contend that MedLab did not share the list of 58 women with CPL or Sonic USA.  CPL also contends that MedLab did not inform CPL of the 2016 NSS policy change until two years later in 2018.  MedLab has offered no explanation for why it would keep information of a pending onslaught of litigation from CPL for two years, only to later turn around and point the finger at CPL as the liable party.

SMRH:4851-5634-2990.5

76.     On March 23, 2016, MedLab, through the broker, submitted the list of 58 women to its insurer Vero.  Even though many of the women listed had slides reviewed by CPL, CPL did not provide this information to Homeland.

77.     Homeland has requested, among other things, board meeting minutes from this critical time period pursuant to its right to examine books and records of its insureds and pursuant to Defendants' duties of assistance and cooperation under the Policy.  Defendants have refused to comply with these reasonable requests, among others.

78.     Therefore, at the very least, MedLab was aware of the Ms. C lawsuit and the potential for claims by an additional 58 women at the time of the July 2016 Warranty Letter to Homeland.

79.     It is furthermore clear that, contrary to his representations in the Warranty Letter, Mr. Shumpert did not conduct a diligent inquiry on behalf of all of the insureds proposed for coverage (i.e., MedLab and Sonic Ireland) to determine if there were any facts known to potentially give rise to a claim against Sonic Ireland, MedLab, Sonic USA or CPL.  There is no dispute that a lawsuit (aside from the Ms. O claim) was already pending, and at least 58 women were known as potential claimants whose potential claims had already been tendered to another insurer.

### The Ms. Vicky Phelan Claim and Ireland's CervicalCheck Scandal

80.     While the NSS changed its policy in 2016 with respect to disclosure of the CARs—such that MedLab anticipated it could face lawsuits by some 58 women who it presumed would soon be made aware of the errors—confusion arose in Ireland over how to implement the new policy.

SMRH:4851-5634-2990.5

81.     In or around February 2016, the NSS began "issuing letters detailing the audit outcomes to the treating clinicians in relevant cases."  But there was some confusion and/or dispute between the director of CervicalCheck and the treating clinicians as to *who* should tell women diagnosed with cervical cancer that the reviews of their slides indicated that the initial reading had been in error.

82.     Through litigation it later became public knowledge that the CervicalCheck program told doctors in a circular in July 2016 that the revised test results should be added to the woman's file.  They were told as a "general rule of thumb" that the woman should be told about the results but that clinicians should "use their judgment in selected cases where it is clear that discussion of the outcomes of the review could do more harm than good."  In cases where a woman had died, doctors were told simply to ensure that the result was recorded in the woman's notes.

83.     In one particular case, a Limerick gynecologist who treated Ms. Vicky Phelan had been arguing with the director of CervicalCheck since the summer of 2016 that it was the responsibility of CervicalCheck, not the clinicians, to inform the women.  Finally, near the end of September 2017, the clinician finally informed Ms. Phelan of the 2014 CAR results of a slide that had been misread in 2011.

84.     Shortly thereafter, the public began to slowly learn the details of what would quickly become known as Ireland's CervicalCheck cancer scandal.

85.     Ms. Phelan retained counsel and informed the HSE and MedLab at the end of 2017 or beginning of 2018 that she intended to file a lawsuit in Ireland.  Ms. Phelan filed a lawsuit against the HSE and MedLab on February 12, 2018.

SMRH:4851-5634-2990.5

86.     Ms. Phelan's sole allegedly misread slide from 2011 was reviewed by CPL, not MedLab.  Nevertheless, Ms. Phelan's slide was part of MedLab's bulk claim report to Vero in March 2016.

87.     On February 12, 2018, MedLab provided an update to CPL with respect to the Ms. C claim.  According to CPL, during that call, MedLab finally disclosed generally that CARs had been performed on a number of patient slides, that results of the audit reviews might be made known to the patients, and specific mention was made of Ms. Phelan.

88.     On February 14, 2018, according to CPL, MedLab advised CPL that the Ms. Phelan case was progressing quickly and that CPL would soon be named as a defendant.

89.     On or about February 14, 2018, CPL finally reported the Ms. C and Ms. Phelan claims to Homeland, tendering both claims to Homeland under the 2017-2018 Primary Policy.  Both of these claims had been previously tendered to Vero in March 2016, nearly two years earlier.  The notices to Homeland were provided on Homeland's "Health Care Claim/Incident Reporting Form."  This form asked whether the claim or incident was "Reported to previous carriers?"  CPL checked the box for "No" for both claims.

90.     Shortly thereafter in May of 2018, CPL reported a list of 101 slides to Homeland which CPL believed may result in future claims against it.  A large portion of the potential claims had also been reported to Vero in March 2016, over two years earlier.  The bulk claim to Homeland in May 2018 included Ms. C, Ms. Phelan, and the Ms. S claim.

91.     On or about February 15, 2018, counsel for MedLab wrote to Ms. Phelan's counsel advising that the responsibility for processing and reporting on the slides rested with CPL and not MedLab, and foreshadowing that an Application was to be made to the court to substitute CPL as a defendant.  Counsel for MedLab also told the court that there would be no

prejudice to Ms. Phelan as both labs (i.e., MedLab and CPL) were covered under the same insurance policy.  According to Vero, Vero was never consulted with respect to this decision or this representation.

