**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| HOMELAND INSURANCE COMPANY OF NEW YORK,<br><br>    Plaintiff,<br><br>v.<br><br>CLINICAL PATHOLOGY LABORATORIES, INC. AND SONIC HEALTHCARE USA, INC.<br><br>    Defendants. | CIVIL ACTION NO.: 1-20-cv-783 |

## <u>DEFENDANT CLINICAL PATHOLOGY LABORATORIES, INC.'S</u>
## <u>FIRST AMENDED COUNTERCLAIM</u>

## CPL'S FIRST AMENDED COUNTERCLAIM

Pursuant to Federal Rules of Civil Procedure 13 and 15(a)(2),[1] Defendant Clinical Pathology Laboratories, Inc. ("CPL"), for its First Amended Counterclaims (the "Counterclaims") against Plaintiff Homeland Insurance Company of New York ("Homeland"), alleges as follows:

## PRELIMINARY STATEMENT

Through its Counterclaims, CPL brings causes of action against Homeland for breach of contract and anticipatory breach of contract, and violations of Texas Insurance Code Chapters 541 and 542.  At its core, CPL alleges that Homeland breached two insurance policies by refusing to cover CPL for certain claims made in Ireland that are covered by those policies.  CPL also alleges that Homeland acted in bad faith and in violation of Texas Insurance Code Chapters 541 and 542 by failing to reasonably handle, investigate, adjust, settle, and pay those claims, and by misrepresenting and/or failing to disclose certain key policy terms and conditions and their import.

The subject policies that Homeland issued to cover CPL—which have policy periods of June 30, 2017 to June 30, 2018—were designed and placed to protect CPL from, among other things, third-party liability claims brought anywhere in the world (the "2017 Policies").  This coverage was sought by CPL because its operations have, at least at times, extended beyond the borders of the United States.

CPL provided such international services from August 2010 to August 2013, for example, when it provided laboratory services in conjunction with the Irish CervicalCheck Program ("ICCP")—a program that was established by the Irish government to screen women for signs of cervical cancer.  As part of the program, the Irish government contracted with private laboratories

---

[1] Rule 15(a)(2) provides that ". . . a party may amend its pleading only with the opposing party's written consent or the court's leave."  Homeland has agreed to the filing of this First Amended Counterclaim and so CPL is not required to file a motion for leave to amend.

like CPL to provide cytology and cancer-screening services (which included reviewing and interpreting cervical slide samples).

In or around early 2018, it came to CPL's attention that claims and lawsuits were being filed by patients who were screened through the ICCP and who later developed cervical cancer. The clinicians for some of these women had apparently been informed, at some point beginning in February 2016, of the results of a re-review of their patient's slides under a quality improvement program. Some slides were alleged, on re-review, to potentially contain abnormal cells that had allegedly not been identified by CPL during its participation in the ICCP between August 2010 and August 2013. Some of those women and/or their families were informed by their clinicians of the results of the re-reviews and ended up suing certain participating laboratories for negligence and other causes of action (the "ICC Claims").

When CPL learned of these suits in 2018 it promptly notified Homeland of those circumstances and/or claims and sought coverage under its 2017 Policies. Homeland, instead of accepting its obligations under the policies, promptly retained insurance coverage counsel and proceeded to engage in a purported claims investigation that lasted over two years. During that time, and despite repeated requests for a coverage determination, Homeland refused to take an official position on coverage for the ICC Claims. Homeland instead flooded CPL and its counsel with unreasonable demands for information that Homeland claimed was required for it to complete its coverage analysis. The reality is that, upon information and belief, Homeland had already made up its mind—it was going to deny coverage—and so it requested extensive information hoping that it could manufacture a basis for a denial.

In July 2020, after two-plus years of purportedly investigating the ICC Claims and soon after an ICC Claim that triggered the policies settled—specifically, the Ms. S Claim[2]—Homeland finally issued a coverage determination.  Not surprisingly, it was a denial.

Homeland's denial was predicated on its contention that CPL misrepresented the extent of its knowledge regarding the ICC Claims before the execution of the 2017 Policies.  Homeland also asserted that CPL's alleged knowledge implicated the 2017 Policies' prior knowledge exclusion and that another entity's alleged notice to its insurer of issues related to the ICCP implicated the 2017 Policies' prior notice exclusion.  Homeland's assertions, however, were predicated on what other insured entities—not CPL—allegedly knew or did.  Homeland ignored and failed to mention the fact that the 2017 Policies contain a condition providing that the knowledge of one insured shall not be imputed to another.

