**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| HOMELAND INSURANCE COMPANY OF NEW YORK, | |
| Plaintiff, | CIVIL ACTION NO. 1:20-cv-783 |
| v. | |
| CLINICAL PATHOLOGY LABORATORIES, INC. AND SONIC HEALTHCARE USA, INC. | |
| Defendants. | |

## HOMELAND INSURANCE COMPANY OF NEW YORK'S ANSWER AND AFFIRMATIVE DEFENSES TO DEFENDANT AND COUNTERCLAIMANT CLINICAL PATHOLOGY LABORATORIES, INC.'S AMENDED COUNTERCLAIMS

Plaintiff and Counterclaim Defendant Homeland Insurance Company of New York ("Homeland"), by and through counsel, hereby submits its answer and defenses to the Amended Counterclaims [Doc. 46] of Defendant and Counterclaimant, Clinical Pathology Laboratories, Inc. ("CPL"), states as follows:

## ANSWER TO AMENDED COUNTERCLAIM

### PRELIMINARY STATEMENT

Through its Counterclaims, CPL brings causes of action against Homeland for breach of contract and anticipatory breach of contract, and violations of Texas Insurance Code Chapters 541 and 542. At its core, CPL alleges that Homeland breached two insurance policies by refusing to cover CPL for certain claims made in Ireland that are covered by those policies. CPL also alleges that Homeland acted in bad faith and in violation of Texas Insurance Code Chapters 541 and 542 by failing to reasonably handle, investigate, adjust, settle, and pay those claims, and by misrepresenting and/or failing to disclose certain key

policy terms and conditions and their import.

**ANSWER:** Admitted that CPL brings the alleged causes of action against Homeland. Denied that CPL is entitled to any of the relief it seeks. Except as expressly admitted, Homeland denies the allegations set forth in this preliminary paragraph.

The subject policies that Homeland issued to cover CPL—which have policy periods of June 30, 2017 to June 30, 2018—were designed and placed to protect CPL from, among other things, third-party liability claims brought anywhere in the world (the "2017 Policies"). This coverage was sought by CPL because its operations have, at least at times, extended beyond the borders of the United States.

**ANSWER:** Admitted that Homeland issued a primary and excess policy for the period of June 30, 2017 to June 30, 2018 (the "2017 Policies"). Also admitted that part of this dispute arises out of insurance CPL sought from Homeland with respect to third-party liability claims brought outside the United States of America, its territories or possessions, Puerto Rico and Canada. Except as expressly admitted, Homeland denies the allegations set forth in this preliminary paragraph.

CPL provided such international services from August 2010 to August 2013, for example, when it provided laboratory services in conjunction with the Irish CervicalCheck Program ("ICCP")—a program that was established by the Irish government to screen women for signs of cervical cancer. As part of the program, the Irish government contracted with private laboratories like CPL to provide cytology and cancer-screening services (which included reviewing and interpreting cervical slide samples).

**ANSWER:** Upon information and belief, admitted that CPL was engaged in certain international services from August 2010 to August 2013, including its involvement in the Irish CervicalCheck Program ("ICCP"). Further admitted that the ICCP was developed by the Irish government to screen women for cervical cancer, and that the Irish government

contracted with CPL (and its sister entities) as part of the ICCP. Except as expressly admitted, Homeland denies the allegations set forth in this preliminary paragraph.

In or around early 2018, it came to CPL's attention that claims and lawsuits were being filed by patients who were screened through the ICCP and who later developed cervical cancer. The clinicians for some of these women had apparently been informed, at some point beginning in February 2016, of the results of a re-review of their patient's slides under a quality improvement program. Some slides were alleged, on re-review, to potentially contain abnormal cells that had allegedly not been identified by CPL during its participation in the ICCP between August 2010 and August 2013. Some of those women and/or their families were informed by their clinicians of the results of the re-reviews and ended up suing certain participating laboratories for negligence and other causes of action (the "ICC Claims").

**ANSWER:** Upon information and belief, admitted that in 2018, CPL was aware that claims and lawsuits were being filed by patients who were screened through the ICCP and later developed cervical cancer. Denied that this was the first time CPL was on notice of, aware of, or otherwise had constructive knowledge of these claims and lawsuits, and/or the facts and circumstances that could give rise to the same.

When CPL learned of these suits in 2018 it promptly notified Homeland of those circumstances and/or claims and sought coverage under its 2017 Policies. Homeland, instead of accepting its obligations under the policies, promptly retained insurance coverage counsel and proceeded to engage in a purported claims investigation that lasted over two years. During that time, and despite repeated requests for a coverage determination, Homeland refused to take an official position on coverage for the ICC Claims. Homeland instead flooded CPL and its counsel with unreasonable demands for information that Homeland claimed was required for it to complete its coverage analysis. The reality is that, upon

information and belief, Homeland had already made up its mind—it was going to deny coverage—and so it requested extensive information hoping that it could manufacture a basis for a denial.

**ANSWER:** Admitted that CPL tendered certain ICC claims to Homeland for coverage, and that Homeland thereafter engaged in a reasonable coverage investigation. Except as expressly admitted, Homeland denies the allegations set forth in this preliminary paragraph.


In July 2020, after two-plus years of purportedly investigating the ICC Claims and soon after an ICC Claim that triggered the policies settled—specifically, the Ms. S Claim—Homeland finally issued a coverage determination. Not surprisingly, it was a denial.

**ANSWER:** Admitted that Homeland appropriately denied the Ms. S claim on July 10, 2020, based on the information known to date. Except as expressly admitted, Homeland denies the allegations set forth in this preliminary paragraph.


Homeland's denial was predicated on its contention that CPL misrepresented the extent of its knowledge regarding the ICC Claims before the execution of the 2017 Policies. Homeland also asserted that CPL's alleged knowledge implicated the 2017 Policies' prior knowledge exclusion and that another entity's alleged notice to its insurer of issues related to the ICCP implicated the 2017 Policies' prior notice exclusion. Homeland's assertions, however, were predicated on what other insured entities—not CPL—allegedly knew or did. Homeland ignored and failed to mention the fact that the 2017 Policies contain a condition providing that the knowledge of one insured shall not be imputed to another.

**ANSWER:** Admitted that Homeland's coverage position was based, in part, on CPL misstating the extent of its knowledge of the potential for additional claims against it, including the ICC claims, as well as the efforts CPL reportedly undertook to conduct a diligent inquiry into the same. Homeland denies that such misstatements were the sole basis for Homeland's appropriate denial of coverage for the Ms. S claim. Except as expressly

admitted, Homeland denies the allegations set forth in this preliminary paragraph.

Since July 2020 and the settlement of the Ms. S Claim, CPL has settled certain other ICC Claims. Specifically, it has settled the Ms. A Claim, Ms. OD Claim, and Ms. CR Claim. Homeland has refused to cover the Ms. A Claim for the same reasons it has refused to cover the Ms. S Claim. As of the date of this filing, Homeland has not articulated a coverage position with respect to the Ms. OD and Ms. CR Claims. Instead, Homeland has filed a declaratory judgment action in this case in which it seeks a declaration that it has no obligation to cover, and therefore Homeland has expressed an intent to deny coverage for, those claims and any other past, present, or future ICC Claims.

**ANSWER:** Upon information and belief, admitted that CPL has participated in settlements of other ICC claims besides the Ms. S claim. Homeland further admits that in this action, Homeland seeks, among other things, a judicial declaration regarding the extent of its coverage obligations (if any) regarding the ICC claims. Except as expressly admitted, Homeland denies the allegations set forth in this preliminary paragraph.

Because Homeland has denied coverage for (or has expressed an intent to deny coverage for) those claims, and because Homeland has failed to reasonably handle, investigate, adjust, settle, and pay those claims, CPL brings causes of action against Homeland for breach of contract and anticipatory breach of contract, and violations of Texas Insurance Code Chapters 541 and 542. Those causes of action and the bases upon which they are predicated are explained further below.

**ANSWER:** Admitted that CPL brings the alleged causes of action against Homeland. Denied that CPL is entitled to any of the relief it seeks. Except as expressly admitted, Homeland denies the allegations set forth in this preliminary paragraph.

## THE PARTIES

1.      Counter-Plaintiff CPL is a corporation organized and existing under the laws of

Texas, with its principal place of business in Texas.

**ANSWER:** Upon information and belief, admitted.

2.      Counter-Defendant Homeland is a corporation organized and existing under the laws of New York, with its principal place of business in Minnesota.

**ANSWER:** Admitted.

<u>**JURISDICTION AND VENUE**</u>

3.      The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(a). There is complete diversity of citizenship between CPL and Homeland. The amount in controversy exceeds $2,000,000, exclusive of interest and other costs.

**ANSWER:** Admitted.

4.      The Court has personal jurisdiction over Homeland as described herein, and venue is proper in this District under 28 U.S.C. § 1391.

**ANSWER:** Admitted that the Court has personal jurisdiction over Homeland and venue is proper in this District. Except as expressly admitted, Homeland denies the allegations of paragraph 4.