92.    On or about February 16, 2018, Vero contends it received an email from the broker dated February 14, 2018 enclosing correspondence from Ms. Phelan's counsel to MedLab and CervicalCheck.   According to Vero, this was the first time a claim was made to it (presumably with respect to the filing of a lawsuit, as opposed to the notice of potential claim provided to Vero in March 2016).  Also according to Vero, the  email made no mention of CPL in the material provided to it, only MedLab.

93.    That same day, Vero granted indemnity to MedLab under the terms and conditions of Vero's policy and based on the facts and circumstances known to it to date.  Vero requested confirmation of where the testing of the slides was carried out, but no response to this question was ever provided.

94.    On or about February 22, 2018, Ms. Phelan amended her lawsuit to name CPL instead of MedLab.

95.    Homeland immediately began investigating coverage for the Ms. Phelan claim.

96.    As Homeland carried out its coverage investigation, it raised to CPL what it believed to be several obstacles to coverage for the Ms. Phelan claim.  In order to assist in its investigation, Homeland sought various categories of documents from CPL and the other Defendants.

97.    CPL produced a small portion of the documents Homeland reasonably requested.  But critically, CPL failed to produce key documents such as the 2016 bulk claim report to

Vero—information necessary for Homeland to determine whether the Policy's Prior Notice (to another insurer) Exclusion applied to bar coverage.

98.     While Homeland was in the middle of its coverage investigation for the Ms. Phelan matter, it received notice on April 26, 2018 that no further action from Homeland would be required:

> The matter has settled as against Medlab/CPL for 2.5 million euros plus costs. Please inform [Homeland] that another insurer (Vero) has granted indemnity in relation to the settlement.

> At this point, it would appear no further action will be needed from [Homeland].

99.     Homeland therefore closed its file for the Ms. Phelan claim.

100.     In or around January or February of 2019, Homeland received information from the broker that Vero would be seeking reimbursement from Sonic for various of the CervicalCheck claims.

101.     While Homeland is not privy to all of those communications, the broker did forward a letter dated October 2, 2018 from Vero concerning the Ms. Phelan matter outlining the information pertaining to Vero above.  The Vero letter contains conflicting information as to whether CPL is covered under the Vero policy for the CervicalCheck claims.

102.     Vero's letter makes clear that: (1) Vero believes it was misled with respect to which Sonic entity was the liable party in the Ms. Phelan matter, (2) that it did not receive timely updates or responses with respect to its reasonable requests for information in order to investigate coverage and assess the Ms. Phelan claim in the time between the lawsuit's inception and trial/settlement, and (3) that Sonic "may have considered that there was an indemnity issue relating to coverage for CPL under the Vero policy" but that at no point was this issue raised with Vero.

**The Ms. S Claim**

103.    Against this backdrop, CPL now seeks reimbursement under the Homeland Primary Policy and the Excess Policy for defense expenses and settlement of the Ms. S[7] claim, which combined amounts are within the combined limits of both policies and in excess of the Court's jurisdictional threshold.

104.    Ms. S's claim, like Ms. Phelan's, concerns only one allegedly misread slide.

105.    As with Ms. C's and Ms. Phelan's claims, Ms. S's claim was also tendered to Vero in March of 2016.

106.    Here, MedLab tendered a potential claim concerning the exact same slide regarding Ms. S to Vero in 2016 as it did to Homeland in 2018, and upon which CPL now seeks reimbursement.

107.    Originally, as with the Ms. Phelan matter, the Ms. S lawsuit only named MedLab and not CPL when it was filed in August 2018.

108.    Although MedLab was always aware that the sole allegedly misread Ms. S slide was reviewed by CPL, it did not provide this information to Ms. S's counsel until March 2019. In May of 2019, Ms. S added Sonic Ireland and CPL as defendants in the lawsuit, in addition to MedLab and the HSE.

109.    Only then did CPL begin to aggressively seek coverage under the Homeland policies.

110.    CPL settled the Ms. S matter in October 2019.  Defendants Sonic Ireland and MedLab did not contribute to the settlement.

---

[7] The name of the claimant has been abbreviated and details omitted to ensure privacy and confidentiality as Homeland is unsure whether this matter was made public in Ireland.

111.     Because the Worldwide Territory Endorsement provides for only a duty to reimburse—as opposed to a duty to defend—Homeland's only potential duty to pay with respect to any of the CervicalCheck claims filed in Ireland could be triggered only upon CPL's payment of covered defense expenses and/or loss in excess of the Primary Policy's deductible.

112.     On or about May 13, 2020, CPL provided notice that it contended it had paid covered defense expenses and/or loss in excess of the Primary Policy's deductible.

113.     On May 26, 2020, Homeland advised CPL that, as discussed in earlier correspondence, Homeland believed CPL continued to face a number of obstacles to coverage for the Ms. S claim.  This included the Primary Policy's exclusion resulting from MedLab's prior notice of the Ms. S claim to Vero, as well as concerns that the July 27, 2016 Warranty Letter signed by Mr. Shumpert on behalf of all persons and entities proposed for coverage, and upon which Homeland relied in issuing a policy containing the Worldwide Territory Endorsement, was materially inaccurate.  Homeland explained that, at that time, it believed these two issues were likely to preclude coverage for the Ms. S claim.  Homeland, however, wanted to provide CPL and the other Defendants with one final chance to produce the remaining documents that Homeland had been requesting or any other information that might provide a basis for Homeland to find coverage in CPL's favor.