Since July 2020 and the settlement of the Ms. S Claim, CPL has settled certain other ICC Claims.  Specifically, it has settled the Ms. A Claim, Ms. OD Claim, and Ms. CR Claim.  Homeland has refused to cover the Ms. A Claim for the same reasons it has refused to cover the Ms. S Claim.  As of the date of this filing, Homeland has not articulated a coverage position with respect to the Ms. OD and Ms. CR Claims.  Instead, Homeland has filed a declaratory judgment action in this case in which it seeks a declaration that it has no obligation to cover, and therefore Homeland has expressed an intent to deny coverage for, those claims and any other past, present, or future ICC Claims.

Because Homeland has denied coverage for (or has expressed an intent to deny coverage for) those claims, and because Homeland has failed to reasonably handle, investigate, adjust, settle, and pay those claims, CPL brings causes of action against Homeland for breach of contract and

---

[2] The name of the some of the claimants have been abbreviated and details omitted to preserve their privacy.

anticipatory breach of contract, and violations of Texas Insurance Code Chapters 541 and 542. Those causes of action and the bases upon which they are predicated are explained further below.

## THE PARTIES

1.       Counter-Plaintiff CPL is a corporation organized and existing under the laws of Texas, with its principal place of business in Texas.

2.       Counter-Defendant Homeland is a corporation organized and existing under the laws of New York, with its principal place of business in Minnesota.

## JURISDICTION AND VENUE

3.       The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(a). There is complete diversity of citizenship between CPL and Homeland.   The amount in controversy exceeds $2,000,000, exclusive of interest and other costs.

4.       The Court has personal jurisdiction over Homeland as described herein, and venue is proper in this District under 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

**A.       The Irish CervicalCheck Program.**

5.       In January 2007, following the launch of Ireland's "Strategy for Cancer Control," the country's Minister of Health and Children established the Irish National Cancer Screening Service ("NCSS").[3]

6.       The purpose of the NCSS program was and is the prevention, screening, detection, treatment, and management of cancer in Ireland.

7.       In September 2008, the NCSS established the ICCP to provide cervical cancer screening services to women between the ages of twenty-five and sixty-five.

---

[3] On January 1, 2014, the NCSS became the National Screening Service ("NSS"), part of the Health and Wellbeing Division of the Health Service Executive ("HSE"), Ireland's governing health authority.

8.      The goal of the ICCP was and is to reduce the number of women in Ireland who develop cervical cancer.

**B.      CPL is Engaged to Provide Cancer Screening Services for the NCSS.**

9.      CPL is an Austin-based medical laboratory that provides a broad range of services, from cancer screening to facilitating COVID-19 testing.

10.      Between August 2010 and August 2013, CPL provided cervical cancer screening services in conjunction with the ICCP.

**C.      CPL Purchased the Homeland Policies to Cover Certain Risks.**

11.      CPL, like most companies, regularly purchases liability insurance to protect itself from third-party liability risks.  Since CPL is actively engaged in the medical field, it has regularly purchased professional liability policies that are tailored to providers of health and medical services.  Such policies are designed to protect medical providers like CPL from, among other things, malpractice and negligence-type claims made by patients.

12.      Because CPL's operations have, at least at times, extended beyond the borders of the United States (*e.g.*, its work in conjunction with the ICCP), it has endeavored to purchase and secure worldwide liability coverage.   It indeed did so prior to June 30, 2014 and after June 30, 2016.

13.      In that intervening period from June 30, 2014 to June 30, 2016, unbeknownst to CPL, it purchased from Homeland primary and excess-level policies that only covered claims made in the United States, Puerto Rico, and Canada.  The policies issued to cover that period did not cover claims made abroad (*e.g.*, it did not cover claims made in Ireland).

**D.     The Ms. OB Claim.**

14.     On April 7, 2016, a patient who participated in the ICCP and later developed cervical cancer—Ms. OB—served CPL with a lawsuit that was pending in Ireland.