<u>**FACTUAL BACKGROUND**</u>

A.      **The Irish CervicalCheck Program.**

5.      In January 2007, following the launch of Ireland's "Strategy for Cancer Control," the country's Minister of Health and Children established the Irish National Cancer Screening Service ("NCSS").[1]

---

[1] On January 1, 2014, the NCSS became the National Screening Service ("NSS"), part of the Health and Wellbeing Division of the Health Service Executive ("HSE"), Ireland's governing health authority.

**ANSWER:** Upon information and belief, admitted.

6. The purpose of the NCSS program was and is the prevention, screening, detection, treatment, and management of cancer in Ireland.

**ANSWER:** Upon information and belief, admitted.

7. In September 2008, the NCSS established the ICCP to provide cervical cancer screening services to women between the ages of twenty-five and sixty-five.

**ANSWER:** Upon information and belief, admitted.

8. The goal of the ICCP was and is to reduce the number of women in Ireland who develop cervical cancer.

**ANSWER:** Upon information and belief, admitted.

**B.      CPL is Engaged to Provide Cancer Screening Services for the NCSS.**

9. CPL is an Austin-based medical laboratory that provides a broad range of services, from cancer screening to facilitating COVID-19 testing.

**ANSWER:** Homeland is without sufficient information to form a belief as to the veracity of the allegations contained in paragraph 9.

10. Between August 2010 and August 2013, CPL provided cervical cancer screening services in conjunction with the ICCP.

**ANSWER:** Denied as phrased. Upon information and belief, the NCSS entered into a contract with Sonic Healthcare (Ireland) Limited for the supply of cervical cytology laboratory (liquid based cytology) screening services (the "NCSS Contract"). CPL was

identified in the NCSS Contract under the "Laboratory(ies)" schedule.

**C.     CPL Purchased the Homeland Policies to Cover Certain Risks.**

11.     CPL, like most companies, regularly purchases liability insurance to protect itself from third-party liability risks.  Since CPL is actively engaged in the medical field, it has regularly purchased professional liability policies that are tailored to providers of health and medical services.  Such policies are designed to protect medical providers like CPL from, among other things, malpractice and negligence-type claims made by patients.

**ANSWER:**  Homeland is without sufficient information to form a belief as to the veracity of the allegations contained in paragraph 11.

12.     Because CPL's operations have, at least at times, extended beyond the borders of the United States (*e.g.*, its work in conjunction with the ICCP), it has endeavored to purchase and secure worldwide liability coverage. It indeed did so prior to June 30, 2014 and after June 30, 2016.

**ANSWER:**  Homeland is without sufficient information to form a belief as to the veracity of the allegations contained in paragraph 12.

13.     In that intervening period from June 30, 2014 to June 30, 2016, unbeknownst to CPL, it purchased from Homeland primary and excess-level policies that only covered claims made in the United States, Puerto Rico, and Canada. The policies issued to cover that period did not cover claims made abroad (*e.g.*, it did not cover claims made in Ireland).

**ANSWER:**  Admitted that Homeland issued primary and excess policies to its insureds, which included CPL, for the time periods from June 30, 2014 to June 30, 2016.  Further

admitted that those policies covered certain claims against the insureds, but only if made in the U.S., including its territories or possessions, Puerto Rico, or Canada. Also admitted that those policies did not cover claims made anywhere else, including Ireland. Except as expressly admitted, Homeland denies the allegations set forth in paragraph 13.

**D.   The Ms. OB Claim.**

14.     On April 7, 2016, a patient who participated in the ICCP and later developed cervical cancer—Ms. OB—served CPL with a lawsuit that was pending in Ireland.

**ANSWER:** Upon information and belief, CPL was served with a copy of a lawsuit (filed in Ireland) by Ms. OB. Denied that this was the first time CPL became aware of the Ms. OB claim. Except as expressly admitted, Homeland denies the allegations set forth in paragraph 14.

15.     Ms. OB also sued other laboratories. Her theory was that CPL and the other laboratories negligently failed to detect early signs of her cervical cancer.

**ANSWER:** Upon information and belief, Ms. OB named several entities as defendants in her lawsuit, including CPL, based on the alleged misreading of several of her slides prior to her cancer diagnosis. Except as expressly admitted, Homeland denies the allegations set forth in paragraph 15.

16.     That same day, on April 7, 2016, CPL forwarded the Summons associated with the Ms. OB claim to Homeland (although, upon information and belief, Homeland may have already known about the Ms. OB Claim).

**ANSWER:** Admitted that in April 2016, Homeland received a copy of Ms. OB's lawsuit. Also admitted that in or around September 2014, Defendants' broker notified Homeland of the potential suit to be filed related to the Ms. OB claim. Except as expressly admitted,

Homeland denies the allegations set forth in paragraph 16.

17.     In its preliminary coverage analysis for the Ms. OB Claim, Homeland asserted that the claim triggered the 2014-15 policies, that those policies did not provide worldwide coverage, and that Homeland therefore had no obligation to cover the claim.

**ANSWER:**  Admitted that in or around July 2015, Homeland provided a preliminary analysis of coverage for the Ms. OB claim reserving rights under the applicable 2014 policy. Among other things, Homeland notified CPL that General Condition (E) Territory limited coverage to a claim or suit made against an insured in the U.S., its territories, Puerto Rico, or Canada.  But because Ms. OB's solicitors had not yet provided written notice of an intent to hold CPL liable, no "Claim" had yet been technically made for which the 2014 Homeland policy could respond.  Until such time as a claim or suit was filed in the United States, there was nothing for Homeland to do.  Except as expressly admitted, Homeland denies the allegations set forth in paragraph 17.

18.     The Ms. OB claim was subsequently resolved by CPL with no contribution from Homeland.

**ANSWER:**  Upon information and belief, admitted that the Ms. OB claim was resolved. Further admitted that Homeland closed its file for the Ms. OB claim after receiving a letter sent on behalf of all Sonic entities confirming that those entities would not be looking to Homeland for coverage with respect to the Ms. OB claim.  Except as expressly admitted, Homeland denies the allegations set forth in paragraph 18.

19.     The Ms. OB Claim did, however, cause CPL to realize that it lacked worldwide coverage from Homeland for the period of June 30, 2014 to June 30, 2016.

**ANSWER:** Homeland is without sufficient information to form a belief as to the veracity of the allegations contained in paragraph 19.

20.     CPL's realization caused it to seek to secure worldwide coverage for subsequent policy periods so that CPL would be fully and properly covered for claims made outside the United States (including in Ireland).

**ANSWER:**  Admitted that after discussing the Ms. OB claim with CPL's broker, that broker—on behalf of Defendants, MedLab, and Sonic Ireland, and at the direction of Sonic—approached Homeland seeking to expand coverage to: (1) include claims made outside the U.S. against existing U.S. insureds (i.e., CPL and Sonic USA), and (2) include MedLab and Sonic Ireland as additional named insureds limited to coverage for cervical cytology screening services provided under the Irish contract from August 2010 to June 2013 for claims made in the U.S.  Except as expressly admitted, Homeland denies the allegations set forth in paragraph 20.

**E.     CPL Negotiated with Homeland to Expand Coverage for Certain Specified Risks, Including for Claims Made Outside the U.S.**

21.     During the negotiation and application process for the June 30, 2016 to June 30, 2017 Homeland policy, CPL sought to secure worldwide coverage. It sought to do so, in part, so that it would be covered for any claims like the Ms. OB Claim that arose in the future. To be clear, CPL was not aware of any such claims, or of any circumstances that may lead to such claims, at that time. Nevertheless, CPL sought to have seamless worldwide coverage to protect the company in the event that such claims or circumstances arose in the future.

**ANSWER:**  Admitted that after discussing the Ms. OB claim with CPL's broker, that

broker—on behalf of Defendants, MedLab, and Sonic Ireland, and at the direction of Sonic—approached Homeland seeking to expand coverage to: (1) include claims made outside the U.S. against existing U.S. insureds (i.e., CPL and Sonic USA), and (2) include MedLab and Sonic Ireland as additional named insureds limited to coverage for cervical cytology screening services provided under the Irish contract from August 2010 to June 2013 for claims made in the U.S. Upon information and belief, further admitted that Sonic insisted on coverage for Sonic Ireland and MedLab for liability these entities might face in the United States in connection with work performed by CPL in Texas related to the Irish contract. Sonic considered any refusal to add MedLab or Sonic Ireland to the policy as a "deal breaker." Except as expressly admitted, Homeland denies the allegations set forth in paragraph 21.

22. Fully understanding and appreciating CPL's motivation for worldwide coverage—indeed, Homeland had corresponded with CPL at-length regarding the OB Claim—Homeland agreed to provide CPL with worldwide coverage. It did so through its issuance of two policies, a primary policy and an excess policy that covered the period of June 30, 2016 to June 30, 2017 (the "2016 Policies"), and a corresponding Worldwide Territory Endorsement.