114.     As of the date of the filing of this complaint, Defendants have failed to provide any additional information or documents.

115.     Homeland appropriately denied the Ms. S claim on July 10, 2020 based on the information known to date.

SMRH:4851-5634-2990.5

116.    Homeland now seeks a final declaration from the Court that there is no coverage for any of the Defendants under the Primary Policy or Excess Policy for the Ms. S claim based on at least all of the facts adduced herein.

## THE INSURANCE POLICIES

### The Primary Policy

117.    Homeland issued a Primary Medical Facilities and Providers Professional Liability Insurance Policy, policy number MFL-004062-0617 (the "Primary Policy"), to Named Insured Sonic Healthcare Investments, G.P. for the policy period June 30, 2017 through June 30, 2018, which provides certain coverage pursuant to the policy's terms, conditions, and exclusions. Sonic Healthcare Investments, G.P.'s principal place of business is listed as 9737 Great Hills Trail, Suite 100, Austin, TX 78759-6449.  Primary Policy, Declarations ITEM 1 and ITEM 2. The Primary Policy is attached hereto as **Exhibit 2**.

118.    The Insuring Agreement in the Primary Policy provides:

> The Underwriter will pay up to the applicable Limit of Liability shown in ITEM 4.A. of the Declarations on behalf of the **Insured** any **Loss** that the **Insured** is legally obligated to pay as a result of any covered **Claim** for a **Professional Services Wrongful Act** happening on or after the **Retroactive Date**; provided, that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable Extended Reporting Period and reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

Primary Policy, § I(A) Claims Made Professional Liability Insurance.

119.    The term "**Claim**" is defined as "any written notice received by an **Insured** that any person or entity intends to hold an **Insured** responsible for a **Wrongful Act** or an **Occurrence**."  Primary Policy, § II, Definition (F).

120.    The term "**Defense Expenses**" is defined as "the reasonable fees of attorneys, experts and consultants and costs and expenses incurred in the investigation, adjustment, defense or appeal of a **Claim** with the approval or at the direction of the Underwriter; provided, that

**Defense Expenses** shall not include: (1) remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of an **Insured**; (2) any amounts incurred in defense of a **Claim** for which any other insurer has a duty to defend, regardless of whether such other insurer undertakes such duty; or (3) any benefits under an **Employee Benefit Program**." Primary Policy, § II, Definition (H).

121.    The term "**Insured**" is defined as, as relevant here, "the **Named Insured**." Primary Policy, § II, Definition (S).

122.    The term "**Named Insured**" is defined as "the **First Named Insured** and each other entity listed as a **Named Insured** in Schedule A to this Policy." Primary Policy, § II, Definition (CC).

123.    The term "**First Named Insured**" is defined as "the entity designated as such in ITEM 1 of the Declarations [Sonic Healthcare Investments, G.P.]." Primary Policy, § II, Definition (O) and Declarations ITEM 1.

124.    The Primary Policy contains the following Additional Named Insured Endorsement:

(1)    The term "**Named Insured**,"[8] as defined in Section II DEFINITIONS of this Policy, is amended to include the entity(ies) scheduled below (each an "Additional Named Insured"), but solely:

(a)    with respect to liability imposed or sought to be imposed on such Additional Named Insured that is based on or arises out of acts, errors or omissions committed or allegedly committed by such Additional Named Insured when and to the extent that, such Additional Named Insured is acting on behalf of, and within the capacity and scope of its duties for

Sonic Healthcare Investments, G.P.

; and

(b)    for **Wrongful Acts** happening on or after the Retroactive Date identified for each Additional Named Insured in the schedule

---

[8] Bolded terms are terms that are defined in the policies.

below and **Occurrences** happening on or after the effective date of this endorsement [June 30, 2017]:

SCHEDULE

| Additional Named Insured: | Retroactive Date: |
|---|---|
| Sonic Healthcare USA, Inc | February 05, 2007 |
| … | |
| Clinical Pathology Laboratories, Inc | October 01, 2000 |
| … | |
| Sonic Healthcare Limited | February 05, 2007 |
| … | |
| Sonic Healthcare (Ireland) Limited (term date 06.30.2013) | August 01, 2010 |
| Medlab Pathology (term date 06.30.2013) | August 01, 2010 |

(2)    It is understood and agreed that the Additional Named Insured(s) share in the applicable Limits of Liability set forth in ITEM 4 of the Declarations.

(3)    ITEM 3 of the Declarations shall be deemed amended to the extent necessary to effect the purpose and intent of this endorsement.

All other terms, conditions and limitations of the Policy shall remain unchanged.

Primary Policy, § II, Definition (CC) Named Insured as amended by Endorsement No. 22, Additional Named Insured.