15.     Ms. OB also sued other laboratories.  Her theory was that CPL and the other laboratories negligently failed to detect early signs of her cervical cancer.

16.     That same day, on April 7, 2016, CPL forwarded the Summons associated with the Ms. OB claim to Homeland (although, upon information and belief, Homeland may have already known about the Ms. OB Claim).

17.     In its preliminary coverage analysis for the Ms. OB Claim, Homeland asserted that the claim triggered the 2014-15 policies, that those policies did not provide worldwide coverage, and that Homeland therefore had no obligation to cover the claim.

18.     The Ms. OB claim was subsequently resolved by CPL with no contribution from Homeland.

19.     The Ms. OB Claim did, however, cause CPL to realize that it lacked worldwide coverage from Homeland for the period of June 30, 2014 to June 30, 2016.

20.     CPL's realization caused it to seek to secure worldwide coverage for subsequent policy periods so that CPL would be fully and properly covered for claims made outside the United States (including in Ireland).

**E.     CPL Negotiated with Homeland to Expand Coverage for Certain Specified Risks, Including for Claims Made Outside the U.S.**

21.     During the negotiation and application process for the June 30, 2016 to June 30, 2017 Homeland policy, CPL sought to secure worldwide coverage.  It sought to do so, in part, so that it would be covered for any claims like the Ms. OB Claim that arose in the future.  To be clear, CPL was not aware of any such claims, or of any circumstances that may lead to such

claims, at that time.  Nevertheless, CPL sought to have seamless worldwide coverage to protect the company in the event that such claims or circumstances arose in the future.

22.     Fully understanding and appreciating CPL's motivation for worldwide coverage—indeed, Homeland had corresponded with CPL at-length regarding the OB Claim—Homeland agreed to provide CPL with worldwide coverage.  It did so through its issuance of two policies, a primary policy and an excess policy that covered the period of June 30, 2016 to June 30, 2017 (the "2016 Policies"), and a corresponding Worldwide Territory Endorsement.

23.     Before it agreed to issue the Worldwide Territory Endorsement, Homeland asked CPL whether it was aware of any potential claims, or circumstances that may lead to potential claims, related to its ICCP work.  CPL did not and indeed represented as much in a letter (the "2016 Letter") that preceded the issuance of the 2016 Policies.  The 2016 Letter was *not* attached to either of the 2016 Policies nor was it included as an endorsement.  The 2016 Policies also did not attach any application.

24.     The next year, CPL purchased the 2017 Policies.[4]

25.     The 2017 Policies were issued after a new application process and new and additional negotiations regarding the specific terms, conditions, and endorsements that would be contained within the 2017 Policies.

26.     Put differently, for the issuance of the 2017 Policies, Homeland and CPL did *not* rely on the application and negotiations for the 2016 Policies; rather, they started anew.

27.     And, to be sure, the 2016 Policies and 2017 Policies are *not* identical.

---

[4] The 2017 Policies at issue are Homeland's primary Medical Facilities and Providers Professional Liability Insurance Policy (No. MFL-004062-0617) (the "2017 Primary Policy") and an Excess Medical Facilities Liability Insurance Policy (No. MFX-002013-0617) (the " 2017 Excess Policy,"), which cover Sonic Healthcare Investments, G.P. and several additional named insureds, including CPL, for the policy period of June 30, 2017 to June 30, 2018.   The 2017 Primary Policy has been filed at Dkt. No. 18-1.  The 2017 Excess Policy has been filed at Dkt. No. 18-2.

28.     For example, the 2017 Policies and 2016 Policies do not have identical endorsements.

29.     The 2017 Policies did not attach an application or the 2016 Letter, nor did the 2017 Policies include an endorsement expressly incorporating the 2016 Letter.

30.     The 2017 Policies provide broad coverage for "Loss" and "Defense Expenses" arising out of "Claims" for, among other things, "Professional Services Wrongful Acts" occurring on or after October 1, 2000, provided that the Claim is first made during the policy period or during an extended reporting period of thirty-six months.  *See* Primary Policy, at Declarations, § I(A) (Dkt. 18-1).

31.     The 2017 Policies define "Loss" as, among other things, "settlements . . . an Insured is legally obligated to pay as a result of a Claim."  *See id.* at § II(X) (Dkt. 18-1).