**ANSWER:** Admitted that Homeland agreed to the requested expansion of coverage, beginning with the June 30, 2016 to June 30, 2017 policy period, conditioned upon the veracity of the following warranties set forth on behalf of CPL, Sonic USA, MedLab, and Sonic Ireland, in a letter dated July 27, 2016, provided on CPL letterhead by CPL's then-President and Director, and Sonic USA's then-Chief Executive Officer and Director, Stephen R. Shumpert (the "Warranty Letter"):

> The undersigned [Stephen R. Shumpert], on behalf of Sonic and any person proposed for coverage (the insureds) does hereby represent to OneBeacon Insurance and its writing company [Homeland] that:

> The insureds, after diligent inquiry, are not aware of any claims against the insured(s) or any fact, circumstance, situation, transaction, event, act, error, or omission that may give rise to a claim against the insured(s) Sonic Healthcare (Ireland) Limited, Medlab Pathology, and CPL of Austin as respect the cervical cytology laboratory screening services conducted between 8/1/2010 to 6/30/2013 and all claims and facts, circumstances, situations, transactions, events, acts, errors, or omissions against the insured(s) that may result in a claim have been reported to prior insurance carrier(s).
>
> OneBeacon Insurance and its writing company will be issuing its policy in reliance upon the conditions and statements made in this letter and the application both of which will be deemed to be a part of the policy.

Further admitted that in reliance on the truth of the warranties in the July 27, 2016 Warranty Letter, which were explicitly made on behalf of the insureds proposed for coverage, including defendants CPL and Sonic USA, as well as MedLab and Sonic Ireland, Homeland added the Worldwide Territory Endorsement (No. 13) and the Additional Named Insured Endorsement (No. 24) to the 2016 policies, which respectively provided coverage for certain claims made outside of the United States to entities domiciled in the United States (i.e., Sonic USA and CPL), and coverage for Sonic Ireland and MedLab for cervical cytology screening services provided under the Irish contract from August 2010 to June 2013 for claims made in the U.S. Also admitted that, as expressly stated in the Warranty Letter, that Letter, including all conditions and statements made therein, were agreed to be a part of the policy. Except as expressly admitted, Homeland denies the allegations set forth in paragraph 22.

23. Before it agreed to issue the Worldwide Territory Endorsement, Homeland asked CPL whether it was aware of any potential claims, or circumstances that may lead to potential claims, related to its ICCP work. CPL did not and indeed represented as much in a letter (the "2016 Letter") that preceded the issuance of the 2016 Policies. The 2016 Letter was *not* attached to either of the 2016 Policies nor was it included as an endorsement. The 2016 Policies also did not attach any application.

**ANSWER:** Admitted that Homeland issuing the expanded coverage based on the veracity of the warranties set forth in the Warranty Letter (as outlined above). Except as expressly admitted, Homeland denies the allegations set forth in paragraph 23.

24.     The next year, CPL purchased the 2017 Policies.[2]

**ANSWER:** Admitted that the 2017 Policies were both renewals of the corresponding policies for the prior policy year incorporating the same terms and conditions as the 2016 Policies—including the representations in the July 27, 2016 Warranty Letter on which Homeland had relied and continued to rely. Except as expressly admitted, Homeland denies the allegations set forth in paragraph 24.

25.     The 2017 Policies were issued after a new application process and new and additional negotiations regarding the specific terms, conditions, and endorsements that would be contained within the 2017 Policies.

**ANSWER:** Admitted that the 2017 Policies were both renewals of the corresponding policies for the prior policy year incorporating the same terms and conditions as the 2016 Policies—including the representations in the July 27, 2016 Warranty Letter on which Homeland had relied and continued to rely. Further admitted that during the renewal process, Homeland and CPL discussed other terms, conditions, and/or endorsements to potentially be incorporated into the 2017 Policies. Denied that any such discussions negated the incorporation of the 2016 Policies' terms and conditions. Except as expressly admitted, Homeland denies the allegations set forth in paragraph 25.

---

[2] The 2017 Policies at issue are Homeland's primary Medical Facilities and Providers Professional Liability Insurance Policy (No. MFL-004062-0617) (the "2017 Primary Policy") and an Excess Medical Facilities Liability Insurance Policy (No. MFX-002013-0617) (the " 2017 Excess Policy,") which cover Sonic Healthcare Investments, G.P. and several additional named insureds, including CPL, for the policy period of June 30, 2017 to June 30, 2018. The 2017 Primary Policy has been filed at Dkt. No. 18-1. The 2017 Excess Policy has been filed at Dkt. No. 18-2.

26.     Put differently, for the issuance of the 2017 Policies, Homeland and CPL did *not* rely on the application and negotiations for the 2016 Policies; rather, they started anew.

**ANSWER:** Denied.

27.     And, to be sure, the 2016 Policies and 2017 Policies are *not* identical.

**ANSWER:** Admitted that the 2017 Policies are not identical to the 2016 Policies. Except as expressly admitted, Homeland denies the allegations set forth in paragraph 27.

28.     For example, the 2017 Policies and 2016 Policies do not have identical endorsements.

**ANSWER:** Admitted that the 2017 Policies and the 2016 Policies do not have identical endorsements. Except as expressly admitted, Homeland denies the allegations set forth in paragraph 28.

29.     The 2017 Policies did not attach an application or the 2016 Letter, nor did the 2017 Policies include an endorsement expressly incorporating the 2016 Letter.

**ANSWER:** Admitted that in the 2016 Warranty Letter, the parties expressly agreed that the "letter and the application" would "be deemed to be a part of the policy." Further admitted that the application itself, which was signed on behalf of CPL and the other insureds, stated, among other things, that: "[Homeland] will maintain the information contained in and submitted with this Application on file and along with the Application will be considered physically attached to, part of, and incorporated into the policy, if issued." Except as expressly admitted, Homeland denies the allegations set forth in paragraph 29.

30.     The 2017 Policies provide broad coverage for "Loss" and "Defense Expenses"

arising out of "Claims" for, among other things, "Professional Services Wrongful Acts" occurring on or after October 1, 2000, provided that the Claim is first made during the policy period or during an extended reporting period of thirty-six months. *See* Primary Policy, at Declarations, § I(A) (Dkt. 18-1).

**ANSWER:** The Policies are written contracts that speak for themselves and are the best evidence of their contents. The Policies also contain conditions and terms, such as retroactive dates, that vary based on the insured. Homeland denies the allegations in paragraph 30 to the extent that they are incomplete and inconsistent with the terms, conditions and full language of the Policies. Homeland denies any additional factual allegations and legal conclusions regarding the terms, conditions and language in paragraph 30 as alleged in CPL's Amended Counterclaims. Additionally, as asserted in Homeland's First Amended Complaint [Doc. 21] and proposed Second Amended Complaint, Homeland is entitled to reformation of the Policies, and/or to void the Worldwide Endorsement (No. 13) in its entirety, and the Additional Named Insured Endorsement (Nos. 3 and 22) as to the Defendants and other insureds (i.e., CPL, MedLab Pathology, Sonic Healthcare, USA, Sonic Healthcare (Ireland) Limited, and Sonic Healthcare Ireland) with respect to any claims arising out of work related to the Irish contract for cervical cytology screening services.

31.     The 2017 Policies define "Loss" as, among other things, "settlements . . . an Insured is legally obligated to pay as a result of a Claim." *See id.* at § II(X) (Dkt. 18-1).

**ANSWER:** Homeland admits that the Primary Policy contains the language quoted in paragraph 31. The Policies are written contracts that speak for themselves and are the best evidence of their contents. Homeland denies the allegations in paragraph 31 to the extent that they are incomplete and inconsistent with the terms, conditions and full language of the Policies. Homeland denies any additional factual allegations and legal conclusions regarding the terms, conditions and language in paragraph 31, as alleged in CPL's Amended

Counterclaims. Additionally, as asserted in Homeland's First Amended Complaint [Doc. 21] and proposed Second Amended Complaint, Homeland is entitled to reformation of the Policies, and/or to void the Worldwide Endorsement (No. 13) in its entirety, and the Additional Named Insured Endorsement (Nos. 3 and 22) as to the Defendants and other insureds (i.e., CPL, MedLab Pathology, Sonic Healthcare, USA, Sonic Healthcare (Ireland) Limited, and Sonic Healthcare Ireland) with respect to any claims arising out of work related to the Irish contract for cervical cytology screening services.

32.     The 2017 Policies define "Defense Expenses" as, among other things, "the reasonable fees of attorneys, experts and consultants and costs and expenses incurred in the investigation, adjustment, defense or appeal of a Claim." *See id.* at § II(H) (Dkt. 18-1)

**ANSWER:**  Homeland admits that the Primary Policy contains the language quoted in paragraph 32.  The Policies are written contracts that speak for themselves and are the best evidence of their contents.  Homeland denies the allegations in paragraph 32 to the extent that they are incomplete and inconsistent with the terms, conditions and full language of the Policies.  Homeland denies any additional factual allegations and legal conclusions regarding the terms, conditions and language in paragraph 32, as alleged in CPL's Amended Counterclaims.  Additionally, as asserted in Homeland's First Amended Complaint [Doc. 21] and proposed Second Amended Complaint, Homeland is entitled to reformation of the Policies, and/or to void the Worldwide Endorsement (No. 13) in its entirety, and the Additional Named Insured Endorsement (Nos. 3 and 22) as to the Defendants and other insureds (i.e., CPL, MedLab Pathology, Sonic Healthcare, USA, Sonic Healthcare (Ireland) Limited, and Sonic Healthcare Ireland) with respect to any claims arising out of work related to the Irish contract for cervical cytology screening services.