125.    The term "**Loss**" is defined as, as relevant here:

(1)    for the purposes of INSURING AGREEMENTS (A), (B) and (C), any damages, settlements, judgments or other amounts (including punitive or exemplary damages if insurable under the applicable law most favorable to the insurability thereof) in excess of the applicable deductible or self-insured retention, if any, stated in ITEM 4 of the Declarations which an **Insured** is legally obligated to pay as a result of a **Claim**; …

**Loss** shall not include:

(a)    **Defense Expenses**;

(b)    the multiple portion of any multiplied damage award;

SMRH:4851-5634-2990.5

(c)  fines, penalties, sanctions, fees, government payments or taxes;

(d)  amounts owed to any provider of **Medical Services** under any contract;

(e)  restitution, return or disgorgement of fees, profits, charges for products or services rendered, capitation payments, premium or any other funds allegedly wrongfully held or obtained;

(f)  benefits under an **Employee Benefit Program**;

(g)  relief or redress in any form other than monetary compensation or monetary damages, including without limitation the cost of complying with any injunctive, declaratory or administrative relief;

(h)  the payment, satisfaction or writing off of any medical bills or charges by an **Insured**; or

(i)  matters which are uninsurable under applicable law.

Primary Policy, § II, Definition (X).

126.  The term "**Policy Period**" means "the period from the Inception Date of this Policy stated in ITEM 2(a) of the Declarations [June 30, 2017] to the Expiration Date of this Policy stated in ITEM 2(b) of the Declarations [June 30, 2018] or to any earlier cancellation date of this Policy."  Primary Policy, § II, Definition (HH).

127.  The term "**Medical Services**" means "health care, medical care, or treatment provided to any individual, including without limitation any of the following: medical, surgical, dental, psychiatric, mental health, chiropractic, osteopathic, nursing, or other professional health care; the furnishing or dispensing of medications, drugs, blood, blood products, or medical, surgical, dental, or psychiatric supplies, equipment, or appliances in connection with such care; the furnishing of food or beverages in connection with such care; the providing of counseling or other social services in connection with such care; and the handling of, or the performance of post-mortem examinations on, human bodies."  Primary Policy, § II, Definition (Z).

SMRH:4851-5634-2990.5

128.     The term "**Professional Services**" means, as relevant here, "**Medical Services** in connection with the Covered Operations/Services set forth in ITEM 5 of the Declarations [Medical Laboratory]."  Primary Policy, § II, Definition (KK) and Declarations ITEM 5.

129.     The term "**Professional Services Wrongful Act**" means, as relevant here:

(1)     any actual or alleged act, error or omission, or series of acts, errors or omissions, by an **Insured** in rendering, or failing to render, **Professional Services**;

(2)     any actual or alleged act, error or omission, or series of acts, errors or omissions, by any person other than an **Insured** in rendering, or failing to render, **Medical Services**, but only for an **Insured**'s vicarious liability with regard to such **Medical Services**.  In no event shall this Policy provide coverage for the direct liability of any person other than an **Insured** for the rendering of, or failure to render, **Medical Services**; …

Primary Policy, § II, Definition (LL).

130.     The term "**Wrongful Act**" means "any **Professional Services Wrongful Act** or **Employee Benefit Wrongful Act**."  Primary Policy, § II, Definition (RR).

131.     The term "**Related Claims**" means "all **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, in any way involving, or in any way having a common nexus of the same or related facts, circumstances, situations, transactions, or events, or the same or related series of facts, circumstances, situations, transactions or events." Primary Policy, § II, Definition (NN).

132.     The Primary Policy contains Exclusion (D)(1), the Prior Knowledge Exclusion. The Prior Knowledge Exclusion provides:

(D)     Except as otherwise expressly provided in this Policy, this Policy does not apply to, and the Underwriter will not pay **Loss** or **Defense Expenses**, for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)     act, error, omission or **Wrongful Act** if, on or before the Inception Date set forth in ITEM 2 of the Declarations, the

Risk Management Dept or Legal Dept or any Executive of the **Named Insured** knew or reasonably could have foreseen that such act, error, omission, or **Wrongful Act** might result in a **Claim**.

If, however, this Policy is a renewal of one or more policies previously issued by the Underwriter to the **First Named Insured**, and the coverage provided by the Underwriter to the **First Named Insured** was in effect, without interruption, for the entire time between the inception date of the first such other policy and the Inception Date of this Policy, the reference in this EXCLUSION (D)(1) to the Inception Date will be deemed to refer instead to the inception date of the first policy under which the Underwriter began to provide the **First Named Insured** with the continuous and uninterrupted coverage of which this Policy is a renewal;

All other terms, conditions and limitations of this Policy shall remain unchanged.

Primary Policy, § III, (D)(1) Prior Knowledge Exclusion as amended by Endorsement No. 19.

133.   The Primary Policy contains Exclusion (D)(2), the Prior Notice Exclusion.  The

Prior Notice Exclusion provides:

(D)   Except as otherwise expressly provided in this Policy, this Policy does not apply to, and the Underwriter will not pay **Loss** or **Defense Expenses**, for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(2)   act, error, omission, **Wrongful Act**, event, suit or demand which was the subject of any notice given under:

(a)   any medical professional liability or similar policy of insurance or plan or program of self-insurance, with respect to any **Claim** otherwise covered under INSURING AGREEMENT (A);

(b)   any general liability or similar policy of insurance or plan or program of self-insurance, with respect to any **Claim** otherwise covered under INSURING AGREEMENT (B); or

(c)   any employee benefit liability or similar policy of insurance or plan or program of self-insurance, with

SMRH:4851-5634-2990.5

respect to any **Claim** otherwise covered under INSURING AGREEMENT (C);

in effect prior to the Inception Date set forth in ITEM 2 [June 30, 2017] of the Declarations;

Primary Policy, § III, (D)(2) Prior Notice Exclusion.