32.     The 2017 Policies define "Defense Expenses" as, among other things, "the reasonable fees of attorneys, experts and consultants and costs and expenses incurred in the investigation, adjustment, defense or appeal of a Claim."  *See id.* at § II(H) (Dkt. 18-1)

33.     Coverage for Defense Expenses do *not* erode the limits of the 2017 Policies (even for coverage provided under the Worldwide Territory Endorsement).

34.     The Policies define "Claim" as "any written notice received by an Insured that any person or entity intends to hold an Insured responsible for a Wrongful Act or an Occurrence." *See id.* at § II(F) (Dkt. 18-1).

35.     The Policies define "Professional Services Wrongful Act" as, among other things, "any actual or alleged act, error or omission . . . in rendering, or failing to render, Medical Services."  *See id.* at § II(LL) (Dkt. 18-1).

36.     The 2017 Primary Policy provides the aforementioned coverage subject to a $1,000,000 per claim limit and a $3,000,000 aggregate limit.   *See* 2017 Primary Policy, at Declarations (Dkt. 18-1)

37.     The 2017 Excess Policy provides the aforementioned coverage subject to a $5,000,000 per claim limit and $5,000,000 aggregate limit.   *See* 2017 Excess Policy, at Declarations (Dkt. 18-2).

38.     CPL has paid the requisite premiums for the 2017 Policies.

**F.     The ICC Claims, CPL's Notice to Homeland, and the Ms. S Claim.**

39.     In or around early 2018, it came to CPL's attention that certain physicians of women who were screened through the ICCP and later developed cervical cancer were informed, at some point after February 2016, of the results of a re-review of their patient's cervical check slides under a quality improvement program.   Some of those physicians chose to share this information with their patients.

40.     Some slides were alleged on re-review to contain abnormal cells that had allegedly not been identified by CPL during its participation in the ICCP between August 2010 and August 2013.  This is typical with this type of screening program.

41.     Some of those women and/or their families brought the ICC Claims, *i.e.*, lawsuits against certain participating laboratories for negligence and other causes of action.

42.     At around this same time, CPL was informed of the fact that four lawsuits pending in Ireland—the Ms. C, Ms. T, Ms. G, and Ms. P lawsuits—involved slides that had allegedly been interpreted by CPL during its participation in the ICCP.   Shortly thereafter, CPL notified Homeland of this situation.

43.     On March 27, 2018, Homeland issued a letter to CPL through which it reserved its right to deny coverage for the Ms. P Claim.

44.     In its March 27, 2018 reservation of rights letter, Homeland requested information through no less than twenty information requests.

45.     For example, in its March 27, 2018 reservation of rights letter, Homeland requested information regarding MedLab Pathology's "bulk claim submission" to its insurer, Vero.

46.     MedLab Pathology is, like CPL, an insured under the 2017 Policies but only for claims made in the United States, Puerto Rico, or Canada.

47.     Homeland asserted in the March 27, 2018 reservation of rights letter that MedLab Pathology's bulk claim submission to Vero regarded, among other patients, Ms. P.

48.     In its March 27, 2018 reservation of rights letter, Homeland also requested information regarding when CPL first learned of the ICC Claims and the potential for the ICC Claims.

49.     In its March 27, 2018 reservation of rights letter, Homeland indicated that it was aware of the fact that other claims like the Ms. P Claim involved CPL; such claims included the Ms. H Claim, Ms. T Claim, and Ms. C Claim (among others).  Homeland requested information regarding those ICC Claims.

50.     Before coverage for the Ms. P claim became necessary, it was settled and another insurer, Vero, contributed toward and covered any contribution required of CPL.   Vero subsequently asserted that it should not have made, and indeed was not required to make, any contribution toward CPL's obligations.  That was because CPL was not covered by Vero.

51.     On May 15, 2018, CPL provided Homeland with notice of dozens of potential ICC Claims.  Specifically, CPL provided Homeland with a list of patients for whom CPL had read

slides under the ICCP and for whom a re-review was conducted pursuant to the quality improvement program.

52.     One of those potential ICC Claims regarded Ms. S.  Others regarded Ms. A, Ms. OD, and Ms. CR.

53.     In February 2012, Ms. S underwent a cervical smear test under the ICCP.  The cervical sample was sent to CPL for review, and CPL issued a cytology report finding no evidence of abnormalities.