33.     Coverage for Defense Expenses do *not* erode the limits of the 2017 Policies

(even for coverage provided under the Worldwide Territory Endorsement).

**ANSWER:** The Policies are written contracts that speak for themselves and are the best evidence of their contents. The Policies also contain conditions and terms, such as retroactive dates, that vary based on the insured. Homeland denies the allegations in paragraph 33 to the extent that they are incomplete and inconsistent with the terms, conditions and full language of the Policies. Homeland denies any additional factual allegations and legal conclusions regarding the terms, conditions and language in paragraph 33 as alleged in CPL's Amended Counterclaims. Additionally, as asserted in Homeland's First Amended Complaint [Doc. 21] and proposed Second Amended Complaint, Homeland is entitled to reformation of the Policies, and/or to void the Worldwide Endorsement (No. 13) in its entirety, and the Additional Named Insured Endorsement (Nos. 3 and 22) as to the Defendants and other insureds (i.e., CPL, MedLab Pathology, Sonic Healthcare, USA, Sonic Healthcare (Ireland) Limited, and Sonic Healthcare Ireland) with respect to any claims arising out of work related to the Irish contract for cervical cytology screening services.

34. The Policies define "Claim" as "any written notice received by an Insured that any person or entity intends to hold an Insured responsible for a Wrongful Act or an Occurrence." *See id.* at § II(F) (Dkt. 18-1).

**ANSWER:** Homeland admits that the Primary Policy contains the language quoted in paragraph 34. The Policies are written contracts that speak for themselves and are the best evidence of their contents. Homeland denies the allegations in paragraph 34 to the extent that they are incomplete and inconsistent with the terms, conditions and full language of the Policies. Homeland denies any additional factual allegations and legal conclusions regarding the terms, conditions and language in paragraph 34, as alleged in CPL's Amended Counterclaims. Additionally, as asserted in Homeland's First Amended Complaint [Doc. 21] and proposed Second Amended Complaint, Homeland is entitled to reformation of the

Policies, and/or to void the Worldwide Endorsement (No. 13) in its entirety, and the Additional Named Insured Endorsement (Nos. 3 and 22) as to the Defendants and other insureds (i.e., CPL, MedLab Pathology, Sonic Healthcare, USA, Sonic Healthcare (Ireland) Limited, and Sonic Healthcare Ireland) with respect to any claims arising out of work related to the Irish contract for cervical cytology screening services.

35.     The Policies define "Professional Services Wrongful Act" as, among other things, "any actual or alleged act, error or omission . . . in rendering, or failing to render, Medical Services." *See id.* at § II(LL) (Dkt. 18-1).

**ANSWER:**   Homeland admits that the Primary Policy contains the language quoted in paragraph 35.  The Policies are written contracts that speak for themselves and are the best evidence of their contents.  Homeland denies the allegations in paragraph 35 to the extent that they are incomplete and inconsistent with the terms, conditions and full language of the Policies.  Homeland denies any additional factual allegations and legal conclusions regarding the terms, conditions and language in paragraph 35, as alleged in CPL's Amended Counterclaims.  Additionally, as asserted in Homeland's First Amended Complaint [Doc. 21] and proposed Second Amended Complaint, Homeland is entitled to reformation of the Policies, and/or to void the Worldwide Endorsement (No. 13) in its entirety, and the Additional Named Insured Endorsement (Nos. 3 and 22) as to the Defendants and other insureds (i.e., CPL, MedLab Pathology, Sonic Healthcare, USA, Sonic Healthcare (Ireland) Limited, and Sonic Healthcare Ireland) with respect to any claims arising out of work related to the Irish contract for cervical cytology screening services.

36.     The 2017 Primary Policy provides the aforementioned coverage subject to a $1,000,000 per claim limit and a $3,000,000 aggregate limit. *See* 2017 Primary Policy, at Declarations (Dkt. 18-1)

**ANSWER:** Admitted that the Primary Policy contains a $1,000,000 per claim limit and a $3,000,000 aggregate limit, subject to the Primary Policy's terms and conditions. The Primary Policy is a written contracts that speaks for itself and is the best evidence of its contents. Homeland denies any additional factual allegations and legal conclusions regarding the terms, conditions and language in paragraph 36, as alleged in CPL's Amended Counterclaims. Additionally, as asserted in Homeland's First Amended Complaint [Doc. 21] and proposed Second Amended Complaint, Homeland is entitled to reformation of the Policies, and/or to void the Worldwide Endorsement (No. 13) in its entirety, and the Additional Named Insured Endorsement (Nos. 3 and 22) as to the Defendants and other insureds (i.e., CPL, MedLab Pathology, Sonic Healthcare, USA, Sonic Healthcare (Ireland) Limited, and Sonic Healthcare Ireland) with respect to any claims arising out of work related to the Irish contract for cervical cytology screening services.

37.     The 2017 Excess Policy provides the aforementioned coverage subject to a $5,000,000 per claim limit and $5,000,000 aggregate limit. *See* 2017 Excess Policy, at Declarations (Dkt. 18-2).

**ANSWER:** Admitted that the Excess Policy contains a $5,000,000 per claim limit and a $5,000,000 aggregate limit, subject to the Excess Policy's terms and conditions. The Excess Policy is a written contract that speaks for itself and is the best evidence of its contents. Homeland denies any additional factual allegations and legal conclusions regarding the terms, conditions and language in paragraph 37, as alleged in CPL's Amended Counterclaims. Additionally, as asserted in Homeland's First Amended Complaint [Doc. 21] and proposed Second Amended Complaint, Homeland is entitled to reformation of the Policies, and/or to void the Worldwide Endorsement (No. 13) in its entirety, and the Additional Named Insured Endorsement (Nos. 3 and 22) as to the Defendants and other insureds (i.e., CPL, MedLab Pathology, Sonic Healthcare, USA, Sonic Healthcare (Ireland)

Limited, and Sonic Healthcare Ireland) with respect to any claims arising out of work related to the Irish contract for cervical cytology screening services.

38.     CPL has paid the requisite premiums for the 2017 Policies.

**ANSWER:**  Admitted.

**F.     The ICC Claims, CPL's Notice to Homeland, and the Ms. S Claim.**

39.     In or around early 2018, it came to CPL's attention that certain physicians of women who were screened through the ICCP and later developed cervical cancer were informed, at some point after February 2016, of the results of a re-review of their patient's cervical check slides under a quality improvement program. Some of those physicians chose to share this information with their patients.

**ANSWER:**  Upon information and belief, admitted that prior to 2016, the results of the "Cancer Audit Reviews" ("CARs") for slides read as part of the ICCP were considered to be for educational purposes and were not disclosed to patients.  Further admitted that in or around February 2016, the NSS implemented a protocol change which resulted in CAR results being reported to the patients' treating physicians.  Also admitted that the NSS provided notice of this change in protocol to at least MedLab by letter dated February 3, 2016.  Upon information and belief, denied that it was not until 2018 that CPL first learned of this development.  Except as expressly admitted, Homeland denies the allegations set forth in paragraph 39.

40.     Some slides were alleged on re-review to contain abnormal cells that had allegedly not been identified by CPL during its participation in the ICCP between August 2010 and August 2013. This is typical with this type of screening program.

**ANSWER:** Upon information and belief, admitted that there are multiple slides CPL is alleged to have misread during its involvement in the ICCP. Homeland is without sufficient information to form a belief as to the veracity of the remainder of the allegations contained in paragraph 40.

41. Some of those women and/or their families brought the ICC Claims, *i.e.*, lawsuits against certain participating laboratories for negligence and other causes of action.

**ANSWER:** Upon information and belief, admitted, but denied to the extent the allegations in paragraph 41 are incomplete. Some of the affected women and/or their families may have potentially pursued claims without filing lawsuits.

42. At around this same time, CPL was informed of the fact that four lawsuits pending in Ireland—the Ms. C, Ms. T, Ms. G, and Ms. P lawsuits—involved slides that had allegedly been interpreted by CPL during its participation in the ICCP. Shortly thereafter, CPL notified Homeland of this situation.

**ANSWER:** Admitted that CPL notified Homeland of claims asserted by Ms. C, Ms. T, Ms. G, and Ms. P. Homeland is without sufficient information to form a belief as to the veracity of the remainder of the allegations contained in paragraph 42.

43. On March 27, 2018, Homeland issued a letter to CPL through which it reserved its right to deny coverage for the Ms. P Claim.

**ANSWER:** Admitted that on March 27, 2018, Homeland sent CPL a letter that addressed several issues, including Homeland's reservations of its rights under the policies and the law, but denied that paragraph 43 fully or fairly characterizes that letter. Except as expressly admitted, Homeland denies the allegations set forth in paragraph 43.