134.    The Primary Policy includes the following Condition (B) Related Claims Deemed Single Claim:

All **Related Claims**, whenever made, shall be deemed to be a single **Claim**, regardless of:

(1)     the number of **Related Claims**;

(2)     the number or identity of claimants;

(3)     the number or identity of **Insureds** involved or against whom **Related Claims** have been or could be made;

(4)     whether the **Related Claims** are asserted in a class action or otherwise; and

(5)     the number and timing of the **Related Claims**, even if the **Related Claims** comprising such single **Claim** were made in more than one Policy Period.

All **Related Claims** will be treated as a single **Claim** made when the earliest of such **Related Claims** was first made, or when the earliest of such **Related Claims** is treated as having been made in accordance with GENERAL CONDITION (C)(2) below, whichever is earlier.

Primary Policy, § IV, Condition (B) Related Claims Deemed Single Claim.

135.    The Primary Policy includes the following Condition (C)(1), Reporting of Claims, Occurrences and Circumstances:

(1)     If, during the **Policy Period** or any Extended Reporting Period, any **Claim** for a **Wrongful Act** under INSURING AGREEMENT (A) or (C) is first made against an **Insured**, as a condition precedent to its right to any coverage under this Policy, the **Insured** shall give the Underwriter written notice of such Claim as soon as practicable thereafter, but in no event later than:

(a)     thirty (30) days after the Expiration Date or earlier cancellation date of this Policy; or

(b)     the expiration of any Extended Reporting Period.

Timely and sufficient notice by one **Insured** of a **Claim** shall be deemed timely and sufficient notice for all **Insureds** involved in the **Claim**. Such notice shall give full particulars of the **Claim**, including, but not limited to: a description of the **Claim** and **Wrongful Act**; the identity of the patient, all potential claimants and the health care provider(s) and any **Insureds** involved; a description of the injury or damages that resulted from such **Wrongful Act**; information on the time, place and nature of the **Wrongful Act**; and the manner in which the **Insured** first became aware of such **Wrongful Act**.

Primary Policy, § IV, Condition (C)(1) Reporting of Claims, Occurrences and Circumstances.

136.    The Primary Policy includes the following Condition (C)(2) Reporting of Claims,

Occurrences and Circumstances:

(2)     If during the **Policy Period** an **Insured** first becomes aware of any **Wrongful Act** that may subsequently give rise to a **Claim** under INSURING AGREEMENT (A) or (C) and:

(a)     gives the Underwriter written notice of such **Wrongful Act** with full particulars as soon as practicable thereafter but in any event before the Expiration Date or earlier cancellation date of this Policy; and

(b)     requests coverage under INSURING AGREEMENT (A) or (C) of this Policy for any **Claim** subsequently arising from such **Wrongful Act**;

then any **Claim** not otherwise excluded by this Policy subsequently made against the **Insured** arising out of such **Wrongful Act** shall be treated as if it had been first made during the **Policy Period**. Full particulars shall include, but are not limited to: a description of the **Wrongful Act**; the identity of the patient, all potential claimants and the health care provider(s) and any **Insureds** involved; information on the time, place and nature of the **Wrongful Act**; the manner in which the **Insured** first became aware of such **Wrongful Act**; and the reasons the **Insured** believes the **Wrongful Act** is likely to result in a **Claim**.

Primary Policy, § IV, Condition (C)(2) Reporting of Claims, Occurrences and Circumstances.

SMRH:4851-5634-2990.5

137.    The Primary Policy includes the following Condition (E) Territory:

This Policy applies to **Wrongful Acts** or **Occurrences** taking place anywhere in the world.  **Claim** or suit must be made against an **Insured**, however, in the United States of America, including its territories or possessions, Puerto Rico, or Canada.

(1)    Subject to paragraph (2) below and solely for the purposes of the coverage afforded under INSURING AGREEMENT (A) of this Policy, Section IV GENERAL CONDITIONS (E) of this Policy is amended to add the following at the end thereof:

(1)    Subject to the further provisions of this GENERAL CONDITION (E), if a **Claim** is made against an **Insured** outside the United States of America, including its territories or possessions, Puerto Rico or Canada, the Underwriter will have the right but not the duty to defend, investigate or settle such **Claim**. If the Underwriter elects not to defend, investigate or settle such **Claim**, the **Insured** shall be obligated to initiate such defense and investigation as is reasonably necessary and, subject to the Underwriter's prior written consent, may effect settlement.  The Underwriter will reimburse the **Insured,** up to the applicable Limit of Liability, for reasonable **Defense Expenses** and **Loss,** subject to the deductible or self-insured retention set forth in ITEM 4.A. of the Declarations and all other provisions of this Policy.

(2)    All monetary terms in this Policy are in U.S. dollars.  In the event the **Insured** incurs **Loss** or **Defense Expenses** in currency other than U.S. dollars, the Underwriter will reimburse the **Insured** for such amounts in U.S. dollars at the prevailing exchange rate at the time such **Loss** or **Defense Expenses** were incurred.

(3)    No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** made against an **Insured** in any country or jurisdiction which is the subject of trade or economic sanctions or embargo imposed by the laws or regulations of the United States of America to the extent such sanctions or embargo prohibit or limit this insurance.