54.     On April 23, 2013, Ms. S was diagnosed with invasive cervical cancer.

55.     The slide(s) CPL read for Ms. S were subsequently re-reviewed under the quality improvement program.  It was alleged on re-review that the Ms. S slide(s) CPL had read contained abnormal cells that CPL had not identified in 2012.

56.     On or about August 7, 2018, Ms. S and her partner filed suit against other defendants (*i.e.*, not CPL) in Cause No. 2018/7164P in the High Court of Ireland, seeking personal injury damages for alleged medical negligence.  CPL was not initially named as a defendant in the lawsuit but was added by an amended pleading in May 2019.

**G.     Homeland Retains Coverage Counsel and Conducts a Two-Plus Year "Investigation" of Claims It Immediately Decided to Deny.**

57.     In March 2018, before CPL's May 15, 2018 notice to Homeland, and before Homeland could have possibly conducted a meaningful investigation of the ICC Claims, Homeland retained insurance coverage counsel.

58.     CPL provided Homeland with timely notice of the ICC Claims.

59.     Upon retainer, Homeland's insurance coverage counsel took over Homeland's "investigation" and handling of the ICC Claims

60.     CPL was in fact instructed by this outside counsel not to communicate with Homeland or any of Homeland's claims-handlers regarding the ICC Claims, but only with Homeland's outside counsel.

61.     By retaining coverage counsel before CPL had even provided notice of most of the ICC Claims (and before conducting any meaningful claims investigation), Homeland positioned itself for, and indeed was intent on, denial of the ICC Claims.

62.     Coverage under liability insurance policies like the 2017 Policies is primarily determined by the underlying pleadings and the language of the policies.  Through outside coverage counsel, however, and following CPL's May 15, 2018 notice, rather than inform CPL of its coverage position based on a review of the pleadings and policy, Homeland instead conducted a drawn-out, two-plus-year investigation into the ICC Claims requesting information and materials entirely unrelated to coverage and delaying any meaningful attempt at settlement, only to ultimately deny coverage based on information Homeland had been sitting on for years. Homeland further failed to pay defense costs associated with the ICC Claims during that period.

63.     Specifically, Homeland sent information requests to CPL including on April 20, 2016, February 21, 2018, February 2, 2018, March 27, 2018, March 29, 2018, May 24, 2018, May 29, 2018, June 11, 2018, July 24, 2018, August 9, 2018, September 19, 2018, October 12, 2018, November 6, 2018, November 26, 2018, February 4, 2019, May 6, 2019, May 31, 2019, August 12, 2019, October 14, 2019, November 11, 2019, January 9, 2020, and May 26, 2020.  These requests largely asked for information like internal board meeting minutes, confidential and court-sealed personal health and other information of cervical cancer patients and their cases, contracts between CPL and foreign insureds not parties to these claims, documents and knowledge in the possession of Aon (the broker), internal employment documents of CPL, reasons past employees of CPL had

left the laboratory, knowledge of and/or notice by any of the other insured entities,[5] and other documents and correspondence entirely unrelated to a coverage analysis under Texas law.  In other words, Homeland requested information unnecessary to a determination of coverage within the terms of the 2017 Policies and the allegations in the underlying complaints of the ICC Claims.

64.     In response to these information requests, CPL and/or its broker provided continual updates to Homeland regarding the status of the ICC Claims (including the Ms. S Claim) and provided information and materials responsive to certain of Homeland's requests, to the extent reasonably possible, including via updates on April 21, 2018, May 30, 2018, July 18, 2018, December 24, 2018, February 20, 2019, March 12, 2019, March 15, 2019, and April 17, 2019, and May 1, 2019.  In most (if not all) of those updates, CPL demanded that Homeland make a coverage determination with respect to the ICC Claims, broadly, and the specific ICC Claims at-issue (*e.g.*, the Ms. S Claim).  Homeland refused to do so.

65.     Homeland's "investigation" was *not* conducted in good faith but was rather a tactic to delay final coverage determinations for the Ms. S claim and other ICC Claims for over two years, all the while having no intention of ever covering CPL for any of the ICC Claims.

66.     Upon information and belief, Homeland's tactics may have been driven not by what the 2017 Policies cover and do not cover, or by its obligations as an insurer under Texas law, but by its desire to limit its exposure and lower its bottom line.