44.     In its March 27, 2018 reservation of rights letter, Homeland requested information through no less than twenty information requests.

**ANSWER:**  Admitted that in its March 27, 2018 letter, Homeland included several reasonable requests for information and documents that it needed in order to allow it to promptly and fairly complete its coverage investigation, but denied that paragraph 44 fully or fairly characterizes that letter.  Except as expressly admitted, Homeland denies the allegations set forth in paragraph 44.

45.     For example, in its March 27, 2018 reservation of rights letter, Homeland requested information regarding MedLab Pathology's "bulk claim submission" to its insurer, Vero.

**ANSWER:**  Admitted that in its March 27, 2018 letter, in order to complete its coverage investigation, Homeland requested, among other things, a copy of a bulk claim report that MedLab Pathology had purportedly submitted to another one of its insurers, Vero, in February or March 2016.  Denied that paragraph 45 fully or fairly characterizes that letter. Except as expressly admitted, Homeland denies the allegations set forth in paragraph 45.

46.     MedLab Pathology is, like CPL, an insured under the 2017 Policies but only for claims made in the United States, Puerto Rico, or Canada.

**ANSWER:**  Admitted that MedLab Pathology was listed as an additional insured under the 2017 Policies.  The Policies are written contracts that speak for themselves and are the best evidence of their contents.  Homeland denies the allegations in paragraph 46 to the extent that they are incomplete and inconsistent with the terms, conditions and full language of the Policies.  Homeland denies any additional factual allegations and legal conclusions regarding

the terms, conditions and language in paragraph 46, as alleged in CPL's Amended Counterclaims. Additionally, as asserted in Homeland's First Amended Complaint [Doc. 21] and proposed Second Amended Complaint, Homeland is entitled to reformation of the Policies, and/or to void the Worldwide Endorsement (No. 13) in its entirety, and the Additional Named Insured Endorsement (Nos. 3 and 22) as to the Defendants and other insureds (i.e., CPL, MedLab Pathology, Sonic Healthcare, USA, Sonic Healthcare (Ireland) Limited, and Sonic Healthcare Ireland) with respect to any claims arising out of work related to the Irish contract for cervical cytology screening services.

47. Homeland asserted in the March 27, 2018 reservation of rights letter that MedLab Pathology's bulk claim submission to Vero regarded, among other patients, Ms. P.

**ANSWER:** Admitted that in its March 27, 2018 letter, in order to complete its coverage investigation, when Homeland requested, among other things, a copy of a bulk claim report that MedLab Pathology had purportedly submitted to another one of its insurers, Vero, in February or March 2016, Homeland noted that it understood that bulk claim report may have included the Ms. P claim. Denied that paragraph 47 fully or fairly characterizes that letter. Except as expressly admitted, Homeland denies the allegations set forth in paragraph 47.

48. In its March 27, 2018 reservation of rights letter, Homeland also requested information regarding when CPL first learned of the ICC Claims and the potential for the ICC Claims.

**ANSWER:** Admitted that in its March 27, 2018 letter, Homeland included several reasonable requests for information and documents that it needed in order to allow it to promptly and fairly complete its coverage investigation, including information related to when CPL was first on notice or otherwise aware of potential ICC claims. Denied that paragraph 48 fully or fairly characterizes that letter. Except as expressly admitted,

Homeland denies the allegations set forth in paragraph 48.

49.    In its March 27, 2018 reservation of rights letter, Homeland indicated that it was aware of the fact that other claims like the Ms. P Claim involved CPL; such claims included the Ms. H Claim, Ms. T Claim, and Ms. C Claim (among others). Homeland requested information regarding those ICC Claims.

**ANSWER:**  Admitted that in its March 27, 2018 letter, Homeland provided a list of other claims/lawsuits that were "potentially substantively related," including the Ms. H, Ms. T, and Ms. C claims, and asked for confirmation on the status of those actions and "whether they do or may involve claims against CPL, Inc."   Denied that paragraph 49 fully or fairly characterizes that letter.  Except as expressly admitted, Homeland denies the allegations set forth in paragraph 49.

50.    Before coverage for the Ms. P claim became necessary, it was settled and another insurer, Vero, contributed toward and covered any contribution required of CPL. Vero subsequently asserted that it should not have made, and indeed was not required to make, any contribution toward CPL's obligations. That was because CPL was not covered by Vero.

**ANSWER:**  Admitted that while Homeland was in the middle of its coverage investigation for the Ms. P claim, it received notice on April 26, 2018 that no further action from Homeland would be required.  Homeland is without sufficient information to form a belief as to the veracity of the remainder of the allegations contained in paragraph 50.

51.    On May 15, 2018, CPL provided Homeland with notice of dozens of potential ICC Claims. Specifically, CPL provided Homeland with a list of patients for whom CPL had

read slides under the ICCP and for whom a re-review was conducted pursuant to the quality improvement program.

**ANSWER:** Admitted that on or about May 15, 2018, CPL reported a list of 101 slides to Homeland that CPL believed may result in future claims against it. Except as expressly admitted, Homeland denies the allegations of paragraph 51.

52. One of those potential ICC Claims regarded Ms. S. Others regarded Ms. A, Ms. OD, and Ms. CR.

**ANSWER:** Admitted that on or about May 15, 2018, CPL reported a list of 101 slides to Homeland that CPL believed may result in future claims against it, including slides related to Ms. S, Ms. A, Ms. OD, and Ms. CR. Except as expressly admitted, Homeland denies the allegations of paragraph 52.

53. In February 2012, Ms. S underwent a cervical smear test under the ICCP. The cervical sample was sent to CPL for review, and CPL issued a cytology report finding no evidence of abnormalities.

**ANSWER:** Homeland is without sufficient information to form a belief as to the veracity of the remainder of the allegations contained in paragraph 53.

54. On April 23, 2013, Ms. S was diagnosed with invasive cervical cancer.

**ANSWER:** Homeland is without sufficient information to form a belief as to the veracity of the remainder of the allegations contained in paragraph 54.

55. The slide(s) CPL read for Ms. S were subsequently re-reviewed under the quality improvement program. It was alleged on re-review that the Ms. S slide(s) CPL had

read contained abnormal cells that CPL had not identified in 2012.

**ANSWER:** Homeland is without sufficient information to form a belief as to the veracity of the remainder of the allegations contained in paragraph 55.

56.     On or about August 7, 2018, Ms. S and her partner filed suit against other defendants (*i.e.*, not CPL) in Cause No. 2018/7164P in the High Court of Ireland, seeking personal injury damages for alleged medical negligence. CPL was not initially named as a defendant in the lawsuit but was added by an amended pleading in May 2019.

**ANSWER:** Upon information and belief, admitted that the Ms. S Litigation was filed on or about August 7, 2018, and that on or about April 29, 2019, a motion was filed to join CPL and Sonic Healthcare (Ireland) Limited as defendants in the litigation. Except as expressly admitted, Homeland denies the allegations of paragraph 56.

**G.      Homeland Retains Coverage Counsel and Conducts a Two-Plus Year "Investigation" of Claims It Immediately Decided to Deny.**

57.     In March 2018, before CPL's May 15, 2018 notice to Homeland, and before Homeland could have possibly conducted a meaningful investigation of the ICC Claims, Homeland retained insurance coverage counsel.

**ANSWER:**  Admit that Homeland retained counsel to assist in a fair and reasonable investigation. Except as expressly admitted, Homeland denies the allegations set forth in paragraph 57.

58.     CPL provided Homeland with timely notice of the ICC Claims.

**ANSWER:** Denied.

59.     Upon retainer, Homeland's insurance coverage counsel took over Homeland's "investigation" and handling of the ICC Claims.

**ANSWER:**  Denied.


60.     CPL was in fact instructed by this outside counsel not to communicate with Homeland or any of Homeland's claims-handlers regarding the ICC Claims, but only with Homeland's outside counsel.

**ANSWER:**  Based on investigation to date, Homeland is unable to admit or deny.


61.     By retaining coverage counsel before CPL had even provided notice of most of the ICC Claims (and before conducting any meaningful claims investigation), Homeland positioned itself for, and indeed was intent on, denial of the ICC Claims.

**ANSWER:**  Denied.


62.     Coverage under liability insurance policies like the 2017 Policies is primarily determined by the underlying pleadings and the language of the policies. Through outside coverage counsel, however, and following CPL's May 15, 2018 notice, rather than inform CPL of its coverage position based on a review of the pleadings and policy, Homeland instead conducted a drawn-out, two-plus-year investigation into the ICC Claims requesting information and materials entirely unrelated to coverage and delaying any meaningful attempt at settlement, only to ultimately deny coverage based on information Homeland had been sitting on for years. Homeland further failed to pay defense costs associated with the ICC Claims during that period.