(2)    It is understood and agreed that the amendment to Section IV GENERAL CONDITION (E) set forth in paragraph (1) above does not apply to **Claims** made against any **Named Insured** that is domiciled outside the United States of America, including its territories or possessions, Puerto Rico or Canada. Accordingly, no coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** made outside the United States of America, including its territories or possessions, Puerto Rico or Canada

SMRH:4851-5634-2990.5

against any **Named Insured** that is domiciled outside the United States of America, including its territories or possessions, Puerto Rico or Canada.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Primary Policy, § IV, Condition (E) Territory as amended by Endorsement No. 13 Worldwide Territory Endorsement.

138.    The Primary Policy includes the following Condition (J) Assistance and Cooperation:

In the event of a **Claim**, the **Insured** shall provide the Underwriter with all information, assistance and cooperation that the Underwriter reasonably requests. At the Underwriter's request, the **Insured** shall assist in: investigating, defending and settling **Claims**; enforcing any right of contribution or indemnity against another who may be liable to any **Insured**; the conduct of actions, suits, appeals or other proceedings, including, but not limited to, attending trials, hearings and depositions; securing and giving evidence; and obtaining the attendance of witnesses.

Primary Policy, § IV, Condition (J) Assistance and Cooperation.

139.    The Primary Policy includes the following Condition (K) Subrogation:

In the event of any payment hereunder, the Underwriter shall be subrogated to the extent of any payment to all of the rights of recovery of the **Insured**. The **Insured** shall execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the Underwriter effectively to bring suit in its name. The **Insured** shall do nothing that may prejudice the Underwriter's position or potential or actual rights of recovery. The obligations of the **Insured** under this GENERAL CONDITION (K) shall survive the expiration or termination of the Policy.

Primary Policy, § IV, Condition (K) Subrogation.

140.    The Primary Policy includes the following Condition (L) Other Insurance and Risk Transfer Arrangements:

Any **Loss** or **Defense Expenses** resulting from any **Claim** insured under any other insurance or self-insurance policy or program or risk transfer instrument, including, but not limited to, self-insured retentions, deductibles, fronting arrangements, professional liability policies covering any **Insured**, or other alternative arrangements which apply to the **Loss** or **Defense Expenses** shall be

SMRH:4851-5634-2990.5

paid first by those instruments, policies or other arrangements. It is the intent of this Policy to apply only to **Loss** or **Defense Expenses** that are more than the total limit of all deductibles, limits of liability, self-insured amounts or other insurance or risk transfer arrangements, whether primary, contributory, excess, contingent, fronting or otherwise and whether or not collectible. These provisions do not apply to other insurance policies or risk transfer arrangements written as specific umbrella or excess insurance over the applicable Limits of Liability of this Policy. This Policy shall not be subject to the terms of any other policy of insurance or plan or program of self-insurance; and in no event will the Underwriter pay more than the applicable Limits of Liability set forth in ITEM 4 of the Declarations.

Primary Policy, § IV, Condition (L) Other Insurance and Risk Transfer Arrangements.

141.    The Primary Policy includes the following Condition (R) Representation;

Incorporation of Application:

The **Insureds** represent that the particulars and statements contained in the Application attached to this Policy are true, accurate and complete and agree that:

(1)    this Policy is issued and continued in force by the Underwriter in reliance upon the truth of such representation;

(2)    those particulars and statements are the basis of this Policy; and

(3)    the Application and those particulars and statements are incorporated in and form a part of this Policy.

No knowledge or information possessed by any **Insured** shall be imputed to any other **Insured**, except for material facts or information known to the person or persons who signed the Application. In the event of any material untruth, misrepresentation or omission in connection with any of the particulars or statements in the Application, this Policy shall be void with respect to any **Insured** who knew of such untruth, misrepresentation or omission or to whom such knowledge is imputed.

Primary Policy, § IV, Condition (R) Representation; Incorporation of Application.

142.    The Primary Policy includes the following Condition (S)(1) No Action against

Underwriter, in relevant part:

(1)    No action shall be taken against the Underwriter by any **Insured** unless, as conditions precedent thereto, the **Insured** has fully complied with all of

the terms of this Policy and the amount of the **Insured's** obligation to pay has been finally determined either by judgment against the **Insured** after adjudicatory proceedings or by written agreement of the **Insured**, the claimant and the Underwriter.

Primary Policy, § IV, Condition (S)(1) No Action against Underwriter.

143.    The Primary Policy includes the following Condition (X) Examination of Books

and Records:

The Underwriter may examine and audit the books and records of the **Insured** as they relate to this Policy.

Primary Policy, § IV, Condition (X) Examination of Books and Records.

**The Excess Policy**

144.    Homeland also issued an Excess Medical Facilities Liability Insurance Policy, policy number MFX-002013-0617 (the "Excess Policy"), to Sonic Healthcare Investments, G.P. for the policy period June 30, 2017 through June 30, 2018, which provides certain coverage pursuant to the policy's terms, conditions, and exclusions.  Excess Policy, Declarations ITEM 1 and ITEM 2.  The Excess Policy is attached hereto as **Exhibit 3**.