67.     Indeed, Homeland no longer issues medical liability policies like the 2017 Policies. Upon information and belief, Homeland stopped issuing such policies because they proved to be

---

[5] Homeland requested (and continues to request) information from CPL regarding the knowledge of any of CPL's affiliate entities regarding ICC Claims even though the policy explicitly provides that "no knowledge or information possessed by any Insured shall be imputed to any other Insured."

less profitable than other lines of insurance.  By putting its own business considerations ahead of its insured's, Homeland necessarily acted in bad faith and in violation of the Texas Insurance Code.

**H.      Homeland Denies CPL's Request for Coverage for the Ms. S Litigation Based on Information Homeland Possessed for More Than Two Years.**

68.      On May 1, 2019, CPL requested that Homeland participate in and/or contribute toward the defense for the Ms. S claim, but Homeland refused to do so.  CPL therefore undertook its own defense but yet continued to provide Homeland with frequent litigation updates, including updates on August 5, 2019, September 18, 2019, and October 2, 2019.  CPL also demanded a final coverage determination, but Homeland refused to provide one.

69.      On October 13, 2019, CPL invited Homeland to participate in a mediation in hopes of resolving the Ms. S Claim.  Homeland did not do so.

70.      Prior to the mediation, on October 17, 2019, CPL requested Homeland's consent to settle the Ms. S Claim for an amount within a specified range.  Homeland agreed that if CPL settled the Ms. S Claim within that range, Homeland would not raise lack of consent as a coverage defense.

71.      On October 30, 2019, CPL settled the Ms. S Claim within the agreed-upon range and for an amount in excess of $75,000.

72.      CPL promptly provided Homeland with notice of the settlement on November 1, 2019 and requested coverage.  Homeland refused to cover the settlement, asserting that the Policies are for reimbursement only.

73.      After the Ms. S Claim was funded, CPL presented its itemized claim for reimbursement to Homeland by letter dated May 13, 2020.  CPL demanded reimbursement of an amount in excess of $2,000,000.

74.      On or about July 10, 2020, Homeland denied CPL's claim for reimbursement.

75.    Homeland based its denial on the grounds set forth in Homeland's Complaint for Declaratory Relief at paragraph 155.  *See* Pl.'s Compl. ¶ 155.  Homeland's grounds for denial were not supported by the information obtained through Homeland's two-plus year "investigation," but rather on information Homeland possessed years earlier.  Thus, Homeland's investigation of the claim was nothing more than a delay of a final coverage determination for ICC Claims that Homeland never intended to cover, despite that one of the reasons CPL sought worldwide coverage was to protect against the risk of claims like the ICC Claims.

**I.    The Ms. A, Ms. OD, and Ms. CR Claims, and the Other ICC Claims.**

76.    Other ICC Claims have settled beyond the Ms. S Claim.  Such include the Ms. A, Ms. O, and Ms. CR Claims.  Homeland has refused to cover those claims for the same reasons it refuses to cover the Ms. S Claim.

77.    Homeland has not agreed to cover *any* costs associated with *any* of the ICC Claims.

78.    Homeland has instead filed a declaratory judgment action in this case in which it seeks a declaration that it has no obligation to cover, and therefore Homeland has expressed an intent to deny coverage for, any past, present, or future ICC Claims.

79.    By refusing to cover the ICC Claims, Homeland has materially breached its contractual obligations under the 2017 Policies and/or anticipatorily breached its obligations under those policies.  Furthermore, Homeland—by way of, among other things, its two-plus year "investigation" into coverage, its myriad unreasonable information requests, its years-long claims-handling delays, its misrepresentation of and/or failure to consider certain key policy terms,  and its decision at the outset to deny coverage—has  engaged in bad faith claims-handling, investigating, settlement, and payment practices under Texas law.  As a direct and proximate

result, CPL has paid and incurred more than $2,000,000 that Homeland owes CPL under the 2017 Policies.

## CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT AND ANTICIPATORY BREACH OF CONTRACT

80. The foregoing allegations are incorporated herein by reference.

81. The Policies are valid and enforceable contracts.

82. CPL is an insured under the 2017 Policies and therefore has standing to assert claims under the 2017 Policies.

83. CPL has satisfied all conditions precedent under the 2017 Policies.

84. The terms of the 2017 Policies unambiguously provide coverage for the costs associated with the Ms. S Claim, Ms. A Claim, Ms. OD Claim, Ms. CR Claim, and all other past, present, and future ICC Claims that trigger the 2017 Policies.