**ANSWER:** Denied.

63. Specifically, Homeland sent information requests to CPL including on April 20, 2016, February 21, 2018, February 2, 2018, March 27, 2018, March 29, 2018, May 24, 2018, May 29, 2018, June 11, 2018, July 24, 2018, August 9, 2018, September 19, 2018, October 12, 2018, November 6, 2018, November 26, 2018, February 4, 2019, May 6, 2019, May 31, 2019, August 12, 2019, October 14, 2019, November 11, 2019, January 9, 2020, and May 26, 2020. These requests largely asked for information like internal board meeting minutes, confidential and court-sealed personal health and other information of cervical cancer patients and their cases, contracts between CPL and foreign insureds not parties to these claims, documents and knowledge in the possession of Aon (the broker), internal employment documents of CPL, reasons past employees of CPL had left the laboratory, knowledge of and/or notice by any of the other insured entities, and other documents and correspondence entirely unrelated to a coverage analysis under Texas law. In other words, Homeland requested information unnecessary to a determination of coverage within the terms of the 2017 Policies and the allegations in the underlying complaints of the ICC Claims.

**ANSWER:** Admitted that Homeland has made reasonable requests that CPL provide Homeland with information and documents that Homeland needs in order to promptly and fairly complete its coverage investigation, but that CPL has repeatedly failed to provide that requested information and documents. Except as expressly admitted, Homeland denies the allegations of paragraph 63.

64.     In response to these information requests, CPL and/or its broker provided continual updates to Homeland regarding the status of the ICC Claims (including the Ms. S Claim) and provided information and materials responsive to certain of Homeland's requests, to the extent reasonably possible, including via updates on April 21, 2018, May 30, 2018, July 18, 2018, December 24, 2018, February 20, 2019, March 12, 2019, March 15, 2019, and April 17, 2019, and May 1, 2019. In most (if not all) of those updates, CPL demanded that Homeland make a coverage determination with respect to the ICC Claims, broadly, and the specific ICC Claims at-issue (*e.g.*, the Ms. S Claim). Homeland refused to do so.

**ANSWER:** Admitted that CPL has provided limited information and documents in response to Homeland's requests.  Denied that CPL has provided Homeland with all of the information and documents that its needs to promptly and fairly complete its coverage investigation.  Except as expressly admitted, Homeland denies the allegations of paragraph 64.


65.     Homeland's "investigation" was *not* conducted in good faith but was rather a tactic to delay final coverage determinations for the Ms. S claim and other ICC Claims for over two years, all the while having no intention of ever covering CPL for any of the ICC Claims.

**ANSWER:** Denied.


66.     Upon information and belief, Homeland's tactics may have been driven not by what the 2017 Policies cover and do not cover, or by its obligations as an insurer under Texas law, but by its desire to limit its exposure and lower its bottom line.

**ANSWER:** Denied.

67.     Indeed, Homeland no longer issues medical liability policies like the 2017 Policies. Upon information and belief, Homeland stopped issuing such policies because they proved to be less profitable than other lines of insurance. By putting its own business considerations ahead of its insured's, Homeland necessarily acted in bad faith and in violation of the Texas Insurance Code.

**ANSWER:** Admitted that Homeland presently does not write healthcare liability policies. Except as expressly admitted, Homeland denies the allegations of paragraph 67.

**H.      Homeland Denies CPL's Request for Coverage for the Ms. S Litigation Based on Information Homeland Possessed for More Than Two Years.**

68.     On May 1, 2019, CPL requested that Homeland participate in and/or contribute toward the defense for the Ms. S claim, but Homeland refused to do so. CPL therefore undertook its own defense but yet continued to provide Homeland with frequent litigation updates, including updates on August 5, 2019, September 18, 2019, and October 2, 2019. CPL also demanded a final coverage determination, but Homeland refused to provide one.

**ANSWER:** Admitted that because the Worldwide Territory Endorsement provides for only a duty to reimburse—as opposed to a duty to defend—Homeland's only potential duty to pay with respect to any of the CervicalCheck claims filed in Ireland could be triggered only upon CPL's payment of covered defense expenses and/or loss in excess of the 2017 primary policy's deductible.  Further admitted that Homeland has explained to CPL the number of obstacles to coverage that Homeland believes CPL faces with respect to the Ms. S claim, and that Homeland provided CPL with an additional opportunity to provide Homeland with the requested documents and information that might provide a basis for Homeland to find

coverage in CPL's favor, but to date CPL has failed to do so.  Except as expressly admitted, Homeland denies the allegations of paragraph 68.

69.     On October 13, 2019, CPL invited Homeland to participate in a mediation in hopes of resolving the Ms. S Claim. Homeland did not do so.

**ANSWER:**  Denied.

70.     Prior to the mediation, on October 17, 2019, CPL requested Homeland's consent to settle the Ms. S Claim for an amount within a specified range. Homeland agreed that if CPL settled the Ms. S Claim within that range, Homeland would not raise lack of consent as a coverage defense.

**ANSWER:**  Admitted that Homeland advised CPL that if it found an opportunity to settle the Ms. S claim for an amount that CPL deemed reasonable, Homeland would not raise the lack of its consent to the settlement as a coverage defense.  Further admitted that Homeland waived that policy provision for the purpose of the Ms. S claim so that CPL would have the best possible opportunity to reach a settlement that it deemed reasonable, but that Homeland did not waive any other rights or defenses it may have under the policy, including the right to challenge the reasonableness of any settlement of the Ms. S claim.  Except as expressly admitted, Homeland denies the allegations of paragraph 70.

71.     On October 30, 2019, CPL settled the Ms. S Claim within the agreed-upon range and for an amount in excess of $75,000.

**ANSWER:**  Upon information and belief, admitted that the Ms. S claim settled for an amount in excess of $75,000.  Except as expressly admitted, Homeland denies the allegations of paragraph 71.

72.     CPL promptly provided Homeland with notice of the settlement on November 1, 2019 and requested coverage. Homeland refused to cover the settlement, asserting that the Policies are for reimbursement only.

**ANSWER:**  Admitted that because the Worldwide Territory Endorsement provides for only a duty to reimburse—as opposed to a duty to defend—Homeland's only potential duty to pay with respect to any of the CervicalCheck claims filed in Ireland could be triggered only upon CPL's payment of covered defense expenses and/or loss in excess of the 2017 primary policy's deductible.  Except as expressly admitted, Homeland denies the allegations of paragraph 72.

73.     After the Ms. S Claim was funded, CPL presented its itemized claim for reimbursement to Homeland by letter dated May 13, 2020. CPL demanded reimbursement of an amount in excess of $2,000,000.

**ANSWER:**  Admitted that on or about May 13, 2020, CPL provided notice that it contended it had paid covered defense expenses and/or loss in excess of the 2017 primary policy's deductible and asked for reimbursement.  Except as expressly admitted, Homeland denies the allegations of paragraph 73.

74.     On or about July 10, 2020, Homeland denied CPL's claim for reimbursement.

**ANSWER:**  Admitted that Homeland appropriately denied the Ms. S claim on July 10, 2020 based on the information known to date.  Except as expressly admitted, Homeland denies the allegations of paragraph 74.

75.     Homeland based its denial on the grounds set forth in Homeland's Complaint

for Declaratory Relief at paragraph 155. *See* Pl.'s Compl. ¶ 155. Homeland's grounds for denial were not supported by the information obtained through Homeland's two-plus year "investigation," but rather on information Homeland possessed years earlier. Thus, Homeland's investigation of the claim was nothing more than a delay of a final coverage determination for ICC Claims that Homeland never intended to cover, despite that one of the reasons CPL sought worldwide coverage was to protect against the risk of claims like the ICC Claims.

**ANSWER:** Admitted that Homeland appropriately denied the Ms. S claim based on multiple grounds, including those that are at issue in this present coverage action, based on the information known to date. Except as expressly admitted, Homeland denies the allegations of paragraph 75.

I. **The Ms. A, Ms. OD, and Ms. CR Claims, and the Other ICC Claims.**

76. Other ICC Claims have settled beyond the Ms. S Claim. Such include the Ms. A, Ms. O, and Ms. CR Claims. Homeland has refused to cover those claims for the same reasons it refuses to cover the Ms. S Claim.

**ANSWER:** Upon information and belief, admitted that other ICC claims have purportedly settled, including the Ms. A, Ms. O, and Ms. CR claims. Further admitted that, because Homeland has been precluded from completing its coverage investigation, and because this coverage action is ongoing, Homeland has not yet agreed to provide coverage for any of the other ICC claims. Except as expressly admitted, Homeland denies the allegations of paragraph 76.

77. Homeland has not agreed to cover *any* costs associated with *any* of the ICC

Claims.

**ANSWER:** Admitted that, because Homeland has been precluded from completing its coverage investigation, and because this coverage action is ongoing, Homeland has not yet agreed to provide coverage for any of the other ICC claims. Except as expressly admitted, Homeland denies the allegations of paragraph 77.

78. Homeland has instead filed a declaratory judgment action in this case in which it seeks a declaration that it has no obligation to cover, and therefore Homeland has expressed an intent to deny coverage for, any past, present, or future ICC Claims.

**ANSWER:** Admitted that Homeland filed this action, in which it seeks a declaratory judgment regarding the scope of its coverage obligations. Except as expressly admitted, Homeland denies the allegations of paragraph 78.