145.    The Excess Policy is a "follow form excess policy."  Insuring Agreement (A) provides:

The Underwriter shall provide the **Insured** with insurance excess of the **Underlying Insurance** set forth in ITEM 4 of the Declarations, provided that the **Underlying Insurance** also applies and has been exhausted by actual payment thereunder, or would apply but for the exhaustion of the applicable limit(s) of liability thereunder.

Excess Policy, § I, Insuring Agreement (A).

146.    Endorsement 4 to the Excess Policy defines "**Underlying Insurance**" as the

Homeland Primary Policy.  Excess Policy, Endorsement No. 4.

147.    The Excess Policy includes the following Insuring Agreement (D):

This Policy will apply in conformance with, and will follow the form of, the terms, conditions, agreements, exclusions, definitions and endorsements of the **Underlying Insurance,** except:

(1)    the Underwriter will have no obligation under this Policy with respect to any **Claim** that is settled without the Underwriter's written consent;

(2)    with respect to any provisions to the contrary contained in this Policy;

(3)    the applicable limit of liability of the **Underlying Insurance** shall be deemed to be reduced or exhausted solely as a result of payments for loss or damages (including costs, charges and expenses) that are covered under this Policy; and

(4)    the coverage provided by this Policy shall not be broader than any **Underlying Insurance** unless expressly provided herein, including any endorsement hereto.

Excess Policy, § I, Insuring Agreement (B).

148.    The Excess Policy contains the following Definitions:

(A)    "**Application**" means the application attached to and forming part of this Policy, including any materials submitted in connection with such application, all of which are on file with the Underwriter and are a part of the Policy, as if physically attached.

(B)    "**Claim**" has the meaning ascribed to it (or similar term) in the **Underlying Insurance**.

(C)    "**Defense Expenses**" has the meaning ascribed to it (or similar term) in the **Underlying Insurance**.

(D)    "**Insured**" means the persons or organizations insured under the **Underlying Insurance**.

(E)    "**Policy Period**" means the period from the inception date to the expiration date in ITEM 2 of the Declarations, or to any earlier cancellation date.

(F)    "**Primary Policy**" means the policy scheduled as such in ITEM 2 of the Declarations.

(G)   "**Underlying Insurance**" means all insurance policies or risk transfer instruments (including, but not limited to, self-insured retentions or other alternative arrangements) scheduled in ITEM 4 of the Declarations and any policies or risk transfer arrangements renewing or replacing them.

Excess Policy, § II, Definitions (A)-(G).

149.   The Excess Policy contains the following Limit of Liability provision:

The amount stated in ITEM 3 of the Declarations is the limit of the Underwriter's liability under this Policy, and shall be the maximum amount, including **Defense Expenses**, payable by the Underwriter under this Policy.  The limit of liability available to pay damages or settlements shall be reduced, and may be exhausted, by the payment of **Defense Expenses.**

Excess Policy, § IV, Limit of Liability.

150.   The Excess Policy contains the following Claim Participation provision:

The Underwriter may, at its sole discretion, elect to associate in the investigation, settlement or defense of any **Claim** against the **Insured**, even if the **Underlying Insurance** has not been exhausted.  If the Underwriter so elects, the **Insured** will cooperate with the Underwriter and will make available all such information and records as the Underwriter may reasonably require.

Excess Policy, §VI, Claim Participation.

151.   The Excess Policy contains the following Representations and Severability

provision:

The **Insured** represents that the particulars and statements contained in the **Application** are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and to constitute a part of this Policy, as the basis of this Policy.  No knowledge or information possessed by any **Insured** will be imputed to any other **Insured** except for material facts or information known to the person or persons who signed the **Application**.  In the event that any of the particulars or statements in the **Application** is untrue, this Policy will be void with respect to any **Insured** who knew of such untruth or to whom such knowledge is imputed.

Excess Policy, §XI, Representations; Severability.

SMRH:4851-5634-2990.5

## FIRST CLAIM FOR RELIEF

**(Declaratory Relief Against All Defendants: The Ms. Swift Claim)**

152.    Homeland hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 151 of this complaint.

153.    An actual controversy exists between Homeland, on the one hand, and Defendants, on the other, with respect to whether there is coverage for the Ms. S Claim under the Primary Policy and under the Excess Policy.

154.    Homeland is entitled to a declaratory judgment in its favor, stating that there is no coverage for the Ms. S Claim under the Primary Policy or the Excess Policy for any of the Defendants.

## SECOND CLAIM FOR RELIEF

**(Negligent Misrepresentation Against All Defendants: The Ms. Swift Claim)**

155.    Homeland hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 154 of this complaint.

156.    Defendants made or caused to be made at least the following representations in the course of transacting with Homeland to procure insurance coverage:

(i)    That the Warranty Letter was on behalf of MedLab and Sonic Ireland, both of which were insureds "proposed for coverage";

(ii)    That a diligent inquiry had been conducted on behalf of MedLab and Sonic Ireland;

(iii)    That none of the insureds proposed for coverage (i.e., CPL, Sonic USA, MedLab or Sonic Ireland) were aware of any claims against any of these insureds;

(iv)     That none of the insureds proposed for coverage were aware of any fact, circumstance, situation, transaction, event, act, error, or omission that may give rise to a claim against Sonic Ireland, Medlab, and CPL as respect the cervical cytology laboratory screening services conducted between 8/1/2010 to 6/30/2013.