85. Alternatively, the terms of the Policies are ambiguous with respect to coverage and should therefore be construed in favor of CPL, in accord with Texas law.

86. Homeland has breached the 2017 Policies and/or has expressly indicated its intent to breach the 2017 Policies by refusing to reimburse and/or by expressly indicating its intent to refuse to reimburse CPL for the costs associated with the Ms. S Claim, Ms. A Claim, Ms. OD Claim, Ms. CR Claim, and all other past, present, and future ICC Claims that trigger the 2017 Policies. Those claims are covered by the 2017 Policies, but Homeland has refused to cover them and instead has filed a lawsuit in which it argues that it should never have to cover any of the costs associated with the ICC Claims.

87. Homeland has breached the 2017 Policies and/or has anticipatorily breached the 2017 Policies.

88.     Homeland's breaches have caused CPL substantial damages in excess of $2,000,000.

### COUNT II – CHAPTER 542 OF THE TEXAS INSURANCE CODE

89.     The foregoing allegations are incorporated herein by reference.

90.     CPL has made a claim under the 2017 Policies for coverage for the Ms. S Claim, Ms. A Claim, Ms. OD Claim, Ms. CR Claim, and all other past, present, and future ICC Claims that trigger the 2017 Policies.

91.     CPL has satisfied all conditions precedent under the Policies.

92.     Homeland has engaged in conduct that constitutes a violation of Chapter 542 of the Texas Insurance Code by delaying its handling and investigation of the claim and/or failing to timely pay CPL's outstanding defense and indemnity costs and expenses that are associated with the Ms. S Claim, Ms. A Claim, Ms. OD Claim, Ms. CR Claim, and all other past, present, and future ICC Claims.

93.     Consequently, CPL is entitled to the damages set forth in § 542.060 of the Texas Insurance Code.  Specifically, in addition to the amount of CPL's costs associated with those claims, CPL is owed interest at the rate of eighteen percent (18%) per annum as well as any and all other relief provided by the statute.

### COUNT III – CHAPTER 541 OF THE TEXAS INSURANCE CODE

94.     The foregoing allegations are incorporated herein by reference

95.     Homeland has engaged in unfair or deceptive acts or practices as defined by Section 541.060 of the Texas Insurance Code.

96.     Homeland misrepresented or omitted material facts and/or policy provisions relating to coverage for the ICC Claims in violation of Section 541.060(a)(1) and 541.061 of the

Texas Insurance Code by relying on the knowledge of other insureds as a basis for denying coverage for the ICC Claims when the 2017 Policies expressly provide that "no knowledge or information possessed by any Insured shall be imputed to any other Insured."

97.     Homeland violated Section 541.060(a)(2) of the Texas Insurance Code by failing to attempt in good faith to effectuate a prompt, fair and equitable settlement of the ICC Claims and by instead deciding to deny coverage of the ICC Claims immediately after (if not before) it received notice of the potential for those claims and long before Homeland had an opportunity to conduct a real and meaningful investigation of those claims.

98.     Homeland violated Section 541.060(a)(2) of the Texas Insurance Code by failing to attempt in good faith to effectuate a prompt, fair and equitable settlement of the ICC Claims and by instead engaging in a two-plus year "investigation" that consisted of dozens (if not hundreds) of unreasonable and harassing information requests that were aimed at fabricating bases for denying coverage.

99.     Homeland violated Section 541.060(a)(2) of the Texas Insurance Code by failing to attempt in good faith to effectuate a prompt, fair and equitable settlement of the ICC Claims and by refusing to issue a final coverage determination regarding the Ms. S Claim and other ICC Claims within a two-plus year period and by otherwise delaying its coverage determination process.

100.     Homeland violated Section 541.060(a)(3) of the Texas Insurance Code by failing to provide CPL with a prompt and reasonable explanation of whether it was denying coverage for the ICC Claims and upon what grounds its denial is based and by instead waiting over two years to issue a coverage determination when CPL requested such a determination on several occasions.