79. By refusing to cover the ICC Claims, Homeland has materially breached its contractual obligations under the 2017 Policies and/or anticipatorily breached its obligations under those policies. Furthermore, Homeland—by way of, among other things, its two-plus year "investigation" into coverage, its myriad unreasonable information requests, its years-long claims-handling delays, its misrepresentation of and/or failure to consider certain key policy terms, and its decision at the outset to deny coverage—has engaged in bad faith claims-handling, investigating, settlement, and payment practices under Texas law. As a direct and proximate result, CPL has paid and incurred more than $2,000,000 that Homeland owes CPL under the 2017 Policies.

**ANSWER:** Denied.

## CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT AND
### ANTICIPATORY BREACH OF CONTRACT

80.    The foregoing allegations are incorporated herein by reference.

**ANSWER:**  Homeland incorporates by reference the foregoing paragraphs of this Answer as though fully set forth herein.

81.    The Policies are valid and enforceable contracts.

**ANSWER:**  Denied that the Policies are valid and enforceable contracts with respect to any claims arising out of work related to the Irish contract for cervical cytology screening services.

82.    CPL is an insured under the 2017 Policies and therefore has standing to assert claims under the 2017 Policies.

**ANSWER:**  Admitted that CPL is an insured under the Policies subject to their terms and conditions, but denied that Endorsement 13 to the Primary Policy is a valid and enforceable Endorsement to the Policy, and denied that any of the Defendants in this action or other insureds (CPL, MedLab Pathology, Sonic Healthcare, USA, Sonic Healthcare (Ireland) Limited, and Sonic Healthcare Limited) are insureds under the Policies with respect to any claims arising out of work related to the Irish contract for cervical cytology screening services.  Denied that CPL has standing to assert claims under the Policies with respect to any claims arising out of work related to the Irish contract for cervical cytology screening services.  Except as expressly admitted, Homeland denies the allegations of paragraph 82.

83.    CPL has satisfied all conditions precedent under the 2017 Policies.

**ANSWER:**  Denied.

84.     The terms of the 2017 Policies unambiguously provide coverage for the costs associated with the Ms. S Claim, Ms. A Claim, Ms. OD Claim, Ms. CR Claim, and all other past, present, and future ICC Claims that trigger the 2017 Policies.

**ANSWER:**  Denied.

85.     Alternatively, the terms of the Policies are ambiguous with respect to coverage and should therefore be construed in favor of CPL, in accord with Texas law.

**ANSWER:**  Denied.

86.     Homeland has breached the 2017 Policies and/or has expressly indicated its intent to breach the 2017 Policies by refusing to reimburse and/or by expressly indicating its intent to refuse to reimburse CPL for the costs associated with the Ms. S Claim, Ms. A Claim, Ms. OD Claim, Ms. CR Claim, and all other past, present, and future ICC Claims that trigger the 2017 Policies. Those claims are covered by the 2017 Policies, but Homeland has refused to cover them and instead has filed a lawsuit in which it argues that it should never have to cover any of the costs associated with the ICC Claims.

**ANSWER:**  Denied.

87.     Homeland has breached the 2017 Policies and/or has anticipatorily breached the 2017 Policies.

**ANSWER:**  Denied.

88.     Homeland's breaches have caused CPL substantial damages in excess of

$2,000,000.

**ANSWER:** Denied.

## COUNT II – CHAPTER 542 OF THE TEXAS INSURANCE CODE

89.     The foregoing allegations are incorporated herein by reference.

**ANSWER:** Homeland incorporates by reference the foregoing paragraphs of this Answer as though fully set forth herein.

90.     CPL has made a claim under the 2017 Policies for coverage for the Ms. S Claim, Ms. A Claim, Ms. OD Claim, Ms. CR Claim, and all other past, present, and future ICC Claims that trigger the 2017 Policies.

**ANSWER:** Denied.

91.     CPL has satisfied all conditions precedent under the Policies.

**ANSWER:** Denied.

92.     Homeland has engaged in conduct that constitutes a violation of Chapter 542 of the Texas Insurance Code by delaying its handling and investigation of the claim and/or failing to timely pay CPL's outstanding defense and indemnity costs and expenses that are associated with the Ms. S Claim, Ms. A Claim, Ms. OD Claim, Ms. CR Claim, and all other past, present, and future ICC Claims.

**ANSWER:** Denied.

93.     Consequently, CPL is entitled to the damages set forth in § 542.060 of the

Texas Insurance Code. Specifically, in addition to the amount of CPL's costs associated with those claims, CPL is owed interest at the rate of eighteen percent (18%) per annum as well as any and all other relief provided by the statute.

**ANSWER:** Denied.

## COUNT III – CHAPTER 541 OF THE TEXAS INSURANCE CODE

94. The foregoing allegations are incorporated herein by reference.

**ANSWER:** Homeland incorporates by reference the foregoing paragraphs of this Answer as though fully set forth herein.

95. Homeland has engaged in unfair or deceptive acts or practices as defined by Section 541.060 of the Texas Insurance Code.

**ANSWER:** Denied.

96. Homeland misrepresented or omitted material facts and/or policy provisions relating to coverage for the ICC Claims in violation of Section 541.060(a)(1) and 541.061 of the Texas Insurance Code by relying on the knowledge of other insureds as a basis for denying coverage for the ICC Claims when the 2017 Policies expressly provide that "no knowledge or information possessed by any Insured shall be imputed to any other Insured."

**ANSWER:** Denied.

97. Homeland violated Section 541.060(a)(2) of the Texas Insurance Code by failing to attempt in good faith to effectuate a prompt, fair and equitable settlement of the ICC Claims and by instead deciding to deny coverage of the ICC Claims immediately after

(if not before) it received notice of the potential for those claims and long before Homeland had an opportunity to conduct a real and meaningful investigation of those claims.

**ANSWER:** Denied.

98. Homeland violated Section 541.060(a)(2) of the Texas Insurance Code by failing to attempt in good faith to effectuate a prompt, fair and equitable settlement of the ICC Claims and by instead engaging in a two-plus year "investigation" that consisted of dozens (if not hundreds) of unreasonable and harassing information requests that were aimed at fabricating bases for denying coverage.

**ANSWER:** Denied.

99. Homeland violated Section 541.060(a)(2) of the Texas Insurance Code by failing to attempt in good faith to effectuate a prompt, fair and equitable settlement of the ICC Claims and by refusing to issue a final coverage determination regarding the Ms. S Claim and other ICC Claims within a two-plus year period and by otherwise delaying its coverage determination process.

**ANSWER:** Denied.

100. Homeland violated Section 541.060(a)(3) of the Texas Insurance Code by failing to provide CPL with a prompt and reasonable explanation of whether it was denying coverage for the ICC Claims and upon what grounds its denial is based and by instead waiting over two years to issue a coverage determination when CPL requested such a determination on several occasions.

**ANSWER:** Denied.

101.    Homeland violated Section 541.060(a)(4) of the Texas Insurance Code by failing within a reasonable time to affirm or deny coverage of the ICC Claims and by instead waiting over two years to issue a coverage determination when CPL had requested a determination on several occasions.

**ANSWER:** Denied.

102.    Homeland violated Section 541.060(a)(5) of the Texas Insurance Code by suggesting that other insurers may be responsible for some or all of the costs associated with the ICC Claims.

**ANSWER:** Denied.

103.    Homeland violated Section 541.060(a)(7) of the Texas Insurance Code by refusing to cover any of the ICC Claims without conducting a reasonable investigation and by instead engaging in a two-plus year "investigation" that consisted of dozens (if not hundreds) of unreasonable and harassing requests that were aimed at fabricating bases for denying coverage.

**ANSWER:** Denied.

104.    As a result of Homeland's violations of Chapter 541 of the Texas Insurance Code, CPL has sustained substantial damages, including the denial of covered benefits and payments due under the 2017 Policies.

**ANSWER:** Denied.

105.    Homeland, either directly or through its agents, knowingly committed the violations of Section 541.060 of the Texas Insurance Code referenced above. CPL therefore seeks, in addition to actual damages, court costs, and attorneys' fees, an amount not to exceed three times CPL's actual damages, in accordance with the Texas Insurance Code.

**ANSWER:**  Denied.

## COUNT IV – ATTORNEYS' FEES

106.    The foregoing allegations are incorporated herein by reference.

**ANSWER:**  Homeland incorporates by reference the foregoing paragraphs of this Answer as though fully set forth herein.

107.    Due to the actions of Homeland, CPL has been required to retain the services of the law firms of Haynes and Boone, LLP and Germer Beaman & Brown PLLC. CPL has agreed to pay those firms a reasonable fee for their services necessarily rendered and to be rendered in this action. Pursuant to Section 38.001 of the Texas Civil Practice & Remedies Code and/or Chapters 542 and 541 of the Texas Insurance Code, CPL is entitled to an award of its reasonable attorneys' fees against Homeland in an amount to be established at trial.

**ANSWER:**  Denied.

## **JURY DEMAND**

CPL demands a jury trial on all issues contained in this Counterclaim that are so triable.