157.     Some or all of these representations turned out to be false.

158.     Defendants failed to exercise reasonable care or competence in obtaining or communicating this information.

159.     Homeland justifiably relied on these representations in issuing the requested coverage under the Worldwide Endorsement (No. 13) and adding Sonic Ireland and MedLab to the Additional Named Insured Endorsement (Nos. 3 and 22).

160.     Defendants' negligent misrepresentation(s) proximately caused Homeland injury in the form of attorneys' fees incurred to date to discover these misrepresentations and bring the instant action with respect to the Ms. Swift claim.  Additionally, to the extent the Homeland Policies are deemed to provide coverage for the Ms. Swift claim, Homeland will be damaged by the amount of the Ms. Swift claim on account of the negligent misrepresentations made to it by or on account of defendants Sonic, Sonic USA, MedLab, and/or Sonic Ireland.

161.     Homeland is entitled to damages proximately caused by Defendants' negligent misrepresentations.

### THIRD CLAIM FOR RELIEF

**(Breach of Warranty Against All Defendants)**

162.     Homeland hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 161 of this complaint.

SMRH:4851-5634-2990.5

163.    An actual controversy exists between Homeland, on the one hand, and Defendants, on the other, with respect to whether there is coverage for any of the Irish CervicalCheck claims under the Primary Policy and under the Excess Policy.

164.    Defendants provided at least the following material warranties upon which Homeland relied in agreeing to provide coverage under the Worldwide Endorsement (No. 13) and adding Sonic Ireland and MedLab to the Additional Named Insured Endorsement (Nos. 3 and 22) which turned out to be false, any one of which would be sufficient to void coverage:

(i)     That the Warranty Letter was on behalf of MedLab and Sonic Ireland, both of which were insureds "proposed for coverage";

(ii)    That a diligent inquiry had been conducted on behalf of MedLab and Sonic Ireland;

(iii)   That none of the insureds proposed for coverage were aware of any claims against any of the insureds;

(iv)    That none of the insureds proposed for coverage were aware of any fact, circumstance, situation, transaction, event, act, error, or omission that may give rise to a claim against Sonic Ireland, MedLab, and CPL as respect the cervical cytology laboratory screening services conducted between 8/1/2010 to 6/30/2013.

165.    Homeland is entitled to a declaratory judgment in its favor, stating that any coverage that might have been afforded under the Worldwide Endorsement (No. 13) and the Additional Named Insured Endorsement (Nos. 3 and 22) is void as to Defendants with respect to the Irish CervicalCheck claims for breach of the specific warranties in the Warranty Letter upon which Homeland conditioned issuing this coverage.

## FOURTH CLAIM FOR RELIEF

### (Reformation Against All Defendants)

166.    Homeland hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 165 of this complaint.

167.    The parties intended to exclude certain risks under the policies pursuant to the warranties provided in the Warranty Letter for which the Defendants were either mistaken in so warranting, or inequitably induced Homeland to unilaterally mistake in so believing, such that the policy was issued contrary to the actual understanding of the parties.

168.    Homeland is entitled to reformation of the policy to exclude certain risks covered under the Worldwide Endorsement (No. 13) and the Additional Named Insured Endorsement (Nos. 3 and 22) as to Defendants with respect to the Irish CervicalCheck claims based on these mutual and/or unilateral mistakes.

**WHEREFORE**, Homeland prays for relief as follows:

1.    For a declaration that there is no coverage for the Ms. S claim under the Primary Policy;

2.    For a declaration that there is no coverage for the Ms. S claim under the Excess Policy;

3.    For damages resulting from Defendants' negligent misrepresentations;

4.    For a declaration that any coverage that might have been afforded under the Worldwide Endorsement (No. 13) and the Additional Named Insured Endorsement (Nos. 3 and 22) is void as to Defendants with respect to the Irish CervicalCheck claims for breach of the specific warranties in the Warranty Letter upon which Homeland  relied and conditioned issuing this coverage;

5.      For reformation of the policies to exclude certain risks afforded under the Worldwide Endorsement (No. 13) and the Additional Named Insured Endorsement (Nos. 3 and 22) to Defendants with respect to the Irish CervicalCheck claims, based on mutual and/or unilateral mistake;

6.      For costs of suit; and

7.      For such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Homeland demands a trial by jury on all triable issues.

Respectfully submitted this 12th day of October, 2020.

By:  _/s/ Jenna A. Fasone_

John T. Brooks (CA Bar #167793)
Jenna A. Fasone (CA Bar #308886)
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
501 West Broadway, 19th Floor
San Diego, CA 92101
Telephone:  (619) 338-6500
Fax:  (619) 234-3815
jbrooks@sheppardmullin.com
jfasone@sheppardmullin.com
_Admitted Pro Hac Vice_

Joseph R. Little (#784483)
The Little Law Firm
440 Louisiana Street, Suite 900
Houston, Texas 77002
Telephone:  (713) 222-1368
Fax:  (281) 200-0115
jrl@littlelawtexas.com

_Attorneys for Plaintiff Homeland Insurance Company of New York_

SMRH:4851-5634-2990.5

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true copy of this document was served upon counsel of record for all parties who have made an appearance in this case at the addresses indicated by CM/ECF electronic notification on this 12th day of October, 2020. I declare under penalty of perjury that the foregoing is true and correct.


*/s/ Jenna A. Fasone*

SMRH:4851-5634-2990.5