101.   Homeland violated Section 541.060(a)(4) of the Texas Insurance Code by failing within a reasonable time to affirm or deny coverage of the ICC Claims and by instead waiting over two years to issue a coverage determination when CPL had requested a determination on several occasions.

102.   Homeland violated Section 541.060(a)(5) of the Texas Insurance Code by suggesting that other insurers may be responsible for some or all of the costs associated with the ICC Claims.

103.   Homeland violated Section 541.060(a)(7) of the Texas Insurance Code by refusing to cover any of the ICC Claims without conducting a reasonable investigation and by instead engaging in a two-plus year "investigation" that consisted of dozens (if not hundreds) of unreasonable and harassing requests that were aimed at fabricating bases for denying coverage.

104.   As a result of Homeland's violations of Chapter 541 of the Texas Insurance Code, CPL has sustained substantial damages, including the denial of covered benefits and payments due under the 2017 Policies.

105.   Homeland, either directly or through its agents, knowingly committed the violations of Section 541.060 of the Texas Insurance Code referenced above.  CPL therefore seeks, in addition to actual damages, court costs, and attorneys' fees, an amount not to exceed three times CPL's actual damages, in accordance with the Texas Insurance Code.

### COUNT IV – ATTORNEYS' FEES

106.   The foregoing allegations are incorporated herein by reference.

107.   Due to the actions of Homeland, CPL has been required to retain the services of the law firms of Haynes and Boone, LLP and Germer Beaman & Brown PLLC.  CPL has agreed to pay those firms a reasonable fee for their services necessarily rendered and to be rendered in this

action.  Pursuant to Section 38.001 of the Texas Civil Practice & Remedies Code and/or Chapters 542 and 541 of the Texas Insurance Code, CPL is entitled to an award of its reasonable attorneys' fees against Homeland in an amount to be established at trial.

## JURY DEMAND

CPL demands a jury trial on all issues contained in this Counterclaim that are so triable.

## COUNTERCLAIM PRAYER

WHEREFORE, Counter-Plaintiff CPL requests the following relief against Counter-Defendant Homeland:

(1)     Judgment awarding CPL all damages caused by Homeland's breaches and/or anticipatory breaches of the Policies;

(2)     Judgment awarding CPL all damages sustained as a result of Homeland's violations of Chapter 542 of the Texas Insurance Code (including but not limited to 18% interest);

(3)     Judgment awarding CPL all damages sustained as a result of Homeland's violations of Chapter 541 of the Texas Insurance Code (including but not limited to treble damages);

(4)     Judgment awarding CPL all reasonable and necessary attorneys' fees incurred in this matter under Chapter 38 of the Texas Civil Practice & Remedies Code and Chapters 541 and 542 of the Texas Insurance Code;

(5)     Judgment awarding CPL pre-judgment and post-judgment interest in the amount allowed by law;

(6)     Judgment awarding CPL all costs of court; and

(7)     Such other and further relief to which CPL may be justly entitled.

Dated:  June 18, 2021

Respectfully submitted,

By: /s/ Ernest Martin, Jr.
   Ernest Martin, Jr. [Bar No. 13063300]
   Greg Van Houten*
   HAYNES AND BOONE, LLP
   2323 Victory Avenue, Suite 700
   Dallas, TX 75219
   214-651-5651 Direct
   214-651-5000 Main
   214-200-0519 Fax
   ernest.martin@haynesboone.com
   greg.vanhouten@haynesboone.com
   *Admitted *Pro Hac Vice*

    -and-

   Mark T. Beaman [Bar No. 01955700]
   Ryan Bueche [Bar. No. 24064970]
   GERMER BEAMAN & BROWN PLLC
   One Barton Skyway
   1501 S Mopac Expy Suite A400
   Austin, TX 78746
   512-482-3504 Direct
   512-472-0288 Main
   512-472-0721 Fax
   mbeaman@germer-austin.com

   **ATTORNEYS FOR
   DEFENDANT/COUNTER-PLAINTIFF
   CLINICAL PATHOLOGY
   LABORATORIES, INC.**

### CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of June 2021, a copy of the foregoing was electronically filed and served on all known counsel of record pursuant to the Federal Rules of Civil Procedure.


/s/ *Ernest Martin, Jr.*
Ernest Martin, Jr.