## COUNTERCLAIM PRAYER

WHEREFORE, Counter-Plaintiff CPL requests the following relief against Counter-Defendant Homeland:

(1) Judgment awarding CPL all damages caused by Homeland's breaches and/or anticipatory breaches of the Policies;

(2) Judgment awarding CPL all damages sustained as a result of Homeland's violations of Chapter 542 of the Texas Insurance Code (including but not limited to 18% interest);

(3) Judgment awarding CPL all damages sustained as a result of Homeland's violations of Chapter 541 of the Texas Insurance Code (including but not limited to treble damages);

(4) Judgment awarding CPL all reasonable and necessary attorneys' fees incurred in this matter under Chapter 38 of the Texas Civil Practice & Remedies Code and Chapters 541 and 542 of the Texas Insurance Code;

(5) Judgment awarding CPL pre-judgment and post-judgment interest in the amount allowed by law;

(6) Judgment awarding CPL all costs of court; and

(7) Such other and further relief to which CPL may be justly entitled.

**ANSWER:**  Denied that CPL is entitled to any of the relief requested in its Prayer.

## HOMELAND'S AFFIRMATIVE DEFENSES

Without conceding that it has the burden of proof as to any of these matters, Homeland submits the following defenses:

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

Each of CPL's purported Counterclaims for relief fail to state any claim against Homeland upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

### (Prior Knowledge Exclusion)

The purported Counterclaims for relief are barred by the following (D)(1) Prior Knowledge Exclusion:

(D) Except as otherwise expressly provided in this Policy, this Policy does not apply to, and the Underwriter will not pay **Loss** or **Defense Expenses**, for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

> (1) act, error, omission or **Wrongful Act** if, on or before the Inception Date set forth in ITEM 2 of the Declarations, the Risk Management Dept or Legal Dept or any Executive of the **Named Insured** knew or reasonably could have foreseen that such act, error, omission, or **Wrongful Act** might result in a **Claim**.

> If, however, this Policy is a renewal of one or more policies previously issued by the Underwriter to the First Named Insured, and the coverage provided by the Underwriter to the First Named Insured was in effect, without interruption, for the entire time between the inception date of the first such other policy and the Inception Date of this Policy, the reference in this EXCLUSION (D)(1) to the Inception Date will be deemed to refer instead to the inception date of the first policy under which the Underwriter began to provide the First Named Insured with the continuous and uninterrupted coverage of which this Policy is a renewal;

All other terms, conditions and limitations of this Policy shall remain unchanged.

Primary Policy, § III, (D)(1) Prior Knowledge Exclusion, as amended by Endorsement

No. 19.

## THIRD AFFIRMATIVE DEFENSE

### (Prior Notice Exclusion)

The purported Counterclaims for relief are barred by the following (D)(2) Prior

Notice Exclusion:

(D) Except as otherwise expressly provided in this Policy, this Policy does not apply to, and the Underwriter will not pay **Loss** or **Defense Expenses**, for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(2) act, error, omission, **Wrongful Act**, event, suit or demand which was the subject of any notice given under:

(a) any medical professional liability or similar policy of insurance or plan or program of self-insurance, with respect to any **Claim** otherwise covered under INSURING AGREEMENT (A);

(b) any general liability or similar policy of insurance or plan or program of self-insurance, with respect to any **Claim** otherwise covered under INSURING AGREEMENT (B); or

(c) any employee benefit liability or similar policy of insurance or plan or program of self-insurance, with respect to any **Claim** otherwise covered under INSURING AGREEMENT (C);

in effect prior to the Inception Date set forth in ITEM 2 [June 30, 2017] of the Declarations;

Primary Policy, § III, (D)(2) Prior Notice Exclusion.

## FOURTH AFFIRMATIVE DEFENSE

### (Material Misrepresentation)

To the extent that CPL or any insured made a material misrepresentation during the claim or in connection with an insurance application, the purported Counterclaims for relief are barred.

## FIFTH AFFIRMATIVE DEFENSE

### (Concealment)

To the extent that CPL or any insured concealed a material fact from Homeland during the claim or in connection with an insurance application, the purported Counterclaims for relief are barred.

## SIXTH AFFIRMATIVE DEFENSE

### (Condition Precedent)

The purported Counterclaims for relief are barred to the extent that CPL or any insured failed to perform certain conditions precedent to any obligations or indebtedness which Homeland might otherwise have had toward them.

## SEVENTH AFFIRMATIVE DEFENSE

### (Breach of Warranty)

The purported Counterclaims for relief are barred by breach of the specific warranties in the July 27, 2016 Warranty Letter upon which Homeland conditioned issuing coverage to CPL (and the other Defendants) with respect to claims arising out of work related to the Irish contract for cervical cytology screening services.

## EIGHTH AFFIRMATIVE DEFENSE

### (Unilateral or Mutual Mistake)

The purported Counterclaims for relief are barred because the parties intended to exclude certain risks under the Policies, including the ICC claims, pursuant to the warranties provided in the July 27, 2016 Warranty Letter for which the Defendants were either mistaken in so warranting, or inequitably induced Homeland to unilaterally mistake in so believing, such that the Policies were issued contrary to the actual understanding of the parties.

## NINTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

Without in any way admitting that CPL was in any way damaged, or that it was damaged by any conduct of Homeland, CPL's purported Counterclaims are barred to the extent that CPL failed to mitigate its damages, if any, alleged or otherwise, and is therefore estopped from making or pursuing any claim thereon.

## TENTH AFFIRMATIVE DEFENSE

### (Comparative or Contributory Fault)

Without in any way admitting that CPL was in any way damaged, or that it was damaged by any conduct of Homeland, the damages complained of were proximately caused in whole or in part by the comparative or contributory fault and negligence of CPL and/or its agents and representatives.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Conduct of Third Parties)

Without in any way admitting that CPL was in any way damaged, or that it was damaged by any conduct of Homeland, Homeland is informed and believes, and based thereon alleges, that if CPL was damaged, the damage was caused in whole or in part by the acts of third parties other than Homeland.

## TWELFTH AFFIRMATIVE DEFENSE

### (Offset/Credit)

In the event there is a finding of damages for CPL, such damages must be offset to the extent CPL received monetary benefits from collateral sources and/or by the amounts CPL owes to Homeland and/or the credits/offsets to which Homeland is entitled to from CPL.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Breach or Failure to Comply with Contract Terms)

The purported Counterclaims for relief are barred to the extent that any insured has breached or not fully complied with all the terms and conditions of the Policies, including but not limited to the Related Claims, Notice, Territory, Claim, Notice, Assistance and Cooperation, Representation, No Action Against Underwriter, or Examination of Books and Records provisions.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Exclusions From Coverage)

The purported Counterclaims for relief may be barred and/or limited by one or more exclusions and limitations contained within the Policies.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Failure to Cooperate)

The purported Counterclaims for relief are barred to the extent that CPL failed to cooperate in Homeland's attempts to investigate coverage for the ICC claims.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Waiver)

The purported Counterclaims for relief are barred to the extent that CPL waived any rights it may otherwise have had against Homeland.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Estoppel)

Homeland is informed and believes, and based thereon alleges, that CPL is estopped from asserting its Counterclaims.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

CPL's Counterclaims against Homeland may be barred by the doctrine of unclean hands.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Laches)

CPL's Counterclaims against Homeland may be barred by the doctrine of laches.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Additional Unknown Defenses/Reservation of Rights)

Homeland is informed and believes and thereupon alleges that it may have other separate and additional defenses of which it is presently unaware; Homeland reserves the right to allege other separate and additional defenses upon the discovery of additional facts during the course of discovery.

## RELIEF REQUESTED ON ANSWER

(i)     That CPL take nothing by way of its Counterclaims;

(ii)    That CPL's Counterclaims be dismissed with prejudice;

(iii)   That Homeland recover its costs of court; and

(iv)    That Homeland be granted such other and further relief, at law and in equity, to which CPL may show itself entitled and that the Court may deem just and proper.

**DATED:** July 16, 2021      By:   _/s/ John T. Brooks_

> John T. Brooks (CA Bar #167793)
> Jenna A. Fasone (CA Bar #308886)
> Jared K. LeBeau (CA Bar #292742)
> SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
> 501 West Broadway, 19th Floor
> San Diego, CA 92101
> Telephone: (619) 338-6500
> Fax: (619) 234-3815
> jbrooks@sheppardmullin.com
> jfasone@sheppardmullin.com
> jlebeau@sheppardmullin.com
> _Admitted pro hac vice_
>
> Joseph R. Little (#784483)
> The Little Law Firm
> 440 Louisiana Street, Suite 900
> Houston, Texas 77002
> Telephone: (713) 222-1368
> Fax: (281) 200-0115
> jrl@littlelawtexas.com
>
> _Attorneys for Plaintiff and Counterclaim_
> _Defendant Homeland Insurance Company of_
> _New York_

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true copy of this document was served upon counsel of record for all parties who have made an appearance in this case at the addresses indicated by CM/ECF electronic notification on this 16th day of July, 2021. I declare under penalty of perjury that the foregoing is true and correct.


*/s/ John T. Brooks*