**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| HOMELAND INSURANCE COMPANY OF NEW YORK, | CIVIL ACTION NO. 1:20-cv-783 |
| Plaintiff, | |
| v. | **JURY DEMAND** |
| CLINICAL PATHOLOGY LABORATORIES, INC. SONIC HEALTHCARE USA, INC., MEDLAB PATHOLOGY, SONIC HEALTHCARE (IRELAND) LIMITED, AND SONIC HEALTHCARE LIMITED. | |
| Defendants. | |

## HOMELAND INSURANCE COMPANY OF NEW YORK'S SECOND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT, BREACH OF WARRANTY, REFORMATION, AND PROMISSORY ESTOPPEL

SMRH:4843-2402-9941.3

Plaintiff Homeland Insurance Company of New York ("Homeland") brings this complaint against Clinical Pathology Laboratories, Inc. ("CPL") and Sonic Healthcare USA, Inc. ("Sonic USA") (collectively, "Defendants"). Homeland accordingly alleges and seeks relief as follows:

## INTRODUCTION

1. This case concerns an insurance coverage dispute with respect to a medical negligence lawsuit filed in Ireland. Plaintiff Homeland provides Medical Facilities and Providers Professional Liability Insurance to Defendants, who provide cervical cytology laboratory (liquid based cytology) screening services to detect cervical cancer. The policies at issue here provide coverage for lawsuits filed outside of the United States to insured entities domiciled in the United States (e.g., CPL and Sonic USA), as well as for lawsuits filed in the United States to certain insured foreign entities (e.g., MedLab Pathology ["MedLab"], Sonic Healthcare (Ireland) Limited ["Sonic Ireland"], and Sonic Healthcare Limited ["Sonic"]; these entities are collectively referred to as the "Foreign Insureds"), subject to their terms, conditions and exclusions. But this worldwide coverage for CPL and Sonic USA, and coverage for MedLab and Sonic Ireland, were not always part of the coverage that Homeland offered.

2. Defendants specifically sought this broadened worldwide coverage for CPL and Sonic USA, and limited U.S. coverage for MedLab and Sonic Ireland, in 2016 when Defendants realized they had a gap in their insurance coverage for claims made against CPL, Sonic USA, MedLab and Sonic Ireland related to an Irish contract for cervical cytology screening services. Defendants therefore insisted on adding endorsements to the 2016 policy to eliminate this coverage gap or it would be a "deal breaker." Homeland agreed to issue these endorsements significantly broadening potential coverage—but conditioned on the insureds "proposed for

coverage" (i.e., CPL, Sonic USA, MedLab and Sonic Ireland) conducting a diligent inquiry and warranting that there were no known claims (or facts that may give rise to claims) with respect to the Irish cervical cancer screening services, other than claims or facts already reported to prior carrier(s), and thus excluded under the policies.

3.      Defendants provided a warranty letter as requested, and Homeland issued the 2016 and 2017 policies in reliance thereon.  The parties intended that the warranty letter be deemed to be a part of the 2016 and 2017 policies, and the letter and application expressly state that was the case.  But contrary to the warranties made in the letter, at least some (if not all) of the Defendants were aware of at least 59 actual or potential claimants at the time of the 2016 warranty letter.  Also contrary to the warranties made in the letter, CPL did not conduct a diligent inquiry on behalf of all of the insureds proposed for coverage before providing the warranty letter.  Therefore, there is no coverage for the claims now at issue pursuant to at least the Prior Notice and Prior Knowledge Exclusions and/or because the representations in the warranty letter have turned out to be false.  Homeland also asserts the 2016 and 2017 polices are void with respect to all Defendants pursuant to their breach of the warranties and conditions precedent to coverage for all claims related to the Irish contract for cervical cytology screening services.  Finally, Homeland seeks reformation of the 2016 and 2017 policies based on mutual and/or unilateral mistake of the parties.

## The Parties

4.      Homeland is a corporation organized and existing under the laws of New York, with its principal place of business in Plymouth, Minnesota.  Homeland is permitted to issue insurance policies in the State of Texas.

5.      Upon information and belief, Defendant CPL is a corporation organized and

existing under the laws of Texas with its principal place of business in Texas.

6.     Upon information and belief, Defendant Sonic USA is a corporation organized and existing under the laws of Delaware with its principal place of business in Texas.

7.     Upon information and belief, MedLab is a corporation organized and existing under the laws of Ireland with its principal place of business in Ireland.

8.     Upon information and belief, Sonic Ireland is a corporation organized and existing under the laws of Ireland with its principal place of business in Ireland.

9.     Upon information and belief, Sonic is a corporation organized and existing under the laws of Australia with its principal place of business in Australia.

## Jurisdiction and Venue

10.     This is a diversity action for declaratory relief under 28 U.S.C. § 2201 to declare the rights and other legal relations of the parties regarding insurance policies, breach of warranty, and reformation.

11.     The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(a).  There is complete diversity of citizenship between Homeland, on the one hand, and Defendants, on the other.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     The Court has personal jurisdiction over Defendants as described herein, and venue is proper in this District under 28 U.S.C. § 1391.

## Nature of the Action

13.     Homeland brings this action under 28 U.S.C. § 2201, which provides that the Court may declare the rights and other legal relations of the parties.  An actual controversy of a judicial nature exists between Homeland, on the one hand, and Defendants, on the other,

involving the parties' rights and liabilities under insurance policies. The construction of these policies and the controversy existing between Homeland and Defendants may be determined by a judgment of the Court.

14.    This action also seeks: (1) a declaration that the 2016 and 2017 policies are void with respect to coverage for the Defendants related to the Irish contract for cervical cytology screening services, and (2) reformation of the 2016 and all subsequent policies that were renewed at the same rate based on the same terms and conditions as the 2016 policies, as to Defendants with respect to the Irish CervicalCheck claims based on mutual and/or unilateral mistake.

## FACTUAL BACKGROUND

### Ireland's CervicalCheck Program

15.    In or around 2004, Ireland passed the Health Act of 2004 pursuant to which it established the Health Service Executive (the "HSE").

16.    The National Cancer Screening Service ("NCSS") was established by Ireland's Minister for Health and Children in January 2007. The establishment followed the launch of a "Strategy for Cancer Control in Ireland 2006," which advocated a comprehensive cancer control policy program in Ireland. The Strategy examined prevention, screening, detection, treatment and management of cancer in Ireland. On April 1, 2010, the NCSS became part of the HSE within the National Cancer Control Programme ("NCCP"). On January 1, 2014, the NCSS became the National Screening Service ("NSS"), part of the Health and Wellbeing Division of the HSE.

17.    The HSE is thus responsible for, among other things, the NCSS (now NSS) program known as "CervicalCheck." CervicalCheck was introduced in September 2008 to

provide cervical screening of women between the ages of 25 and 60. Its primary objective is to reduce mortality from cervical cancer by detecting and treating changes in the cells of the cervix before they become cancerous.

18. In or around March 2010, the NCSS entered into a contract with Sonic Ireland for the supply of cervical cytology laboratory (liquid based cytology) screening services (the "NCSS Contract"). In or around June 2014, the NCSS also entered into a contract with MedLab for the provision of cervical cytology laboratory (liquid based cytology) screening and HPV testing services. In or around August 2016, the NSS entered into a contract with MedLab for the provision of cervical cytology laboratory (liquid based cytology) screening and HPV testing services.

19. CPL was identified in each of the above NCSS contracts under the "Laboratory(ies)" schedule. According to CPL, CPL provided cytology services only under the NCSS Contract from about August 2010 through July 2013.

20. Pursuant to the NCSS Contract, Sonic Ireland was required to maintain certain levels of insurance, including:

> Professional indemnity insurance for an amount not less than €3,500,000 for any one claim to be maintained at all times during the Term and for a period of seven years following the expiration or termination of this Contract for whatever reason, (or in no less than equivalent amounts in another major currency at the annual renewal dates for each relevant policy)

21. CervicalCheck initiated the development of a clinical cancer audit process in 2010 as part of the quality assurance framework of the program. When screened women develop cancer it is of value to review their screening history to try to assess if any areas of the screening pathway could be improved—i.e., whether any slides were misread in the screenings prior to a known cancer diagnosis. Among other benefits listed, these "Cancer Audit Reviews" ("CARs")

can "[p]rovide information to screened women about why their cancers were not detected or prevented."[1]

22.     According to an NCSS site visit to CPL's facilities in or around May of 2011:

CPL participates in a monthly slide review meeting with designated members of NCSS, colposcopists and MedLab Pathology.  NCSS provides a list of cases for review and selected slides are then scanned using Aperio Scan Scope for demonstration during the video conference.

23.     Similarly, a document from September 2011 titled "NCSS Cytology Services provided by MedLab Pathology & Clinical Pathology Laboratories" and outlining responsibilities between MedLab and CPL states that CPL is responsible for amending results if a request is made to review a slide and a result is changed based on that review.

24.     CARs of at least 22 slides were conducted between November 2012 and February 2013 which resulted in a finding of some level of misreading.  Such CARs were thus conducted while CPL was still involved in the CervicalCheck program.

25.     Upon information and belief, CPL was aware during 2012 to 2013 of at least 22 slides that it misread under the CervicalCheck program which it later noticed to Homeland in 2018.

26.     Prior to 2016, the results of the CARs were considered to be for educational purposes and were not disclosed to patients.  However, in or around February 2016, the NSS implemented a protocol change which resulted in CAR results being reported to the patients' treating physicians.  The NSS provided notice of this change in protocol to at least MedLab by letter dated February 3, 2016.

---

[1]https://data.oireachtas.ie/ie/oireachtas/committee/dail/32/committee_of_public_accounts/submissions/2018/2018-05-17_correspondence-health-service-executive-hse-v-q-and-a-12-jun-2016_en.pdf (HSE Q&A dated June 2016)

27.     Therefore, by February 2016, at least MedLab was on notice that misreads in the CervicalCheck program discovered pursuant to CARs would potentially become the subject of lawsuits by women who were suffering from cervical cancer.

### The Sonic Entities

28.     Sonic is a global healthcare company headquartered in Sydney, Australia, and a publicly listed company on the Australian Securities Exchange.  Sonic is the world's third largest provider of pathology/clinical laboratory services.   Sonic is the parent company of several healthcare practices around the world that make up the Sonic Healthcare group.  Sonic holds a 100% interest in subsidiaries Sonic Healthcare Investments G.P., Sonic Ireland, MedLab, and defendants Sonic USA and CPL.

29.     Sonic has owned a 100% interest in CPL since 2007, at which time Sonic USA was established as Sonic's head office in the United States.  Sonic USA was given the authority and responsibility for planning, directing and controlling Sonic's U.S. operations.[2]

30.     Dr. Colin Goldschmidt is the CEO and Managing Director of Sonic.   Dr. Goldschmidt became CEO of Sonic in 1993.  He was also appointed as an Executive Director of Sonic in 1993 and is a member of Sonic's Risk Management Committee and has been since at least 2010.  The Risk Management Committee's principal role, as set out in the identification and Risk Management Committee Charter, is to assist the Board in its oversight responsibilities by monitoring and advising on the identification and management of all risks, including business, operational and hazard risks; the internal controls and treatments for identified risks, including the Company's insurance program; and the Company's overall risk management program.

31.     Dr. Goldschmidt is also a member of the Board of Directors of Sonic USA and

---

[2] https://investors.sonichealthcare.com/about/?page=history

CPL and has been since at least 2009.

32.     Christopher Wilks is the Finance Director and Chief Financial Officer of Sonic and has been since 1993.

33.     Mr. Wilks is also a member of the Board of Directors of Sonic USA and CPL and has been since at least 2009.

34.     Dr. Goldschmidt and Mr. Wilks were two of four directors on CPL's Board who provided Unanimous Written Consent to execute the NCSS Contract on CPL's behalf on or about March 29, 2010.

35.     Gordon Young is the Risk Manager of Sonic and has been since November 2007. Mr. Young is responsible for, among other things, management of Sonic's global insurance program.

36.     Stephen R. Shumpert was Vice President or President of CPL from 1998 to at least November 2018 and a member of the Board of Directors from at least 2014 to 2018.  Mr. Shumpert was also Chief Executive Officer of Sonic USA from June 2016 to December 2018 and a member of the Board of Directors from 2013 to 2016.

37.     Sheridan Foster was Secretary of CPL from 2010 to at least December 2019.  Ms. Foster was also Senior Vice President of Legal Affairs of Sonic USA from 2007 to 2019 and Secretary from 2010 to at least December 2019.

38.     Upon information and belief, Sonic Ireland was formed in or around 2009 by Sonic to direct and control Sonic's Irish operations.

39.     MedLab was established in May 2010 as Sonic's Irish laboratory facility. MedLab was awarded the contract for 50% of the NCSS CervicalCheck program in 2010, but one of the requirements for MedLab to perform the processing and screening of cervical smears

was to hold ISO 15189 accreditation for the scope of cytology analysis. While MedLab prepared for the accreditation assessments and award, MedLab's sister laboratory CPL was designated by Sonic to provide cytology services.

### History of the Homeland Policy

40.     Homeland provided Medical Facilities and Providers Professional Liability Insurance to defendants CPL, Sonic USA and Sonic since at least the June 30, 2014 to June 30, 2015 policy period. The 2014-2015 and 2015-2016 policies both covered certain claims made against the insureds, but only if made in the U.S., including its territories or possessions, Puerto Rico, or Canada. Those policies did not cover claims made anywhere else, including Ireland.

41.     Upon information and belief, Defendants purchased insurance for international claims through the same broker since at least 2014.

### The Ms. O I Claim

42.     Upon information and belief, the first known CervicalCheck claim was made in 2014 by the survivors of Ms. O I. [3]

43.     CPL became aware of the Ms. O I claim in 2014—over a year before the NSS policy change with respect to disclosure of CARs in 2016.

44.     In or around July 2014, the survivors of Ms. O I, through counsel, wrote to MedLab asking that MedLab and "MedLab Pathology Laboratories in Austin, Texas" (i.e., CPL) nominate solicitors to accept service of proceedings in Ireland. Understandably, Irish citizens were not originally aware of the exact names or roles of non-Irish laboratories.

---

[3] The name of the deceased claimant has been abbreviated and details omitted to ensure privacy as Homeland is unsure whether this matter was made public in Ireland. This claim is referred to as the "Ms. O I" claim as it is separate and distinct from the "Ms. O II" claim discussed below.

45.     In or around September 2014, Defendants' broker notified Homeland of the potential suit to be filed in the near future, tendering the Ms. O I claim under the 2014 Homeland policy, even though CPL was not yet named in the lawsuit.

46.     In or around July 2015, Homeland provided a preliminary analysis of coverage for the Ms. O I claim reserving rights under the applicable 2014 policy.  Among other things, Homeland notified CPL that General Condition (E) Territory limited coverage to a claim or suit made against an insured *in the U.S., its territories, Puerto Rico, or Canada*.  But because Ms. O I's solicitors had not yet provided written notice of an intent to hold CPL liable, no "Claim" had yet been technically made for which the 2014 Homeland policy could respond.  Until such time as a claim or suit was filed in the United States, there was nothing for Homeland to do.

47.     When Homeland spoke with CPL about this coverage issue, Sheridan Foster, Sonic USA's Senior Vice President of Legal Affairs and Risk Management at that time, informed Homeland that she would contact Gordon Young, Sonic's Risk Manager, to confirm whether there was a separate policy in place to cover any exposure related to the CervicalCheck program separate and apart from the 2014 Homeland policy.

48.     Homeland then spoke with Defendants' broker who confirmed there was no global insurance program in place that would cover CPL for the CervicalCheck claims under a different policy.  Homeland again advised that there was nothing for Homeland to do until a lawsuit was filed in the U.S. and served on CPL.

49.     In or around August 2015, the survivors of Ms. O I made an unequivocal "Claim" by filing suit in Ireland against the HSE, CPL, MedLab, Sonic Ireland, Sonic USA, Sonic and Quest Diagnostics, Inc., based on the alleged misreading of several of her slides prior to her

cancer diagnosis. Homeland again explained that there was nothing for Homeland to do unless and until a suit was filed in the United States and served on CPL.

50.     CPL received a copy of the Ms. O I lawsuit (filed in Ireland) in September 2015 by mail, but apparently was not properly served until April 2016.

51.     On or about April 27, 2016, Homeland discussed the Ms. O I claim with the broker and explained that under the policy then in effect, there was no coverage for claims made outside of the U.S. or Canada, as discussed in Homeland's July 2015 reservation of rights.

52.     On or about July 7, 2016, Homeland closed its file for the Ms. O I claim following receipt of the following message from Sheridan Foster:

> I believe that [Homeland] can close its file on this matter. Our ultimate parent company, also name[d] in the action, has arranged for representation of all Sonic affiliated entities under their coverage so we will not be looking to [Homeland] for defense on this matter. We are also aware of the limitation on coverage under the [Homeland] policy in place which provides defense only if the legal action is brought within the USA, which was not the case here.

**The Worldwide Territory and Additional Named Insured Endorsements**

53.     Shortly after the April 27, 2016 conversation, the broker—on behalf of Defendants, MedLab, and Sonic Ireland, and at the direction of Sonic—approached Homeland seeking to expand coverage to: (1) include claims made outside the U.S. against existing U.S. insureds (i.e., CPL and Sonic USA), and (2) include MedLab and Sonic Ireland as additional named insureds limited to coverage for cervical cytology screening services provided under the Irish contract from August 2010 to June 2013 for claims made in the U.S. Upon information and belief, Sonic insisted on coverage for Sonic Ireland and MedLab for liability these entities might face in the United States in connection with work performed by CPL in Texas related to the Irish contract. Sonic considered any refusal to add MedLab or Sonic Ireland to the policy as a "deal

breaker." At that time, Homeland understood that CPL had ceased providing services under Ireland's CervicalCheck program at some point in 2013.

54. Homeland agreed to the requested expansion of coverage, beginning with the June 30, 2016 to June 30, 2017 policy period, but first specifically required a "warranty," conditioning coverage upon the veracity of the following warranties set forth on behalf of CPL, Sonic USA, MedLab, and Sonic Ireland, in a letter dated July 27, 2016, provided on CPL letterhead by CPL's then-President and Director, and Sonic USA's then-Chief Executive Officer and Director, Stephen R. Shumpert (the "Warranty Letter"):

> The undersigned [Stephen R. Shumpert], on behalf of Sonic and any person proposed for coverage (the insureds) does hereby represent to OneBeacon Insurance and its writing company [Homeland] that:
>
> The insureds, after diligent inquiry, are not aware of any claims against the insured(s) or any fact, circumstance, situation, transaction, event, act, error, or omission that may give rise to a claim against the insured(s) Sonic Healthcare (Ireland) Limited, Medlab Pathology, and CPL of Austin as respect the cervical cytology laboratory screening services conducted between 8/1/2010 to 6/30/2013 and all claims and facts, circumstances, situations, transactions, events, acts, errors, or omissions against the insured(s) that may result in a claim have been reported to prior insurance carrier(s).
>
> OneBeacon Insurance and its writing company will be issuing its policy in reliance upon the conditions and statements made in this letter and the application both of which will be deemed to be a part of the policy.

The July 27, 2016 Warranty Letter is attached hereto as **Exhibit 1**. The Warranty Letter was also titled "Warranty letter" by CPL's broker when it transmitted the document to Homeland. It was perfectly reasonable for Homeland to seek warranties that none of the insureds proposed for coverage (i.e., CPL, Sonic USA, MedLab and Sonic Ireland) were aware of any actual or potential claims against any of these entities (without reference to where such claim was or could be brought) because originally many of the CervicalCheck claimants failed to recognize or otherwise include all potentially liable defendants, especially entities not domiciled in Ireland.

The parties subjectively intended that the Warranty Letter, including all conditions and statements made therein, be deemed to be a part of the policy. This intent was reflected by, among other things, the final paragraph in the Warranty Letter, as well as the parties' course of dealing and mutual understandings during the negotiation process. This intent was also made objectively clear by the application itself. The application required the signer, as the authorized agent of all individuals and entities proposed for coverage, to declare that the statements in the application *and information submitted with the application* (e.g., the Warranty Letter) (together referred to as the "Application") were true and complete, and agree that the Application would be "considered physically attached to, part of, and incorporated into the policy, if issued."

55. Upon information and belief, Sonic was directly involved in, and coordinated the provision to Homeland of, the warranties described above in the Warranty Letter, made on behalf of the insureds proposed for coverage, i.e., CPL and Sonic USA (for claims made outside the U.S.) and MedLab and Sonic Ireland (for claims made in the U.S. related to the Irish contract).

56. Years after providing Homeland the Warranty Letter, CPL disclosed for the first time that Mr. Shumpert only consulted with Nancy Stratton, who was Vice President of Quality Assurance of CPL, and with Sheridan Foster, who was Sonic USA's Senior Vice President of Legal Affairs and Risk Management prior to signing the July 27, 2016 Warranty Letter. This was contrary to Mr. Shumpert's representation in the Warranty Letter that he conducted a diligent inquiry regarding facts or circumstances that could give rise to potential claims against all proposed insureds.

57. CPL also then disclosed to Homeland for the first time that the warranty that "all claims and facts, circumstances, situations, transactions, events, acts, errors, or omissions against

-14-

the insured(s) that may result in a claim have been reported to prior insurance carrier(s)" referred to the Ms. O I claim, and only the Ms. O I claim.

58.     Unbeknownst to Homeland—and contrary to the warranties in his letter—Mr. Shumpert did not consult with anyone from Sonic Ireland or MedLab prior to signing the July 27, 2016 Warranty Letter.

59.     In reliance on the truth of the warranties in the July 27, 2016 Warranty Letter, which were explicitly made on behalf of the insureds proposed for coverage, including defendants CPL and Sonic USA, as well as MedLab and Sonic Ireland, Homeland added the Worldwide Territory Endorsement (No. 13) and the Additional Named Insured Endorsement (No. 24) to the 2016 policies, which respectively provided coverage for certain claims made outside of the United States to entities domiciled in the United States (i.e., Sonic USA and CPL), and coverage for Sonic Ireland and MedLab for cervical cytology screening services provided under the Irish contract from August 2010 to June 2013 for claims made in the U.S. Moreover, as expressly stated in the Warranty Letter, that Letter, including all conditions and statements made therein, were agreed to be a part of the policy.

60.     In continued reliance on the truth of these representations, Homeland issued the 2017 primary and excess policies at issue here. The 2017 policies were both renewals of the corresponding policies for the prior policy year. There is a Rate Stabilization Endorsement in the 2016 policies which states that unless there was a material change in exposure, Homeland would agree to renew the policies "upon the same terms, conditions, limits and retentions" at the same rate. That is precisely what happened when Homeland renewed the policies for 2017 at the same rate, thus incorporating the same terms and conditions as the 2016 policies—including the

representations in the July 27, 2016 Warranty Letter on which Homeland had relied and continued to rely.

## MedLab's 2016 Tender of the Ms. C I and Bulk Claim to Insurer Vero

61.     Contrary to the warranties in the Warranty Letter, at least some (if not all) of the insureds proposed for coverage were aware of claims or facts that might give rise to a claim against Sonic Ireland, MedLab, Sonic USA and/or CPL aside from the Ms. O I claim.  In fact, one lawsuit had already been filed concerning the alleged misreading of three slides by CPL and one slide by MedLab, and the names of 58 additional women had been provided to a different insurer as known potential claims against one or more of the Defendants, particularly MedLab and CPL.  This information was kept hidden from Homeland until after it agreed to provide the Worldwide Territory Endorsement and add Sonic Ireland and MedLab to the policy.

62.     MedLab began conducting CARs in 2012 as part of a quality assurance/peer review program.  Pursuant to these audits, when women screened through the CervicalCheck program develop cancer, their screening history was reviewed to determine whether any slides were misread in the screenings prior to a known cancer diagnosis.  Among other benefits listed, these CARs can "[p]rovide information to screened women about why their cancers were not detected or prevented."[4]

63.     Prior to 2016, the results of the CARs were considered to be for educational purposes and were not disclosed to patients.  However, in or around February 2016, the NSS implemented a protocol change which resulted in CAR results being reported to the patients'

---

[4]https://data.oireachtas.ie/ie/oireachtas/committee/dail/32/committee_of_public_accounts/submis sions/2018/2018-05-17_correspondence-health-service-executive-hse-v-q-and-a-12-jun-2016_en.pdf (HSE Q&A dated June 2016)

SMRH:4843-2402-9941.3

treating physicians.  The NSS provided notice of this change in protocol to at least MedLab by letter dated February 3, 2016.

64.     Notably, just because there was no policy of proactively reporting CAR results to patients or their physicians, this did not mean that misread slides would never be discovered by patients.  For example, the survivors of Ms. O I were privy to misreads by at least 2014 and sued several of the Defendants well before the 2016 NSS policy change.  CPL tendered this claim to its insurer, Homeland.  As discussed, CPL withdrew the Ms. O I claim, acknowledging the applicable policy did not provide coverage for lawsuits filed in Ireland.

### The Ms. C I Claim

65.     Upon information and belief, a second claimant became aware of a history of misread slides separate and apart from the 2016 NSS policy change.  By March 1, 2016, Ms. C I[5] had retained counsel and requested that the CervicalCheck program provide her with all of her medical records including, but not limited to, all of her gynecological cytology reports, confirmation as to which laboratory completed each report, a copy of all such reports resulting from the re-testing of all pap smears, and a copy of all correspondence on file including correspondence with testing laboratories.

66.     By March 23, 2016, MedLab tendered the Ms. C I claim to MedLab's insurer, Vero.[6]  The tender of the Ms. C I claim included at least three slides that were analyzed at CPL between 2010 and 2011, and not at MedLab.  CPL did not tender the Ms. C I claim to any insurer

---

[5]The name of the deceased claimant has been abbreviated and details omitted to ensure privacy as Homeland is unsure whether this matter was made public in Ireland.  This claim is referred to as the "Ms. C I" claim as it is separate and distinct from the "Ms. C II" claim discussed below.

[6]"Vero" refers to AAI Limited ABN 48 005 297 807 trading as Vero Insurance.

at this time. CPL also contends that it has no coverage for the Ms. C I claim under any insurance policy with Vero.

67.     CPL provided Homeland with a letter dated April 11, 2016 from counsel for Ms. C I to MedLab which, among other things, explained that counsel was made aware that a CAR had been conducted and four smear tests regarding Ms. C I taken between November 2010 and September 2012 were reviewed and the results were amended in all four cases. One slide was from 2010, two were from 2011, and one was from 2012.

68.     The letter also stated: "If you believe that any other entity/individual may have responsibility for our client's injuries please identify that entity/individual now."

69.     The report generated for each slide analyzed by CPL indicates where the testing and/or pathologist interpretation takes place. Therefore, whether CPL or MedLab was the entity involved in analyzing the slide is readily attainable information.

70.     Moreover, MedLab was not involved in analyzing slides for the CervicalCheck program until 2012. Three of the four Ms. C I slides at issue were analyzed in 2010 and 2011.

71.     MedLab did not inform counsel for Ms. C I that CPL was involved in analyzing three of the slides in response to the April 11, 2016 letter for more than two years after receipt of that letter.

72.     Vero provided liability insurance for professional services (specifically to providers of facilities and services to medical and allied health professionals) to named insured Sonic and its subsidiaries pursuant to its terms and conditions. The Vero policy thus provided medical facilities professional liability insurance similar to the various Homeland policies. Upon information and belief, Vero's policy period was from March 31 to March 31 each year.

73.    In April 2016, Ms. C I sued the HSE and MedLab based on the alleged misreading of four slides, three of which were slides read by CPL, not MedLab.  As with the Ms. O I claim, Ms. C I also did not originally name any non-Irish entities.

74.    Ms. C I died during the pendency of her claim.  Her lawsuit continues in her husband's name.

75.    MedLab apparently failed to inform Ms. C I's counsel until at least 2018 that CPL was the lab that allegedly misread three of the four slides, despite knowing this information at the time Ms. C I specifically requested confirmation of the involved laboratories in her March and April 2016 letters, and at the time she filed suit against MedLab in April 2016.

76.    The Ms. C I litigation was thus commenced months in advance of Mr. Shumpert's purported "diligent inquiry" of the Defendants referenced in the Warranty Letter (i.e., CPL, Sonic USA, MedLab and Sonic Ireland).

77.    Later in 2018, CPL tendered potential claims based on the same three slides related to Ms. C I as part of a bulk notice to Homeland under the 2017 policy, which by that time contained the Worldwide Territory Endorsement.

78.    In or around June of 2018, Homeland received correspondence from CPL's broker concerning the Ms. C I matter and requesting defense and indemnity on behalf of, among other entities, CPL.  According to the information and documents provided to Homeland, as of June 2018, CPL had still not been named as a defendant.

79.    Despite no claim having actually been made against CPL, CPL nevertheless not only provided notice of the claim, but also sought defense and indemnity from Homeland.

80.    In MedLab's Personal Injuries Defence filed in April 2019, MedLab made clear that its position was that liability for these three slides rests with CPL.

**MedLab's 2016 Bulk Claim to Vero**

81.     On or about February 26, 2016, MedLab provided a "MedLab Pathology Incident Report" to at least Defendants' broker.  The report concerned "the change in process for cancer audits."

82.     Following that report, MedLab reviewed all patients involved in the cancer audits to date.

83.     Following that review, on March 17, 2016, MedLab provided a list of 58 women (and related information) whose slides might have been misread and who thus might make a claim to the broker.  The broker provided this same information to Vero.

84.     Many of those claims included women whose slides were reviewed by CPL—and CPL alone—in addition to women whose slides were reviewed by both MedLab and CPL, and women whose slides were reviewed by MedLab alone.

85.     Sonic's Risk Manager, Gordon Young, was involved in the communication of this information from MedLab.  Mr. Young was thus aware by March of 2016 that CPL and Sonic USA faced potential liability for CervicalCheck claims for which they had no insurance coverage in Ireland.  Upon information and belief, at least Dr. Goldschmidt, who sat on the Risk Committee of Sonic and was concurrently a member of the Board of Directors of CPL and Sonic USA from at least 2010 until this time, was also aware of CPL's and Sonic USA's gap in coverage.  Upon information and belief, Mr. Young and Mr. Goldschmidt were also aware by this time that MedLab and Sonic Ireland would not be covered for CervicalCheck claims brought in the U.S.

86.     During the pendency of Homeland's coverage investigation for the CervicalCheck claims, CPL provided Homeland with copies of Vero insurance policies.

87. The Vero policies state that the "Policyholder" is "Sonic Healthcare Ltd and Subsidiaries" (subject to the policies' terms and conditions).

88. One such Vero policy (the "2015-2016 Vero Policy") was issued for the policy period "From 4 pm (Local Standard Time) 31/03/2015 To 4 pm (Local Standard Time) 31/03/2016."

89. The 2015-2016 Vero Policy states that it is a "Civil Liability Professional Indemnity Insurance Policy."

90. The 2015-2016 Vero Policy defines Professional Services as:

Providers of facilities and services to medical and allied health professionals (including but not limited to provision of buildings facilities, laboratories, staff, equipment, training, electronic and manual results delivery, and practice management); Clinical Trials and Research Projects, provider of pathology services including diagnostic services; provider of diagnostic imaging services as well as Tele-radiology services; education and training (theory and practical) in a range of medical and paramedical disciplines; Medical Practitioners; Nurses; Imaging Technicians; Radiologists; Pathologists; Pathology Scientific and Technical Specialists; Positions held with external committees and industry groups relative to the Professional Services; Occupational Health Services; And all activities that are appropriate to be carried out in connection with the above services and advice including but not limited to the provision of imaging, screening, scanning, research, testing, diagnosis, assessment, analysis, training, teaching, publishing, treatment, examination, collection, storage, monitoring, reporting, support, maintenance, administration, management, consultation and advisory services.

91. Vero also issued a policy for "Policyholder: Sonic Healthcare Ltd and Subsidiaries" for the policy period "From 4 pm (Local Standard Time) 31/03/2016 To 4 pm (Local Standard Time) 31/03/2017" (the "2016-2017 Vero Policy").

92. The 2016-2017 Vero Policy states that it is a "Civil Liability Professional Indemnity Insurance Policy."

93. The 2016-2017 Vero Policy defines Professional Services as:

Providers of facilities and services to medical and allied health professionals (including but not limited to provision of buildings facilities, laboratories, staff, equipment, training, electronic and manual results delivery, and practice management); Clinical Trials and Research Projects, provider of pathology services including diagnostic services; provider

of diagnostic imaging services as well as Tele-radiology services; education and training (theory and practical) in a range of medical and paramedical disciplines; Medical Practitioners; Nurses; Imaging Technicians; Radiologists; Pathologists; Pathology Scientific and Technical Specialists; Positions held with external committees and industry groups relative to the Professional Services; Occupational Health Services; Dental Services; And all activities that are appropriate to be carried out in connection with the above services and advice including but not limited to the provision of imaging, screening, scanning, research, testing, diagnosis, assessment, analysis, training, teaching, publishing, treatment, examination, collection, storage, monitoring, reporting, support, maintenance, administration, management, consultation and advisory services.

94. CPL contends that MedLab did not share the list of 58 women with CPL. CPL also contends that MedLab did not inform CPL of the 2016 NSS policy change until two years later in 2018.

95. Upon information and belief, Sonic USA also contends that MedLab did not share the list of 58 women with Sonic USA. Also upon information and belief, Sonic USA contends that MedLab did not inform Sonic USA of the 2016 NSS policy change until two years later in 2018.

96. MedLab has offered no explanation for why it would keep information of a pending onslaught of litigation from CPL for two years, only to later turn around and point the finger at CPL as the liable party.

97. On March 23, 2016, MedLab, through the broker, submitted the list of 58 women to its insurer Vero. Even though many of the women listed had slides reviewed by CPL, CPL did not provide this information to Homeland.

98. Upon information and belief, MedLab, through the broker, noticed the Ms. C I claim and the list of 58 women to its insurer Vero under the 2015-2016 Vero Policy.

99. Homeland has requested, among other things, board meeting minutes from this critical time period pursuant to its right to examine books and records of its insureds and

pursuant to Defendants' duties of assistance and cooperation under the Homeland policies. Defendants have refused to comply with these reasonable requests, among others.

100.    Therefore, at the very least, MedLab was aware of the Ms. C I lawsuit and the potential for claims by an additional 58 women at the time of the July 2016 Warranty Letter to Homeland.

101.    It is furthermore clear that, contrary to his representations in the Warranty Letter, Mr. Shumpert did not conduct a diligent inquiry on behalf of all of the insureds proposed for coverage (i.e., MedLab and Sonic Ireland) to determine if there were any facts known to potentially give rise to a claim against Sonic Ireland, MedLab, Sonic USA or CPL. There is no dispute that a lawsuit (aside from the Ms. O I claim) was already pending, and at least 58 women were known as potential claimants whose potential claims had already been tendered to another insurer.

102.    Upon information and belief, at least some of the slides CPL noticed to Homeland in 2018 were slides that MedLab, through the broker, noticed or tendered to Vero under the 2016-2017 Vero Policy.

103.    Upon information and belief, MedLab is also insured under a Vero "Civil Liability Professional Indemnity Insurance Policy" for policy period "From 4 pm (Local Standard Time) 31/03/2017 To 4 pm (Local Standard Time) 31/03/2018" (the "2017-2018 Vero Policy").

104.    Upon information and belief, at least some of the slides CPL noticed to Homeland in 2018 were slides that MedLab, through the broker, noticed or tendered to Vero under the 2017-2018 Vero Policy.

SMRH:4843-2402-9941.3

## The Ms. Vicky Phelan Claim and Ireland's CervicalCheck Scandal

105. While the NSS changed its policy in 2016 with respect to disclosure of the CARs—such that MedLab anticipated it could face lawsuits by some 58 women who it presumed would soon be made aware of the errors—confusion arose in Ireland over how to implement the new policy.

106. In or around February 2016, the NSS began "issuing letters detailing the audit outcomes to the treating clinicians in relevant cases." But there was some confusion and/or dispute between the director of CervicalCheck and the treating clinicians as to *who* should tell women diagnosed with cervical cancer that the reviews of their slides indicated that the initial reading had been in error.

107. Through litigation it later became public knowledge that the CervicalCheck program told doctors in a circular in July 2016 that the revised test results should be added to the woman's file. They were told as a "general rule of thumb" that the woman should be told about the results but that clinicians should "use their judgment in selected cases where it is clear that discussion of the outcomes of the review could do more harm than good." In cases where a woman had died, doctors were told simply to ensure that the result was recorded in the woman's notes.

108. In one particular case, a Limerick gynecologist who treated Ms. Vicky Phelan had been arguing with the director of CervicalCheck since the summer of 2016 that it was the responsibility of CervicalCheck, not the clinicians, to inform the women. Finally, near the end of September 2017, the clinician finally informed Ms. Phelan of the 2014 CAR results of a slide that had been misread in 2011.

SMRH:4843-2402-9941.3

109.    Shortly thereafter, the public began to slowly learn the details of what would quickly become known as Ireland's CervicalCheck cancer scandal.

110.    Ms. Phelan retained counsel and informed the HSE and MedLab at the end of 2017 or beginning of 2018 that she intended to file a lawsuit in Ireland.  Ms. Phelan filed a lawsuit against the HSE and MedLab on February 12, 2018.

111.    Ms. Phelan's sole allegedly misread slide from 2011 was reviewed by CPL, not MedLab.  Nevertheless, Ms. Phelan's slide was part of MedLab's bulk claim report to Vero in March 2016 noticed under the 2015-2016 Vero Policy.

112.    On February 12, 2018, MedLab provided an update to CPL with respect to the Ms. C I claim.  According to CPL, during that call, MedLab finally disclosed generally that CARs had been performed on a number of patient slides, that results of the audit reviews might be made known to the patients, and specific mention was made of Ms. Phelan.

113.    On February 14, 2018, according to CPL, MedLab advised CPL that the Ms. Phelan case was progressing quickly and that CPL would soon be named as a defendant.

114.    On or about February 14, 2018, CPL finally reported the Ms. C I and Ms. Phelan claims to Homeland, tendering both claims to Homeland under the 2017 primary policy.  Both of these claims had been previously tendered to Vero in March 2016, nearly two years earlier.  The notices to Homeland were provided on Homeland's "Health Care Claim/Incident Reporting Form."  This form asked whether the claim or incident was "Reported to previous carriers?"  CPL checked the box for "No" for both claims.

115.    Shortly thereafter in May of 2018, CPL reported a list of 101 slides to Homeland which CPL believed may result in future claims against it.  A large portion of the potential claims had also been reported to Vero in March 2016 by MedLab (through its broker), over two

years earlier.  The bulk claim to Homeland in May 2018 included the Ms. C I, Ms. Phelan, Ms. S, Ms. A, Ms. O II, and Ms. C II claims.

116.    In March 2016, MedLab noticed and/or tendered, through its broker, the slides at issue in the Ms. C I, Ms. Phelan, Ms. S, Ms. A, Ms. O II, and Ms. C II claims to Vero.

117.    Upon information and belief, MedLab noticed and/or tendered, through its broker, the slides at issue in the Ms. C I, Ms. Phelan, Ms. S, Ms. A, Ms. O II, and Ms. C II claims to Vero under the 2015-2016 Vero Policy.

118.    On or about February 15, 2018, counsel for MedLab wrote to Ms. Phelan's counsel advising that the responsibility for processing and reporting on the slides rested with CPL and not MedLab, and foreshadowing that an Application was to be made to the court to substitute CPL as a defendant.  Counsel for MedLab also told the court that there would be no prejudice to Ms. Phelan as both labs (i.e., MedLab and CPL) were covered under the same insurance policy.  According to Vero, Vero was never consulted with respect to this decision or this representation.

119.    On or about February 16, 2018, Vero contends it received an email from the broker dated February 14, 2018 enclosing correspondence from Ms. Phelan's counsel to MedLab and CervicalCheck.  According to Vero, this was the first time a claim was made to it (presumably with respect to the filing of a lawsuit, as opposed to the notice of potential claim provided to Vero in March 2016).  Also according to Vero, the email made no mention of CPL in the material provided to it, only MedLab.

120.    That same day, Vero granted indemnity to MedLab under the terms and conditions of Vero's policy and based on the facts and circumstances known to it to date.  Vero

requested confirmation of where the testing of the slides was carried out, but no response to this question was ever provided.

121.     On or about February 22, 2018, Ms. Phelan amended her lawsuit to name CPL instead of MedLab.

122.     Homeland immediately began investigating coverage for the Ms. Phelan claim.

123.     As Homeland carried out its coverage investigation, it raised to CPL what it believed to be several obstacles to coverage for the Ms. Phelan claim.  In order to assist in its investigation, Homeland sought various categories of documents from CPL and the other Defendants/insureds.

124.     CPL produced a small portion of the documents Homeland reasonably requested. But critically, CPL failed to produce key documents such as the 2016 bulk claim report to Vero—information necessary for Homeland to determine whether the Homeland policy's Prior Notice or Prior Knowledge (to another insurer) Exclusions applied to bar coverage.

125.     While Homeland was in the middle of its coverage investigation for the Ms. Phelan matter, it received notice on April 26, 2018 that no further action from Homeland would be required:

> The matter has settled as against Medlab/CPL for 2.5 million euros plus costs. Please inform [Homeland] that another insurer (Vero) has granted indemnity in relation to the settlement.

> At this point, it would appear no further action will be needed from [Homeland].

126.     Homeland therefore closed its file for the Ms. Phelan claim.

127.     In or around January or February of 2019, Homeland received information from the broker that Vero would be seeking reimbursement from Sonic for various of the CervicalCheck claims.

SMRH:4843-2402-9941.3

128.    While Homeland is not privy to all of those communications, the broker did forward a letter dated October 2, 2018 from Vero concerning the Ms. Phelan matter outlining the information pertaining to Vero above.  The Vero letter contains conflicting information as to whether CPL is covered under the Vero policy for the CervicalCheck claims.

129.    Vero's letter makes clear that: (1) Vero believes it was misled with respect to which Sonic entity was the liable party in the Ms. Phelan matter, (2) that it did not receive timely updates or responses with respect to its reasonable requests for information in order to investigate coverage and assess the Ms. Phelan claim in the time between the lawsuit's inception and trial/settlement, and (3) that Sonic "may have considered that there was an indemnity issue relating to coverage for CPL under the Vero policy" but that at no point was this issue raised with Vero.

### The Ms. S Claim

130.    Against this backdrop, CPL now seeks reimbursement under Homeland's 2017 policies for defense expenses and settlement of the Ms. S[7] claim, which combined amounts are within the combined limits of both policies and in excess of the Court's jurisdictional threshold.

131.    Ms. S's claim, like Ms. Phelan's, concerns only one allegedly misread slide.

132.    As with Ms. C I's and Ms. Phelan's claims, Ms. S's claim was also tendered to Vero in March of 2016.

133.    Upon information and belief, MedLab, through the broker, noticed the slide at issue in the Ms. S claim to its insurer Vero under the 2015-2016 Vero Policy.

---

[7] The name of the claimant has been abbreviated and details omitted to ensure privacy and confidentiality as Homeland is unsure whether this matter was made public in Ireland.

134.     Here, MedLab tendered a potential claim concerning the exact same slide regarding Ms. S to Vero in 2016 as it did to Homeland in 2018, and upon which CPL now seeks reimbursement.

135.     Originally, as with the Ms. Phelan matter, the Ms. S lawsuit only named MedLab and not CPL when it was filed in August 2018.

136.     Although MedLab was always aware that the sole allegedly misread Ms. S slide was reviewed by CPL, it did not provide this information to Ms. S's counsel until March 2019. In May of 2019, Ms. S added Sonic Ireland and CPL as defendants in the lawsuit, in addition to MedLab and the HSE.

137.     Only then did CPL begin to aggressively seek coverage under the Homeland policies.

138.     CPL settled the Ms. S matter in October 2019.  Defendants Sonic Ireland and MedLab did not contribute to the settlement.

139.     Because the Worldwide Territory Endorsement provides for only a duty to reimburse—as opposed to a duty to defend—Homeland's only potential duty to pay with respect to any of the CervicalCheck claims filed in Ireland could be triggered only upon CPL's payment of covered defense expenses and/or loss in excess of the 2017 primary policy's deductible.

140.     On or about May 13, 2020, CPL provided notice that it contended it had paid covered defense expenses and/or loss in excess of the 2017 primary policy's deductible.

141.     On May 26, 2020, Homeland advised CPL that, as discussed in earlier correspondence, Homeland believed CPL continued to face a number of obstacles to coverage for the Ms. S claim.  This included the 2017 primary policy's exclusion resulting from MedLab's prior notice of the Ms. S claim to Vero, as well as concerns that the July 27, 2016 Warranty

Letter signed by Mr. Shumpert on behalf of all persons and entities proposed for coverage, and upon which Homeland relied in issuing policies containing the Worldwide Territory Endorsement, was materially inaccurate. Homeland explained that, at that time, it believed these two issues were likely to preclude coverage for the Ms. S claim. Homeland, however, wanted to provide CPL and the other Defendants with one final chance to produce the remaining documents that Homeland had been requesting or any other information that might provide a basis for Homeland to find coverage in CPL's favor.

142.    As of the date of the filing of this complaint, Defendants have failed to provide any additional information or documents.

143.    Homeland appropriately denied the Ms. S claim on July 10, 2020 based on the information known to date.

144.    Homeland now seeks a final declaration from the Court that there is no coverage for any of the Defendants under the 2017 policies for the Ms. S claim based on at least all of the facts adduced herein.

## The Ms. A Claim

145.    Against this backdrop, CPL also now seeks reimbursement under Homeland's 2017 policies for defense expenses and settlement of the Ms. A[8] claim, which combined amounts are within the combined limits of both policies and in excess of the Court's jurisdictional threshold.

146.    Ms. A's claim involves multiple allegedly misread slides (at least seven), including slides read by CPL and MedLab. On information and belief, CPL read at least one

---

[8] The name of the claimant has been abbreviated and details omitted to ensure privacy and confidentiality as Homeland is unsure whether this matter was made public in Ireland.

SMRH:4843-2402-9941.3

slide (in or about January 2011), and MedLab read at least three slides (in or about January and December 2012 and January 2014).

147.    As with Ms. C I's, Ms. Phelan's, and Ms. S claims, Ms. A's claim was also tendered to Vero in March of 2016.

148.    Upon information and belief, MedLab, through the broker, noticed the slide at issue in the Ms. A claim to its insurer Vero under the 2015-2016 Vero Policy.

149.    On information and belief, Ms. A was diagnosed with cervical cancer in 2015, and was informed in or about May 2018 that her slides may have been misread (including slides purportedly read by CPL and MedLab).  Ms. A was thereafter notified that her cancer was terminal.

150.    The Ms. A claim was part of both the March 2016 bulk claim to Vero, as well as the May 2018 bulk claim to Homeland.

151.    Ms. A filed her initial lawsuit in Ireland in or about April 2020, in which she named several defendants, including CPL and MedLab.  In or about September 2020, CPL's counsel (William Fry) accepted service of that lawsuit on CPL's behalf.  On information and belief, MedLab was also thereafter served.

152.    On or about February 2, 2021, CPL's counsel notified Homeland that CPL and MedLab had reached a settlement on the Ms. A claim.

153.    In or about April 2021, CPL requested through its counsel that Homeland reimburse it for settlement and defense costs within the jurisdictional limit of this Court.

154.    Because the Worldwide Territory Endorsement provides for only a duty to reimburse—as opposed to a duty to defend—Homeland's only potential duty to pay with respect

to any of the CervicalCheck claims filed in Ireland could be triggered only upon CPL's payment of covered defense expenses and/or loss in excess of the 2017 primary policy's deductible.

155.    As with the Ms. S claim, CPL faces a number of obstacles to coverage for the Ms. A claim. This includes, but is not limited to, the 2017 primary policy's exclusions resulting from MedLab's prior notice of the Ms. A claim to Vero and/or prior knowledge of the same, as well as concerns with the July 27, 2016 Warranty Letter signed by Mr. Shumpert on behalf of all persons and entities proposed for coverage, and upon which Homeland relied in issuing policies containing the Worldwide Territory Endorsement, was materially inaccurate.

156.    Homeland now seeks a final declaration from the Court that there is no coverage for any of the Defendants under the 2017 policies for the Ms. A claim based on at least all of the facts adduced herein.

## The Ms. O II Claim

157.    Against this backdrop, CPL also now seeks reimbursement under Homeland's 2017 policies for defense expenses and settlement of the Ms. O II[9] claim, which combined amounts are within the combined limits of both policies and in excess of the Court's jurisdictional threshold.

158.    Ms. O II's claim involves multiple allegedly misread slides (at least three), including slides read by CPL. On information and belief, CPL read at least two slides (in or about October 2010 and August 2011), which were then reported by MedLab.

---

[9] The name of the claimant has been abbreviated and details omitted to ensure privacy and confidentiality as Homeland is unsure whether this matter was made public in Ireland. This claim is referred to as the "Ms. O II" claim as it is separate and distinct from the above-noted "Ms. O I" claim.

159.   As with Ms. C I's, Ms. Phelan's, Ms. S's, and Ms. A's claims, Ms. O II's claim was also tendered to Vero in March of 2016.

160.   Upon information and belief, MedLab, through the broker, noticed the slides at issue in the Ms. O II claim to its insurer Vero under the 2015-2016 Vero Policy.

161.   On information and belief, Ms. O II was diagnosed with cervical cancer in or around November 2011, and was informed in or about May 2018 that her slides may have been misread (including slides purportedly read by CPL).

162.   The Ms. O II claim was part of both the March 2016 bulk claim to Vero, as well as the May 2018 bulk claim to Homeland.

163.   Ms. O II filed her lawsuit in Ireland in or about August 2018, in which she named several defendants, including CPL.  In or about November 2018, CPL was served with Ms. O II's complaint.  In or about January 2019, CPL's counsel (William Fry) appeared in the lawsuit on CPL's behalf.

164.   On or about April 28, 2021, CPL's counsel notified Homeland that CPL and its co-defendants had reached a settlement on the Ms. O II claim.

165.   In or about May 2021, CPL's counsel confirmed that CPL was requesting that Homeland reimburse it for settlement and defense costs within the jurisdictional limits of this Court.

166.   Because the Worldwide Territory Endorsement provides for only a duty to reimburse—as opposed to a duty to defend—Homeland's only potential duty to pay with respect to any of the CervicalCheck claims filed in Ireland could be triggered only upon CPL's payment of covered defense expenses and/or loss in excess of the 2017 primary policy's deductible.

SMRH:4843-2402-9941.3

167.    As with the Ms. S and Ms. A claim, CPL faces a number of obstacles to coverage for the Ms. O II claim.   This includes the 2017 primary policy's exclusions resulting from MedLab's prior notice of the Ms. O claim to Vero and/or prior knowledge of the same, as well as concerns with the July 27, 2016 Warranty Letter signed by Mr. Shumpert on behalf of all persons and entities proposed for coverage, and upon which Homeland relied in issuing policies containing the Worldwide Territory Endorsement, was materially inaccurate.

168.    Homeland now seeks a final declaration from the Court that there is no coverage for any of the Defendants under the 2017 policies for the Ms. O II claim based on at least all of the facts adduced herein.

## The Ms. C II Claim

169.    Against this backdrop, CPL also now seeks reimbursement under Homeland's 2017 policies for defense expenses and settlement of the Ms. C II[10] claim, which combined amounts are within the combined limits of both policies and in excess of the Court's jurisdictional threshold.

170.    On information and belief, Ms. C II's claim involves at least one allegedly misread slide that was read by CPL.

171.    As with Ms. C I's, Ms. Phelan's, Ms. S's, Ms. A's, and Ms. O II's claims, Ms. C II's claim was also tendered to Vero in March of 2016.

172.    Upon information and belief, MedLab, through the broker, noticed the slide at issue in the Ms. C II claim to its insurer Vero under the 2015-2016 Vero Policy.

---

[10] The name of the claimant has been abbreviated and details omitted to ensure privacy and confidentiality as Homeland is unsure whether this matter was made public in Ireland.   This claim is referred to as the "Ms. C II" claim as it is separate and distinct from the above-noted "Ms. C I" claim.

SMRH:4843-2402-9941.3

173. On information and belief, Ms. C II was diagnosed with cervical cancer and, unfortunately, passed away.

174. The Ms. C II claim was part of both the March 2016 bulk claim to Vero, as well as the May 2018 bulk claim to Homeland.

175. On information and belief, Ms. C II's surviving spouse filed a lawsuit in Ireland in or about 2018, in which she named several defendants, including CPL, MedLab, and Sonic Ireland. In or about January 2019, CPL's counsel (William Fry) appeared in the lawsuit on CPL's behalf.

176. On or about May 5, 2021, CPL's counsel notified Homeland that CPL had reached a settlement in the Ms. C II claim.

177. In or about May 2021, CPL's counsel confirmed that CPL was requesting that Homeland reimburse it for settlement and defense costs within the jurisdictional limits of this Court.

178. Because the Worldwide Territory Endorsement provides for only a duty to reimburse—as opposed to a duty to defend—Homeland's only potential duty to pay with respect to any of the CervicalCheck claims filed in Ireland could be triggered only upon CPL's payment of covered defense expenses and/or loss in excess of the 2017 primary policy's deductible.

179. As with the Ms. S, Ms. A, and Ms. O II claims, CPL faces a number of obstacles to coverage for the Ms. C II claim. This includes the 2017 primary policy's exclusions resulting from MedLab's prior notice of the Ms. C II claim to Vero and/or prior knowledge of the same, as well as concerns with the July 27, 2016 Warranty Letter signed by Mr. Shumpert on behalf of all persons and entities proposed for coverage, and upon which Homeland relied in issuing policies containing the Worldwide Territory Endorsement, was materially inaccurate.

SMRH:4843-2402-9941.3

180.    Homeland now seeks a final declaration from the Court that there is no coverage for any of the Defendants under the 2017 policies for the Ms. C II claim based on at least all of the facts adduced herein.

**<u>Additional Ongoing Claims</u>**

181.    Since Homeland initiated this suit, CPL has made claims for reimbursement of settlement and defense expenses for the Ms. A, Ms. O II, and Ms. C II claims.  CPL has given Homeland notice of other potential claims arising out of the Irish CervicalCheck program that have not yet resulted in settlements or judgments or in claims by CPL to Homeland for reimbursement.  Homeland anticipates that, as CPL has recently done with respect to the Ms. A, Ms. O II, and Ms. C II claims, CPL will continue to request reimbursement under the Homeland 2017 policies for such additional claims as those claims continue to resolve ("Additional Ongoing Claims").

182.    As with the above-noted specific claims, CPL will continue to face a number of obstacles to coverage for any such Additional Ongoing Claims.  This includes the 2017 primary policy's exclusions resulting from MedLab's prior notice of any such claims to Vero and/or prior knowledge of the same, as well as concerns with the July 27, 2016 Warranty Letter signed by Mr. Shumpert on behalf of all persons and entities proposed for coverage, and upon which Homeland relied in issuing policies containing the Worldwide Territory Endorsement, was materially inaccurate.

183.    Homeland now seeks a final declaration from the Court that there is no coverage for any of the Defendants under the 2017 policies for any Additional Ongoing Claims based on the facts alleged herein.

SMRH:4843-2402-9941.3

## THE INSURANCE POLICIES

### The 2016 Primary Policy

184.     Homeland issued a Primary Medical Facilities and Providers Professional Liability Insurance Policy number MFL-004062-0616 (the "2016 Primary Policy"), to Named Insured Sonic Healthcare Investments, G.P. for the policy period June 30, 2016 through June 30, 2017, which provides certain coverage pursuant to the policy's terms, conditions, and exclusions. Sonic Healthcare Investments, G.P.'s principal place of business is listed as 9737 Great Hills Trail, Suite 100, Austin, TX 78759-6449. (2016 Primary Policy ITEM 1 and ITEM 2.) As outlined above, based on the warranties in the 2016 Warranty Letter, Homeland added the Worldwide Territory Endorsement (No. 13) and the Additional Named Insured Endorsement (No. 24) to the 2016 Primary Policy. The 2016 Primary Policy with those additional endorsements is attached hereto as **Exhibit 2**.

185.     Incorporated into the 2016 Primary Policy was the July 27, 2016 Warranty Letter. As expressly stated in that Letter, Homeland issued the 2016 policies "in reliance upon the conditions and statements made in this letter and application both of which will be deemed to be a part of the policy." In other words, Homeland and all of the insureds (including, but not limited to, CPL and Sonic USA), explicitly agreed that the Warranty Letter would be incorporated into the 2016 policies.

186.     The 2016 Primary Policy also included a Rate Stabilization Endorsement that stated, in pertinent part:

In consideration of the premium charged:

(1)   It is understood and agreed that, unless there is a **Material Change In Exposure** or a **Material Change In Loss Picture**, as such terms are defined below, the Underwriter agrees to renew this Policy, upon the same terms,

conditions, limits and retention(s), at a rate that shall not exceed the rate used to determine the premium charged for this Policy.

2016 Primary Policy, Endorsement No. 11.

187.    The 2016 Primary Policy contains several other terms and conditions, including those outlined in further detail below with respect to the 2017 Primary Policy.

## The 2016 Excess Policy

188.    Homeland also issued an Excess Medical Facilities Liability Insurance Policy, policy number MFX-002013-0616 (the "2016 Excess Policy"), to Sonic Healthcare Investments, G.P. for the policy period June 30, 2016 through June 30, 2017, which provides certain coverage pursuant to the policy's terms, conditions, and exclusions.  2016 Excess Policy, Declarations ITEM 1 and ITEM 2.  The 2016 Excess Policy is attached hereto as **Exhibit 3**.

189.    The 2016 Excess Policy contains several other terms and conditions, including those outlined in further detail below with respect to the 2017 Excess Policy.

## The 2017 Primary Policy

190.    Homeland renewed the Primary Medical Facilities and Providers Professional Liability Insurance Policy, policy number MFL-004062-0617 (the "2017 Primary Policy"), which was again issued to Named Insured Sonic Healthcare Investments, G.P. for the policy period June 30, 2017 through June 30, 2018, which provides certain coverage pursuant to the policy's terms, conditions, and exclusions.  Sonic Healthcare Investments, G.P.'s principal place of business is listed as 9737 Great Hills Trail, Suite 100, Austin, TX 78759-6449.  2017 Primary Policy, Declarations ITEM 1 and ITEM 2.  The 2017 Primary Policy is attached hereto as **Exhibit 4**.

191.    Subject to the Rate Stabilization Endorsement in the 2016 Primary Policy, Homeland renewed the 2017 Primary Policy at the same rate that it had charged for the previous

SMRH:4843-2402-9941.3

year.  Thus, pursuant to the Rate Stabilization Endorsement, the 2017 Primary Policy was renewed based "upon the same terms, conditions, limits and retention(s)" as the 2016 Primary Policy, including, but not limited to, the 2016 Warranty Letter, which was incorporated into the 2016 Primary Policy for the reasons outlined above.

192.    The Insuring Agreement in the 2017 Primary Policy provides:

> The Underwriter will pay up to the applicable Limit of Liability shown in ITEM 4.A. of the Declarations on behalf of the **Insured** any **Loss** that the **Insured** is legally obligated to pay as a result of any covered **Claim** for a **Professional Services Wrongful Act** happening on or after the **Retroactive Date**; provided, that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable Extended Reporting Period and reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

2017 Primary Policy, § I(A) Claims Made Professional Liability Insurance.

193.    The term "**Claim**" is defined as "any written notice received by an **Insured** that any person or entity intends to hold an **Insured** responsible for a **Wrongful Act** or an **Occurrence**."  2017 Primary Policy, § II, Definition (F).

194.    The term "**Defense Expenses**" is defined as "the reasonable fees of attorneys, experts and consultants and costs and expenses incurred in the investigation, adjustment, defense or appeal of a **Claim** with the approval or at the direction of the Underwriter; provided, that **Defense Expenses** shall not include: (1) remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of an **Insured**; (2) any amounts incurred in defense of a **Claim** for which any other insurer has a duty to defend, regardless of whether such other insurer undertakes such duty; or (3) any benefits under an **Employee Benefit Program**."  2017 Primary Policy, § II, Definition (H).

195.    The term "**Insured**" is defined as, as relevant here, "the **Named Insured**."  2017 Primary Policy, § II, Definition (S).

196.    The term "**Named Insured**" is defined as "the **First Named Insured** and each other entity listed as a **Named Insured** in Schedule A to this Policy."  2017 Primary Policy, § II, Definition (CC).

SMRH:4843-2402-9941.3

197. The term "**First Named Insured**" is defined as "the entity designated as such in ITEM 1 of the Declarations [Sonic Healthcare Investments, G.P.]." 2017 Primary Policy, § II, Definition (O) and Declarations ITEM 1.

198. The 2017 Primary Policy contains the following Additional Named Insured Endorsement:

(1)     The term "**Named Insured**,"[11] as defined in Section II DEFINITIONS of this Policy, is amended to include the entity(ies) scheduled below (each an "Additional Named Insured"), but solely:

    (a)     with respect to liability imposed or sought to be imposed on such Additional Named Insured that is based on or arises out of acts, errors or omissions committed or allegedly committed by such Additional Named Insured when and to the extent that, such Additional Named Insured is acting on behalf of, and within the capacity and scope of its duties for

        Sonic Healthcare Investments, G.P.

        ; and

    (b)     for **Wrongful Acts** happening on or after the Retroactive Date identified for each Additional Named Insured in the schedule below and **Occurrences** happening on or after the effective date of this endorsement [June 30, 2017]:

SCHEDULE

| Additional Named Insured: | Retroactive Date: |
| --- | --- |
| Sonic Healthcare USA, Inc | February 05, 2007 |
| … | |
| Clinical Pathology Laboratories, Inc | October 01, 2000 |
| … | |
| Sonic Healthcare Limited | February 05, 2007 |
| … | |
| Sonic Healthcare (Ireland) Limited (term date 06.30.2013) | August 01, 2010 |

---

[11] Bolded terms are terms that are defined in the policies.

(2)      It is understood and agreed that the Additional Named Insured(s) share in the applicable Limits of Liability set forth in ITEM 4 of the Declarations.

(3)      ITEM 3 of the Declarations shall be deemed amended to the extent necessary to effect the purpose and intent of this endorsement.

All other terms, conditions and limitations of the Policy shall remain unchanged.

2017 Primary Policy, § II, Definition (CC) Named Insured as amended by Endorsement Nos. 22 and 24, Additional Named Insured.

199.   The term "**Loss**" is defined as, as relevant here:

(1)      for the purposes of INSURING AGREEMENTS (A), (B) and (C), any damages, settlements, judgments or other amounts (including punitive or exemplary damages if insurable under the applicable law most favorable to the insurability thereof) in excess of the applicable deductible or self-insured retention, if any, stated in ITEM 4 of the Declarations which an **Insured** is legally obligated to pay as a result of a **Claim**; …

**Loss** shall not include:

(a)      **Defense Expenses**;

(b)      the multiple portion of any multiplied damage award;

(c)      fines, penalties, sanctions, fees, government payments or taxes;

(d)      amounts owed to any provider of **Medical Services** under any contract;

(e)      restitution, return or disgorgement of fees, profits, charges for products or services rendered, capitation payments, premium or any other funds allegedly wrongfully held or obtained;

(f)      benefits under an **Employee Benefit Program**;

(g)      relief or redress in any form other than monetary compensation or monetary damages, including without limitation the cost of complying with any injunctive, declaratory or administrative relief;

(h)      the payment, satisfaction or writing off of any medical bills or charges by an **Insured**; or

(i)      matters which are uninsurable under applicable law.

2017 Primary Policy, § II, Definition (X).

200.    The term "**Policy Period**" means "the period from the Inception Date of this Policy stated in ITEM 2(a) of the Declarations [June 30, 2017] to the Expiration Date of this Policy stated in ITEM 2(b) of the Declarations [June 30, 2018] or to any earlier cancellation date of this Policy."  2017 Primary Policy, § II, Definition (HH).

201.    The term "**Medical Services**" means "health care, medical care, or treatment provided to any individual, including without limitation any of the following: medical, surgical, dental, psychiatric, mental health, chiropractic, osteopathic, nursing, or other professional health care; the furnishing or dispensing of medications, drugs, blood, blood products, or medical, surgical, dental, or psychiatric supplies, equipment, or appliances in connection with such care; the furnishing of food or beverages in connection with such care; the providing of counseling or other social services in connection with such care; and the handling of, or the performance of post-mortem examinations on, human bodies."  2017 Primary Policy, § II, Definition (Z).

202.    The term "**Professional Services**" means, as relevant here, "**Medical Services** in connection with the Covered Operations/Services set forth in ITEM 5 of the Declarations [Medical Laboratory]."  2017 Primary Policy, § II, Definition (KK) and Declarations ITEM 5.

203.    The term "**Professional Services Wrongful Act**" means, as relevant here:

(1)    any actual or alleged act, error or omission, or series of acts, errors or omissions, by an **Insured** in rendering, or failing to render, **Professional Services**;

(2)    any actual or alleged act, error or omission, or series of acts, errors or omissions, by any person other than an **Insured** in rendering, or failing to render, **Medical Services**, but only for an **Insured**'s vicarious liability with regard to such **Medical Services**.  In no event shall this Policy provide coverage for the direct liability of any person other than an **Insured** for the rendering of, or failure to render, **Medical Services**; …

SMRH:4843-2402-9941.3

2017 Primary Policy, § II, Definition (LL).

204.    The term "**Wrongful Act**" means "any **Professional Services Wrongful Act** or **Employee Benefit Wrongful Act**."  2017 Primary Policy, § II, Definition (RR).

205.    The term "**Related Claims**" means "all **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, in any way involving, or in any way having a common nexus of the same or related facts, circumstances, situations, transactions, or events, or the same or related series of facts, circumstances, situations, transactions or events." 2017 Primary Policy, § II, Definition (NN).

206.    The 2017 Primary Policy contains Exclusion (D)(1), the Prior Knowledge Exclusion.  The Prior Knowledge Exclusion provides:

(D)     Except as otherwise expressly provided in this Policy, this Policy does not apply to, and the Underwriter will not pay **Loss** or **Defense Expenses**, for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)     act, error, omission or **Wrongful Act** if, on or before the Inception Date set forth in ITEM 2 of the Declarations, the Risk Management Dept or Legal Dept or any Executive of the **Named Insured** knew or reasonably could have foreseen that such act, error, omission, or **Wrongful Act** might result in a **Claim**.

If, however, this Policy is a renewal of one or more policies previously issued by the Underwriter to the **First Named Insured**, and the coverage provided by the Underwriter to the **First Named Insured** was in effect, without interruption, for the entire time between the inception date of the first such other policy and the Inception Date of this Policy, the reference in this EXCLUSION (D)(1) to the Inception Date will be deemed to refer instead to the inception date of the first policy under which the Underwriter began to provide the **First Named Insured** with the continuous and uninterrupted coverage of which this Policy is a renewal;

All other terms, conditions and limitations of this Policy shall remain unchanged.

2017 Primary Policy, § III, (D)(1) Prior Knowledge Exclusion as amended by Endorsement No.

19.

207.    The 2017 Primary Policy contains Exclusion (D)(2), the Prior Notice Exclusion.

The Prior Notice Exclusion provides:

(D)    Except as otherwise expressly provided in this Policy, this Policy does not apply to, and the Underwriter will not pay **Loss** or **Defense Expenses**, for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(2)    act, error, omission, **Wrongful Act**, event, suit or demand which was the subject of any notice given under:

(a)    any medical professional liability or similar policy of insurance or plan or program of self-insurance, with respect to any **Claim** otherwise covered under INSURING AGREEMENT (A);

(b)    any general liability or similar policy of insurance or plan or program of self-insurance, with respect to any **Claim** otherwise covered under INSURING AGREEMENT (B); or

(c)    any employee benefit liability or similar policy of insurance or plan or program of self-insurance, with respect to any **Claim** otherwise covered under INSURING AGREEMENT (C);

in effect prior to the Inception Date set forth in ITEM 2 [June 30, 2017] of the Declarations;

2017 Primary Policy, § III, (D)(2) Prior Notice Exclusion.

208.    The 2017 Primary Policy includes the following Condition (B) Related Claims

Deemed Single Claim:

All **Related Claims**, whenever made, shall be deemed to be a single **Claim**, regardless of:

(1)    the number of **Related Claims**;

SMRH:4843-2402-9941.3

(2)      the number or identity of claimants;

(3)      the number or identity of **Insureds** involved or against whom **Related Claims** have been or could be made;

(4)      whether the **Related Claims** are asserted in a class action or otherwise; and

(5)      the number and timing of the **Related Claims**, even if the **Related Claims** comprising such single **Claim** were made in more than one Policy Period.

All **Related Claims** will be treated as a single **Claim** made when the earliest of such **Related Claims** was first made, or when the earliest of such **Related Claims** is treated as having been made in accordance with GENERAL CONDITION (C)(2) below, whichever is earlier.

2017 Primary Policy, § IV, Condition (B) Related Claims Deemed Single Claim.

209.     The 2017 Primary Policy includes the following Condition (C)(1), Reporting of Claims, Occurrences and Circumstances:

(1)      If, during the **Policy Period** or any Extended Reporting Period, any **Claim** for a **Wrongful Act** under INSURING AGREEMENT (A) or (C) is first made against an **Insured**, as a condition precedent to its right to any coverage under this Policy, the **Insured** shall give the Underwriter written notice of such Claim as soon as practicable thereafter, but in no event later than:

(a)      thirty (30) days after the Expiration Date or earlier cancellation date of this Policy; or

(b)      the expiration of any Extended Reporting Period.

Timely and sufficient notice by one **Insured** of a **Claim** shall be deemed timely and sufficient notice for all **Insureds** involved in the **Claim**. Such notice shall give full particulars of the **Claim**, including, but not limited to: a description of the **Claim** and **Wrongful Act**; the identity of the patient, all potential claimants and the health care provider(s) and any **Insureds** involved; a description of the injury or damages that resulted from such **Wrongful Act**; information on the time, place and nature of the **Wrongful Act**; and the manner in which the **Insured** first became aware of such **Wrongful Act**.

SMRH:4843-2402-9941.3

2017 Primary Policy, § IV, Condition (C)(1) Reporting of Claims, Occurrences and Circumstances.

210.    The 2017 Primary Policy includes the following Condition (C)(2) Reporting of Claims, Occurrences and Circumstances:

(2)    If during the **Policy Period** an **Insured** first becomes aware of any **Wrongful Act** that may subsequently give rise to a **Claim** under INSURING AGREEMENT (A) or (C) and:

(a)    gives the Underwriter written notice of such **Wrongful Act** with full particulars as soon as practicable thereafter but in any event before the Expiration Date or earlier cancellation date of this Policy; and

(b)    requests coverage under INSURING AGREEMENT (A) or (C) of this Policy for any **Claim** subsequently arising from such **Wrongful Act**;

then any **Claim** not otherwise excluded by this Policy subsequently made against the **Insured** arising out of such **Wrongful Act** shall be treated as if it had been first made during the **Policy Period**. Full particulars shall include, but are not limited to: a description of the **Wrongful Act**; the identity of the patient, all potential claimants and the health care provider(s) and any **Insureds** involved; information on the time, place and nature of the **Wrongful Act**; the manner in which the **Insured** first became aware of such **Wrongful Act**; and the reasons the **Insured** believes the **Wrongful Act** is likely to result in a **Claim**.

2017 Primary Policy, § IV, Condition (C)(2) Reporting of Claims, Occurrences and Circumstances.

211.    The 2017 Primary Policy includes the following Condition (E) Territory:

This Policy applies to **Wrongful Acts** or **Occurrences** taking place anywhere in the world. **Claim** or suit must be made against an **Insured**, however, in the United States of America, including its territories or possessions, Puerto Rico, or Canada.

(1)    Subject to paragraph (2) below and solely for the purposes of the coverage afforded under INSURING AGREEMENT (A) of this Policy, Section IV GENERAL CONDITIONS (E) of this Policy is amended to add the following at the end thereof:

SMRH:4843-2402-9941.3

(1)    Subject to the further provisions of this GENERAL CONDITION (E), if a **Claim** is made against an **Insured** outside the United States of America, including its territories or possessions, Puerto Rico or Canada, the Underwriter will have the right but not the duty to defend, investigate or settle such **Claim**. If the Underwriter elects not to defend, investigate or settle such **Claim**, the **Insured** shall be obligated to initiate such defense and investigation as is reasonably necessary and, subject to the Underwriter's prior written consent, may effect settlement. The Underwriter will reimburse the **Insured,** up to the applicable Limit of Liability, for reasonable **Defense Expenses** and **Loss,** subject to the deductible or self-insured retention set forth in ITEM 4.A. of the Declarations and all other provisions of this Policy.

(2)    All monetary terms in this Policy are in U.S. dollars. In the event the **Insured** incurs **Loss** or **Defense Expenses** in currency other than U.S. dollars, the Underwriter will reimburse the **Insured** for such amounts in U.S. dollars at the prevailing exchange rate at the time such **Loss** or **Defense Expenses** were incurred.

(3)    No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** made against an **Insured** in any country or jurisdiction which is the subject of trade or economic sanctions or embargo imposed by the laws or regulations of the United States of America to the extent such sanctions or embargo prohibit or limit this insurance.

(2)    It is understood and agreed that the amendment to Section IV GENERAL CONDITION (E) set forth in paragraph (1) above does not apply to **Claims** made against any **Named Insured** that is domiciled outside the United States of America, including its territories or possessions, Puerto Rico or Canada. Accordingly, no coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** made outside the United States of America, including its territories or possessions, Puerto Rico or Canada against any **Named Insured** that is domiciled outside the United States of America, including its territories or possessions, Puerto Rico or Canada.

All other terms, conditions and limitations of this Policy shall remain unchanged.

2017 Primary Policy, § IV, Condition (E) Territory as amended by Endorsement No. 13 Worldwide Territory Endorsement.

212.    The 2017 Primary Policy includes the following Condition (J) Assistance and Cooperation:

In the event of a **Claim**, the **Insured** shall provide the Underwriter with all information, assistance and cooperation that the Underwriter reasonably requests. At the Underwriter's request, the **Insured** shall assist in: investigating, defending and settling **Claims**; enforcing any right of contribution or indemnity against another who may be liable to any **Insured**; the conduct of actions, suits, appeals or other proceedings, including, but not limited to, attending trials, hearings and depositions; securing and giving evidence; and obtaining the attendance of witnesses.

2017 Primary Policy, § IV, Condition (J) Assistance and Cooperation.

213.   The 2017 Primary Policy includes the following Condition (K) Subrogation:

In the event of any payment hereunder, the Underwriter shall be subrogated to the extent of any payment to all of the rights of recovery of the **Insured**. The **Insured** shall execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the Underwriter effectively to bring suit in its name. The **Insured** shall do nothing that may prejudice the Underwriter's position or potential or actual rights of recovery. The obligations of the **Insured** under this GENERAL CONDITION (K) shall survive the expiration or termination of the Policy.

2017 Primary Policy, § IV, Condition (K) Subrogation.

214.   The 2017 Primary Policy includes the following Condition (L) Other Insurance

and Risk Transfer Arrangements:

Any **Loss** or **Defense Expenses** resulting from any **Claim** insured under any other insurance or self-insurance policy or program or risk transfer instrument, including, but not limited to, self-insured retentions, deductibles, fronting arrangements, professional liability policies covering any **Insured**, or other alternative arrangements which apply to the **Loss** or **Defense Expenses** shall be paid first by those instruments, policies or other arrangements. It is the intent of this Policy to apply only to **Loss** or **Defense Expenses** that are more than the total limit of all deductibles, limits of liability, self-insured amounts or other insurance or risk transfer arrangements, whether primary, contributory, excess, contingent, fronting or otherwise and whether or not collectible. These provisions do not apply to other insurance policies or risk transfer arrangements written as specific umbrella or excess insurance over the applicable Limits of Liability of this Policy. This Policy shall not be subject to the terms of any other policy of insurance or plan or program of self-insurance; and in no event will the Underwriter pay more than the applicable Limits of Liability set forth in ITEM 4 of the Declarations.

2017 Primary Policy, § IV, Condition (L) Other Insurance and Risk Transfer Arrangements.

215. The 2017 Primary Policy includes the following Condition (R) Representation;

Incorporation of Application:

> The **Insureds** represent that the particulars and statements contained in the Application attached to this Policy are true, accurate and complete and agree that:
>
> (1)　　this Policy is issued and continued in force by the Underwriter in reliance upon the truth of such representation;
>
> (2)　　those particulars and statements are the basis of this Policy; and
>
> (3)　　the Application and those particulars and statements are incorporated in and form a part of this Policy.
>
> No knowledge or information possessed by any **Insured** shall be imputed to any other **Insured**, except for material facts or information known to the person or persons who signed the Application. In the event of any material untruth, misrepresentation or omission in connection with any of the particulars or statements in the Application, this Policy shall be void with respect to any **Insured** who knew of such untruth, misrepresentation or omission or to whom such knowledge is imputed.

2017 Primary Policy, § IV, Condition (R) Representation; Incorporation of Application.

216. The 2017 Primary Policy includes the following Condition (S)(1) No Action

against Underwriter, in relevant part:

> (1)　　No action shall be taken against the Underwriter by any **Insured** unless, as conditions precedent thereto, the **Insured** has fully complied with all of the terms of this Policy and the amount of the **Insured's** obligation to pay has been finally determined either by judgment against the **Insured** after adjudicatory proceedings or by written agreement of the **Insured**, the claimant and the Underwriter.

2017 Primary Policy, § IV, Condition (S)(1) No Action against Underwriter.

217. The 2017 Primary Policy includes the following Condition (X) Examination of

Books and Records:

> The Underwriter may examine and audit the books and records of the **Insured** as they relate to this Policy.

SMRH:4843-2402-9941.3

2017 Primary Policy, § IV, Condition (X) Examination of Books and Records.

## The 2017 Excess Policy

218.     Homeland also renewed the Excess Medical Facilities Liability Insurance Policy,

policy number MFX-002013-0617 (the "2017 Excess Policy"), to Sonic Healthcare Investments,

G.P. for the policy period June 30, 2017 through June 30, 2018, which provides certain coverage

pursuant to the policy's terms, conditions, and exclusions.   2017 Excess Policy, Declarations

ITEM 1 and ITEM 2.  The 2017 Excess Policy is attached hereto as **Exhibit 5**.

219.     The 2017 Excess Policy is a "follow form excess policy."  Insuring Agreement

(A) provides:

> The Underwriter shall provide the **Insured** with insurance excess of the
> **Underlying Insurance** set forth in ITEM 4 of the Declarations, provided that the
> **Underlying Insurance** also applies and has been exhausted by actual payment
> thereunder, or would apply but for the exhaustion of the applicable limit(s) of
> liability thereunder.

2017 Excess Policy, § I, Insuring Agreement (A).

220.     Endorsement 4 to the 2017 Excess Policy defines "**Underlying Insurance**" as the

Homeland Primary Policy.  2017 Excess Policy, Endorsement No. 4.

221.     The 2017 Excess Policy includes the following Insuring Agreement (D):

This Policy will apply in conformance with, and will follow the form of, the
terms, conditions, agreements, exclusions, definitions and endorsements of the
**Underlying Insurance,** except:

(1)     the Underwriter will have no obligation under this Policy with respect to
        any **Claim** that is settled without the Underwriter's written consent;

(2)     with respect to any provisions to the contrary contained in this Policy;

(3)     the applicable limit of liability of the **Underlying Insurance** shall be
        deemed to be reduced or exhausted solely as a result of payments for loss
        or damages (including costs, charges and expenses) that are covered
        under this Policy; and

SMRH:4843-2402-9941.3

(4)    the coverage provided by this Policy shall not be broader than any **Underlying Insurance** unless expressly provided herein, including any endorsement hereto.

2017 Excess Policy, § I, Insuring Agreement (B).

222.    The 2017 Excess Policy contains the following Definitions:

(A)    "**Application**" means the application attached to and forming part of this Policy, including any materials submitted in connection with such application, all of which are on file with the Underwriter and are a part of the Policy, as if physically attached.

(B)    "**Claim**" has the meaning ascribed to it (or similar term) in the **Underlying Insurance**.

(C)    "**Defense Expenses**" has the meaning ascribed to it (or similar term) in the **Underlying Insurance**.

(D)    "**Insured**" means the persons or organizations insured under the **Underlying Insurance**.

(E)    "**Policy Period**" means the period from the inception date to the expiration date in ITEM 2 of the Declarations, or to any earlier cancellation date.

(F)    "**Primary Policy**" means the policy scheduled as such in ITEM 2 of the Declarations.

(G)    "**Underlying Insurance**" means all insurance policies or risk transfer instruments (including, but not limited to, self-insured retentions or other alternative arrangements) scheduled in ITEM 4 of the Declarations and any policies or risk transfer arrangements renewing or replacing them.

2017 Excess Policy, § II, Definitions (A)-(G).

223.    The 2017 Excess Policy contains the following Limit of Liability provision:

The amount stated in ITEM 3 of the Declarations is the limit of the Underwriter's liability under this Policy, and shall be the maximum amount, including **Defense Expenses**, payable by the Underwriter under this Policy. The limit of liability available to pay damages or settlements shall be reduced, and may be exhausted, by the payment of **Defense Expenses.**

2017 Excess Policy, § IV, Limit of Liability.

SMRH:4843-2402-9941.3

224.    The 2017 Excess Policy contains the following Claim Participation provision:

The Underwriter may, at its sole discretion, elect to associate in the investigation, settlement or defense of any **Claim** against the **Insured**, even if the **Underlying Insurance** has not been exhausted.  If the Underwriter so elects, the **Insured** will cooperate with the Underwriter and will make available all such information and records as the Underwriter may reasonably require.

2017 Excess Policy, §VI, Claim Participation.

225.    The 2017 Excess Policy contains the following Representations and Severability

provision:

The **Insured** represents that the particulars and statements contained in the **Application** are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and to constitute a part of this Policy, as the basis of this Policy.  No knowledge or information possessed by any **Insured** will be imputed to any other **Insured** except for material facts or information known to the person or persons who signed the **Application**.  In the event that any of the particulars or statements in the **Application** is untrue, this Policy will be void with respect to any **Insured** who knew of such untruth or to whom such knowledge is imputed.

2017 Excess Policy, §XI, Representations; Severability.

## FIRST CLAIM FOR RELIEF

**(Declaratory Relief Against All Defendants: The Ms. S, Ms. A, Ms. O II, Ms. C II Claims**

**and any Additional Ongoing Claims)**

226.    Homeland hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 225 of this complaint.

227.    An actual controversy exists between Homeland, on the one hand, and Defendants, on the other, with respect to whether there is coverage for the Ms. S, Ms. A, Ms. O II, and Ms. C II Claims, and any Additional Ongoing Claims under the 2017 Primary Policy and under the 2017 Excess Policy.

228.    Homeland is entitled to a declaratory judgment in its favor, stating that there is no coverage for the Ms. S, Ms. A, Ms. O II, and Ms. C II Claims, or any Additional Ongoing Claims, under the 2017 Primary Policy or the 2017 Excess Policy for any of the Defendants.

## SECOND CLAIM FOR RELIEF

### (Breach of Warranty Against All Defendants)

229.    Homeland hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 228 of this complaint.

230.    An actual controversy exists between Homeland, on the one hand, and Defendants, on the other, with respect to whether there is coverage for any of the Irish CervicalCheck claims under the Homeland 2017 policies.

231.    Defendants provided at least the following material warranties upon which Homeland relied in agreeing to provide coverage under the Worldwide Endorsement (No. 13) and adding Sonic Ireland and MedLab to the Additional Named Insured Endorsement (No. 24) in the 2016 policies, and in subsequently renewing the 2017 policies at the same rate based on the same terms and conditions as the 2016 policies, which turned out to be false, any one of which would be sufficient to void coverage:

    (i)    That the Warranty Letter was on behalf of MedLab and Sonic Ireland, both of which were insureds "proposed for coverage";

    (ii)    That a diligent inquiry had been conducted on behalf of MedLab and Sonic Ireland;

    (iii)    That none of the insureds proposed for coverage were aware of any claims against any of the insureds;

-53-

(iv)     That none of the insureds proposed for coverage were aware of any fact, circumstance, situation, transaction, event, act, error, or omission that may give rise to a claim against Sonic Ireland, MedLab, and CPL as respect the cervical cytology laboratory screening services conducted between 8/1/2010 to 6/30/2013; and

(v)     That all claims and facts, circumstances, situations, transactions, events, acts, errors, or omissions against the insured(s) that may result in a claim had been reported to prior insurance carrier(s).

232.     Homeland is entitled to a declaratory judgment in its favor, stating that any coverage that might have been afforded under the Worldwide Endorsement (No. 13) and the Additional Named Insured Endorsement (No. 24) in the 2016 policies, and in the 2017 policies that were renewed at the same rate based on the same terms and conditions as the 2016 policies, is void as to Defendants with respect to the Irish CervicalCheck claims for breach of the specific warranties in the Warranty Letter upon which Homeland conditioned issuing this coverage.

### THIRD CLAIM FOR RELIEF

### (Reformation Against All Defendants)

233.     Homeland hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 232 of this complaint.

234.     The parties mutually agreed to include certain risks under the 2016 and subsequent policies only if certain facts or warranties provided in the Warranty Letter were actually true.  The Warranty Letter (which was incorporated into the 2016 and 2017 policies) contained warranties that the Defendants were either mistaken in so warranting, or inequitably induced Homeland to unilaterally mistake in so believing, such that the 2016 and 2017 policies were issued contrary to the actual understanding of the parties.

SMRH:4843-2402-9941.3

235. Homeland is entitled to reformation of the policies to exclude certain risks covered under the Worldwide Endorsement (No. 13) and the Additional Named Insured Endorsement (No. 24) in the 2016 and all subsequent policies that were renewed at the same rate based on the same terms and conditions as the 2016 policies, as to Defendants with respect to the Irish CervicalCheck claims based on these mutual and/or unilateral mistakes.

236. Furthermore and independently of the reformation sought in paragraph 235, to the extent the Warranty Letter is not deemed to have already been incorporated into the 2016 and/or 2017 policies, such failure to incorporate was a mistake and contrary to the parties' mutual intent. Homeland seeks to reform those policies to include the Warranty Letter consistent with the parties' expressed intent in that Letter that it "be deemed to be a part of the policy."

## FOURTH CLAIM FOR RELIEF

### (Promissory Estoppel Against All Defendants)

237. Homeland hereby incorporates by reference and re-alleges as if fully stated herein, each and every allegation of Paragraphs 1 through 236 of this complaint.

238. The parties intended that Homeland rely on the statements made in the July 27, 2016 Warranty Letter, and that the Warranty Letter be incorporated into the 2016 policies. This is evidenced by the parties above-summarized conduct leading up to Homeland's issuance of the Worldwide Endorsement (No. 13) and the Additional Named Insured Endorsement (No. 24), as well as by the representations by CPL on behalf of itself and all proposed insureds (e.g., defendant Sonic USA, Sonic Ireland, and MedLab) in the Warranty Letter itself, including the statement that: "OneBeacon Insurance and its writing company will be issuing its policy in reliance upon the conditions and statements made in this letter and the application both of which will be deemed to be a part of the policy."

SMRH:4843-2402-9941.3

239. At the time Defendants made these representations, including those in the Warranty Letter, it was foreseeable that Homeland would rely on those representations in issuing the Worldwide Endorsement (No. 13) and the Additional Named Insured Endorsement (No. 24). In fact, Defendants expressly acknowledged in the Warranty Letter that Homeland would be relying on the conditions and statements made in that Letter.

240. Homeland relied on the representations made by Defendants, including in the Warranty Letter, to its detriment. Homeland issued the Worldwide Endorsement (No. 13) and the Additional Named Insured Endorsement (No. 24) based on Defendants' representations, and Homeland is now being asked to provide coverage for claims that Homeland never would have agreed to cover had it been informed that Defendants were aware of at least 58 other potential Irish CervicalCheck claims against them and the proposed insureds.

241. Defendants should therefore be estopped from arguing or otherwise contending that the Warranty Letter was not incorporated into the operative insurance policies.

**WHEREFORE**, Homeland prays for relief as follows:

1. For a declaration that there is no coverage for the Ms. S, Ms. A, Ms. O II, or Ms. C II claims, or any Additional Ongoing Claims, under the 2017 Primary Policy;

2. For a declaration that there is no coverage for the Ms. S, Ms. A, Ms. O II, or Ms. C II claims, or any Additional Ongoing Claims, under the 2017 Excess Policy;

3. For a declaration that any coverage that might have been afforded under the Worldwide Endorsement (No. 13) and the Additional Named Insured Endorsement (No. 24) in the 2016 policies, and in the 2017 policies that were renewed at the same rate based on the same terms and conditions as the 2016 policies, is void as to Defendants with respect to the Irish

CervicalCheck claims for breach of the specific warranties in the Warranty Letter upon which Homeland relied and conditioned issuing this coverage;

4.     For reformation of the policies (i) to exclude certain risks afforded under the Worldwide Endorsement (No. 13) and the Additional Named Insured Endorsement (No. 24) in the 2016 and all subsequent policies that were renewed at the same rate based on the same terms and conditions as the 2016 policies, to Defendants with respect to the Irish CervicalCheck claims, based on mutual and/or unilateral mistake; and (ii) to incorporate the Warranty Letter into the 2016 and 2017 Policies, to the extent not already properly incorporated therein as intended by the parties;

5.     For Defendants to be estopped from arguing or otherwise contending that the July 27, 2016 Warranty Letter was not incorporated into the operative policies;

6.     For costs of suit; and

7.     For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Homeland demands a trial by jury on all triable issues.

Respectfully submitted this 17th day of August, 2021.

By:  */s/ Jenna A. Fasone*
John T. Brooks (CA Bar #167793)
Jenna A. Fasone (CA Bar #308886)
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
501 West Broadway, 19th Floor
San Diego, CA 92101
Telephone:  (619) 338-6500
Fax:  (619) 234-3815
jbrooks@sheppardmullin.com
jfasone@sheppardmullin.com
*Admitted Pro Hac Vice*

Joseph R. Little (#784483)
The Little Law Firm
440 Louisiana Street, Suite 900
Houston, Texas 77002
Telephone:  (713) 222-1368
Fax:  (281) 200-0115
jrl@littlelawtexas.com

*Attorneys for Plaintiff Homeland Insurance
Company of New York*

SMRH:4843-2402-9941.3

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of this document was served upon counsel of record for all parties who have made an appearance in this case at the addresses indicated by CM/ECF electronic notification on this 17th day of August, 2021. I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Jenna A. Fasone*

SMRH:4843-2402-9941.3

# EXHIBIT 1

July 27, 2016

OneBeacon Insurance Group
Plymouth, MN

The undersigned, on behalf of Sonic and any person proposed for coverage (the insureds) does hereby represent to OneBeacon Insurance and its writing company that:

The insureds, after diligent inquiry, are not aware of any claims against the insured(s) or any fact, circumstance, situation, transaction, event, act, error, or omission that may give rise to a claim against the insured(s) Sonic Healthcare (Ireland) Limited, Medlab Pathology, and CPL of Austin as respect the cervical cytology laboratory screening services conducted between 8/1/2010 to 6/30/2013  and all claims and facts, circumstances, situations, transactions, events, acts, errors, or omissions against the insured(s) that may result in a claim have been reported to prior insurance carrier(s).

OneBeacon Insurance and its writing company will be issuing its policy in reliance upon the conditions and statements made in this letter and the application both of which will be deemed to be a part of the policy.

Sincerely,

Stephen R. Shumpert
President

**EXHIBIT 2**



onebeaconhc.com

| RE: | Medical Facilities Liability Coverage<br>Sonic Healthcare Investments, G.P. | Policy |
|-----|-----|-----|
| 08.30.2016 | Account No: 34379 | Policy No: MFL-004062-0616 |

199 Scott Swamp Road
Farmington, CT 06032

877.701.0171 t
866.625.3590 f



## Welcome to OneBeacon Healthcare Group™.

Thank you for choosing a member company[1] of OneBeacon Insurance Group, Ltd. as your liability insurance carrier.

At OneBeacon Healthcare Group we take a unique approach with helping policyholders manage risk and advance patient safety by providing them with a broad range of practical and effective tools and resources. Our industry-leading in-house and external consultants have decades of risk management experience. Talk with us about your challenges and risk exposures and we'll assist you with possible strategies and solutions.

### Risk Management Information and Support at Your Fingertips

As an added value to a professional liability policy we are pleased to offer the following resources, many of which are already included in the policy's cost!

### Resources Include:

- **Exclusive website:** a policyholders-only risk management portal page with dozens of resources for all healthcare settings.
- **AboutRisk® Learning Webinar Series:** interactive webinars presented monthly, most with continuing education credits available.
- **AboutRisk Learning Library:** an extensive selection of pre-recorded educational sessions available on demand for risk manager, staff or leadership continuing education.
- **AboutRisk Learning Course:** unique, web-based fundamentals in healthcare risk management training course, with dedicated faculty support.
- **Risk Management Continuing Education Programs:** powered by MRM Group™, this program offers a curriculum designed with your specific risk management education needs in mind, delivered by experienced medical malpractice defense attorneys and practicing healthcare providers.
- **Consultative Services:** access to specialty-focused healthcare risk management professionals including The Rozovsky Group, The Virtual Group, Robinson+Cole, LLC and the OneBeacon Healthcare Group LTC Consultant Team.
- **Electronic Assessments:** custom created by OneBeacon's risk management consultants with over a dozen different assessments for you to choose from. These tools provide an opportunity for your organization to conduct a risk assessment of a specific care delivery setting, a key risk exposure or your own risk management program from a desktop, at your own pace, easily and effectively. Following completion of the risk inventory, reports are provided back to you and information on opportunities for improvement identified in the assessments is available.

---

[1] Coverages may be underwritten by one of the following insurance companies: Atlantic Specialty Insurance Company, Homeland Insurance Company of New York, Homeland Insurance Company of Delaware, OBI America Insurance Company and OBI National Insurance Company.


- **On-site Risk Assessments:** the Risk Management team can assist in coordinating an on-site risk assessment.
- **Tools and Guides:** OneBeacon Healthcare Group™ has created easy to read, case study-based "pocket" risk management guides for use by leadership and clinicians, as well as tools to help assess and address risk exposures.
- **Enewsletters and Publications:** monthly OneBeacon Healthcare Group Newsletter and complimentary access to The Rozovsky Group's Dialogues in Healthcare and TRG eNewsletter.

**As a policyholder, you can register to start accessing this material now.**

- To register, go to http://obpi.therozovskygroup.com/. If you have previously registered please take an opportunity to update your information by re-registering so that we can send you our webinar invitations and Enewsletter updates. Please know we value your privacy and will never sell or otherwise distribute your personal information to any third party.
- If you have difficulty registering, please contact Joshua Rozovsky at 860.242.1302 or josh@therozovskygroup.com.

**Liability Policy Coverage Questions**

If you have any questions regarding your policy or coverage afforded under your liability policy(s), please contact your liability insurance broker, retailer or producer. OneBeacon Healthcare Group Underwriting and Risk Management cannot provide direct communication with policyholders regarding specific policy language and/or coverage.

**Claims Management Support**

We realize that - despite best efforts - claims sometimes do occur.  At OneBeacon Healthcare Group, an experienced Claims Examiner is assigned for each reported claim, and will serve as a dedicated resource and point of contact.

Please refer to the **OneBeacon Healthcare Group Medical Professional and General Liability Claim Reporting Guidelines** on Page 4. If you have any questions about what to report or how to report please contact Tom Ruane at truane@onebeacon.com.

- To submit a claim or incident (a "potentially compensable event "/PCE), please use the reporting form that can be found on **onebeaconhc.com**.
- **Claims can be submitted one of three ways:**
  **1. Secure E-mail:  obiclaims@onebeacon.com.** (You will receive an immediate email acknowledgment). *Please DO NOT send new claims reports directly to a member of the Claims department, use unsecured email to report or discuss claims or include any protected health information (PHI) or personally identifiable information (PII). Do not "cc" anyone on a claims report email.
  **2. Fax:** 877.256.5067



199 Scott Swamp Road
Farmington, CT 06032
onebeaconhc.com

A Member of OneBeacon Insurance Group

**3. U.S. Mail:**

Claims

OneBeacon Insurance

199 Scott Swamp Road

Farmington, CT 06032

Thank you again for selecting OneBeacon Healthcare Group™ as your specialists for providing professional liability solutions. We look forward to working with you.

Patricia Hughes, MSN, CPHRM, FASHRM

Senior Vice President

Healthcare Risk Management

860.321.2601

phughes@onebeacon.com

Tom Ruane

Vice President, Claims Leader

Medical and Professional Claims

860.321.2902

truane@onebeacon.com



199 Scott Swamp Road
Farmington, CT 06032
onebeaconhc.com

A Member of OneBeacon Insurance Group

## OneBeacon Healthcare Group™ Medical Professional and General Liability Claim Reporting Guidelines

Following are some examples of the types of events that should be reported in accordance with the general conditions regarding Reporting of Claims, Occurrences and Circumstances under your professional liability policy:

- Medication errors resulting in injury and/or requiring further treatment (including patient not receiving medication; receiving incorrect dosage of medication; or receiving wrong medication)
- Falls resulting in injury
- Family/patient complaints of inadequate or negligent care resulting in injury
- Events reported to a state Department of Health or other state or federal regulatory body
- Visitor injuries
- Unexpected death
- Injury (including, but not limited to: loss of limb or function including spinal cord injury and any neurological impairment)
- Elopement
- Allegations of psychological, physical or sexual abuse, neglect or violence by a patient/resident or their authorized representative
- Sentinel events and Serious Reportable Events (as defined by the Joint Commission and National Quality Forum)
- Provider licensure board or similar administrative proceeding arising from a potential medical malpractice claim
- Oral or written demands for compensation or damages
- Lawsuits
- Communication from an attorney regarding any of the events noted above
- Request from an attorney for medical records
- Any other event the policyholder reasonably believes could result in a claim under the policy

*The above list of events is not meant to be exhaustive or exclusive. Nothing contained in or omitted from this document should be deemed a waiver of any terms or conditions of any applicable policy. These guidelines are provided for general informational purposes only and should not be considered or relied upon as coverage, legal or risk-management advice. Readers should consult the specific terms of their policy and their own legal counsel for advice.*

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

# TEXAS COMPLAINT NOTICE

## IMPORTANT NOTICE

To obtain information or make a complaint:

1. You may call **877.701.0171** toll-free telephone number for information or to make a complaint at:

   **OneBeacon Insurance**
   **199 Scott Swamp Road**
   **Farmington, CT 06032**
   **Facsimile:   888.777.3719**

2. You may call the Texas Department of Insurance at:

   **1.800.252.3439**

3. You may write the Texas Department of Insurance at:

   **Texas Department of Insurance**
   **P.O. Box 149104**
   **Austin, TX 78714-9104**
   **800-252-3439 (512-463-6515)**
   **FAX # (512) 475-1771**
   **Web: http://www.tdi.state.tx.us**
   **E-mail: ConsumerProtection@tdi.state.tx.us**


## PREMIUM OR CLAIM DISPUTES:

Should you have a dispute concerning your premium or about a claim you should contact the agent or the company first.  If the dispute is not resolved, you may contact the Texas Department of Insurance.

## ATTACH THIS NOTICE TO YOUR POLICY:

This notice is for information only and does not become a part or condition of the attached document.

# AVISO IMPORTANTE

Para obtener informacion o para someter una queja:

1.  Usted puede llamar **877.701.0171** al numero de telefono gratis someter una queja a:

    **OneBeacon Insurance
    199 Scott Swamp Road
    Farmington, CT 06032
    Facsimile:   888.777.3719**

2.  Usted puede comunicarse con el Departamento de Seguros de Texas para obtener informacion sobre companies, cubierto de seguros, derechos, o quejas al el numero:

    **1.800.252.3439**

3.  Puede escribir al Departamento de Seguros de Texas a:

    **Texas Department of Insurance
    P.O. Box 149104
    Austin, TX 78714-9104
    800-252-3439 (512-463-6515)
    Facsimile: 512.475.1771
    Web: http://www.tdi.state.tx.us
    E-mail: ConsumerProtection@tdi.state.tx.us**

## DISPUTAS SOBRE PRIMAS O RECLAMOS:

Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el agente o la compania primero.   Si no se resuelve la disputa, puede enetonces comunicarse con el departamento (TDI).

## UNA ESTE AVISO A SU POLIZIA:

Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

**Homeland Insurance Company of New York**
1000 Woodbury Road, Suite 403
Woodbury, NY 11797



*(hereinafter referred to as the "Underwriter")*

**Policy Number:** MFL-004062-0616

## DECLARATIONS

### MEDICAL FACILITIES AND PROVIDERS
### PROFESSIONAL LIABILITY, GENERAL LIABILITY AND EMPLOYEE BENEFIT LIABILITY POLICY

**PORTIONS OF THIS POLICY PROVIDE CLAIMS MADE AND REPORTED COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR AN APPLICABLE EXTENDED REPORTING PERIOD AND REPORTED IN ACCORDANCE WITH THIS POLICY'S REPORTING PROVISIONS. PLEASE READ THIS POLICY CAREFULLY.**

| | |
|---|---|
| **ITEM 1.** | **FIRST NAMED INSURED** |

Name and Principal Address:

Sonic Healthcare Investments, G.P.

9737 Great Hills Trl Ste 100

Austin, TX 78759-6449

**ITEM 2.** **POLICY PERIOD:**

(a) Inception Date: June 30, 2016
(b) Expiration Date: June 30, 2017
Both dates at 12:01 a.m. at the Principal Address in ITEM 1.

**ITEM 3.** **COVERAGE/TYPE/RETROACTIVE DATE(S)**

| Coverage | Type | Retroactive Date |
|---|---|---|
| A. Healthcare Professional Liability | Claims Made | February 05, 2007 |
| B. General Liability | Not Covered | Not Covered |
| C. Employee Benefit Liability | Claims Made | Not Covered |
| D. Evacuation Expense | Expense Reimbursement | N/A |
| E. Legal/Media Expense | Expense Reimbursement | As Per Insuring Agreement (A) |

**ITEM 4.** **LIMIT(S) OF LIABILITY; DEDUCTIBLE/SELF-INSURED RETENTION**

A. Healthcare Professional Liability
 Each Claim.................................................................. ■■■■■■
 Aggregate for all Claims................................................. ■■■■■■
 Deductible [X]  Self-Insured Retention [ ]
 Per Claim ...................................................... ■■■■■■
 Aggregate ...................................................... N/A

B. General Liability
    Each Claim ................................................................ Not Covered
    Products and Completed Operations Hazard .................. Not Covered
    Damage to Rented Premises........................................... Not Covered
    Aggregate for all Claims ............................................... Not Covered
    Deductible ☐  Self-Insured Retention ☐
        Per Claim.............................................................. Not Covered
        Aggregate............................................................. Not Covered

C. Employee Benefit Liability
    Each Claim ................................................................ Not Covered
    Aggregate for all Claims ............................................... Not Covered
    Deductible ☐  Self-Insured Retention ☐
        Per Claim.............................................................. Not Covered
        Aggregate ............................................................ Not Covered

D. Evacuation Expense
    Each Evacuation ...........................................................  █████
    Aggregate for all Evacuations .......................................  █████

E. Legal/Media Expense
    Each Legal Defense Proceeding .....................................  █████
    Aggregate for all Legal Defense Proceeding...................  █████

| ITEM 5. | **COVERED OPERATIONS/SERVICES:** |
|---|---|

    Medical Laboratory

| ITEM 6. | **PREMIUM** |
|---|---|

A. Policy Premium:  ████████

B. Minimum Earned Premium: 25%   of Policy Premium shown above.

  N/A  This Policy provides coverage for acts of terrorism as defined in the Terrorism Risk Insurance Act in accordance with all the terms and conditions of this Policy (including all endorsements attached hereto). The premium attributable to this coverage is   _____

  N/A  This Policy specifically excludes coverage for acts of terrorism in accordance with all of the terms and conditions of this Policy (including all endorsements attached hereto).

| ITEM 7. | **EXTENDED REPORTING PERIOD OPTION(S):** |
|---|---|

    36 Months   at 150%   of Full Annual Premium

    **"Full Annual Premium" means the amount set forth in ITEM 6 above including any premium adjustments made during the Policy Period.**

| ITEM 8. | **ALL NOTICES REQUIRED TO BE GIVEN TO THE UNDERWRITER UNDER GENERAL CONDITION (C) OF THE POLICY MUST BE ADDRESSED TO:** |
|---|---|

Claims
OneBeacon Insurance
199 Scott Swamp Road
Farmington, CT 06032
obiclaims@onebeacon.com

**ALL OTHER NOTICES REQUIRED TO BE GIVEN TO THE UNDERWRITER UNDER THIS POLICY MUST BE ADDRESSED TO:**

OneBeacon Healthcare Group
199 Scott Swamp Road
Farmington, CT 06032

| ITEM 9. | **POLICY FORM AND ENDORSEMENTS ATTACHED AT ISSUANCE:** |
|---|---|

| | |
|---|---|
| HPF-30001-03-13 | Medical Facilities and Providers Professional Liability, General Liability and Employee Benefit Liability Policy |
| HPE-00019-07-08 | Delete General Liability and Employee Benefit Liability Coverages |
| HPE-00023-03-13 | Amend Prior Knowledge Exclusion (D)(1) |
| HPE-00042-02-13 | Amend Cancellation to Ninety (90) Days |
| HPE-00061-02-11 | Sexual Misconduct Coverage |
| HPE-00063-04-11 | Additional Named Insured - Related to Original Named Insured |
| HPE-00064-07-11 | Notice of Cancellation to Scheduled Party |
| HPE-30028-03-13 | Deductible/Self-Insured Retention - Indemnity Only |
| HPE-30060-03-13 | Peer Review Coverage |
| HPE-00038-08-09 | Fronted Deductible |
| HPE-30017A-02-10 | Schedule of Insured Physicians and Locum Tenens |
| HPE-3SONIC-08-16 | Rate Stabilization |
| HPE-3SONIC2-0616 | Amend General Condition (E) Worldwide Territory |

These Declarations, the completed signed Application, and the Policy (together with any and all endorsements thereto) shall constitute the entire agreement between the Underwriter and the Insured(s).

**Homeland Insurance Company of New York**
By:

_(signature)_

_____     08.30.2016_____
Its Authorized Representative                          Date:

**MEDICAL FACILITIES AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL
LIABILITY AND EMPLOYEE BENEFIT
LIABILITY POLICY**



**PORTIONS OF THIS POLICY PROVIDE CLAIMS MADE AND REPORTED COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR AN APPLICABLE EXTENDED REPORTING PERIOD AND REPORTED IN ACCORDANCE WITH THIS POLICY'S REPORTING PROVISIONS.  PLEASE READ THIS POLICY CAREFULLY.**

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the Underwriter, and subject to all of the terms and conditions of this Policy (including all endorsements hereto), the Underwriter and the **Insured** agree as follows:

**I.     INSURING AGREEMENTS**

**(A)     Claims Made Professional Liability Insurance:**

The Underwriter will pay up to the applicable Limit of Liability shown in ITEM 4.A. of the Declarations on behalf of the **Insured** any **Loss** that the **Insured** is legally obligated to pay as a result of any covered **Claim** for a **Professional Services Wrongful Act** happening on or after the **Retroactive Date**; provided, that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable Extended Reporting Period and reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

**(B)     Occurrence-Based General Liability Insurance:**

The Underwriter will pay up to the applicable Limit of Liability shown in ITEM 4.B. of the Declarations on behalf of the **Insured** any **Loss** which the **Insured** is legally obligated to pay as a result of a covered **Claim** alleging **Bodily Injury**, **Property Damage**, **Advertising Injury** or **Personal Injury** that is caused by an **Occurrence** that takes place during the **Policy Period**; provided, that the **Claim** is reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

**(C)     Claims Made Employee Benefit Liability Insurance:**

The Underwriter will pay up to the Limit of Liability shown in ITEM 4.C. of the Declarations on behalf of the **Insured** any **Loss** that the **Insured** is legally obligated to pay as a result of any covered **Claim** for an **Employee Benefit Wrongful Act** happening on or after the **Retroactive Date**; provided, that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable Extended Reporting Period and reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

**(D)     Evacuation Expense Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Named Insured**, the Underwriter will reimburse the **Named Insured** up to the amount set forth in ITEM 4.D. of the Declarations for **Evacuation Expenses** actually paid by the **Named Insured** in connection with an **Evacuation** that occurs during the **Policy Period**; provided, that such **Evacuation Expenses** are incurred by the **Named Insured** no later than sixty (60) days after the Expiration Date or earlier cancellation date of this Policy and reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

**(E)     Legal/Media Expense Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Named Insured**, the Underwriter will reimburse the **Named Insured** up to the amount set forth in ITEM 4.E. of the Declarations for **Legal/Media Expenses**

actually paid by the **Insured** in connection with a **Legal Defense Proceeding** first brought against the **Insured** during the **Policy Period**; provided, that:

(1)    such **Legal Defense Proceeding** arises out of **Professional Services** rendered by the **Insured** on or after the **Retroactive Date** applicable to the **Insured** against whom/which such **Legal Defense Proceeding** is brought; and

(2)    such **Legal Defense Proceeding** is reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

**(F)    Defense and Supplementary Payments:**

The Underwriter has the right and duty to defend any **Claim** that is covered by INSURING AGREEMENTS (A), (B), and (C) of this Policy, even if any of the allegations of such **Claim** are groundless, false or fraudulent.  In addition to the Limits of Liability for INSURING AGREEMENTS (A), (B), and (C), the Underwriter will pay **Defense Expenses** and will:

(1)    pay the premium on any bond to release attachments for an amount not in excess of the Limits of Liability for INSURING AGREEMENTS (A), (B), and (C) of this Policy and the premium on any appeal bond required in any defended suit, provided, that the Underwriter will not be obligated to apply for or furnish any such bond;

(2)    pay all costs imposed against the **Insured** in any such suit;

(3)    provide a legal defense and pay **Defense Expenses** for any arbitration, mediation or other alternative dispute proceeding if:

    (a)    the dispute at issue is a **Claim** covered by this Policy, and

    (b)    the **Insured** provides notice of the proceeding as required by GENERAL CONDITION (C) of this Policy; and

(4)    pay reasonable expenses, plus loss of earnings due to time off from work, incurred by an **Insured** as a result of being a defendant or co-defendant in a **Claim** or at the Underwriter's request, but not to exceed:

    (a)    ▮▮▮per day per **Insured**; and

    (b)    ▮▮▮▮ per **Claim**.

## II.    DEFINITIONS

(A)    "**Administration**" means:

(1)    giving advice or counsel to **Employees** or their beneficiaries concerning their rights or interest with respect to **Employee Benefit Programs**;

(2)    determining the eligibility of **Employees** to participate in **Employee Benefit Programs**;

(3)    interpreting the provisions of **Employee Benefit Programs**;

(4)    handling and keeping records and processing of claims in connection with **Employee Benefit Programs**; and

(5)    effecting enrollment, termination or cancellation of **Employees** under **Employee Benefit Programs**.

(B)     "**Advertisement**" means a notice that is broadcast or published to the general public or specific market segments about the **Insured's** goods, products or services, for the purpose of attracting customers or supporters. For purposes of this Definition:

   (1)     notice that is broadcast or published includes material placed on the Internet or similar means of electronic communication; and

   (2)     with regard to websites, only that part of a website that is about the **Insured's** goods, products or services, for the purpose of attracting customers or supporters, will be considered an **Advertisement**.

(C)     "**Advertising Injury**" means injury arising out of one or more of the following offenses:

   (1)     the **Insured's** use of another's advertising idea in an **Advertisement**;

   (2)     the **Insured's** use of another's copyright, trade dress or slogan in an **Advertisement**; or

   (3)     the **Insured's** infringement upon another's copyright, trade dress or slogan in an **Advertisement**.

(D)     "**Auto**" means:

   (1)     a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

   (2)     any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

   **Auto** does not include **Mobile Equipment**.

(E)     "**Bodily Injury**" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time; mental anguish; and mental injury.

(F)     "**Claim**" means any written notice received by an **Insured** that any person or entity intends to hold an **Insured** responsible for a **Wrongful Act** or an **Occurrence**.

(G)     "**Covered Contract**" means any lease of premises; sidetrack agreement; elevator maintenance agreement; easement or license agreement; or contract or agreement specifically added as a **Covered Contract** by written endorsement to this Policy, under which the **Named Insured** assumes the tort liability of another to pay damages for **Bodily Injury** or **Property Damage** covered by this Policy that is sustained by others.

(H)     "**Defense Expenses**" means the reasonable fees of attorneys, experts and consultants and costs and expenses incurred in the investigation, adjustment, defense or appeal of a **Claim** with

   the approval or at the direction of the Underwriter; provided, that **Defense Expenses** shall not include:

   (1)     remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of an **Insured**;

   (2)     any amounts incurred in defense of a **Claim** for which any other insurer has a duty to defend, regardless of whether such other insurer undertakes such duty; or

   (3)     any benefits under an **Employee Benefit Program**.

(I)     "**Employee**" means any person who has an assigned work schedule for and is on the regular payroll of the **Named Insured**, with federal and state taxes withheld.  Independent contractors are not **Employees**.  An **Employee's** status as an **Insured** shall be determined as of the date of the **Occurrence** or **Wrongful Act** upon which a **Claim** involving the **Employee** is based.

(J)     "**Employee Benefit Programs**" means any group life insurance, group accident and health insurance, profit sharing plans, pension plans, **Employee** stock subscription plans, workers' compensation, unemployment insurance, social security and disability benefits insurance or any other similar plan under the **Administration** of the **Named Insured** for the benefit of its **Employees**.

(K)     "**Employee Benefit Wrongful Act**" means any actual or alleged act, error or omission, or series of acts, errors or omissions, by an **Insured** in the **Administration** of an **Employee Benefit Program**.

(L)     "**Employment Practices**" means any of the following: breach of any employment contract; failure or refusal to hire or employ; dismissal, discharge, reduction in force, downsizing or termination of employment, whether actual or constructive; demotion, reassignment, failure or refusal to promote, or deprivation of career opportunity; discipline of **Employees**; evaluation of **Employees**; discrimination or harassment of any kind or on any basis including, but not limited to, discrimination, limitation, segregation or classification based on race, sex, marital status, ancestry, physical or mental handicaps, age, sexual preference, pregnancy or religion or other status that is protected under any applicable federal, state or local statute or ordinance affecting any present or former **Employee** or applicant for employment; humiliation or defamation of any present or former **Employee** or applicant for employment; retaliatory treatment against an **Employee** arising out of the **Employee's** attempted or actual exercise of the **Employee's** rights under the law; employment-related misrepresentations; or failure to implement appropriate workplace or employment policies or procedures.

(M)     "**Evacuation**" means the removal from one or more of the **Named Insured's** facilities to any other location of fifteen (15) or more patients or residents in such facility(ies) as a result of any natural or man-made occurrence that, in the reasonable judgment of the **Named Insured's** management, causes or could potentially cause such facility(ies) to be unsafe for such patients or residents.

(N)     "**Evacuation Expenses**" means reasonable costs incurred by the **Named Insured** in connection with an **Evacuation**, including costs associated with transporting, lodging and providing meals to patients or residents who have been evacuated.  **Evacuation Expenses** shall not include any remuneration, salaries, overhead or benefit expenses of the **Named Insured**.

(O)     "**First Named Insured**" means the entity designated as such in ITEM 1 of the Declarations.

(P)     "**Good Samaritan Acts**" means emergency medical treatment provided by an **Insured**, without remuneration, at the scene of an accident, medical crisis or disaster.

(Q)     "**Hostile Fire**" means a fire which becomes uncontrollable or breaks out from where it was intended to be contained; provided, that **Hostile Fire** does not include any fire that originates at any site operating as a waste disposal facility or waste storage facility.

(R)     "**Impaired Property**" means tangible property, other than **Insured Product** or **Insured Work**, that cannot be used or is not useful because:

(1)     it incorporates **Insured Product** or **Insured Work** that is known or thought to be defective, deficient, inadequate or dangerous; or

(2)     the **Named Insured** has failed to fulfill the terms of any contract or agreement.

(S)     "**Insured**" means any of the following:

(1)     the **Named Insured**;

(2) any **Employee** or **Volunteer**, but only when such **Employee** or **Volunteer** is acting within the capacity and scope of his or her duties as such;

(3) the **Named Insured's** medical directors, department heads, or chiefs of staff, but only while acting within the scope and capacity of their duties as such for the **Named Insured**;

(4) any member of a duly authorized board or committee of the **Named Insured**;

(5) solely with respect to and limited to coverage afforded under INSURING AGREEMENT (A), the lawful spouses of individual **Insureds** and, in the event of the death, incapacity, or bankruptcy of an individual **Insured**, the estates, heirs, legal representatives or assigns of such individual **Insured**;

(6) any person enrolled as a student in a formal training program offered by the **Named Insured**, but only when such person is acting within the capacity and scope of his or her duties as such;

(7) any person hired or retained by the **Named Insured** to provide language interpretation services in connection with the provision of **Medical Services;**

(8) any member or partner of a joint venture or partnership specifically listed as a **Named Insured** in Schedule A to this Policy, but only with respect to such member or partner's liability arising out of such joint venture or partnership;

(9) any member of a **Named Insured** that is a limited liability company, but only when named in a **Claim** by reason of such member's ownership interest in such **Named Insured** and only to the extent of such ownership interest; and

(10) any driver or operator of **Mobile Equipment**, but only when operating **Mobile Equipment** at the direction and with the permission of the **Named Insured**;

provided, that **Insured** shall not include any person who is an intern, resident, physician, surgeon, dentist, psychiatrist, nurse anesthetist, nurse midwife, podiatrist or chiropractor while rendering **Medical Services**, whether such person is an **Employee**, **Volunteer** or student.

(T) "**Insured Product**" means:

(1) any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) the **Named Insured**;

(b) others trading under the name of the **Named Insured**; or

(c) a person or an organization whose business or assets the **Named Insured** has acquired; and

(2) containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products. **Insured Product** includes:

(a) warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of the **Insured Product**; and

(b) the providing of or failure to provide warnings or instructions.

**Insured Product** does not include vending machines or other property rented to, or located for the use

of, others but not sold.

(U)     "**Insured Work**" means:

    (1)     work or operations performed by the **Named Insured** or on the **Named Insured's** behalf; and

    (2)     materials, parts or equipment furnished in connection with such work or operations.  **Insured Work** includes:

        (a)     warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of the **Insured Work;** and

        (b)     the providing of or failure to provide warnings or instructions.

(V)     "**Legal Defense Proceeding**" means: (1) a hearing or disciplinary action against an **Insured** before a state or other licensing board or governmental regulatory body; (2) a civil or criminal proceeding in which the **Insured** is not a defendant but has been ordered to offer deposition testimony regarding treatment rendered to a **Patient**; or (3) a civil or criminal proceeding in which the **Insured** is not a party but has received a subpoena for record production regarding treatment rendered to a **Patient**.

(W)     "**Legal/Media Expenses**" means reasonable fees and costs of attorneys, experts and consultants incurred by the **Insured** in the investigation and defense of a **Legal Defense Proceeding**. **Legal/Media Expenses** also include reasonable costs incurred by the **Insured** in the management of public relations with respect to a **Legal Defense Proceeding**, including reasonable fees and costs of third-party media consultants.  **Legal/Media Expenses** shall not include any remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of an **Insured**.

(X)     "**Loss**" means:

    (1)     for the purposes of INSURING AGREEMENTS (A), (B) and (C), any damages, settlements, judgments or other amounts (including punitive or exemplary damages if insurable under the applicable law most favorable to the insurability thereof) in excess of the applicable deductible or self-insured retention, if any, stated in ITEM 4 of the Declarations which an **Insured** is legally obligated to pay as a result of a **Claim**;

    (2)     for the purposes of INSURING AGREEMENT (D), **Evacuation Expenses**;

    (3)     for the purposes of INSURING AGREEMENT (E), **Legal/Media Expenses**.

**Loss** shall not include:

(a)     **Defense Expenses**;

(b)     the multiple portion of any multiplied damage award;

(c)     fines, penalties, sanctions, fees, government payments or taxes;

(d)     amounts owed to any provider of **Medical Services** under any contract;

(e)     restitution, return or disgorgement of fees, profits, charges for products or services rendered, capitation payments, premium or any other funds allegedly wrongfully held or obtained;

(f)     benefits under an **Employee Benefit Program**;

(g)     relief or redress in any form other than monetary compensation or monetary damages, including without limitation the cost of complying with any injunctive, declaratory or administrative relief;

(h)     the payment, satisfaction or writing off of any medical bills or charges by an **Insured**; or

(i)     matters which are uninsurable under applicable law.

(Y)     "**Managed Care Services**" means services or activities performed in the administration or management of health care plans; advertising, marketing or selling health care plans or health care products; handling, investigating or adjusting claims for benefits or coverages under health care plans; or establishing health care provider networks.

(Z)     "**Medical Services**" means health care, medical care, or treatment provided to any individual, including without limitation any of the following: medical, surgical, dental, psychiatric, mental health, chiropractic, osteopathic, nursing, or other professional health care; the furnishing or dispensing of medications, drugs, blood, blood products, or medical, surgical, dental, or psychiatric supplies, equipment, or appliances in connection with such care; the furnishing of food or beverages in connection with such care; the providing of counseling or other social services in connection with such care; and the handling of, or the performance of post-mortem examinations on, human bodies.

(AA)    "**Mobile Equipment**" means any of the following types of land vehicles, including any attached machinery or equipment:

(1)     bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

(2)     vehicles maintained for use solely on or next to premises owned or rented by an **Insured**;

(3)     vehicles that travel on crawler treads;

(4)     vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(a)     power cranes, shovels, loaders, diggers or drills, or

(b)     road construction or resurfacing equipment such as graders, scrapers or rollers;

(5)     vehicles not described in clauses (1)-(4) above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(a)     air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(b)     cherry pickers and similar devices used to raise or lower workers; and

(6)     vehicles not described in clauses (1)-(4) above maintained primarily for purposes other than the transportation of persons or cargos.

**Mobile Equipment** does not include:

(i)     self-propelled vehicles with the following types of permanently attached equipment:

(aa)    equipment designed primarily for:

(AA)    snow removal;

(BB)    road maintenance but not construction or resurfacing; or

          (CC)    street cleaning;

      (bb)    cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

      (cc)    air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

  (ii)    any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

(BB)    "**Mold**" means mold, mildew, spores, mycotoxins, fungi, organic pathogens or other micro organisms of any type, nature or description whatsoever.

(CC)    "**Named Insured**" means the **First Named Insured** and each other entity listed as a **Named Insured** in Schedule A to this Policy.

(DD)    "**Occurrence**" means:

  (1)    with respect to **Bodily Injury** or **Property Damage**, an accident, including continuous or repeated exposure to substantially the same harmful conditions, which results in injury or damage neither expected nor intended by the **Insured**; and

  (2)    with respect to **Advertising Injury** or **Personal Injury**, a covered offense as set forth in DEFINITIONS (C) or DEFINITIONS (FF) of this Policy.

(EE)    "**Patient**" means any person or human body admitted or registered to receive **Medical Services** from an **Insured**, whether on an inpatient, outpatient or emergency basis.

(FF)    "**Personal Injury**" means injury, other than **Bodily Injury**, arising out of one or more of the following offenses:

  (1)    false arrest, detention or imprisonment;

  (2)    malicious prosecution;

  (3)    the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

  (4)    oral or written publication of material that slanders or libels a person or an organization or disparages a person's or an organization's goods, products or services; or

  (5)    oral or written publication of material that violates a person's right of privacy.

(GG)    "**Personally Identifiable Health Information**" means a natural person's name used in combination with his/her confidential health care or other medical information, including "protected health information" as defined in the Health Insurance Portability and Accountability Act of 1996, as amended, and any rules or regulations promulgated thereunder. **Personally Identifiable Health Information** does not include information that is lawfully available to the general public, including but not limited to information from any federal, state or local governmental or regulatory agency or entity.

(HH)    "**Policy Period**" means the period from the Inception Date of this Policy stated in ITEM 2(a) of the Declarations to the Expiration Date of this Policy stated in ITEM 2(b) of the Declarations or to any earlier cancellation date of this Policy.

(II) "**Pollutant**" means smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, medical waste, waste materials (including materials which are intended to be or have been recycled, reconditioned or reclaimed) or other irritants, pollutants or contaminants. **Pollutant** does not include smoke, fumes, vapor or soot emanating from equipment used to heat or cool a building owned or operated by the **Named Insured**.

(JJ) "**Products and Completed Operations Hazard**" means **Bodily Injury** and **Property Damage** occurring away from premises owned or rented by the **Insured** and arising out of **Insured Product** or **Insured Work**, except:

(1) products that are still in the **Insured's** physical possession; and

(2) work that has not yet been completed or abandoned; provided that work will be deemed completed at the earliest of the following times:

(a) when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project;

(b) when all of the work called for in the **Insured's** contract has been completed; or

(c) when all of the work to be done at the job site has been completed if the **Insured's** contract calls for work at more than one job site.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed work.

**Products and Completed Operations Hazard** does not include **Bodily Injury** or **Property Damage** arising out of:

(i) the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by the **Insured**, and that condition was created by the loading or unloading of that vehicle by an **Insured**; or

(ii) the existence of tools, uninstalled equipment, or abandoned or unused materials.

(KK) "**Professional Services**" means:

(1) **Medical Services** in connection with the Covered Operations/Services set forth in ITEM 5 of the Declarations;

(2) **Good Samaritan Acts**;

(3) the activities of an **Insured** as a member of a board or committee of the **Named Insured**, or as a member of any committee of the medical or professional staff of the **Named Insured**, when engaged in **Utilization Review**;

(4) the activities of an **Insured** as a member of a formal accreditation, standards review or similar professional board or committee, including executing the directives of such board or committee; or

(5) reviewing the quality of **Medical Services** or providing quality assurance on behalf of the **Named Insured**.

(LL) "**Professional Services Wrongful Act**" means:

(1) any actual or alleged act, error or omission, or series of acts, errors or omissions, by an **Insured** in rendering, or failing to render, **Professional Services**;

(2) any actual or alleged act, error or omission, or series of acts, errors or omissions, by any person other than an **Insured** in rendering, or failing to render, **Medical Services**, but only for an **Insured's** vicarious liability with regard to such **Medical Services**. In no event shall this Policy provide coverage for the direct liability of any person other than an **Insured** for the rendering of, or failure to render, **Medical Services**; or

(3) any inadvertent:

(a) publication of **Personally Identifiable Health Information**; or

(b) utterance of confidential health care or other medical information,

of a **Patient** by an **Insured** while providing **Medical Services** to such **Patient**.

(MM) "**Property Damage**" means:

(1) physical injury to tangible property, including all resulting loss of use of that property; provided, that such loss of use shall be deemed to have occurred at the time of the physical injury that caused it; or

(2) loss of use of tangible property that is not physically injured; provided, that such loss of use shall be deemed to occur at the time of the **Occurrence** that caused it. **Property Damage** shall not include loss of use of tangible property that results from any actual or alleged theft.

(NN) "**Related Claims**" means all **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, in any way involving, or in any way having a common nexus of the same or related facts, circumstances, situations, transactions, or events, or the same or related series of facts, circumstances, situations, transactions or events.

(OO) "**Retroactive Date**" means the applicable date(s) set forth in ITEM 3 of the Declarations.

(PP) "**Utilization Review**" means the process of evaluating the appropriateness or necessity of **Medical Services** provided or to be provided by an **Insured**. **Utilization Review** shall include prospective review of proposed **Medical Services**, concurrent review of ongoing **Medical Services**, and retrospective review of already rendered **Medical Services**. **Utilization Review** does not include services or activities performed in the administration or management of health care plans.

(QQ) "**Volunteer**" means a person who provides his or her services or labor to the **Named Insured**, and whose activities are supervised and directed by the **Named Insured**, but who is not compensated for such services and labor. No **Employee** or physician shall be considered a **Volunteer**.

(RR) "**Wrongful Act**" means any **Professional Services Wrongful Act** or **Employee Benefit Wrongful Act**.

## III. EXCLUSIONS

**(A) Exclusions Applicable to INSURING AGREEMENT (A):**

In addition to the EXCLUSIONS listed under (D) below, no coverage will be available under INSURING AGREEMENT (A), and the Underwriter will not pay any **Loss** or **Defense Expenses,** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1) **Professional Services Wrongful Act** that happened before the **Retroactive Date**;

(2) **Bodily Injury** or **Property Damage**, except to the extent such **Claim** arises out of a **Professional Services Wrongful Act;**

(3) **Advertising Injury** or **Personal Injury**, except to the extent that such injury relates to the rendering of, or failure to render, **Professional Services**;

(4) **Employee Benefit Wrongful Act;**

(5) rendering of, or failure to render, **Medical Services** by any **Insured** or any person for whom an **Insured** is vicariously liable:

    (a) while the **Insured's** or such person's license to practice is or was not active;

    (b) in violation of any restriction imposed or placed upon the **Insured's** or such person's license; or

    (c) if such **Medical Services** fall outside the scope of the **Insured's** or such person's license;

(6) rendering of, or failure to render, **Medical Services** by any person other than an **Insured**; except this EXCLUSION (A)(6) will not apply to an **Insured's** vicarious liability with regard to such **Medical Services**; or

(7) treatment of any **Patient** with any drug, medical device, or biologic or radiation-emitting product not approved by the U.S. Food and Drug Administration.

**(B)** **Exclusions Applicable to INSURING AGREEMENT (B):**

In addition to the EXCLUSIONS listed under (D) below, no coverage will be available under INSURING AGREEMENT (B), and the Underwriter will not pay any **Loss** or **Defense Expenses,** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1) **Occurrence** that happened before the Inception Date set forth in ITEM 2 of the Declarations;

(2) **Professional Services Wrongful Act**;

(3) injury to a **Patient**; except this EXCLUSION (B)(3) shall not apply to any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving: fire or lightning; windstorm or hail; explosion; riot, including riot attending a strike or civil commotion; smoke; vandalism or malicious mischief; sprinkler leakage; elevator malfunction; earthquake or flood; or structural collapse of a building;

(4) **Bodily Injury**, **Property Damage**, **Personal Injury** or **Advertising Injury** expected or intended from the standpoint of any **Insured**; except for **Bodily Injury** resulting from use of reasonable force to protect persons or property;

(5) **Personal Injury** or **Advertising Injury** arising out of oral or written publication of material:

    (a) if done by or at the direction of an **Insured** with knowledge of its falsity; or

    (b) whose first publication took place before the Inception Date set forth in ITEM 2 of the Declarations;

(6)    **Advertising Injury** arising out of any false, incorrect or misleading description of the price of goods, products or services;

(7)    **Employee Benefit Wrongful Act**;

(8)    **Bodily Injury** or **Property Damage** for which an **Insured** is or may be held liable by reason of:

    (a)    causing or contributing to the intoxication of any person;

    (b)    the furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

    (c)    any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages;

except this EXCLUSION (B)(8) will not apply if the **Insured** is not in the business of manufacturing, selling or distributing alcoholic beverages;

(9)    **Bodily Injury** or **Property Damage** arising out of:

    (a)    the transportation of **Mobile Equipment** by, in or on an **Auto** owned or operated by, or rented or loaned to, any **Insured**; or

    (b)    the use of **Mobile Equipment** in, or while in practice or preparation for, any prearranged racing, speed, demolition or stunt activity;

(10)    **Bodily Injury** or **Property Damage** arising from any consequence, direct or indirect, of war, invasion, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power, strike, riot or civil insurrection;

(11)    **Property Damage** to:

    (a)    property the **Insured** owns, rents or occupies;

    (b)    premises sold, given away or abandoned by the **Named Insured**, if the **Property Damage** arises out of any part of those premises;

    (c)    property loaned to the **Insured**;

    (d)    personal property in the care, custody or control of the **Insured**;

    (e)    that particular part of real property on which the **Insured**, or any contractor or subcontractor working directly or indirectly on the **Insured's** behalf, is performing operations, if the **Property Damage** arises out of those operations;

    (f)    that particular part of any property that must be restored, repaired or replaced because the **Insured's Work** was incorrectly, poorly or improperly performed on it; or

    (g)    property which is being transported by the **Insured** by automobile, **Mobile Equipment** or team, including the loading and unloading thereof;

EXCLUSION (B)(11)(a) above does not apply to any **Claim** for **Property Damage** resulting from any fire caused by the **Insured's** negligence and occurring on premises rented by the **Insured** or temporarily occupied by the **Insured** with the permission of the owner of such premises, up

to the "Damage to Rented Premises" Limit of Liability set forth in ITEM 4.B. of the Declarations;

EXCLUSIONS (B)(11)(a), (c) and (d) above do not apply to any **Claim** for **Property Damage** (other than damage caused by fire) to premises, including the contents of such premises, rented to the **Insured** for a period of seven (7) or fewer consecutive days, up to the "Damage to Rented Premises" Limit of Liability set forth in ITEM 4.B. of the Declarations.

EXCLUSION (B)(11)(b) above does not apply if the premises are **Insured Work** and were never occupied, rented or held for rental by the **Named Insured**;

EXCLUSIONS (B)(11)(c), (d), (e), and (f) above do not apply to liability assumed under a sidetrack agreement; and

EXCLUSION (B)(11)(f) above does not apply to **Property Damage** included in the **Products and Completed Operations Hazard**;

(12)   **Property Damage** to the **Insured Product** arising out of it or any part of it;

(13)   **Property Damage** to **Insured Work** arising out of it or any part of it and included in the **Products and Completed Operations Hazard**; except if the damaged work or the work out of which the damage arises was performed on behalf of the **Named Insured** by a subcontractor;

(14)   **Property Damage** to **Impaired Property** or property that has not been physically injured, arising out of:

   (a)   defect, deficiency, inadequacy or dangerous condition in **Insured Product** or **Insured Work**; or

   (b)   a delay or failure by an **Insured** or anyone acting on the **Named Insured's** behalf to perform a contract or an agreement in accordance with its terms; except this EXCLUSION (B)(14)(b) does not apply to the loss of use of other property arising out of sudden and accidental physical injury to **Insured Product** or **Insured Work** after it has been put to its intended use;

(15)   damages claimed for any loss, cost or expense incurred by the **Named Insured** or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

   (a)   **Insured Product**;

   (b)   **Insured Work**; or

   (c)   **Impaired Property**, if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it;

(16)   injury or damage arising in whole or in part, either directly or indirectly, out of asbestos, regardless whether the asbestos is:

   (a)   airborne as a fiber or particle;

   (b)   contained in a product;

   (c)   carried or transmitted on clothing or by any other means; or

(d)     contained in or a part of:

      (i)     any building;

      (ii)    any building material;

      (iii)   any insulation product; or

      (iv)   any component part of any building, building material or insulation product;

(17)   (a)     exposure to, or the manifestation, release, dispersal, seepage, migration, discharge, appearance, presence, reproduction or growth of, **Mold**;

      (b)     fee, cost, expense or charge to test, monitor, clean up, remediate, mitigate, remove, contain, treat, detoxify, neutralize, rehabilitate, or in any other way respond to or assess the effect(s) of **Mold**; or

      (c)     fee, cost, expense, charge, fine or penalty incurred, sustained or imposed by order, direction, request or agreement of any court, governmental agency, regulatory body or civil, public or military authority in connection with or in any way relating to **Mold**;

(18)   (a)     exposure to, or generation, storage, manifestation, transportation, discharge, emission, release, dispersal, seepage, migration, escape, appearance, presence, reproduction, growth of, treatment, removal or disposal of, any **Pollutant**, including any threat thereof, except where such exposure, generation, storage, manifestation, transportation, discharge, emission, release, dispersal, seepage, migration, escape, appearance, presence, reproduction, growth, treatment, removal or disposal was caused by an unintentional fire or any heat, smoke or fumes issuing from such unintentional fire;

      (b)     fee, cost, expense or charge to test, monitor, clean up, remediate, mitigate, remove, contain, treat, detoxify, neutralize or rehabilitate any **Pollutant**; or

      (c)     fee, cost, expense, charge, fine or penalty incurred, sustained or imposed by order, direction, request or agreement of any court, governmental agency, regulatory body or civil, public or military authority in connection with or in any way relating to any **Pollutant**;

except this EXCLUSION (B)(18) will not apply to any **Claim** for **Bodily Injury** or **Property Damage** caused by heat, smoke or fumes from a **Hostile Fire**;

(19)   nuclear reaction, nuclear radiation, radioactive contamination, or radioactive substance; or

(20)   violation of the Telephone Consumer Protection Act, the CAN-SPAM Act of 2003, the Fair Credit Reporting Act, the Fair and Accurate Credit Transaction Act, all as may be amended, or any other federal, state or local statutory or common law that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information, or any rules or regulations promulgated thereunder.

## (C)     Exclusions Applicable to INSURING AGREEMENT (C):

In addition to the Exclusions listed in EXCLUSION (D) below, no coverage will be available under INSURING AGREEMENT (C), and the Underwriter will not pay any **Loss** or **Defense Expenses,** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)     **Employee Benefit Wrongful Act** that happened before the **Retroactive Date**;

(2)     **Advertising Injury**, **Bodily Injury**, **Personal Injury** or **Property Damage**;

(3)     failure of performance by any insurer;

(4)     failure of securities or other investments to perform as represented or advice given to an **Employee** to participate or not to participate in stock subscription or other benefit programs; provided, that for purposes of this EXCLUSION (C)(4), "security" means a security of any nature whatsoever including, without limitation, stocks, shares, bonds, debentures, options, derivatives, partnership interests, limited liability company interests, any other form of debt or equity instrument and any other forms of ownership interest;

(5)     insufficiency of funds to meet any obligations of **Employee Benefit Programs**; or

(6)     **Professional Services Wrongful Act**.

**(D)    Exclusions Applicable to All INSURING AGREEMENTS:**

Except as otherwise expressly provided in this Policy, this Policy does not apply to, and the Underwriter will not pay **Loss** or **Defense Expenses**, for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)     act, error, omission or **Wrongful Act** if any **Insured**, on or before the Inception Date set forth in ITEM 2 of the Declarations, knew or reasonably could have foreseen that such act, error, omission or **Wrongful Act** might result in a **Claim**.

If, however, this Policy is a renewal of one or more policies previously issued by the Underwriter to the **First Named Insured**, and the coverage provided by the Underwriter to the **First Named Insured** was in effect, without interruption, for the entire time between the inception date of the first such other policy and the Inception Date of this Policy, the reference in this EXCLUSION (D)(1) to the Inception Date will be deemed to refer instead to the inception date of the first policy under which the Underwriter began to provide the **First Named Insured** with the continuous and uninterrupted coverage of which this Policy is a renewal;

(2)     act, error, omission, **Wrongful Act**, event, suit or demand which was the subject of any notice given under:

(a)     any medical professional liability or similar policy of insurance or plan or program of self-insurance, with respect to any **Claim** otherwise covered under INSURING AGREEMENT (A);

(b)     any general liability or similar policy of insurance or plan or program of self-insurance, with respect to any **Claim** otherwise covered under INSURING AGREEMENT (B); or

(c)     any employee benefit liability or similar policy of insurance or plan or program of self-insurance, with respect to any **Claim** otherwise covered under INSURING AGREEMENT (C);

in effect prior to the Inception Date set forth in ITEM 2 of the Declarations;

(3)     violation of any federal, state or local antitrust, restraint of trade, unfair competition, or price-fixing law, or any rules or regulations promulgated thereunder, or any involvement in any agreement or conspiracy to restrain trade, except for any **Claim** otherwise covered under INSURING AGREEMENT (A) arising out of the rendering of, or failure to render, **Medical Services**;

(4) dishonest, fraudulent, criminal or intentionally malicious act, error or omission by an **Insured**; any willful violation of law, statute, rule or regulation by an **Insured**; or the gaining of any profit, remuneration or advantage by an **Insured** to which such **Insured** was not legally entitled, including, but not limited to, health care fraud; provided, however, that no such act of one **Insured** will be imputed to any other **Insured** who was not aware of and did not participate in such act;

(5) **Bodily Injury** or **Property Damage** arising out of the ownership, maintenance, use, operation or entrustment to others of any aircraft, **Auto** or watercraft or the loading or unloading thereof; except this EXCLUSION (D)(5) will not apply to any **Claim** for a **Professional Services Wrongful Act** in connection with the loading or unloading of any **Patient** from any aircraft or **Auto**;

(6) obligation of an **Insured** pursuant to any  workers' compensation, unemployment compensation, disability benefits or similar law;

(7) obligation which an **Insured** has assumed under a written or oral contract or agreement; except this EXCLUSION (D)(7) will not apply to:

(a) liability an **Insured** would have had in the absence of such contract or agreement; or

(b) liability assumed by the **Named Insured** under a **Covered Contract**;

(8) **Claim** made by or for the benefit of, or in the name or right of, one current or former **Insured** against another current or former **Insured**; except this EXCLUSION (D)(8) will not apply to any **Claim** for:

(a) the rendering of, or failure to render, **Medical Services** otherwise covered under INSURING AGREEMENT (A) of this Policy; or

(b) any **Employee Benefit Wrongful Act** otherwise covered under INSURING AGREEMENT (C) of this Policy;

(9) discrimination of any kind on any basis, including, but not limited to, discrimination, limitation, segregation or classification based on race, sex, marital status, ancestry, physical or mental handicaps, age, sexual preference, pregnancy, religion or other status that is protected under any applicable federal, state or local statute or ordinance, including any discrimination in the rendering of, or failure to render, **Professional Services**;

(10) **Employment Practices**;

(11) liability of any "Acquired Entity" described in GENERAL CONDITION (F) or its individual **Insureds** acting in their capacity as such for any **Claim**, **Occurrence**, fact, circumstance, situation, transaction, event or **Wrongful Act** or series of **Claims**, **Occurrences**, facts, circumstances, situations, transactions, events or **Wrongful Acts** happening before the date such entity became an "Acquired Entity;"

(12) (a) unauthorized, unlawful, or unintentional taking, obtaining, accessing, using, disclosing, distributing, disseminating, transmitting, gathering, collecting, acquiring, corrupting, damaging, destroying, deleting, or impairing of any information or data of any kind, including but not limited to any health care or other medical information or **Personally Identifiable Health Information**; provided, that this EXCLUSION (D)(12)(a) shall not apply to any **Claim** for a **Professional Services Wrongful Act** as defined in DEFINTION (LL)(3);

(b)     failure or inability of any computer, computer component (including but not limited to any hardware, network, terminal device, data storage device, input and output device, or back up facility), application, program, software, code, or script of any kind (a "System") to perform or function as planned or intended, including but not limited to any failure or inability of any System to prevent any hack, virus, contaminant, worm, trojan horse, logic bomb, or unauthorized or unintended accessing or use involving any System; or

(c)     creation, development, design, manufacture, programming, leasing, licensing, distribution, assembly, installation, alteration, modification, or sale of any computer, computer component (including but not limited to any hardware, network, terminal device, data storage device, input and output device, or back up facility), application, program, software, code, script, or data of any kind;

(13)    liability of any individual or entity acting as an independent contractor for an **Insured**; except this EXCLUSION (D)(13) will not apply to any **Claim** otherwise covered under INSURING AGREEMENT (A) for the **Insured's** vicarious liability with regard to such independent contractor;

(14)    infringement of any right of patent, service mark, trademark, copyright, title or slogan; except this EXCLUSION (D)(14) will not apply to liability of an **Insured** for infringement of copyright, trade dress or slogan in an **Advertisement**;

(15)    liability of any **Insured** for **Managed Care Services**; except this EXCLUSION (D)(15) will not apply to liability of an **Insured** for **Professional Services**;

(16)    evaluation of any provider of **Medical Services** by an **Insured** for purposes of selecting, employing, contracting with or credentialing such provider of **Medical Services**, if such **Claim** is made by or on behalf of any such provider of **Medical Services**;

(17)    **Claim** made by or on behalf of any federal, state or local governmental or regulatory agency or entity, including but not limited to any **Claim** alleging health care fraud and abuse or violation of the Health Insurance Portability and Accountability Act of 1996 or the Health Information Technology for Economic and Clinical Health Act, all as may be amended, or any rules or regulations promulgated thereunder; or

(18)    violation of the Employee Retirement Income Security Act of 1974 (ERISA), the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, all as may be amended, or any similar federal, state or local statutory or common law, or any rules or regulations promulgated thereunder; except this EXCLUSION (D)(18) will not apply to any **Claim** arising out of the rendering of, or failure to render, **Medical Services**, which is otherwise covered under INSURING AGREEMENT (A) of this Policy and for which reimbursement for such services was received from health care plans covered by such statutes, rules or regulations.


## IV.     GENERAL CONDITIONS

## (A)    Limits of Liability

(1)     Insuring Agreement (A) – Professional Liability

(a)     The "Each Claim" amount stated in ITEM 4.A. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (A).

(b)    The "Aggregate for all Claims" amount stated in ITEM 4.A. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (A).

(2)    Insuring Agreement (B) – General Liability

(a)    The "Each Claim" amount stated in ITEM 4.B. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (B).

(b)    The Underwriter's Limits of Liability for **Claims** alleging **Bodily Injury** or **Property Damage** included in the **Products and Completed Operations Hazard** shall be equal to, part of, and not in addition to, the "Each Claim" and "Aggregate for all Claims" amounts stated in ITEM 4.B. of the Declarations.

(c)    The "Damage to Rented Premises" amount stated in ITEM 4.B. of the Declarations will be the Underwriter's maximum aggregate Limit of Liability for all (i) **Claims** for **Property Damage** resulting from any and all fires caused by the **Insured's** negligence and occurring on premises rented to the **Insured** or temporarily occupied by the **Insured** with the permission of the owner of such premises and (ii) **Claims** for **Property Damage** (other than damage caused by fire) to premises, including the contents of such premises, rented to the **Insured** for a period of seven (7) or fewer consecutive days. Such amount shall be part of, and not in addition to, the "Aggregate for all Claims" amount stated in ITEM 4.B. of the Declarations.

(d)    The "Aggregate for all Claims" amount stated in ITEM 4.B. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (B).

(3)    Insuring Agreement (C) – Employee Benefit Liability

(a)    The "Each Claim" amount stated in ITEM 4.C. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (C).

(b)    The "Aggregate for all Claims" amount stated in ITEM 4.C. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (C).

(4)    Insuring Agreement (D) – Evacuation Expense

(a)    The "Each Evacuation" amount stated in ITEM 4.D. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Evacuation** for which this Policy provides coverage under INSURING AGREEMENT (D).

(b)    The "Aggregate for all Evacuations" amount stated in ITEM 4.D. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Evacuations** for which this Policy provides coverage under INSURING AGREEMENT (D).

(5)    Insuring Agreement (E) – Legal/Media Expense

(a) The "Each Legal Defense Proceeding" amount stated in ITEM 4.E. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Legal Defense Proceeding** for which this Policy provides coverage under INSURING AGREEMENT (E).

(b) The "Aggregate for all Legal Defense Proceedings" amount stated in ITEM 4.E. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Legal Defense Proceedings** for which this Policy provides coverage under INSURING AGREEMENT (E).

(6) Each Limit of Liability described in paragraphs (1) through (5) above shall apply regardless of the time of payment by the Underwriter, the number of persons or entities included within the definition of **Insured,** or the number of claimants, and regardless of whether such **Claim** or **Related Claims** is/are first made during the **Policy Period** or during any Extended Reporting Period.

(7) (a) The **Insured** shall be responsible for payment in full of the applicable deductible or self-insured retention stated in ITEM 4 of the Declarations, and the Underwriter's obligation to pay **Loss** or **Defense Expenses** under this Policy shall be excess of such deductible or self-insured retention; provided, that no deductible or self-insured retention shall apply to (i) **Claims** for **Property Damage** resulting from any fire caused by the **Insured's** negligence and occurring on premises rented to the **Insured** or temporarily occupied by the **Insured** with the permission of the owner of such premises or (ii) **Claims** for **Property Damage** (other than damage caused by fire) to premises, including the contents of such premises, rented to the **Insured** for a period of seven (7) or fewer consecutive days, and which are subject to the "Damage to Rented Premises" Limit of Liability set forth in ITEM 4.B. of the Declarations.  The applicable deductible or self-insured retention shall apply to each **Claim** or **Related Claims** (subject to the applicable aggregate deductible or self-insured retention amount, if any), and shall be eroded (or exhausted) by the **Insured's** payment of **Loss** or **Defense Expenses**.  The Underwriter shall have no obligation whatsoever, either to the **Insured** or any other person or entity, to pay all or any portion of the applicable deductible or self-insured retention on behalf of the **Insured**. The Underwriter shall, however, at its sole discretion, have the right and option to do so, in which event the **Insured** will repay the Underwriter any amounts so paid.

(b) If  a "Deductible" is selected under any Insuring Agreement in ITEM 4 of the Declarations,  any amounts paid within such deductible will reduce, and may exhaust, the applicable Limits of Liability for such Insuring Agreement.

If  a "Self-Insured Retention" is selected under any Insuring Agreement in ITEM 4 of the Declarations,  any amounts paid within such self-insured retention will not reduce the applicable Limits of Liability for such Insuring Agreement.

(8) All **Insureds** under this Policy share the Limits of Liability. In no event will the number of **Insureds** involved in a **Claim** or **Related Claims** increase the applicable Limit of Liability.

(9) In the event a **Claim** under this Policy involves more than one (1) Insuring Agreement hereunder, it is understood and agreed that only one (1) deductible or self-insured retention and one (1) Limit of Liability will apply to such **Claim**, which shall be the highest applicable "Each Claim" Limit of Liability stated in ITEM 4 of the Declarations and the deductible or self-insured retention corresponding to such Limit of Liability.

(10) If any **Claim** made against the **Insureds** gives rise to coverage both under this Policy and under any other policy or policies issued by the Underwriter or any affiliate of the Underwriter, the Underwriter's and, if applicable, such affiliate's maximum aggregate limit of liability under all such

policies for all **Loss** in respect of such **Claim** will not exceed the largest single available limit of liability under any such policy, including this Policy. In no event will more than one policy issued by the Underwriter respond to a **Claim**.

**(B)     Related Claims Deemed Single Claim:**

All **Related Claims**, whenever made, shall be deemed to be a single **Claim**, regardless of:

(1)     the number of **Related Claims**;

(2)     the number or identity of claimants;

(3)     the number or identity of **Insureds** involved or against whom **Related Claims** have been or could be made;

(4)     whether the **Related Claims** are asserted in a class action or otherwise; and

(5)     the number and timing of the **Related Claims**, even if the **Related Claims** comprising such single **Claim** were made in more than one **Policy Period**.

All **Related Claims** will be treated as a single **Claim** made when the earliest of such **Related Claims** was first made, or when the earliest of such **Related Claims** is treated as having been made in accordance with GENERAL CONDITION (C)(2) below, whichever is earlier.

**(C)     Reporting of Claims, Occurrences and Circumstances:**

(1)     If, during the **Policy Period** or any Extended Reporting Period, any **Claim** for a **Wrongful Act** under INSURING AGREEMENT (A) or (C) is first made against an **Insured**, as a condition precedent to its right to any coverage under this Policy, the **Insured** shall give the Underwriter written notice of such **Claim** as soon as practicable thereafter, but in no event later than:

(a)     thirty (30) days after the Expiration Date or earlier cancellation date of this Policy; or

(b)     the expiration of any Extended Reporting Period.

Timely and sufficient notice by one **Insured** of a **Claim** shall be deemed timely and sufficient notice for all **Insureds** involved in the **Claim**. Such notice shall give full particulars of the **Claim**, including, but not limited to: a description of the **Claim** and **Wrongful Act**; the identity of the patient, all potential claimants and the health care provider(s) and any **Insureds** involved; a description of the injury or damages that resulted from such **Wrongful Act**; information on the time, place and nature of the **Wrongful Act**; and the manner in which the **Insured** first became aware of such **Wrongful Act** .

(2)     If during the **Policy Period** an **Insured** first becomes aware of any **Wrongful Act** that may subsequently give rise to a **Claim** under INSURING AGREEMENT (A) or (C) and:

(a)     gives the Underwriter written notice of such **Wrongful Act** with full particulars as soon as practicable thereafter but in any event before the Expiration Date or earlier cancellation date of this Policy; and

(b)     requests coverage under INSURING AGREEMENT (A) or (C) of this Policy for any **Claim** subsequently arising from such **Wrongful Act**;

then any **Claim** not otherwise excluded by this Policy subsequently made against the **Insured** arising out of such **Wrongful Act** shall be treated as if it had been first made during the **Policy Period**. Full particulars shall include, but are not limited to: a description of the **Wrongful Act**;

the identity of the patient, all potential claimants and the health care provider(s) and any **Insureds** involved; information on the time, place and nature of the **Wrongful Act**; the manner in which the **Insured** first became aware of such **Wrongful Act**; and the reasons the **Insured** believes the **Wrongful Act** is likely to result in a **Claim**.

(3)     If any **Claim** alleging **Bodily Injury**, **Property Damage**, **Advertising Injury** or **Personal Injury** that is caused by an **Occurrence** under INSURING AGREEMENT (B) is first made against an **Insured**, as a condition precedent to its right to any coverage under this Policy, the **Insured** shall give the Underwriter written notice of such **Claim** as soon as practicable thereafter.  Timely and sufficient notice by one **Insured** of a **Claim** shall be deemed timely and sufficient notice for all **Insureds** involved in the **Claim**. Such notice shall give full particulars of the **Claim**, including, but not limited to: a description of the **Claim** and **Occurrence**; the identity of all potential claimants and any **Insureds** involved; a description of the injury or damages that resulted from such **Occurrence**; information on the time, place and nature of the **Occurrence**; and the manner in which the **Insured** first became aware of such **Occurrence.**

If an **Insured** becomes aware of an **Occurrence** that may subsequently give rise to a **Claim** under INSURING AGREEMENT (B), the **Insured** shall give the Underwriter written notice of such **Occurrence** as soon as practicable thereafter. Such notice shall include a description of the **Occurrence**; the identity of all potential claimants and any **Insureds** involved; a description of the injury or damages that resulted from such **Occurrence**; information on the time, place and nature of the **Occurrence**; the manner in which the **Insured** first became aware of such **Occurrence**; and the reasons the **Insured** believes such **Occurrence** is likely to result in a **Claim.**

(4)     As a condition precedent to its right to any reimbursement under INSURING AGREEMENT (D) of this Policy, the **Named Insured** shall provide the Underwriter written proof of payment of **Evacuation Expenses** as soon as practicable, but in no event later than sixty (60) days after the Expiration Date or earlier cancellation date of this Policy.

(5)     As a condition precedent to its right to any reimbursement under INSURING AGREEMENT (E) of this Policy:

(a)     the **Insured** shall provide the Underwriter written notice of any **Legal Defense Proceeding** as soon as practicable, but in no event later than thirty (30) days after the **Insured** first receives notice of such **Legal Defense Proceeding**; and

(b)     the **Named Insured** shall provide the Underwriter written proof of payment of **Legal/Media Expenses** in connection with such **Legal Defense Proceeding** within sixty (60) days of the **Insured's** payment of such **Legal/Media Expenses**.

## (D)     Defense and Settlement:

(1)     No **Insured** shall, except at its own cost, incur any expense, make any payment, admit liability for, assume any obligation, or settle any **Claim** without the Underwriter's written consent. With respect to any **Claim,** the Underwriter will have the right to investigate, direct the defense, and conduct settlement negotiations it deems appropriate. The Underwriter may make any settlement of any **Claim** which it deems appropriate.

(2)     The Underwriter will have no obligation to pay **Loss** or **Defense Expenses**, or continue to direct the defense of any **Insured**, after the applicable Limit of Liability has been exhausted by the payment of **Loss**.

(3)     If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred, either because a **Claim** made against the **Insureds** includes both covered and uncovered matters, or because a **Claim** is made against both **Insureds** and others not included within the definition of

"**Insured**" set forth in DEFINITION (S) above, the **Insureds** and the Underwriter agree to use their best efforts to determine a fair and proper allocation of all such amounts.  The Underwriter's obligation to pay **Loss** under this Policy shall relate only to those sums allocated to the **Insureds**.  In making such determination, the parties shall take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim** by the **Insureds** and others.  In the event that the Underwriter and the **Insureds** do not reach an agreement with respect to an allocation, then the Underwriter shall be obligated to make an interim payment of the amount of **Loss** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

**(E)    Territory:**

This Policy applies to **Wrongful Acts** or **Occurrences** taking place anywhere in the world. **Claim** or suit must be made against an **Insured**, however, in the United States of America, including its territories or possessions, Puerto Rico, or Canada.

**(F)    Mergers, Acquisitions or Newly Created Entities:**

If, during the **Policy Period,** the **Named Insured** acquires or creates another entity or subsidiary or becomes a member of a joint venture or partner in a partnership, or if the **Named Insured** merges or consolidates with another entity such that the **Named Insured** is the surviving entity (any such acquired, created, merged or consolidated entity an "Acquired Entity"), then for a period of sixty (60) days after the effective date of the transaction, such Acquired Entity shall be included within the term "**Named Insured**" with respect to **Wrongful Acts** or **Occurrences** happening after the effective date of the transaction.  Upon the expiration of the sixty (60) day period, there will be no coverage under this Policy for any **Claim** in any way involving the Acquired Entity or its **Insureds** unless within such sixty (60) day period:

(1)    the **Named Insured** gives the Underwriter such information regarding the transaction as the Underwriter requests; and

(2)    the Underwriter has specifically agreed by written endorsement to this Policy to provide coverage with respect to such Acquired Entity and its **Insureds**, and the **Named Insured** accepts any terms, conditions, exclusions or limitations, including payment of additional premium, as the Underwriter, in its sole discretion, imposes in connection with the transaction.

For purposes of this GENERAL CONDITION (F), "subsidiary" means any entity for which the **Named Insured** owns or possesses fifty percent (50%) of the issued and outstanding capital stock, or has or controls the right to elect or appoint more than fifty percent (50%) of the directors or trustees.

**(G)    Sales or Dissolution of Insured Entities; Cessation of Business:**

(1)    If, during the **Policy Period**:

(a)    the **First Named Insured** is dissolved, sold, acquired by, merged into, or consolidated with another entity such that the **First Named Insured** is not the surviving entity; or

(b)    any person, entity, or affiliated group of persons or entities obtains:

(i)    ownership or possession of fifty percent (50%) or more of the issued and outstanding capital stock of the **First Named Insured**; or

(ii)    the right to elect or appoint more than fifty percent (50%) of the **First Named Insured's** directors or trustees; or

(c)     the **First Named Insured** ceases to do business for any reason;

(any of which events is referred to as a "Transaction" in this GENERAL CONDITION (G)) coverage under this Policy shall continue in full force and effect until the Expiration Date or any earlier cancellation date, but this Policy shall apply only to **Occurrences** or **Wrongful Acts** happening before the effective date of such Transaction. This Policy will not apply to, and the Underwriter will not pay any **Loss** or **Defense Expenses** for, any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any **Occurrence** or **Wrongful Act** happening on or after the effective date of such Transaction. It is further understood and agreed that if such a Transaction occurs during the **Policy Period**, then no coverage will be available for any **Evacuation** that occurs on or after the effective date of such Transaction or any **Legal Defense Proceeding** that is first brought against an **Insured** on or after the effective date of such Transaction.

(2)     If, during the **Policy Period**, any **Named Insured**, other than the **First Named Insured**, is involved in an event described in paragraph (1) above, then solely with respect to such **Named Insured** and its **Insureds**, coverage under this Policy for **Occurrences** or **Wrongful Acts** happening before the effective date of such event shall continue in full force and effect until the Expiration Date or any earlier cancellation date and this Policy will not apply to, and the Underwriter will not pay any **Loss** or **Defense Expenses** for, any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any **Occurrence** or **Wrongful Act** happening on or after the effective date of such event. It is further understood and agreed that if any **Named Insured**, other than the **First Named Insured**, is involved in an event described in paragraph (1) above during the **Policy Period**, then solely with respect to such **Named Insured** and its **Insureds**, no coverage will be available for any **Evacuation** that occurs on or after the effective date of such event or any **Legal Defense Proceeding** that is first brought against an **Insured** on or after the effective date of such event.

**(H)    Extended Reporting Period for INSURING AGREEMENTS (A) and (C):**

If this Policy is canceled for any reason other than fraud, misrepresentation or non-payment of premium or is not renewed by the Underwriter or the **First Named Insured**, an additional period of time during which **Claims** made under INSURING AGREEMENTS (A) and (C) of this Policy may be reported (an "Extended Reporting Period") shall be made available as described in this GENERAL CONDITION (H), but any such Extended Reporting Period shall apply only to **Claims** for **Wrongful Acts** committed or allegedly committed before the effective date of such cancellation or non-renewal (the "Termination Date") or the date of any conversion of coverage under GENERAL CONDITION (G), whichever is earlier. No Extended Reporting Period shall in any way increase the Underwriter's Limits of Liability as stated in ITEM 4 of the Declarations, and the Underwriter's Limit of Liability for **Claims** made during any Extended Reporting Period shall be part of, and not in addition to, the Limits of Liability stated in ITEM 4 of the Declarations. The Extended Reporting Period will apply as follows:

(1)     An Extended Reporting Period of sixty (60) days, beginning as of the Termination Date, will apply automatically and requires no additional premium; provided, that such Extended Reporting Period will remain in effect only as long as no other policy of insurance is in effect that would apply to any **Claim** made during such Extended Reporting Period.

(2)     The **First Named Insured** may purchase an additional Extended Reporting Period for one of the periods of time stated in ITEM 7 of the Declarations by notifying the Underwriter in writing of its intention to do so no later than thirty (30) days after the Termination Date. The additional premium for this additional Extended Reporting Period shall be equal to the applicable amount stated in ITEM 7 of the Declarations and must be paid no later than thirty (30) days after the Termination Date. Such additional premium shall be deemed fully earned upon inception of such Extended Reporting Period.

If no election to purchase an additional Extended Reporting Period is made as described in GENERAL CONDITION (H)(2) above, or if the additional premium for any such Extended Reporting Period is not paid within thirty (30) days after the Termination Date, there will be no right to purchase an additional Extended Reporting Period at any later time.

**(I)**     **Cancellation; Non-Renewal:**

    (1)     The Underwriter may cancel this Policy by mailing written notice to the **First Named Insured** at the last known address shown on the Declarations stating when, not less than sixty (60) days thereafter (or such longer period of time as required by applicable law), such cancellation shall be effective; except that, in the event of cancellation for non-payment of premium, the Underwriter may make the cancellation effective upon notice of only ten (10) days (or such longer period of time as required by applicable law). Notwithstanding the foregoing, if the Underwriter receives no premium whatsoever by the premium due date and no premium whatsoever is received by the last day of such ten (10) day notice period (or such longer period of time as required by applicable law), the Underwriter may cancel this Policy as of the Inception Date set forth in ITEM 2(a) of the Declarations.

    (2)     Except as set forth in GENERAL CONDITION (M), the **First Named Insured** may cancel this Policy by mailing the Underwriter written notice stating when, not later than the Expiration Date set forth in ITEM 2(b) of the Declarations, such cancellation will be effective. In such event, and subject at all times to GENERAL CONDITION (N), the earned premium will be computed in accordance with the customary short rate table and procedure. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

    (3)     The Underwriter will not be required to renew this Policy upon its expiration.

**(J)**     **Assistance and Cooperation:**

In the event of a **Claim**, the **Insured** shall provide the Underwriter with all information, assistance and cooperation that the Underwriter reasonably requests. At the Underwriter's request, the **Insured** shall assist in: investigating, defending and settling **Claims**; enforcing any right of contribution or indemnity against another who may be liable to any **Insured**; the conduct of actions, suits, appeals or other proceedings, including, but not limited to, attending trials, hearings and depositions; securing and giving evidence; and obtaining the attendance of witnesses.

**(K)**     **Subrogation:**

In the event of any payment hereunder, the Underwriter shall be subrogated to the extent of any payment to all of the rights of recovery of the **Insured**. The **Insured** shall execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the Underwriter effectively to bring suit in its name. The **Insured** shall do nothing that may prejudice the Underwriter's position or potential or actual rights of recovery. The obligations of the **Insured** under this GENERAL CONDITION (K) shall survive the expiration or termination of the Policy.

**(L)**     **Other Insurance and Risk Transfer Arrangements:**

Any **Loss** or **Defense Expenses** resulting from any **Claim** insured under any other insurance or self-insurance policy or program or risk transfer instrument, including, but not limited to, self-insured retentions, deductibles, fronting arrangements, professional liability policies covering any **Insured**, or other alternative arrangements which apply to the **Loss** or **Defense Expenses** shall be paid first by those instruments, policies or other arrangements. It is the intent of this Policy to apply only to **Loss** or **Defense Expenses** that are more than the total limit of all deductibles, limits of liability, self-insured amounts or other insurance or risk transfer arrangements, whether primary, contributory, excess,

contingent, fronting or otherwise and whether or not collectible. These provisions do not apply to other insurance policies or risk transfer arrangements written as specific umbrella or excess insurance over the applicable Limits of Liability of this Policy. This Policy shall not be subject to the terms of any other policy of insurance or plan or program of self-insurance; and in no event will the Underwriter pay more than the applicable Limits of Liability set forth in ITEM 4 of the Declarations.

**(M)** **Exhaustion:**

If the Underwriter's applicable Aggregate Limit of Liability for any Insuring Agreement, as set forth in ITEM 4 of the Declarations, is exhausted by the payment of **Loss**, all obligations of the Underwriter under such Insuring Agreement will be completely fulfilled and exhausted, including any obligation to pay **Defense Expenses** or to continue to direct the defense of any **Insured**, and the Underwriter will have no further obligations of any kind or nature whatsoever under such Insuring Agreement.

If all of the Underwriter's applicable Limits of Liability are exhausted by the payment of **Loss**, the premium will be fully earned, all obligations of the Underwriter under this Policy will be completely fulfilled and exhausted, including any obligation to pay **Defense Expenses** or to continue to direct the defense of any **Insured**, and the Underwriter will have no further obligations of any kind or nature whatsoever under this Policy.

**(N)** **Minimum Earned Premium:**

The percentage set forth in ITEM 6.B. of the Declarations is the percentage of the Policy Premium set forth in ITEM 6.A. of the Declarations that shall be deemed fully earned as of the Inception Date set forth in ITEM 2(a) of the Declarations.

**(O)** **Risk Management:**

The Underwriter directly or indirectly may make available risk management services in connection with this Policy for the purpose of managing and reducing the risks covered under this Policy. Such risk management services may cease or change in the Underwriter's sole discretion at any time.

**(P)** **Authorization and Notices:**

The **First Named Insured** will act on behalf of all **Insureds** with respect to: the giving or receiving of any notices under this Policy; the payment of premiums to, and receiving of return premiums from, the Underwriter; the receiving and acceptance of any endorsements issued to form a part of this Policy; and the exercising or declining to exercise any Extended Reporting Period.

**(Q)** **Conformance:**

Any terms of this Policy that are in conflict with the laws or regulations of the state in which this Policy is issued are amended to conform with such laws or regulations.

**(R)** **Representation; Incorporation of Application:**

The **Insureds** represent that the particulars and statements contained in the Application attached to this Policy are true, accurate and complete and agree that:

(1)     this Policy is issued and continued in force by the Underwriter in reliance upon the truth of such representation;

(2)     those particulars and statements are the basis of this Policy; and

(3)     the Application and those particulars and statements are incorporated in and form a part of this Policy.

No knowledge or information possessed by any **Insured** shall be imputed to any other **Insured**, except for material facts or information known to the person or persons who signed the Application. In the event of any material untruth, misrepresentation or omission in connection with any of the particulars or statements in the Application, this Policy shall be void with respect to any **Insured** who knew of such untruth, misrepresentation or omission or to whom such knowledge is imputed.

**(S)** **No Action against Underwriter:**

(1)     No action shall be taken against the Underwriter by any **Insured** unless, as conditions precedent thereto, the **Insured** has fully complied with all of the terms of this Policy and the amount of the **Insured's** obligation to pay has been finally determined either by judgment against the **Insured** after adjudicatory proceedings or by written agreement of the **Insured**, the claimant and the Underwriter.

(2)     No individual or entity shall have any right under this Policy to join the Underwriter as a party to any **Claim** to determine the liability of any **Insured**; nor shall the Underwriter be impleaded by an **Insured** or his, her, or its legal representative in any such **Claim**.

**(T)** **Notice:**

(1)     Notice to any **Insured** shall be sent to the **First Named Insured** at the address designated in ITEM 1 of the Declarations.

(2)     Notice to the Underwriter shall be sent to the address designated in ITEM 8 of the Declarations.

**(U)** **Changes:**

Notice to or knowledge possessed by any agent or other person acting on behalf of the Underwriter shall not effect a waiver or change in any part of this Policy or prevent or estop the Underwriter from asserting any right(s) under this Policy. This Policy can only be altered, waived, or changed by written endorsement issued to form a part of this Policy.

**(V)** **Insolvency of Insured:**

The Underwriter will not be relieved of any of its obligations under this Policy by the bankruptcy or insolvency of any **Insured** or his/her/its estate.

**(W)** **Inspections and Surveys:**

The Underwriter or its duly authorized agent has the right but is not obliged to:

(1)     make inspections and surveys of the **Named Insured's** premises and operations at any time;

(2)     provide the **Insured** with reports on the conditions found;

(3)     recommend changes;

(4)     conduct loss control and prevention activity.

Any inspections, surveys, reports, or recommendations relate only to insurability and the premium to be charged.

The Underwriter does not:

(a)     make safety inspections;

(b)    undertake to perform the duty of any entity to provide for the health or safety of workers or the public; or

(c)    warrant that conditions:

    (i)    are safe or healthy; or

    (ii)    comply with laws, regulations or codes.

**(X)    Examination of Books and Records:**

The Underwriter may examine and audit the books and records of the **Insured** as they relate to this Policy.

**(Y)    Service of Suit:**

Pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Underwriter hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose by statute, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured**, or any beneficiary hereunder, arising out of this contract of insurance.

**(Z)    Assignment:**

No assignment of interest under this Policy shall bind the Underwriter without its written consent issued as a written endorsement to form a part of this Policy.

**(AA)    Entire Agreement:**

The **Insureds** agree that this Policy, including the Application and any endorsements, constitutes the entire agreement between them and the Underwriter or any of its agents relating to this insurance.

**(BB)    Headings:**

The descriptions in the headings and sub-headings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.

**In witness whereof the Underwriter has caused this Policy to be executed by its authorized officers.**

ENDORSEMENT NO. 1

# DELETE GENERAL LIABILITY AND
# EMPLOYEE BENEFIT LIABILITY COVERAGES ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on June 30, 2016 _____, forms part of:

| | |
|---|---|
| Policy No. | MFL-004062-0616 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged, it is understood and agreed that no coverage will be available under this Policy for General Liability or Employee Benefit Liability.  Consequently:

(1)    INSURING AGREEMENTS (B) and (C) of this Policy are deleted in their entirety.  Any and all references in this Policy to INSURING AGREEMENT (B) or (C) are deleted.

(2)    Section III EXCLUSIONS (B) and (C) of this Policy are deleted in their entirety.

(3)    Each of ITEM 3 and 4 of the Declarations is amended by deleting clauses "B" and "C" therefrom.

All other terms, conditions and limitations of this Policy shall remain unchanged.

# ENDORSEMENT NO. 2

## AMEND PRIOR KNOWLEDGE EXCLUSION (D)(1) ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on <u>June 30, 2016</u>, forms part of

    Policy No.    MFL-004062-0616
    Issued by    Homeland Insurance Company of New York
    Issued to    Sonic Healthcare Investments, G.P.

In consideration of the premium charged, Section III EXCLUSIONS (D)(1) of this Policy is amended to read in its entirety as follows:

(1)     act, error, omission or **Wrongful Act** if, on or before the Inception Date set forth in ITEM 2 of the Declarations, the

Risk Management Dept of Legal Dept or any Executive

of the **Named Insured** knew or reasonably could have foreseen that such act, error, omission, or **Wrongful Act** might result in a **Claim**.

If, however, this Policy is a renewal of one or more policies previously issued by the Underwriter to the **First Named Insured**, and the coverage provided by the Underwriter to the **First Named Insured** was in effect, without interruption, for the entire time between the inception date of the first such other policy and the Inception Date of this Policy, the reference in this EXCLUSION (D)(1) to the Inception Date will be deemed to refer instead to the inception date of the first policy under which the Underwriter began to provide the **First Named Insured** with the continuous and uninterrupted coverage of which this Policy is a renewal;

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 3

## AMEND CANCELLATION TO NINETY (90) DAYS ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2016</u>, forms part of:

> Policy No.  MFL-004062-0616
> Issued by  Homeland Insurance Company of New York
> Issued to  Sonic Healthcare Investments, G.P.

In consideration of the premium charged, paragraph (1) of Section IV GENERAL CONDITIONS (I) of this Policy is amended to read in its entirety as follows:

> (1)  The Underwriter may cancel this Policy by mailing written notice to the **First Named Insured** at the last known address shown on the Declarations stating when, not less than ninety (90) days thereafter (or such longer period of time as required by applicable law), such cancellation shall be effective; except that, in the event of cancellation for non-payment of premium, the Underwriter may make the cancellation effective upon notice of only ten (10) days (or such longer period of time as required by applicable law).  Notwithstanding the foregoing, if the Underwriter receives no premium whatsoever by the premium due date and no premium whatsoever is received by the last day of such ten (10) day notice period (or such longer period of time as required by applicable law), the Underwriter may cancel this Policy as of the Inception Date set forth in ITEM 2(a) of the Declarations.

All other terms, conditions and limitations of the Policy shall remain unchanged.

## SEXUAL MISCONDUCT COVERAGE ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on <u>June 30, 2016</u>, forms part of

| | |
|---|---|
| Policy No. | MFL-004062-0616 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged:

(1)     The Underwriter's maximum aggregate Limit of Liability for all **Sexual Misconduct Claims** (as defined below) shall be part of, and not in addition to, the Underwriter's maximum aggregate Limit of Liability for INSURING AGREEMENT (A) of this Policy, as set forth in ITEM 4.A. of the Declarations.

(2)     For the purposes of this endorsement, Section II DEFINITIONS of this Policy shall be amended to include the following terms:

(a)     "**Sexual Misconduct**" means any welcome or unwelcome conduct, physical acts, gestures or spoken or written words of a sexual nature, including without limitation sexual intimacy (even if consensual), sexual molestation, sexual assault, sexual battery, sexual abuse, sexual harassment, sexual exploitation or any sexual act.

(b)     "**Sexual Misconduct Claim**" means any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Sexual Misconduct**.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  5

## ADDITIONAL NAMED INSURED – RELATED TO ORIGINAL NAMED INSURED ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on <u>June 30, 2016</u>, forms part of:

| | |
|---|---|
| Policy No. | MFL-004062-0616 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged:

(1)     The term "**Named Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include the entity(ies) scheduled below (each an "Additional Named Insured"), but solely:

     (a)     with respect to liability imposed or sought to be imposed on such Additional Named Insured that is based on or arises out of acts, errors or omissions committed or allegedly committed by such Additional Named Insured when and to the extent that, such Additional Named Insured is acting on behalf of, and within the capacity and scope of its duties for

        Sonic Healthcare Investments, G.P.

        ; and

     (b)     for **Wrongful Acts** happening on or after the Retroactive Date identified for each Additional Named Insured in the schedule below and **Occurrences** happening on or after the effective date of this endorsement:

     <u>SCHEDULE</u>

| <u>Additional Named Insured:</u> | <u>Retroactive Date:</u> |
|---|---|
| Sonic Healthcare USA, Inc | February 05, 2007 |
| Sunrise Medical Laboratories, Inc | March 05, 1995 |
| Clinical Pathology Laboratories, Inc | October 01, 2000 |
| Mullins Pathology & Cytology Laboratory, Inc | April 30, 2007 |
| Woodbury Clinical Pathology, Inc | January 05, 1992 |
| Memphis Pathology Laboratory | January 07, 2007 |
| Clinical Laboratory Services, Inc | January 07, 2007 |
| Fairfax Medical Laboratories, Inc | June 19, 2006 |
| Pathology Laboratories, Inc dba Lima Pathology Laboratories | March 01, 1987 |
| Cognoscenti Health Institute, LLC | September 01, 2006 |
| DRL Labs, Ltd. Completely merged into Clinical Pathology as of 03/28/2003 | March 28, 2003 |
| American Esoteric Laboratories, Inc. Closed Lab in March 2007 - Continues | N/A |

| Additional Named Insured: | Retroactive Date: |
|---|---|
| as a holding company | |
| Piedmont Joint venture Laboratory, Inc | August 05, 2003 |
| American Clinical Services | February 01, 2004 |
| Clinical Pathology Laboratories Southwest, Inc | March 29, 2010 |
| Clinical Laboratories of Hawaii, LLP | August 01, 1985 |
| Pan Pacific Pathologists, LLC | August 01, 1985 |
| East Side Clinical Laboratory, Inc | June 30, 1990 |
| Physician's Automated Laboratory | June 01, 1989 |
| CBLPath Holdings Corp | May 01, 2004 |
| CBLPath  Inc | July 01, 2004 |
| CBLPath Transport | January 01, 2007 |
| Sonic Healthcare Limited | February 05, 2007 |
| Douglass Hanly Moir Pathology Pty Limited | February 05, 2007 |
| Sonic Healthcare Internatoinal Pty Ltd | February 05, 2007 |
| Sonic Healthcare Pathology Pty Ltd | February 05, 2007 |
| Sonic Reference Laboratory Inc | December 01, 2014 |
| Sonic Healthcare (Ireland) Limited (term date 06.30.2013) | August 01, 2010 |
| Medlab Pathology (term date 06.30.2013) | August 01, 2010 |
| Clinical Pathology Laboratories, Southeast, Inc | March 29, 2010 |

(2)    It is understood and agreed that the Additional Named Insured(s) share in the applicable Limits of Liability set forth in ITEM 4 of the Declarations.

(3)    ITEM 3 of the Declarations shall be deemed amended to the extent necessary to effect the purpose and intent of this endorsement.


All other terms, conditions and limitations of the Policy shall remain unchanged.

## NOTICE OF CANCELLATION TO SCHEDULED PARTY ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on <u>June 30, 2016</u>, forms part of:

| | |
|---|---|
| Policy No. | MFL-004062-0616 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged:

(1)     If the Underwriter cancels this Policy for any reason other than non-payment of premium, the Underwriter will endeavor to provide notice of such cancellation to the individual(s) or entity(ies) identified in the schedule below (each a "Scheduled Party"), at the address set forth next to the Scheduled Party's name, when notice of cancellation is sent to the **First Named Insured**.  In no event will the timing of notice to a Scheduled Party exceed the timing of notice to the **First Named Insured**. It is understood and agreed that notice of cancellation to a Scheduled Party is provided solely as a courtesy for the convenience of the **First Named Insured** and does not constitute a prerequisite to effective policy cancellation.

(2)     Failure to provide notice of cancellation to a Scheduled Party shall impose no liability of any kind or nature whatsoever on the Underwriter and shall not amend or extend the effective date of policy cancellation or invalidate the cancellation.

| Scheduled Party: | Scheduled Party Address: |
|---|---|
| State of Hawaii, Department of Public Safety, ASO-Purchasing and Contracts Staff | 919 Ala Moana Boulevard, Honolulu, Hawaii 96814 |
| County of Kern Public Health Services Department | 1800 Mount Vernon Avenue, 3rd Floor, Bakersfield, CA 93306-3302 |
| MediGold, Provider Credentialing | 6150 East Broad Street, Columbus, Ohio 43213 |

All other terms, conditions and limitations of the Policy shall remain unchanged.

# ENDORSEMENT NO. 7

## DEDUCTIBLE/SELF-INSURED RETENTION – INDEMNITY ONLY ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2016</u>, forms part of:

| | |
|---|---|
| Policy No. | MFL-004062-0616 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged, subparagraph (a) of Section IV GENERAL CONDITIONS (A)(7) of this Policy is amended to read in its entirety as follows:

(a)   The **Insured** shall be responsible for payment in full of the applicable deductible or self-insured retention stated in ITEM 4 of the Declarations, and the Underwriter's obligation to pay **Loss** under this Policy shall be excess of such deductible or self-insured retention; provided, that no deductible or self-insured retention shall apply to (i) **Claims** for **Property Damage** resulting from any fire caused by the **Insured's** negligence and occurring on premises rented to the **Insured** or temporarily occupied by the **Insured** with the permission of the owner of such premises or (ii) **Claims** for **Property Damage** (other than damage caused by fire) to premises, including the contents of such premises, rented to the **Insured** for a period of seven (7) or fewer consecutive days, and which are subject to the "Damage to Rented Premises" Limit of Liability set forth in ITEM 4.B. of the Declarations.  The applicable deductible or self-insured retention shall apply to each **Claim** or **Related Claims** (subject to the applicable aggregate deductible or self-insured retention amount, if any), and shall be eroded (or exhausted) by the **Insured's** payment of **Loss**.  The Underwriter shall have no obligation whatsoever, either to the **Insured** or any other person or entity, to pay all or any portion of the applicable deductible or self-insured retention on behalf of the **Insured**. The Underwriter shall, however, at its sole discretion, have the right and option to do so, in which event the **Insured** will repay the Underwriter any amounts so paid.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 8

**PEER REVIEW COVERAGE ENDORSEMENT**

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2016</u>, forms part of:

|  |  |
|---|---|
| Policy No. | MFL-004062-0616 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged:

(1)     Subparagraph (3) of the term "**Professional Services**," as defined in Section II DEFINITIONS of this Policy, is amended to read in its entirety as follows:

>        (3)     the activities of an **Insured** as a member of a board or committee of the **Named Insured**, or as a member of any committee of the medical or professional staff of the **Named Insured**, when engaged in **Peer Review** or **Utilization Review**;

(2)     Section II DEFINITIONS of this Policy is amended to include the following term:

>        "**Peer Review**" means the process of evaluating, by members of a formal, duly constituted professional review board or committee of the **Named Insured**, any individual or entity for purposes of selecting, employing, contracting with or credentialing current or prospective providers of **Medical Services.**

(3)     Section III EXCLUSIONS (D)(8) of this Policy will not apply to any **Claim** for **Peer Review** activities otherwise covered under INSURING AGREEMENT (A) of  this Policy.

(4)     Section III EXCLUSIONS (D)(16) of this Policy is deleted in its entirety.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 9

**FRONTED DEDUCTIBLE ENDORSEMENT**

This Endorsement, effective at 12:01 a.m. on June 30, 2016, forms part of

Policy No.      MFL-004062-0616
Issued by       Homeland Insurance Company of New York
Issued to       Sonic Healthcare Investments, G.P.

In consideration of the premium charged, in accordance with Section IV GENERAL CONDITIONS (A)(7)(a) of this Policy, the Underwriter has agreed to pay the applicable deductible on behalf of the **Insured**; provided, that the **Insured** understands and agrees that he/she/it shall repay the Underwriter any amounts so paid as soon as practicable upon demand of the Underwriter.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  10

## SCHEDULE OF INSURED PHYSICIANS AND LOCUM TENENS ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on June 30, 2016, forms part of

Policy No.    MFL-004062-0616
Issued by     Homeland Insurance Company of New York
Issued to     Sonic Healthcare Investments, G.P.

In consideration of the premium charged:

(1)     Notwithstanding anything to the contrary contained in this Policy or any endorsement thereto, the term "**Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include the physician(s) scheduled below, but only while rendering **Professional Services** on behalf of, and within the scope and capacity of his or her duties for, the **Named Insured**.

SCHEDULE

| Name | Retroactive Date | Specialty |
|---|---|---|
| On File with Company | Date of Hire | Physicians |

(2)     The term "**Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include any **Locum Tenens**, but only when such **Locum Tenens** is acting within the capacity and scope of his or her duties as such.  Coverage for any **Locum Tenens** shall only extend for up to sixty (60) days during the **Policy Period** per **Insured** physician for whom such **Locum Tenens** is serving as a substitute.

(3)     Section II DEFINITIONS of this Policy is amended to include the following term:

"**Locum Tenens**" means any physician who is temporarily serving as a substitute physician for an **Insured** physician scheduled in paragraph (1) above while such **Insured** physician is temporarily absent from professional practice.

(4)     No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Professional Services Wrongful Act** committed or allegedly committed by any **Insured** physician scheduled in paragraph (1) above:

(a)     prior to the Retroactive Date set forth opposite such **Insured** physician's name; or

(b)     on or after (i) the date such **Insured** physician ceased to be an employee of the **Named Insured** or (ii) the termination date of the contract or agreement under which such **Insured** physician was rendering **Professional Services** on behalf of the **Named Insured**.

(5)     It is understood and agreed that the **Insured** physicians scheduled in paragraph (1) above and any **Locum Tenens** share in the applicable Limits of Liability set forth in ITEM 4 of the Declarations.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  11

**RATE STABILIZATION ENDORSEMENT**

This Endorsement, effective at 12:01 a.m. on <u>June 30, 2016</u>, forms part of

| | |
|---|---|
| Policy No. | MFL-004062-0616 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged:

(1)  It is understood and agreed that, unless there is a **Material Change In Exposure** or a **Material Change in Loss Picture**, as such terms are defined below, the Underwriter agrees to renew this Policy, upon the same terms, conditions, limits and retention(s), at a rate that shall not exceed the rate used to determine the premium charged for this Policy.

(2)  For purposes of this endorsement, the term "**Material Change In Exposure**" means:

   (a)  any material change in the operations of the **First Named Insured** or any other **Named Insured**;

   (b)  during the **Policy Period**, any material change in the type, character, scope or extent of the services rendered by the **First Named Insured** or any other **Named Insured** from the type, character, scope or extent of the services described in the application(s) and any additional information submitted with such application(s) by the **Named Insured** in connection with this Policy;

   (c)  during the **Policy Period**, any change in the ownership, control or management of the **First Named Insured** or any other **Named Insured**; or

   (d)  the total number of tests (i) performed by the **Insured**, and (ii) projected to be performed by the **Insured**, during the **Policy Period** is more than ten percent (10%) greater than 112,386,536.

(3)  It is understood and agreed that in the event the **Named Insured** acquires any entity during the **Policy Period**, such acquisition shall not constitute a **Material Change in Exposure** and any entity so acquired shall be afforded the same policy rate as the rate used to compute the premium charged for this Policy; provided, that any entity so acquired is located in similar geographic areas and conducts substantially similar operations as the **First Named Insured** or any other **Named Insured**.

   In the event the **Named Insured** acquires any entity during the **Policy Period** that is not located in similar geographic areas or does not conduct substantially similar operations as the **First Named Insured** or any other **Named Insured**, then any such acquisition shall constitute a **Material Change in Exposure**.

(4)  For purposes of this endorsement, the term "**Material Change in Loss Picture**" means a "net incurred loss ratio" of greater than forty percent (40%) under this Policy and all policies issued by the Underwriter of which this Policy is a direct or indirect renewal.  For purposes of this endorsement, "net incurred loss ratio" means the ratio of all paid and reserved losses (indemnity and loss adjustment expenses) under this Policy and all

policies issued by the Underwriter of which this Policy is a direct or indirect renewal, net of any deductible(s), divided by the total amount of written premium for this Policy and all policies issued by the Underwriter of which this Policy is a direct or indirect renewal.

(5)     In order to determine whether there has been a **Material Change in Loss Picture**, the Underwriter will use its paid and reserved losses under this Policy and all policies issued by the Underwriter of which this Policy is a direct or indirect renewal, valued as of April 30, 2017.

(6)     If:

     (a)     there is a **Material Change in Exposure**; or

     (b)     there is a **Material Change in Loss Picture,**

     it is understood and agreed that the Underwriter:

     (i)     will have no obligation to renew this Policy upon its expiration with the same terms, conditions, limits and retention(s), or using a rate that is no higher than the rate used to calculate the premium charged for this Policy; and

     (ii)     in its sole discretion, may offer to renew this Policy upon terms, conditions and limitations, and for such premium, as the Underwriter deems appropriate.

(7)     Nothing in this endorsement is intended, nor shall it be construed, to affect the Underwriter's right to cancel or non-renew coverage in accordance with Section IV GENERAL CONDITIONS (I) of this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 12

**AMEND GENERAL CONDITION (E) WORLDWIDE TERRITORY ENDORSEMENT**

This Endorsement, effective at 12:01 a.m. on <u>June 30, 2016</u>, forms part of

Policy No.    MFL-004062-0616
Issued by    Homeland Insurance Company of New York
Issued to    Sonic Healthcare Investments, G.P.

In consideration of the premium charged:

(1)     Subject to paragraph (2) below and solely for the purposes of the coverage afforded under INSURING AGREEMENT (A) of this Policy, Section IV GENERAL CONDITIONS (E) of this Policy is amended to add the following at the end thereof:

    (1)     Subject to the further provisions of this GENERAL CONDITION (E), if a **Claim** is made against an **Insured** outside the United States of America, including its territories or possessions, Puerto Rico or Canada, the Underwriter will have the right but not the duty to defend, investigate or settle such **Claim**. If the Underwriter elects not to defend, investigate or settle such **Claim**, the **Insured** shall be obligated to initiate such defense and investigation as is reasonably necessary and, subject to the Underwriter's prior written consent, may effect settlement. The Underwriter will reimburse the **Insured,** up to the applicable Limit of Liability, for reasonable **Defense Expenses** and **Loss,** subject to the deductible or self-insured retention set forth in ITEM 4.A. of the Declarations and all other provisions of this Policy.

    (2)     All monetary terms in this Policy are in U.S. dollars. In the event the **Insured** incurs **Loss** or **Defense Expenses** in currency other than U.S. dollars, the Underwriter will reimburse the **Insured** for such amounts in U.S. dollars at the prevailing exchange rate at the time such **Loss** or **Defense Expenses** were incurred.

    (3)     No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** made against an **Insured** in any country or jurisdiction which is the subject of trade or economic sanctions or embargo imposed by the laws or regulations of the United States of America to the extent such sanctions or embargo prohibit or limit this insurance.

(2)     It is understood and agreed that the amendment to Section IV GENERAL CONDITION (E) set forth in paragraph (1) above does not apply to **Claims** made against any **Named Insured** that is domiciled outside the United States of America, including its territories or possessions, Puerto Rico or Canada. Accordingly, no coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** made outside the United States of America, including its territories or possessions, Puerto Rico or Canada against any **Named Insured** that is domiciled outside the United States of America, including its territories or possessions, Puerto Rico or Canada.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 13

## HIPAA VIOLATION REIMBURSEMENT COVERAGE ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on June 30, 2016_____, forms part of

    Policy No.    MFL-004062-0616
    Issued by    Homeland Insurance Company of New York
    Issued to    Sonic Healthcare Investments, G.P.

In consideration of the premium charged:

(1)    In addition to the coverage afforded under all INSURING AGREEMENTS of this Policy, upon satisfactory proof of payment by the **Named Insured**, the Underwriter will reimburse the **Named Insured**, up to the Limit of Liability set forth in paragraph (4) below, for **HIPAA Fines and Penalties** actually paid by the **Named Insured** resulting from a **HIPAA Violation** that occurs during the **Policy Period**.

(2)    Section II DEFINITIONS of this Policy is amended to include the following terms:

        **"HIPAA Fines and Penalties"** means any civil fines or penalties imposed upon an **Insured** for violation of Title II of the Health Insurance Portability and Accountability Act of 1996.

        **"HIPAA Violation**" means any violation by an **Insured** of Title II of the Health Insurance Portability and Accountability Act of 1996.

(3)    Solely with respect to the coverage afforded under paragraph (1) above, clause (c) of the term "**Loss**," as defined in Section II DEFINITIONS of this Policy, is amended to read in its entirety as follows:

        (c)    fines, penalties, sanctions, fees, government payments or taxes, except **HIPAA Fines and Penalties**;

(4)    The Underwriter's maximum aggregate Limit of Liability for all **HIPAA Fines and Penalties** resulting from all **HIPAA Violations** reimbursed under paragraph (1) above shall be ███_____. Payment of such maximum aggregate Limit of Liability shall terminate the Underwriter's obligation to reimburse any further **HIPAA Fines and Penalties** under this Policy.

(5)    If, during the **Policy Period**, a **HIPAA Violation** occurs, as a condition precedent to its right to reimbursement under paragraph (1) above, the **Named Insured** shall give the Underwriter written notice of such **HIPAA Violation** as soon as practicable thereafter, but in no event later than thirty (30) days after the Expiration Date or earlier cancellation date of this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 14

**DELETE ENDORSEMENT**

This Endorsement, which is effective at 12:01 a.m. on <u>March 03, 2017</u>, forms part of:

Policy No.    MFL-004062-0616
Issued by    Homeland Insurance Company of New York
Issued to    Sonic Healthcare Investments, G.P.


In consideration of the premium charged, Endorsement No.


5    HPE-00063-04-11            Additional Named Insured - Related to Original Named Insured


to this Policy is deleted in its entirety and shall be of no force or effect from and after the effective date of this Endorsement.


All other terms, conditions and limitations of this Policy shall remain unchanged.

## ADDITIONAL NAMED INSURED – RELATED TO ORIGINAL NAMED INSURED ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on <u>March 03, 2017</u>, forms part of:

| | |
|---|---|
| Policy No. | MFL-004062-0616 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged:

(1)    The term "**Named Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include the entity(ies) scheduled below (each an "Additional Named Insured"), but solely:

   (a)    with respect to liability imposed or sought to be imposed on such Additional Named Insured that is based on or arises out of acts, errors or omissions committed or allegedly committed by such Additional Named Insured when and to the extent that, such Additional Named Insured is acting on behalf of, and within the capacity and scope of its duties for

   Sonic Healthcare Investments, G.P.

   ; and

   (b)    for **Wrongful Acts** happening on or after the Retroactive Date identified for each Additional Named Insured in the schedule below and **Occurrences** happening on or after the effective date of this endorsement:

   SCHEDULE

| Additional Named Insured: | Retroactive Date: |
|---|---|
| Sonic Healthcare USA, Inc | February 05, 2007 |
| Sunrise Medical Laboratories, Inc | March 05, 1995 |
| Clinical Pathology Laboratories, Inc | October 01, 2000 |
| Mullins Pathology & Cytology Laboratory, Inc | April 30, 2007 |
| Woodbury Clinical Pathology, Inc | January 05, 1992 |
| Memphis Pathology Laboratory | January 07, 2007 |
| Clinical Laboratory Services, Inc | January 07, 2007 |
| Fairfax Medical Laboratories, Inc | June 19, 2006 |
| Pathology Laboratories, Inc dba Lima Pathology Laboratories | March 01, 1987 |
| Cognoscenti Health Institute, LLC | September 01, 2006 |
| DRL Labs, Ltd. Completely merged into Clinical Pathology as of 03/28/2003 | March 28, 2003 |
| American Esoteric Laboratories, Inc. Closed Lab in March 2007 - Continues | TBD |

| Additional Named Insured: | Retroactive Date: |
|---|---|
| as a holding company | |
| Piedmont Joint venture Laboratory, Inc | August 05, 2003 |
| American Clinical Services | February 01, 2004 |
| Clinical Pathology Laboratories Southwest, Inc | March 29, 2010 |
| Clinical Laboratories of Hawaii, LLP | August 01, 1985 |
| Pan Pacific Pathologists, LLC | August 01, 1985 |
| East Side Clinical Laboratory, Inc | June 30, 1990 |
| Physician's Automated Laboratory | June 01, 1989 |
| CBLPath Holdings Corp | May 01, 2004 |
| CBLPath  Inc | July 01, 2004 |
| CBLPath Transport | January 01, 2007 |
| Sonic Healthcare Limited | February 05, 2007 |
| Douglass Hanly Moir Pathology Pty Limited | February 05, 2007 |
| Sonic Healthcare Internatoinal Pty Ltd | February 05, 2007 |
| Sonic Healthcare Pathology Pty Ltd | February 05, 2007 |
| Sonic Reference Laboratory Inc | December 01, 2014 |
| Sonic Healthcare (Ireland) Limited (term date 06.30.2013) | August 01, 2010 |
| Medlab Pathology (term date 06.30.2013) | August 01, 2010 |
| Clinical Pathology Laboratories, Southeast, Inc | March 29, 2010 |
| Memphis Pathology Holdings, LLC | September 23, 2016 |
| BMHSI/AEL Microbiology Laboratory, GP | October 26, 2016 |

(2)     It is understood and agreed that the Additional Named Insured(s) share in the applicable Limits of Liability set forth in ITEM 4 of the Declarations.

(3)     ITEM 3 of the Declarations shall be deemed amended to the extent necessary to effect the purpose and intent of this endorsement.


All other terms, conditions and limitations of the Policy shall remain unchanged.

# EXHIBIT 3



onebeaconhc.com

| RE: | Excess Medical Facilities Liability Coverage | Policy |
|---|---|---|
| | Sonic Healthcare Investments, G.P. | |

| 09.29.2016 | Account No: 34379 | Policy No: MFX-002013-0616 |
|---|---|---|

199 Scott Swamp Road
Farmington, CT 06032

877.701.0171 t
866.625.3590 f


## Welcome to OneBeacon Healthcare Group™.

Thank you for choosing a member company[1] of OneBeacon Insurance Group, Ltd. as your liability insurance carrier.

At OneBeacon Healthcare Group we take a unique approach with helping policyholders manage risk and advance patient safety by providing them with a broad range of practical and effective tools and resources. Our industry-leading in-house and external consultants have decades of risk management experience.  Talk with us about your challenges and risk exposures and we'll assist you with possible strategies and solutions.

### Risk Management Information and Support at Your Fingertips

As an added value to a professional liability policy we are pleased to offer the following resources, many of which are already included in the policy's cost!

### Resources Include:

- **Exclusive website:** a policyholders-only risk management portal page with dozens of resources for all healthcare settings.
- **AboutRisk® Learning Webinar Series:** interactive webinars presented monthly, most with continuing education credits available.
- **AboutRisk Learning Library:** an extensive selection of pre-recorded educational sessions available on demand for risk manager, staff or leadership continuing education.
- **AboutRisk Learning Course:** unique, web-based fundamentals in healthcare risk management training course, with dedicated faculty support.
- **Risk Management Continuing Education Programs:** powered by MRM Group™, this program offers a curriculum designed with your specific risk management education needs in mind, delivered by experienced medical malpractice defense attorneys and practicing healthcare providers.
- **Consultative Services:** access to specialty-focused healthcare risk management professionals including The Rozovsky Group, The Virtual Group, Robinson+Cole, LLC and the OneBeacon Healthcare Group LTC Consultant Team.
- **Electronic Assessments:** custom created by OneBeacon's risk management consultants with over a dozen different assessments for you to choose from. These tools provide an opportunity for your organization to conduct a risk assessment of a specific care delivery setting, a key risk exposure or your own risk management program from a desktop, at your own pace, easily and effectively. Following completion of the risk inventory, reports are provided back to you and information on opportunities for improvement identified in the assessments is available.

---

[1] Coverages may be underwritten by one of the following insurance companies: Atlantic Specialty Insurance Company, Homeland Insurance Company of New York, Homeland Insurance Company of Delaware, OBI America Insurance Company and OBI National Insurance Company.


- **On-site Risk Assessments:** the Risk Management team can assist in coordinating an on-site risk assessment.
- **Tools and Guides:** OneBeacon Healthcare Group™ has created easy to read, case study-based "pocket" risk management guides for use by leadership and clinicians, as well as tools to help assess and address risk exposures.
- **Enewsletters and Publications:** monthly OneBeacon Healthcare Group Newsletter and complimentary access to The Rozovsky Group's Dialogues in Healthcare and TRG eNewsletter.

**As a policyholder, you can register to start accessing this material now.**

- To register, go to http://obpi.therozovskygroup.com/. If you have previously registered please take an opportunity to update your information by re-registering so that we can send you our webinar invitations and Enewsletter updates. Please know we value your privacy and will never sell or otherwise distribute your personal information to any third party.
- If you have difficulty registering, please contact Joshua Rozovsky at 860.242.1302 or josh@therozovskygroup.com.

**Liability Policy Coverage Questions**

If you have any questions regarding your policy or coverage afforded under your liability policy(s), please contact your liability insurance broker, retailer or producer. OneBeacon Healthcare Group Underwriting and Risk Management cannot provide direct communication with policyholders regarding specific policy language and/or coverage.

**Claims Management Support**

We realize that - despite best efforts - claims sometimes do occur.  At OneBeacon Healthcare Group, an experienced Claims Examiner is assigned for each reported claim, and will serve as a dedicated resource and point of contact.

Please refer to the **OneBeacon Healthcare Group Medical Professional and General Liability Claim Reporting Guidelines** on Page 4. If you have any questions about what to report or how to report please contact Tom Ruane at truane@onebeacon.com.

- To submit a claim or incident (a "potentially compensable event "/PCE), please use the reporting form that can be found on **onebeaconhc.com.**
- **Claims can be submitted one of three ways:**
  **1. Secure E-mail:  obiclaims@onebeacon.com.** (You will receive an immediate email acknowledgment). *Please DO NOT send new claims reports directly to a member of the Claims department, use unsecured email to report or discuss claims or include any protected health information (PHI) or personally identifiable information (PII). Do not "cc" anyone on a claims report email.
  **2. Fax:** 877.256.5067



199 Scott Swamp Road
Farmington, CT 06032
onebeaconhc.com

A Member of OneBeacon Insurance Group

**3. U.S. Mail:**

Claims

OneBeacon Insurance

199 Scott Swamp Road

Farmington, CT 06032

Thank you again for selecting OneBeacon Healthcare Group™ as your specialists for providing professional liability solutions. We look forward to working with you.

Patricia Hughes, MSN, CPHRM, FASHRM

Senior Vice President

Healthcare Risk Management

860.321.2601

phughes@onebeacon.com

Tom Ruane

Vice President, Claims Leader

Medical and Professional Claims

860.321.2902

truane@onebeacon.com


## OneBeacon Healthcare Group™ Medical Professional and General Liability Claim Reporting Guidelines

Following are some examples of the types of events that should be reported in accordance with the general conditions regarding Reporting of Claims, Occurrences and Circumstances under your professional liability policy:

- Medication errors resulting in injury and/or requiring further treatment (including patient not receiving medication; receiving incorrect dosage of medication; or receiving wrong medication)
- Falls resulting in injury
- Family/patient complaints of inadequate or negligent care resulting in injury
- Events reported to a state Department of Health or other state or federal regulatory body
- Visitor injuries
- Unexpected death
- Injury (including, but not limited to: loss of limb or function including spinal cord injury and any neurological impairment)
- Elopement
- Allegations of psychological, physical or sexual abuse, neglect or violence by a patient/resident or their authorized representative
- Sentinel events and Serious Reportable Events (as defined by the Joint Commission and National Quality Forum)
- Provider licensure board or similar administrative proceeding arising from a potential medical malpractice claim
- Oral or written demands for compensation or damages
- Lawsuits
- Communication from an attorney regarding any of the events noted above
- Request from an attorney for medical records
- Any other event the policyholder reasonably believes could result in a claim under the policy

*The above list of events is not meant to be exhaustive or exclusive. Nothing contained in or omitted from this document should be deemed a waiver of any terms or conditions of any applicable policy. These guidelines are provided for general informational purposes only and should not be considered or relied upon as coverage, legal or risk-management advice. Readers should consult the specific terms of their policy and their own legal counsel for advice.*

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

**Homeland Insurance Company of New York**
1000 Woodbury Road, Suite 403
Woodbury, NY 11797

**Policy Number:** MFX-002013-0616

## DECLARATIONS

## FOLLOW FORM EXCESS POLICY

**NOTICE: PORTIONS OF THIS POLICY APPLY ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE UNDERWRITER DURING THE POLICY PERIOD. *PLEASE READ THIS POLICY CAREFULLY.***

| | |
|---|---|
| ITEM 1. | **NAMED INSURED**<br>Name and Principal Address:<br><br>Sonic Healthcare Investments, G.P.<br>9737 Great Hills Trl Ste 100<br>Austin, TX 78759-6449 |
| ITEM 2. | **POLICY PERIOD:**<br><br>(a) Inception Date: June 30, 2016<br>(b) Expiration Date: June 30, 2017<br>Both dates at 12:01 a.m. at the Principal Address in ITEM 1. |

ITEM 3.    **LIMIT(S) OF LIABILITY** (subject to Section IV and inclusive of **Defense Expenses**):

███████ Per Claim
███████ Aggregate

ITEM 4.    **UNDERLYING INSURANCE:**

| **Carrier** | **Policy Number** | **Limits of Liability** | **Coverage** |
|---|---|---|---|
| See Schedule of Underlying Insurance Endorsement | | | |

ITEM 5.    **PREMIUM:** ████

☐ ***Gross Premium:*** **The Underwriter will pay a percentage of the Premium shown above as brokerage commission. The Underwriter does not pay contingent or deferred commissions. Consult your broker for information concerning commission.**

☒ ***Net Premium:*** **The Premium shown above is net, and the Underwriter will pay no brokerage commission of any kind thereon.**

N/A    This Policy provides coverage for acts of terrorism as defined in the Terrorism Risk Insurance Act in accordance with all the terms and conditions of this Policy (including all endorsements attached hereto). The premium attributable to this coverage is  $0

X    This Policy specifically excludes coverage for acts of terrorism in accordance with all of the terms and conditions of this Policy (including all endorsements attached hereto).

| ITEM 6. | **ALL NOTICES REQUIRED TO BE GIVEN TO THE UNDERWRITER UNDER SECTION VIII OF THE POLICY MUST BE ADDRESSED TO:** |
|---------|---------|

Claims
OneBeacon Insurance
199 Scott Swamp Road
Farmington, CT 06032
obiclaims@onebeacon.com

| ITEM 7. | **POLICY FORM AND ENDORSEMENTS ATTACHED AT ISSUANCE:** |
|---------|---------|
| PF-0008-05-07 | Follow Form Excess Policy |
| AMP-00008-10-15 | Service of Suit |
| HPL-X-0004 | Minimum Earned Premium |
| HPL-X-0006 | Mold, Mildew And Other Fungi Exclusion |
| HPL-X-0009 | Schedule of Underlying Insurance |
| HPL-X-0029FF-06-07 | Grace Period for Notice of Claims Upon Renewal of Policy |
| HPL-X-0037 | Pollution Exclusion |
| HPL-X-0107FF-03-09 | Not Follow Form Of Sublimited Coverage(s) |
| HPL-X-0122FF-10-14 | Network Security and Privacy Exclusion |

These Declarations, the completed signed Application, and the Policy (together with any and all endorsements thereto) shall constitute the entire agreement between the Underwriter and the Insured(s).

**Homeland Insurance Company of New York**
By:

_Michael Price_ _____      ___09.29.2016_____
Its Authorized Representative                                                    Date

**THIS IS A CLAIMS MADE POLICY WHICH APPLIES ONLY TO ANY CLAIM FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD. THE LIMITS OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE EXPENSES.**

## Homeland Insurance Company of New York

## FOLLOW FORM EXCESS POLICY

**In consideration of the payment of the premium, and in reliance on all statements made and information furnished to Homeland Insurance Company of New York (hereinafter called the "Underwriter") and to the Insurer(s) of the Underlying Insurance, and subject to all of the terms, conditions and endorsements of this Policy, the Underwriter and the Insured agree as follows:**

**I.    INSURING AGREEMENT**

(A)    The Underwriter shall provide the **Insured** with insurance excess of the **Underlying Insurance** set forth in ITEM 4 of the Declarations, provided that the **Underlying Insurance** also applies and has been exhausted by actual payment thereunder, or would apply but for the exhaustion of the applicable limit(s) of liability thereunder.

(B)    With respect to any coverage provided by the **Underlying Insurance** on a claims-made basis, this Policy applies only to **Claims** first made against the **Insured** during the **Policy Period**. In all events, Professional Liability coverage shall be deemed to apply on a claims-made basis.

(C)    With respect to any coverage (other than Professional Liability coverage) provided by the **Underlying Insurance** on an occurrence basis, this Policy applies only to **Claims** arising out of an occurrence during the **Policy Period**.

(D    This Policy will apply in conformance with, and will follow the form of, the terms, conditions, agreements, exclusions, definitions and endorsements of the **Underlying Insurance,** except:

   (1)    the Underwriter will have no obligation under this Policy with respect to any **Claim** that is settled without the Underwriter's written consent;

   (2)    with respect to any provisions to the contrary contained in this Policy;

   (3)    the applicable limit of liability of the **Underlying Insurance** shall be deemed to be reduced or exhausted solely as a result of payments for loss or damages (including costs, charges and expenses) that are covered under this Policy; and

   (4)    the coverage provided by this Policy shall not be broader than any **Underlying Insurance** unless expressly provided herein, including any endorsement hereto.

(E)    The Underwriter will not have any obligation to make any payment hereunder unless and until the full amount of the applicable limit of liability of the **Underlying Insurance** has been paid by the issuer(s) of

the **Underlying Insurance,** the **Insured** or by another party on behalf, or for the benefit, of the **Insured** or the issuer(s) of the **Underlying Insurance**.

## II.   DEFINITIONS

(A)     "**Application**" means the application attached to and forming part of this Policy, including any materials submitted in connection with such application, all of which are on file with the Underwriter and are a part of the Policy, as if physically attached.

(B)     "**Claim**" has the meaning ascribed to it (or similar term) in the **Underlying Insurance**.

(C)     "**Defense Expenses**" has the meaning ascribed to it (or similar term) in the **Underlying Insurance**.

(D)     "**Insured**" means the persons or organizations insured under the **Underlying Insurance**.

(E)     "**Policy Period**" means the period from the inception date to the expiration date in ITEM 2 of the Declarations, or to any earlier cancellation date.

(F)     "**Primary Policy**" means the policy scheduled as such in ITEM 4 of the Declarations.

(G)     "**Underlying Insurance**" means all insurance policies or risk transfer instruments (including, but not limited to, self-insured retentions or other alternative arrangements) scheduled in ITEM 4 of the Declarations and any policies or risk transfer arrangements renewing or replacing them.

## III.   UNDERLYING INSURANCE

(A)     All of the **Underlying Insurance** scheduled in ITEM 4 of the Declarations shall be maintained during the **Policy Period** in full force and effect, except for any reduction of the limits of liability available under the **Underlying Insurance** solely by reason of actual payment of **Claims** or losses thereunder.  Subject at all times to clause (D) of this SECTION III, this Policy shall not be invalidated solely by reason of any failure of the **Insured** to comply with the foregoing, but under no circumstances shall the Underwriter be liable under this Policy earlier, or to any greater extent, than it would have been if the **Insured** had complied with this provision.

(B)     Without prejudice to any rights of the Underwriter, in the event of any actual or alleged (1) failure by the **Insured** to give any notice or to exercise any extensions under any **Underlying Insurance**, or (2) misrepresentation or breach of warranty by the **Insured** with respect to any **Underlying Insurance**, the Underwriter will not be liable under this Policy earlier or to any greater extent than it would have been in the absence of such actual or alleged failure, misrepresentation or breach of warranty.

(C)     No amendment or modification to any **Underlying Insurance** shall be binding upon the Underwriter or effective in extending the coverage or limits of liability afforded by this Policy without the express written agreement of the Underwriter.

(D)     Notwithstanding anything to the contrary contained in this Policy, this Policy shall terminate immediately upon the rescission of any **Underlying Insurance**.

## IV.   LIMIT OF LIABILITY

The amount stated in ITEM 3 of the Declarations is the limit of the Underwriter's liability under this Policy, and shall be the maximum amount, including **Defense Expenses**, payable by the Underwriter under this Policy. The limit of liability available to pay damages or settlements shall be reduced, and may be exhausted, by the payment of **Defense Expenses.**

## V.    DEFENSE EXPENSES AND SETTLEMENTS

In the event a **Claim** is made which involves the coverage afforded by this Policy, no **Defense Expenses** shall be incurred without the Underwriter's prior written consent, which consent shall not be unreasonably withheld.

The **Insured** shall not admit liability for, or settle or offer to settle any **Claim** for, any amount that would involve the coverage afforded by this Policy without the Underwriter's prior written consent.

## VI.    CLAIM PARTICIPATION

The Underwriter may, at its sole discretion, elect to associate in the investigation, settlement or defense of any **Claim** against the **Insured,** even if the **Underlying Insurance** has not been exhausted.  If the Underwriter so elects, the **Insured** will cooperate with the Underwriter and will make available all such information and records as the Underwriter may reasonably require.

## VII.    SUBROGATION AND RECOVERIES

In the event of any payment under this Policy, the Underwriter will be subrogated to all the **Insured's** rights of recovery against any person or entity, and the **Insured** shall execute and deliver all instruments and papers and do whatever else is necessary to secure such rights. The **Insured** shall do nothing that may prejudice the Underwriter's position or potential or actual right of recovery. The obligations of the **Insured** under this provision shall survive the expiration or termination of this Policy. The expenses of all such recovery proceedings shall be first subtracted from the amount of any recovery and the remaining amount so recovered shall be apportioned in the inverse order of payment to the extent of actual payment.

## VIII.    NOTICE

As a condition precedent to any right to payment of the **Insured** under this Policy, and in accordance with ITEM 6 of the Declarations, the **Insured** shall give the Underwriter's Claims Department written notice of:

(A)    any **Claim** under the **Underlying Insurance** as soon as possible, and in any event within the time period set forth by the **Underlying Insurance** with respect to notice of **Claims**; and

(B)    any matter with respect to which notice has been provided under any **Underlying Insurance.**

With respect to Underlying Insurance written on a claims-made basis, if the **Insured** exercises the right under the **Underlying Insurance** to report a Notice of Circumstance (as defined below), then the **Insured** must also report such Notice of Circumstance to the Underwriter prior to the expiration of the **Policy Period**, and in such event any **Claim** that subsequently may arise out of such circumstance shall be deemed to have been made during the **Policy Period** in which such Notice of Circumstance first was reported.

As used herein, the term "Notice of Circumstance" means written notice of specific facts or circumstances of which the **Insured** becomes aware during the **Policy Period** that may subsequently give rise to a **Claim**.

## IX. ALTERATION

No change in or modification of this Policy shall be effective unless made by endorsement signed by an authorized employee or agent of the Underwriter.

## X. POLICY TERMINATION

(A) The **Insured** may cancel this Policy at any time by delivering by hand delivery or overnight mail service or by mailing registered, certified or other first-class mail, written notice stating when thereafter such cancellation is to be effective.

(B) The Underwriter may cancel this Policy only in accordance with the terms and conditions of the **Underlying Insurance**.

(C) The Underwriter will refund any unearned premium computed at its customary short rate if the Policy is canceled by the **Insured.** Under all other circumstances, any unearned premium shall be computed pro rata.

(D) The Underwriter will have no obligation to renew this Policy upon its expiration.

## XI. REPRESENTATIONS; SEVERABILITY

The **Insured** represents that the particulars and statements contained in the **Application** are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and to constitute a part of this Policy, are the basis of this Policy. No knowledge or information possessed by any **Insured** will be imputed to any other **Insured** except for material facts or information known to the person or persons who signed the **Application**. In the event that any of the particulars or statements in the **Application** is untrue, this Policy will be void with respect to any **Insured** who knew of such untruth or to whom such knowledge is imputed.

## XII. AUTHORIZATION AND NOTICES

The person or entity first named in ITEM 1 of the Declarations shall be the sole agent, and shall act on behalf, of the **Insured** with respect to all matters under this Policy, including but not limited to giving and receiving notices and other communications, effecting or accepting any endorsements to or notice of cancellation of this Policy, the payment of premium and the receipt of any return premiums.

**In Witness Whereof, the Underwriter has caused this Policy to be executed by its authorized officers.**

ENDORSEMENT NO. 1

# SERVICE OF SUIT ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on June 30, 2016        , forms part of:

      Policy No.     MFX-002013-0616
      Issued by     Homeland Insurance Company of New York
      Issued to      Sonic Healthcare Investments, G.P.


In consideration of the premium charged:

(1)     We designate and authorize the following person as our agent for service of process for any proceeding brought by or on behalf of the insured, or any beneficiary under this policy, and arising out of this policy of insurance.  Such service of process must be made by certified mail return receipt requested to:

          General Counsel
          OneBeacon Insurance Group – Legal Department
          605 North Highway 169
          Suite 800
          Plymouth, MN 55441

(2)     If required by applicable statute, we also designate the Superintendent, Commissioner or Director of Insurance, or other officer or individual specified in the law of the jurisdiction in which this policy is issued, to receive on our behalf service of process for any proceeding brought by or on behalf of the insured, or any beneficiary under this policy, and arising out of this policy of insurance.  We authorize the Superintendent, Commissioner, Director or other officer or individual upon whom service is made to mail a copy of the process to the person identified in Paragraph 1. above.

(3)     In Rhode Island, we also designate and authorize the following person as our agent for service of process for any proceeding brought by or on behalf of the insured, or any beneficiary under this policy, and arising out of this policy of insurance:

          Sherry A. Goldin
          10 Weybosset Street
          Providence, Rhode Island 02903

(4)     In Oregon, service of process for any proceeding brought by or on behalf of the insured, or any beneficiary under this policy, and arising out of this policy of insurance may be made upon the insurance producer in the courts for the county where the insurance producer who registered or delivered the policy resides or transacts business.

(5)     By agreeing to the service of process provisions above, we do not waive our right to commence an action in any court of competent jurisdiction in the United States, remove an action to a United States District Court or seek a transfer of a case to another court as permitted by the laws of the United States or of any state within the United States.

As used above, the word "insured" means any person or organization qualifying as an insured under the policy, and the words "we" and "our" refer to the company providing this insurance.


All other terms, conditions and limitations of this Policy shall remain unchanged.

## HEALTHCARE EXCESS INDEMNITY POLICY
## MINIMUM EARNED PREMIUM ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2016</u>, forms part of:

    Policy No.     MFX-002013-0616
    Issued by     Homeland Insurance Company of New York
    Issued to     Sonic Healthcare Investments, G.P.

In consideration of the premium charged:

It is understood and agreed that, for all purposes under the Policy, premium in the amount of $█████ will be deemed fully earned as of the Inception Date set forth in Item 2(a) of the Declarations.

All other terms, conditions and limitations of this Policy shall remain unchanged.

## HEALTHCARE EXCESS INDEMNITY POLICY
## MOLD, MILDEW AND OTHER FUNGI EXCLUSION

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2016</u>, forms part of:

Policy No.   MFX-002013-0616
Issued by    Homeland Insurance Company of New York
Issued to    Sonic Healthcare Investments, G.P.

In consideration of the premium charged:

(1)   No coverage will be available under this Policy for

(a)   Claims for Bodily Injury, Property Damage, Personal Injury or Advertising Injury based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving exposure to, or the manifestation, release, dispersal, seepage, migration, discharge, appearance, presence, reproduction or growth of, mold, mildew, spores, mycotoxins, fungi, organic pathogens or other micro organisms of any type, nature or description whatsoever;

(b)   any cost, expense or charge to test for, monitor, clean up, remediate, mitigate, remove, contain, treat, detoxify, neutralize, rehabilitate, or in any other way respond to or assess the effect(s) of mold, mildew, spores, mycotoxins, fungi, organic pathogens or other micro organisms of any type, nature or description whatsoever; or

(c)   any cost, expense, charge, fine or penalty incurred, sustained or imposed by order, direction, request or agreement of any court, governmental agency, regulatory body or civil, public or military authority in connection with or in any way relating to mold, mildew, spores, mycotoxins, fungi, organic pathogens or other micro organisms of any type, nature or description whatsoever;

provided, however, that this exclusion shall not apply to any Claim based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the Insured's use of mold, mildew, spores, mycotoxins, fungi, organic pathogens or other micro organisms of any type, nature or description whatsoever in connection with the rendering of Medical Services, including medical research activities.

(2)   For the purposes of this endorsement:

(i)   "Advertising Injury" means injury arising out of one or more of the following offenses:

(a)   oral or written publication of material that slanders or libels a person or an organization or disparages a person's or an organization's goods, products or services;

(b)   oral or written publication of material that violates a person's right of privacy; or

(c)   misappropriation of advertising ideas or style of doing business.

(ii)   "Bodily Injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time; mental anguish; and mental injury.

(iii)   "Medical Services" means health care, medical care, or treatment provided to any individual.

(iv)   "Personal Injury" means injury, other than Bodily Injury, arising out of one or more of the following

offenses:

    (a)    false arrest, detention or imprisonment;

    (b)    malicious prosecution;

    (c)    the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

    (d)    oral or written publication of material that slanders or libels a person or an organization or disparages a person's or an organization's goods, products or services; or

    (e)    oral or written publication of material that violates a person's right of privacy.

(v)    "Property Damage" means

    (a)    physical injury to tangible property, including all resulting loss of use of that property; provided, that such loss of use shall be deemed to have occurred at the time of the physical injury that caused it; or

    (b)    loss of use of tangible property that is not physically injured; provided, that such loss of use shall be deemed to occur at the time of the occurrence that caused it.

All other terms, conditions and limitations of this Policy shall remain unchanged.

## HEALTHCARE EXCESS INDEMNITY POLICY
## SCHEDULE OF UNDERLYING INSURANCE ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on June 30, 2016          , forms part of:

|  |  |
|---|---|
| Policy No. | MFX-002013-0616 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged:

The term "Underlying Insurance," as used in the Policy shall mean the following:

| Carrier | Policy# | Limit | Coverage |
|---|---|---|---|
| A OneBeacon Company | MFL-004062-0616 | ▉ Each Claim<br>▉ Aggregate | Professional Liability |

All other terms, conditions and limitations of this Policy shall remain unchanged.

## GRACE PERIOD FOR NOTICE OF CLAIMS UPON RENEWAL OF POLICY

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2016</u>, forms part of:

| | |
|---|---|
| Policy No. | MFX-002013-0616 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged, in the event that this Policy is renewed by the Underwriter:

1. Clause (A) of Section VIII, NOTICE, of this Policy is amended to read in its entirety as follows:

    (A)     any **Claim** under the **Underlying Insurance** as soon as possible, but in no event later than sixty (60) days after the expiration date set forth in ITEM 2(b) of the Declarations; and

2. The penultimate paragraph of Section VIII, NOTICE, of this Policy is amended to read in its entirety as follows:

    With respect to **Underlying Insurance** written on a claims-made basis, if the **Insured** exercises a right under the **Underlying Insurance** to provide Notice of Circumstance (as defined below), then the **Insured** must also provide such Notice of Circumstance to the Underwriter as soon as possible, but in no event later than sixty (60) days after the expiration date set forth in ITEM 2(b) of the Declarations, and in such event any **Claim** that subsequently may arise out of such circumstance shall be deemed to have been made during the **Policy Period**.

It is understood and agreed that the amendments set forth above shall apply *only* in the event this Policy is renewed by the Underwriter.  In the event that this Policy is not renewed by the Underwriter, Clause (A) of Section VIII, NOTICE, of this Policy shall remain unchanged, such that as a condition precedent to any right to payment of the **Insured** under this Policy, the **Insured** shall give the Underwriter written notice of any **Claim** under the **Underlying Insurance** as soon as possible, and in any event within the time period set forth by the **Underlying Insurance** with respect to notice of **Claims**.

No other provision of Section VIII, NOTICE of this Policy shall be deemed or construed to have been modified or amended in any way by reason of this endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

# HEALTHCARE EXCESS INDEMNITY POLICY
## POLLUTION EXCLUSION

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2016</u>, forms part of:

Policy No.    MFX-002013-0616
Issued by    Homeland Insurance Company of New York
Issued to    Sonic Healthcare Investments, G.P.

In consideration of the premium charged:

1.    No coverage will be available under this Policy for any Claim based on, arising out of, directly or indirectly resulting from, or in any way involving any:

    (a)    actual or alleged exposure to, or generation, storage, manifestation, transportation, discharge, emission, release, dispersal, seepage, migration, escape, appearance, presence, reproduction, growth, treatment, removal or disposal of, any Pollutant, except where such exposure, generation, storage, manifestation, transportation, discharge, emission, release, dispersal, seepage, migration, escape, appearance, presence, reproduction, growth, treatment, removal or disposal was caused by an unintentional fire or any heat, smoke or fumes issuing from such unintentional fire;

    (b)    fee, cost, expense or charge to test for, monitor, clean up, remediate, mitigate, remove, contain, treat, detoxify, neutralize or rehabilitate any Pollutant;

    (c)    fee, cost, expense, charge, fine or penalty incurred, sustained or imposed by order, direction, request or agreement of any court, governmental agency, regulatory body or civil, public or military authority in connection with or in any way relating to any Pollutant;

except this exclusion will not apply to any Claim for Bodily Injury or Property Damage caused by heat, smoke or fumes from a Hostile Fire.

2.    For the purposes of this endorsement:

    (a)    The terms Bodily Injury and Property Damage shall have the meanings ascribed to them in the Underlying Insurance;

    (b)    the term "Pollutant" means smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, medical waste, waste materials (including materials which are intended to be or have been recycled, reconditioned or reclaimed) or other irritants, pollutants or contaminants. Pollutant does not include smoke, fumes, vapor or soot emanating from equipment used to heat or cool a building owned or operated by the Named Insured; and

    (c)    the term "Hostile Fire" means a fire which becomes uncontrollable or breaks out from where it was intended to be contained; provided, that Hostile Fire does not include any fire that originates at any site operating as a waste disposal facility or waste storage facility.

All other terms, conditions and limitations of the Policy shall remain unchanged.

## NOT FOLLOW FORM OF SUBLIMITED COVERAGE(S) ENDORSEMENT
## (RECOGNITION OF UNDERLYING EROSION)

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2016</u>, forms part of:

Policy No.   MFX-002013-0616
Issued by    Homeland Insurance Company of New York
Issued to    Sonic Healthcare Investments, G.P.

In consideration of the premium charged:

(1)     It is understood and agreed that notwithstanding any provision to the contrary in this Policy, no coverage will be available under this Policy for any **Claim** which is subject to a **Sublimit** (as defined below) in any **Underlying Insurance**.

(2)     Notwithstanding Section I INSURING AGREEMENT (D)(3) of this Policy and solely with respect to **Claims** which are subject to a **Sublimit** in any **Underlying Insurance**, for purposes of determining when coverage afforded under this Policy shall attach, it is understood and agreed that the applicable limit(s) of liability of any **Underlying Insurance** shall be deemed to have been reduced, and may be exhausted, by the payment of loss or damages (including **Defense Expenses**) in connection with any such **Claim**.

(3)     For purposes of this endorsement, the term "**Sublimit**" means any limit of liability of any **Underlying Insurance** which:

    (a)     applies only to a particular grant of coverage under such **Underlying Insurance**, and

    (b)     is part of, and not in addition to the otherwise applicable limits of liability of such **Underlying Insurance**.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 8

## NETWORK SECURITY AND PRIVACY EXCLUSION

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2016</u>, forms part of:

Policy No.      MFX-002013-0616
Issued by       Homeland Insurance Company of New York
Issued to       Sonic Healthcare Investments, G.P.


In consideration of the premium charged:

(1)     No coverage will be available under this Policy for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

   (a)     unauthorized, unlawful, or unintentional taking, obtaining, accessing, using, disclosing, distributing, disseminating, transmitting, gathering, collecting, acquiring, corrupting, damaging, destroying, deleting, or impairing of any information or data of any kind, including but not limited to any **Personally Identifiable Information**;

   (b)     failure or inability of any computer, computer component (including but not limited to any hardware, network, terminal device, data storage device, input and output device, or back up facility), application, program, software, code, or script of any kind (a "System") to perform or function as planned or intended, including but not limited to any failure or inability of any System to prevent any hack, virus, contaminant, worm, trojan horse, logic bomb, or unauthorized or unintended accessing or use involving any System; or

   (c)     creation, development, design, manufacture, programming, leasing, licensing, distribution, assembly, installation, alteration, modification, or sale of any computer, computer component (including but not limited to any hardware, network, terminal device, data storage device, input and output device, or back up facility), application, program, software, code, script, or data of any kind.

(2)     For the purposes of this endorsement, the term "**Personally Identifiable Information**" means a natural person's name used in combination with one or more of the following:

   (a)     health care or other medical information, including "protected health information" as defined in the Health Insurance Portability and Accountability Act of 1996, as amended, or any rules or regulations promulgated thereunder;

   (b)     "non-public personal information" as defined in the Gramm-Leach Bliley Act of 1999, as amended, or any rules or regulations promulgated thereunder;

   (c)     social security, driver's license, or other state identification numbers or credit, debit, or other financial account numbers with their related security and access codes, passwords or pin numbers that provide access to the natural person's financial account information; or

   (d)     any other non-public personally identifiable information protected under any federal, state or local statutory or common law or any rules or regulations promulgated thereunder.

**Personally Identifiable Information** does not include information that is lawfully available to the general public, including but not limited to information from any federal, state or local governmental or regulatory agency or entity.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  9

**HEALTHCARE EXCESS INDEMNITY POLICY**
**DELETE ENDORSEMENT**

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2016</u>, forms part of:

Policy No:          MFX-002013-0616
Issued by:          Homeland Insurance Company of New York
Issued to:          Sonic Healthcare Investments, G.P.

In consideration of the premium charged:

Endorsement No.  8          Network Security and Privacy Exclusion

to the Policy is deleted in its entirety and shall be of no force or effect from and after the effective date of this Endorsement.

All other terms, conditions and limitations of the Policy shall remain unchanged.

**EXHIBIT 4**



onebeaconhc.com

| RE: | Medical Facilities Liability Coverage<br>Sonic Healthcare Investments, G.P. | Policy |
|---|---|---|
| 06.26.2017 | Account No: 34379 | Policy No: MFL-004062-0617 |



199 Scott Swamp Road
Farmington, CT 06032
onebeaconhc.com

A Member of OneBeacon Insurance Group

## Welcome to OneBeacon Healthcare Group™.

Thank you for choosing a member company[1] of OneBeacon Insurance Group, Ltd. as your liability insurance carrier.

At OneBeacon Healthcare Group we take a unique approach with helping policyholders manage risk and advance patient safety by providing them with a broad range of practical and effective tools and resources. Our industry-leading in-house and external consultants have decades of risk management experience. Talk with us about your challenges and risk exposures and we'll assist you with possible strategies and solutions.

### Risk Management Information and Support at Your Fingertips

As an added value to a professional liability policy we are pleased to offer the following resources, many of which are already included in the policy's cost!

### Resources Include:

- **Exclusive website**: a policyholders-only risk management portal page with dozens of resources for all healthcare settings.
- **AboutRisk® Learning Webinar Series**: interactive webinars presented monthly, most with continuing education credits available.
- **AboutRisk Learning Library:** an extensive selection of pre-recorded educational sessions available on demand for risk manager, staff or leadership continuing education.
- **AboutRisk Learning Course:** unique, web-based fundamentals in healthcare risk management training course, with dedicated faculty support.
- **Consultative Services:** access to specialty-focused healthcare risk management professionals including The Rozovsky Group, The Virtual Group, Robinson+Cole, LLC and the OneBeacon Healthcare Group LTC Consultant Team.
- **Electronic Assessments:** custom created by OneBeacon's risk management consultants with over a dozen different assessments for you to choose from. These tools provide an opportunity for your organization to conduct a risk assessment of a specific care delivery setting, a key risk exposure or your own risk management program from a desktop, at your own pace, easily and effectively. Following completion of the risk inventory, reports are provided back to you and information on opportunities for improvement identified in the assessments is available.

---

[1] Coverages may be underwritten by one of the following insurance companies: Atlantic Specialty Insurance Company, Homeland Insurance Company of New York, Homeland Insurance Company of Delaware, OBI America Insurance Company and OBI National Insurance Company.


- **On-site Risk Assessments:** the Risk Management team can assist in coordinating an on-site risk assessment.
- **Tools and Guides:** OneBeacon Healthcare Group™ has created easy to read, case study-based "pocket" risk management guides for use by leadership and clinicians, as well as tools to help assess and address risk exposures.
- **Enewsletters and Publications:** monthly OneBeacon Healthcare Group Newsletter and complimentary access to The Rozovsky Group's Dialogues in Healthcare and TRG eNewsletter.

**As a policyholder, you can register to start accessing this material now.**

- To register, go to **https://obpi.therozovskygroup.com** If you have previously registered please take an opportunity to update your information by re-registering so that we can send you our webinar invitations and Enewsletter updates. Please know we value your privacy and will never sell or otherwise distribute your personal information to any third party.
- If you have difficulty registering, please contact Joshua Rozovsky at 860.242.1302 or josh@therozovskygroup.com.

**Liability Policy Coverage Questions**

If you have any questions regarding your policy or coverage afforded under your liability policy(s), please contact your liability insurance broker, retailer or producer. OneBeacon Healthcare Group Underwriting and Risk Management cannot provide direct communication with policyholders regarding specific policy language and/or coverage.

**Claims Management Support**

We realize that - despite best efforts - claims sometimes do occur.  At OneBeacon Healthcare Group, an experienced Claims Examiner is assigned for each reported claim, and will serve as a dedicated resource and point of contact.

Please refer to the **OneBeacon Healthcare Group Medical Professional and General Liability Claim Reporting Guidelines** on Page 4. If you have any questions about what to report or how to report please contact Maureen Ringland at **MRingland@onebeacon.com.**

- To submit a claim or incident (a "potentially compensable event "/PCE), please use the reporting form that can be found on **onebeaconhc.com**.



199 Scott Swamp Road
Farmington, CT 06032
onebeaconhc.com

A Member of OneBeacon Insurance Group

- **Claims can be submitted one of three ways:**

  **1. Secure E-mail:  obiclaims@onebeacon.com**. (You will receive an immediate email acknowledgment). *Please DO NOT send new claims reports directly to a member of the Claims department, use unsecured email to report or discuss claims or include any protected health information (PHI) or personally identifiable information (PII). Do not "cc" anyone on a claims report email.

  **2. Fax:** 877.256.5067

  **3. U.S. Mail:**

  Claims

  OneBeacon Insurance

  199 Scott Swamp Road

  Farmington, CT 06032

Thank you again for selecting OneBeacon Healthcare Group™ as your specialists for providing professional liability solutions. We look forward to working with you.

Patricia Hughes, MSN, CPHRM, FASHRM

Senior Vice President

Healthcare Risk Management

860.321.2601

phughes@onebeacon.com

Maureen Ringland

Vice President

Healthcare Claims

303-531-3810

MRingland@onebeacon.com



199 Scott Swamp Road
Farmington, CT 06032
onebeaconhc.com

A Member of OneBeacon Insurance Group

## OneBeacon Healthcare Group™ Medical Professional and General Liability Claim Reporting Guidelines

Following are some examples of the types of events that should be reported in accordance with the general conditions regarding Reporting of Claims, Occurrences and Circumstances under your professional liability policy:

- Medication errors resulting in injury and/or requiring further treatment (including patient not receiving medication; receiving incorrect dosage of medication; or receiving wrong medication)
- Falls resulting in injury
- Family/patient complaints of inadequate or negligent care resulting in injury
- Events reported to a state Department of Health or other state or federal regulatory body
- Visitor injuries
- Unexpected death
- Injury (including, but not limited to: loss of limb or function including spinal cord injury and any neurological impairment)
- Elopement
- Allegations of psychological, physical or sexual abuse, neglect or violence by a patient/resident or their authorized representative
- Sentinel events and Serious Reportable Events (as defined by the Joint Commission and National Quality Forum)
- Provider licensure board or similar administrative proceeding arising from a potential medical malpractice claim
- Oral or written demands for compensation or damages
- Lawsuits
- Communication from an attorney regarding any of the events noted above
- Request from an attorney for medical records
- Any other event the policyholder reasonably believes could result in a claim under the policy

*The above list of events is not meant to be exhaustive or exclusive. Nothing contained in or omitted from this document should be deemed a waiver of any terms or conditions of any applicable policy. These guidelines are provided for general informational purposes only and should not be considered or relied upon as coverage, legal or risk-management advice. Readers should consult the specific terms of their policy and their own legal counsel for advice.*

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

 © ISO Properties, Inc., 2004

INSURED
150

**Homeland Insurance Company of New York**
1000 Woodbury Road, Suite 403
Woodbury, NY 11797



*(hereinafter referred to as the "Underwriter")*

**Policy Number:** MFL-004062-0617

## DECLARATIONS

### MEDICAL FACILITIES AND PROVIDERS
### PROFESSIONAL LIABILITY, GENERAL LIABILITY AND EMPLOYEE BENEFIT LIABILITY POLICY

**PORTIONS OF THIS POLICY PROVIDE CLAIMS MADE AND REPORTED COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR AN APPLICABLE EXTENDED REPORTING PERIOD AND REPORTED IN ACCORDANCE WITH THIS POLICY'S REPORTING PROVISIONS. PLEASE READ THIS POLICY CAREFULLY.**

| | |
|---|---|
| **ITEM 1.** | **FIRST NAMED INSURED**<br>Name and Principal Address:<br><br>Sonic Healthcare Investments, G.P.<br>9737 Great Hills Trl Ste 100<br>Austin, TX 78759-6449 |
| **ITEM 2.** | **POLICY PERIOD:**<br><br>(a) Inception Date:   June 30, 2017<br>(b) Expiration Date:   June 30, 2018<br>Both dates at 12:01 a.m. at the Principal Address in ITEM 1. |

**ITEM 3.        COVERAGE/TYPE/RETROACTIVE DATE(S)**

| Coverage | Type | Retroactive Date |
|---|---|---|
| A.  Healthcare Professional Liability | Claims Made | February 05, 2007 |
| B.  General Liability | Not Covered | Not Covered |
| C.  Employee Benefit Liability | Claims Made | Not Covered |
| D.  Evacuation Expense | Expense Reimbursement | N/A |
| E.  Legal/Media Expense | Expense Reimbursement | As Per Insuring Agreement (A) |

**ITEM 4.        LIMIT(S) OF LIABILITY; DEDUCTIBLE/SELF-INSURED RETENTION**

A.   Healthcare Professional Liability
Each Claim.................................................................. ██████
Aggregate for all Claims............................................... ██████
Deductible ⊠   Self-Insured Retention ☐
Per Claim ....................................................... ██████
Aggregate ....................................................... N/A

B. General Liability
   Each Claim ................................................................. Not Covered
   Products and Completed Operations Hazard .................. Not Covered
   Damage to Rented Premises........................................... Not Covered
   Aggregate for all Claims ............................................. Not Covered
   Deductible ☐   Self-Insured Retention ☐
      Per Claim................................................................ Not Covered
      Aggregate............................................................... Not Covered

C. Employee Benefit Liability
   Each Claim ................................................................. Not Covered
   Aggregate for all Claims ............................................. Not Covered
   Deductible ☐  Self-Insured Retention ☐
      Per Claim................................................................ Not Covered
      Aggregate .............................................................. Not Covered

D. Evacuation Expense
   Each Evacuation .......................................................... █████
   Aggregate for all Evacuations ...................................... █████

E. Legal/Media Expense
   Each Legal Defense Proceeding ..................................... █████
   Aggregate for all Legal Defense Proceeding................... █████

| ITEM 5. | **COVERED OPERATIONS/SERVICES:** |
|---|---|

   Medical Laboratory

| ITEM 6. | **PREMIUM** |
|---|---|

A.  Policy Premium: ██████

B.  Minimum Earned Premium: __25%__ of Policy Premium shown above.

   __N/A__ This Policy provides coverage for acts of terrorism as defined in the Terrorism Risk Insurance Act in
   accordance with all the terms and conditions of this Policy (including all endorsements attached
   hereto). The premium attributable to this coverage is _____

   __N/A__ This Policy specifically excludes coverage for acts of terrorism in accordance with all of the terms and
   conditions of this Policy (including all endorsements attached hereto).

| ITEM 7. | **EXTENDED REPORTING PERIOD OPTION(S):** |
|---|---|

   __36 Months__ at __150%__ of Full Annual Premium

   **"Full Annual Premium" means the amount set forth in ITEM 6 above including any
   premium adjustments made during the Policy Period.**

| ITEM 8. | **ALL NOTICES REQUIRED TO BE GIVEN TO THE UNDERWRITER UNDER GENERAL CONDITION (C) OF THE POLICY MUST BE ADDRESSED TO:** |
|---|---|

Claims
OneBeacon Insurance
199 Scott Swamp Road
Farmington, CT 06032
obiclaims@onebeacon.com

**ALL OTHER NOTICES REQUIRED TO BE GIVEN TO THE UNDERWRITER UNDER THIS POLICY MUST BE ADDRESSED TO:**

OneBeacon Healthcare Group
199 Scott Swamp Road
Farmington, CT 06032

| ITEM 9. | **POLICY FORM AND ENDORSEMENTS ATTACHED AT ISSUANCE:** |
|---|---|
| HPF-30001-03-13 | Medical Facilities and Providers Professional Liability, General Liability and Employee Benefit Liability Policy |
| HPE-00023-03-13 | Amend Prior Knowledge Exclusion (D)(1) |
| HPE-00042-02-13 | Amend Cancellation to Ninety (90) Days |
| HPE-00063-04-11 | Additional Named Insured - Related to Original Named Insured |
| HPE-00064-07-11 | Notice of Cancellation to Scheduled Party |
| HPE-30017A-02-10 | Schedule of Insured Physicians and Locum Tenens |
| HPE-30028-03-13 | Deductible/Self-Insured Retention - Indemnity Only |
| HPE-30060-03-13 | Peer Review Coverage |
| HPE-30065-03-13 | HIPAA Violation Reimbursement Coverage |
| HPE-30103-01-13 | Delete General Liability and Employee Benefit Liability Coverages with Product Exclusion |
| HPE-00038-08-09 | Fronted Deductible |
| HPE-00098-05-17 | Physical Abuse / Sexual Misconduct |
| HPE-3SONIC-0816 | Rate Stabilization |
| HPE-3SONIC2-0616 | Amend General Condition (E) Worldwide Territory |

These Declarations, the completed signed Application, and the Policy (together with any and all endorsements thereto) shall constitute the entire agreement between the Underwriter and the Insured(s).

**Homeland Insurance Company of New York**
By:

_____     06.26.2017
Its Authorized Representative                                      Date:

**MEDICAL FACILITIES AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL
LIABILITY AND EMPLOYEE BENEFIT
LIABILITY POLICY**



**PORTIONS OF THIS POLICY PROVIDE CLAIMS MADE AND REPORTED COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR AN APPLICABLE EXTENDED REPORTING PERIOD AND REPORTED IN ACCORDANCE WITH THIS POLICY'S REPORTING PROVISIONS.  PLEASE READ THIS POLICY CAREFULLY.**

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the Underwriter, and subject to all of the terms and conditions of this Policy (including all endorsements hereto), the Underwriter and the **Insured** agree as follows:

**I.     INSURING AGREEMENTS**

**(A)     Claims Made Professional Liability Insurance:**

The Underwriter will pay up to the applicable Limit of Liability shown in ITEM 4.A. of the Declarations on behalf of the **Insured** any **Loss** that the **Insured** is legally obligated to pay as a result of any covered **Claim** for a **Professional Services Wrongful Act** happening on or after the **Retroactive Date**; provided, that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable Extended Reporting Period and reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

**(B)     Occurrence-Based General Liability Insurance:**

The Underwriter will pay up to the applicable Limit of Liability shown in ITEM 4.B. of the Declarations on behalf of the **Insured** any **Loss** which the **Insured** is legally obligated to pay as a result of a covered **Claim** alleging **Bodily Injury**, **Property Damage**, **Advertising Injury** or **Personal Injury** that is caused by an **Occurrence** that takes place during the **Policy Period**; provided, that the **Claim** is reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

**(C)     Claims Made Employee Benefit Liability Insurance:**

The Underwriter will pay up to the Limit of Liability shown in ITEM 4.C. of the Declarations on behalf of the **Insured** any **Loss** that the **Insured** is legally obligated to pay as a result of any covered **Claim** for an **Employee Benefit Wrongful Act** happening on or after the **Retroactive Date**; provided, that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable Extended Reporting Period and reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

**(D)     Evacuation Expense Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Named Insured**, the Underwriter will reimburse the **Named Insured** up to the amount set forth in ITEM 4.D. of the Declarations for **Evacuation Expenses** actually paid by the **Named Insured** in connection with an **Evacuation** that occurs during the **Policy Period**; provided, that such **Evacuation Expenses** are incurred by the **Named Insured** no later than sixty (60) days after the Expiration Date or earlier cancellation date of this Policy and reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

**(E)     Legal/Media Expense Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Named Insured**, the Underwriter will reimburse the **Named Insured** up to the amount set forth in ITEM 4.E. of the Declarations for **Legal/Media Expenses**

actually paid by the **Insured** in connection with a **Legal Defense Proceeding** first brought against the **Insured** during the **Policy Period**; provided, that:

(1)      such **Legal Defense Proceeding** arises out of **Professional Services** rendered by the **Insured** on or after the **Retroactive Date** applicable to the **Insured** against whom/which such **Legal Defense Proceeding** is brought; and

(2)      such **Legal Defense Proceeding** is reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

**(F)**    **Defense and Supplementary Payments:**

The Underwriter has the right and duty to defend any **Claim** that is covered by INSURING AGREEMENTS (A), (B), and (C) of this Policy, even if any of the allegations of such **Claim** are groundless, false or fraudulent.  In addition to the Limits of Liability for INSURING AGREEMENTS (A), (B), and (C), the Underwriter will pay **Defense Expenses** and will:

(1)      pay the premium on any bond to release attachments for an amount not in excess of the Limits of Liability for INSURING AGREEMENTS (A), (B), and (C) of this Policy and the premium on any appeal bond required in any defended suit, provided, that the Underwriter will not be obligated to apply for or furnish any such bond;

(2)      pay all costs imposed against the **Insured** in any such suit;

(3)      provide a legal defense and pay **Defense Expenses** for any arbitration, mediation or other alternative dispute proceeding if:

      (a)      the dispute at issue is a **Claim** covered by this Policy, and

      (b)      the **Insured** provides notice of the proceeding as required by GENERAL CONDITION (C) of this Policy; and

(4)      pay reasonable expenses, plus loss of earnings due to time off from work, incurred by an **Insured** as a result of being a defendant or co-defendant in a **Claim** or at the Underwriter's request, but not to exceed:

      (a)      ██████ per day per **Insured**; and

      (b)      ████████ per **Claim**.

## II.   DEFINITIONS

(A)    "**Administration**" means:

(1)      giving advice or counsel to **Employees** or their beneficiaries concerning their rights or interest with respect to **Employee Benefit Programs**;

(2)      determining the eligibility of **Employees** to participate in **Employee Benefit Programs**;

(3)      interpreting the provisions of **Employee Benefit Programs**;

(4)      handling and keeping records and processing of claims in connection with **Employee Benefit Programs**; and

(5)      effecting enrollment, termination or cancellation of **Employees** under **Employee Benefit Programs**.

(B) "**Advertisement**" means a notice that is broadcast or published to the general public or specific market segments about the **Insured's** goods, products or services, for the purpose of attracting customers or supporters. For purposes of this Definition:

   (1) notice that is broadcast or published includes material placed on the Internet or similar means of electronic communication; and

   (2) with regard to websites, only that part of a website that is about the **Insured's** goods, products or services, for the purpose of attracting customers or supporters, will be considered an **Advertisement**.

(C) "**Advertising Injury**" means injury arising out of one or more of the following offenses:

   (1) the **Insured's** use of another's advertising idea in an **Advertisement**;

   (2) the **Insured's** use of another's copyright, trade dress or slogan in an **Advertisement**; or

   (3) the **Insured's** infringement upon another's copyright, trade dress or slogan in an **Advertisement**.

(D) "**Auto**" means:

   (1) a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

   (2) any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

   **Auto** does not include **Mobile Equipment**.

(E) "**Bodily Injury**" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time; mental anguish; and mental injury.

(F) "**Claim**" means any written notice received by an **Insured** that any person or entity intends to hold an **Insured** responsible for a **Wrongful Act** or an **Occurrence**.

(G) "**Covered Contract**" means any lease of premises; sidetrack agreement; elevator maintenance agreement; easement or license agreement; or contract or agreement specifically added as a **Covered Contract** by written endorsement to this Policy, under which the **Named Insured** assumes the tort liability of another to pay damages for **Bodily Injury** or **Property Damage** covered by this Policy that is sustained by others.

(H) "**Defense Expenses**" means the reasonable fees of attorneys, experts and consultants and costs and expenses incurred in the investigation, adjustment, defense or appeal of a **Claim** with

   the approval or at the direction of the Underwriter; provided, that **Defense Expenses** shall not include:

   (1) remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of an **Insured**;

   (2) any amounts incurred in defense of a **Claim** for which any other insurer has a duty to defend, regardless of whether such other insurer undertakes such duty; or

   (3) any benefits under an **Employee Benefit Program**.

(I)      "**Employee**" means any person who has an assigned work schedule for and is on the regular payroll of the **Named Insured**, with federal and state taxes withheld. Independent contractors are not **Employees**. An **Employee's** status as an **Insured** shall be determined as of the date of the **Occurrence** or **Wrongful Act** upon which a **Claim** involving the **Employee** is based.

(J)      "**Employee Benefit Programs**" means any group life insurance, group accident and health insurance, profit sharing plans, pension plans, **Employee** stock subscription plans, workers' compensation, unemployment insurance, social security and disability benefits insurance or any other similar plan under the **Administration** of the **Named Insured** for the benefit of its **Employees**.

(K)      "**Employee Benefit Wrongful Act**" means any actual or alleged act, error or omission, or series of acts, errors or omissions, by an **Insured** in the **Administration** of an **Employee Benefit Program**.

(L)      "**Employment Practices**" means any of the following: breach of any employment contract; failure or refusal to hire or employ; dismissal, discharge, reduction in force, downsizing or termination of employment, whether actual or constructive; demotion, reassignment, failure or refusal to promote, or deprivation of career opportunity; discipline of **Employees**; evaluation of **Employees**; discrimination or harassment of any kind or on any basis including, but not limited to, discrimination, limitation, segregation or classification based on race, sex, marital status, ancestry, physical or mental handicaps, age, sexual preference, pregnancy or religion or other status that is protected under any applicable federal, state or local statute or ordinance affecting any present or former **Employee** or applicant for employment; humiliation or defamation of any present or former **Employee** or applicant for employment; retaliatory treatment against an **Employee** arising out of the **Employee's** attempted or actual exercise of the **Employee's** rights under the law; employment-related misrepresentations; or failure to implement appropriate workplace or employment policies or procedures.

(M)      "**Evacuation**" means the removal from one or more of the **Named Insured's** facilities to any other location of fifteen (15) or more patients or residents in such facility(ies) as a result of any natural or man-made occurrence that, in the reasonable judgment of the **Named Insured's** management, causes or could potentially cause such facility(ies) to be unsafe for such patients or residents.

(N)      "**Evacuation Expenses**" means reasonable costs incurred by the **Named Insured** in connection with an **Evacuation**, including costs associated with transporting, lodging and providing meals to patients or residents who have been evacuated. **Evacuation Expenses** shall not include any remuneration, salaries, overhead or benefit expenses of the **Named Insured**.

(O)      "**First Named Insured**" means the entity designated as such in ITEM 1 of the Declarations.

(P)      "**Good Samaritan Acts**" means emergency medical treatment provided by an **Insured**, without remuneration, at the scene of an accident, medical crisis or disaster.

(Q)      "**Hostile Fire**" means a fire which becomes uncontrollable or breaks out from where it was intended to be contained; provided, that **Hostile Fire** does not include any fire that originates at any site operating as a waste disposal facility or waste storage facility.

(R)      "**Impaired Property**" means tangible property, other than **Insured Product** or **Insured Work**, that cannot be used or is not useful because:

      (1)      it incorporates **Insured Product** or **Insured Work** that is known or thought to be defective, deficient, inadequate or dangerous; or

      (2)      the **Named Insured** has failed to fulfill the terms of any contract or agreement.

(S)      "**Insured**" means any of the following:

      (1)      the **Named Insured**;

(2) any **Employee** or **Volunteer**, but only when such **Employee** or **Volunteer** is acting within the capacity and scope of his or her duties as such;

(3) the **Named Insured's** medical directors, department heads, or chiefs of staff, but only while acting within the scope and capacity of their duties as such for the **Named Insured**;

(4) any member of a duly authorized board or committee of the **Named Insured**;

(5) solely with respect to and limited to coverage afforded under INSURING AGREEMENT (A), the lawful spouses of individual **Insureds** and, in the event of the death, incapacity, or bankruptcy of an individual **Insured**, the estates, heirs, legal representatives or assigns of such individual **Insured**;

(6) any person enrolled as a student in a formal training program offered by the **Named Insured**, but only when such person is acting within the capacity and scope of his or her duties as such;

(7) any person hired or retained by the **Named Insured** to provide language interpretation services in connection with the provision of **Medical Services;**

(8) any member or partner of a joint venture or partnership specifically listed as a **Named Insured** in Schedule A to this Policy, but only with respect to such member or partner's liability arising out of such joint venture or partnership;

(9) any member of a **Named Insured** that is a limited liability company, but only when named in a **Claim** by reason of such member's ownership interest in such **Named Insured** and only to the extent of such ownership interest; and

(10) any driver or operator of **Mobile Equipment**, but only when operating **Mobile Equipment** at the direction and with the permission of the **Named Insured**;

provided, that **Insured** shall not include any person who is an intern, resident, physician, surgeon, dentist, psychiatrist, nurse anesthetist, nurse midwife, podiatrist or chiropractor while rendering **Medical Services**, whether such person is an **Employee**, **Volunteer** or student.

(T) "**Insured Product**" means:

(1) any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) the **Named Insured**;

(b) others trading under the name of the **Named Insured**; or

(c) a person or an organization whose business or assets the **Named Insured** has acquired; and

(2) containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products. **Insured Product** includes:

(a) warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of the **Insured Product**; and

(b) the providing of or failure to provide warnings or instructions.

**Insured Product** does not include vending machines or other property rented to, or located for the use

of, others but not sold.

(U)     "**Insured Work**" means:

(1)     work or operations performed by the **Named Insured** or on the **Named Insured's** behalf; and

(2)     materials, parts or equipment furnished in connection with such work or operations. **Insured Work** includes:

(a)     warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of the **Insured Work;** and

(b)     the providing of or failure to provide warnings or instructions.

(V)     "**Legal Defense Proceeding**" means: (1) a hearing or disciplinary action against an **Insured** before a state or other licensing board or governmental regulatory body; (2) a civil or criminal proceeding in which the **Insured** is not a defendant but has been ordered to offer deposition testimony regarding treatment rendered to a **Patient**; or (3) a civil or criminal proceeding in which the **Insured** is not a party but has received a subpoena for record production regarding treatment rendered to a **Patient**.

(W)     "**Legal/Media Expenses**" means reasonable fees and costs of attorneys, experts and consultants incurred by the **Insured** in the investigation and defense of a **Legal Defense Proceeding**. **Legal/Media Expenses** also include reasonable costs incurred by the **Insured** in the management of public relations with respect to a **Legal Defense Proceeding**, including reasonable fees and costs of third-party media consultants. **Legal/Media Expenses** shall not include any remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of an **Insured**.

(X)     "**Loss**" means:

(1)     for the purposes of INSURING AGREEMENTS (A), (B) and (C), any damages, settlements, judgments or other amounts (including punitive or exemplary damages if insurable under the applicable law most favorable to the insurability thereof) in excess of the applicable deductible or self-insured retention, if any, stated in ITEM 4 of the Declarations which an **Insured** is legally obligated to pay as a result of a **Claim**;

(2)     for the purposes of INSURING AGREEMENT (D), **Evacuation Expenses**;

(3)     for the purposes of INSURING AGREEMENT (E), **Legal/Media Expenses**.

**Loss** shall not include:

(a)     **Defense Expenses**;

(b)     the multiple portion of any multiplied damage award;

(c)     fines, penalties, sanctions, fees, government payments or taxes;

(d)     amounts owed to any provider of **Medical Services** under any contract;

(e)     restitution, return or disgorgement of fees, profits, charges for products or services rendered, capitation payments, premium or any other funds allegedly wrongfully held or obtained;

(f)     benefits under an **Employee Benefit Program**;

(g)     relief or redress in any form other than monetary compensation or monetary damages, including without limitation the cost of complying with any injunctive, declaratory or administrative relief;

(h)     the payment, satisfaction or writing off of any medical bills or charges by an **Insured**; or

(i)     matters which are uninsurable under applicable law.

(Y)     "**Managed Care Services**" means services or activities performed in the administration or management of health care plans; advertising, marketing or selling health care plans or health care products; handling, investigating or adjusting claims for benefits or coverages under health care plans; or establishing health care provider networks.

(Z)     "**Medical Services**" means health care, medical care, or treatment provided to any individual, including without limitation any of the following: medical, surgical, dental, psychiatric, mental health, chiropractic, osteopathic, nursing, or other professional health care; the furnishing or dispensing of medications, drugs, blood, blood products, or medical, surgical, dental, or psychiatric supplies, equipment, or appliances in connection with such care; the furnishing of food or beverages in connection with such care; the providing of counseling or other social services in connection with such care; and the handling of, or the performance of post-mortem examinations on, human bodies.

(AA)    "**Mobile Equipment**" means any of the following types of land vehicles, including any attached machinery or equipment:

(1)     bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

(2)     vehicles maintained for use solely on or next to premises owned or rented by an **Insured**;

(3)     vehicles that travel on crawler treads;

(4)     vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(a)     power cranes, shovels, loaders, diggers or drills, or

(b)     road construction or resurfacing equipment such as graders, scrapers or rollers;

(5)     vehicles not described in clauses (1)-(4) above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(a)     air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(b)     cherry pickers and similar devices used to raise or lower workers; and

(6)     vehicles not described in clauses (1)-(4) above maintained primarily for purposes other than the transportation of persons or cargos.

**Mobile Equipment** does not include:

(i)     self-propelled vehicles with the following types of permanently attached equipment:

(aa)    equipment designed primarily for:

(AA)    snow removal;

(BB)    road maintenance but not construction or resurfacing; or

        (CC)     street cleaning;

    (bb)     cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

    (cc)     air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(ii)     any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

(BB)    "**Mold**" means mold, mildew, spores, mycotoxins, fungi, organic pathogens or other micro organisms of any type, nature or description whatsoever.

(CC)    "**Named Insured**" means the **First Named Insured** and each other entity listed as a **Named Insured** in Schedule A to this Policy.

(DD)    "**Occurrence**" means:

    (1)     with respect to **Bodily Injury** or **Property Damage**,  an accident, including continuous or repeated exposure to substantially the same harmful conditions, which results in injury or damage neither expected nor intended by the **Insured**; and

    (2)     with respect to **Advertising Injury** or **Personal Injury**, a covered offense as set forth in DEFINITIONS (C) OR DEFINITIONS (FF) of this Policy.

(EE)    "**Patient**" means any person or human body admitted or registered to receive **Medical Services** from an **Insured**, whether on an inpatient, outpatient or emergency basis.

(FF)    "**Personal Injury**" means injury, other than **Bodily Injury**, arising out of one or more of the following offenses:

    (1)     false arrest, detention or imprisonment;

    (2)     malicious prosecution;

    (3)     the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

    (4)     oral or written publication of material that slanders or libels a person or an organization or disparages a person's or an organization's goods, products or services; or

    (5)     oral or written publication of material that violates a person's right of privacy.

(GG)    "**Personally Identifiable Health Information**" means a natural person's name used in combination with his/her confidential health care or other medical information, including "protected health information" as defined in the Health Insurance Portability and Accountability Act of 1996, as amended, and any rules or regulations promulgated thereunder.  **Personally Identifiable Health Information** does not include information that is lawfully available to the general public, including but not limited to information from any federal, state or local governmental or regulatory agency or entity.

(HH)    "**Policy Period**" means the period from the Inception Date of this Policy stated in ITEM 2(a) of the Declarations to the Expiration Date of this Policy stated in ITEM 2(b) of the Declarations or to any earlier cancellation date of this Policy.

(II) "**Pollutant**" means smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, medical waste, waste materials (including materials which are intended to be or have been recycled, reconditioned or reclaimed) or other irritants, pollutants or contaminants. **Pollutant** does not include smoke, fumes, vapor or soot emanating from equipment used to heat or cool a building owned or operated by the **Named Insured**.

(JJ) "**Products and Completed Operations Hazard**" means **Bodily Injury** and **Property Damage** occurring away from premises owned or rented by the **Insured** and arising out of **Insured Product** or **Insured Work**, except:

(1) products that are still in the **Insured's** physical possession; and

(2) work that has not yet been completed or abandoned; provided that work will be deemed completed at the earliest of the following times:

(a) when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project;

(b) when all of the work called for in the **Insured's** contract has been completed; or

(c) when all of the work to be done at the job site has been completed if the **Insured's** contract calls for work at more than one job site.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed work.

**Products and Completed Operations Hazard** does not include **Bodily Injury** or **Property Damage** arising out of:

(i) the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by the **Insured**, and that condition was created by the loading or unloading of that vehicle by an **Insured**; or

(ii) the existence of tools, uninstalled equipment, or abandoned or unused materials.

(KK) "**Professional Services**" means:

(1) **Medical Services** in connection with the Covered Operations/Services set forth in ITEM 5 of the Declarations;

(2) **Good Samaritan Acts**;

(3) the activities of an **Insured** as a member of a board or committee of the **Named Insured**, or as a member of any committee of the medical or professional staff of the **Named Insured**, when engaged in **Utilization Review**;

(4) the activities of an **Insured** as a member of a formal accreditation, standards review or similar professional board or committee, including executing the directives of such board or committee; or

(5) reviewing the quality of **Medical Services** or providing quality assurance on behalf of the **Named Insured**.

(LL) "**Professional Services Wrongful Act**" means:

(1)      any actual or alleged act, error or omission, or series of acts, errors or omissions, by an **Insured** in rendering, or failing to render, **Professional Services**;

(2)      any actual or alleged act, error or omission, or series of acts, errors or omissions, by any person other than an **Insured** in rendering, or failing to render, **Medical Services**, but only for an **Insured's** vicarious liability with regard to such **Medical Services**. In no event shall this Policy provide coverage for the direct liability of any person other than an **Insured** for the rendering of, or failure to render, **Medical Services**; or

(3)      any inadvertent:

      (a)      publication of **Personally Identifiable Health Information**; or

      (b)      utterance of confidential health care or other medical information,

      of a **Patient** by an **Insured** while providing **Medical Services** to such **Patient**.

(MM)    "**Property Damage**" means:

(1)      physical injury to tangible property, including all resulting loss of use of that property; provided, that such loss of use shall be deemed to have occurred at the time of the physical injury that caused it; or

(2)      loss of use of tangible property that is not physically injured; provided, that such loss of use shall be deemed to occur at the time of the **Occurrence** that caused it. **Property Damage** shall not include loss of use of tangible property that results from any actual or alleged theft.

(NN)    "**Related Claims**" means all **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, in any way involving, or in any way having a common nexus of the same or related facts, circumstances, situations, transactions, or events, or the same or related series of facts, circumstances, situations, transactions or events.

(OO)    "**Retroactive Date**" means the applicable date(s) set forth in ITEM 3 of the Declarations.

(PP)    "**Utilization Review**" means the process of evaluating the appropriateness or necessity of **Medical Services** provided or to be provided by an **Insured**. **Utilization Review** shall include prospective review of proposed **Medical Services**, concurrent review of ongoing **Medical Services**, and retrospective review of already rendered **Medical Services**. **Utilization Review** does not include services or activities performed in the administration or management of health care plans.

(QQ)    "**Volunteer**" means a person who provides his or her services or labor to the **Named Insured**, and whose activities are supervised and directed by the **Named Insured**, but who is not compensated for such services and labor. No **Employee** or physician shall be considered a **Volunteer**.

(RR)    "**Wrongful Act**" means any **Professional Services Wrongful Act** or **Employee Benefit Wrongful Act**.

## III.    EXCLUSIONS

**(A)**    **Exclusions Applicable to INSURING AGREEMENT (A):**

In addition to the EXCLUSIONS listed under (D) below, no coverage will be available under INSURING AGREEMENT (A), and the Underwriter will not pay any **Loss** or **Defense Expenses,** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)     **Professional Services Wrongful Act** that happened before the **Retroactive Date**;

(2)     **Bodily Injury** or **Property Damage**, except to the extent such **Claim** arises out of a **Professional Services Wrongful Act;**

(3)     **Advertising Injury** or **Personal Injury**, except to the extent that such injury relates to the rendering of, or failure to render, **Professional Services**;

(4)     **Employee Benefit Wrongful Act;**

(5)     rendering of, or failure to render, **Medical Services** by any **Insured** or any person for whom an **Insured** is vicariously liable:

    (a)     while the **Insured's** or such person's license to practice is or was not active;

    (b)     in violation of any restriction imposed or placed upon the **Insured's** or such person's license; or

    (c)     if such **Medical Services** fall outside the scope of the **Insured's** or such person's license;

(6)     rendering of, or failure to render, **Medical Services** by any person other than an **Insured**; except this EXCLUSION (A)(6) will not apply to an **Insured's** vicarious liability with regard to such **Medical Services**; or

(7)     treatment of any **Patient** with any drug, medical device, or biologic or radiation-emitting product not approved by the U.S. Food and Drug Administration.

**(B)     Exclusions Applicable to INSURING AGREEMENT (B):**

In addition to the EXCLUSIONS listed under (D) below, no coverage will be available under INSURING AGREEMENT (B), and the Underwriter will not pay any **Loss** or **Defense Expenses,** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)     **Occurrence** that happened before the Inception Date set forth in ITEM 2 of the Declarations;

(2)     **Professional Services Wrongful Act**;

(3)     injury to a **Patient**; except this EXCLUSION (B)(3) shall not apply to any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving: fire or lightning; windstorm or hail; explosion; riot, including riot attending a strike or civil commotion; smoke; vandalism or malicious mischief; sprinkler leakage; elevator malfunction; earthquake or flood; or structural collapse of a building;

(4)     **Bodily Injury**, **Property Damage**, **Personal Injury** or **Advertising Injury** expected or intended from the standpoint of any **Insured**; except for **Bodily Injury** resulting from use of reasonable force to protect persons or property;

(5)     **Personal Injury** or **Advertising Injury** arising out of oral or written publication of material;

    (a)     if done by or at the direction of an **Insured** with knowledge of its falsity; or

    (b)     whose first publication took place before the Inception Date set forth in ITEM 2 of the Declarations;

(6) **Advertising Injury** arising out of any false, incorrect or misleading description of the price of goods, products or services;

(7) **Employee Benefit Wrongful Act**;

(8) **Bodily Injury** or **Property Damage** for which an **Insured** is or may be held liable by reason of:

    (a) causing or contributing to the intoxication of any person;

    (b) the furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

    (c) any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages;

except this EXCLUSION (B)(8) will not apply if the **Insured** is not in the business of manufacturing, selling or distributing alcoholic beverages;

(9) **Bodily Injury** or **Property Damage** arising out of:

    (a) the transportation of **Mobile Equipment** by, in or on an **Auto** owned or operated by, or rented or loaned to, any **Insured**; or

    (b) the use of **Mobile Equipment** in, or while in practice or preparation for, any prearranged racing, speed, demolition or stunt activity;

(10) **Bodily Injury** or **Property Damage** arising from any consequence, direct or indirect, of war, invasion, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power, strike, riot or civil insurrection;

(11) **Property Damage** to:

    (a) property the **Insured** owns, rents or occupies;

    (b) premises sold, given away or abandoned by the **Named Insured**, if the **Property Damage** arises out of any part of those premises;

    (c) property loaned to the **Insured**;

    (d) personal property in the care, custody or control of the **Insured**;

    (e) that particular part of real property on which the **Insured**, or any contractor or subcontractor working directly or indirectly on the **Insured's** behalf, is performing operations, if the **Property Damage** arises out of those operations;

    (f) that particular part of any property that must be restored, repaired or replaced because the **Insured's Work** was incorrectly, poorly or improperly performed on it; or

    (g) property which is being transported by the **Insured** by automobile, **Mobile Equipment** or team, including the loading and unloading thereof;

EXCLUSION (B)(11)(a) above does not apply to any **Claim** for **Property Damage** resulting from any fire caused by the **Insured's** negligence and occurring on premises rented by the **Insured** or temporarily occupied by the **Insured** with the permission of the owner of such premises, up

to the "Damage to Rented Premises" Limit of Liability set forth in ITEM 4.B. of the Declarations;

EXCLUSIONS (B)(11)(a), (c) and (d) above do not apply to any **Claim** for **Property Damage** (other than damage caused by fire) to premises, including the contents of such premises, rented to the **Insured** for a period of seven (7) or fewer consecutive days, up to the "Damage to Rented Premises" Limit of Liability set forth in ITEM 4.B. of the Declarations.

EXCLUSION (B)(11)(b) above does not apply if the premises are **Insured Work** and were never occupied, rented or held for rental by the **Named Insured**;

EXCLUSIONS (B)(11)(c), (d), (e), and (f) above do not apply to liability assumed under a sidetrack agreement; and

EXCLUSION (B)(11)(f) above does not apply to **Property Damage** included in the **Products and Completed Operations Hazard**;

(12) **Property Damage** to the **Insured Product** arising out of it or any part of it;

(13) **Property Damage** to **Insured Work** arising out of it or any part of it and included in the **Products and Completed Operations Hazard**; except if the damaged work or the work out of which the damage arises was performed on behalf of the **Named Insured** by a subcontractor;

(14) **Property Damage** to **Impaired Property** or property that has not been physically injured, arising out of:

    (a) defect, deficiency, inadequacy or dangerous condition in **Insured Product** or **Insured Work**; or

    (b) a delay or failure by an **Insured** or anyone acting on the **Named Insured's** behalf to perform a contract or an agreement in accordance with its terms; except this EXCLUSION (B)(14)(b) does not apply to the loss of use of other property arising out of sudden and accidental physical injury to **Insured Product** or **Insured Work** after it has been put to its intended use;

(15) damages claimed for any loss, cost or expense incurred by the **Named Insured** or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

    (a) **Insured Product**;

    (b) **Insured Work**; or

    (c) **Impaired Property**, if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it;

(16) injury or damage arising in whole or in part, either directly or indirectly, out of asbestos, regardless whether the asbestos is:

    (a) airborne as a fiber or particle;

    (b) contained in a product;

    (c) carried or transmitted on clothing or by any other means; or

| | (d) | contained in or a part of: |

        (i)      any building;

        (ii)     any building material;

        (iii)    any insulation product; or

        (iv)   any component part of any building, building material or insulation product;

(17) (a) exposure to, or the manifestation, release, dispersal, seepage, migration, discharge, appearance, presence, reproduction or growth of, **Mold**;

    (b) fee, cost, expense or charge to test, monitor, clean up, remediate, mitigate, remove, contain, treat, detoxify, neutralize, rehabilitate, or in any other way respond to or assess the effect(s) of **Mold**; or

    (c) fee, cost, expense, charge, fine or penalty incurred, sustained or imposed by order, direction, request or agreement of any court, governmental agency, regulatory body or civil, public or military authority in connection with or in any way relating to **Mold**;

(18) (a) exposure to, or generation, storage, manifestation, transportation, discharge, emission, release, dispersal, seepage, migration, escape, appearance, presence, reproduction, growth of, treatment, removal or disposal of, any **Pollutant**, including any threat thereof, except where such exposure, generation, storage, manifestation, transportation, discharge, emission, release, dispersal, seepage, migration, escape, appearance, presence, reproduction, growth, treatment, removal or disposal was caused by an unintentional fire or any heat, smoke or fumes issuing from such unintentional fire;

    (b) fee, cost, expense or charge to test, monitor, clean up, remediate, mitigate, remove, contain, treat, detoxify, neutralize or rehabilitate any **Pollutant**; or

    (c) fee, cost, expense, charge, fine or penalty incurred, sustained or imposed by order, direction, request or agreement of any court, governmental agency, regulatory body or civil, public or military authority in connection with or in any way relating to any **Pollutant**;

except this EXCLUSION (B)(18) will not apply to any **Claim** for **Bodily Injury** or **Property Damage** caused by heat, smoke or fumes from a **Hostile Fire**;

(19) nuclear reaction, nuclear radiation, radioactive contamination, or radioactive substance; or

(20) violation of the Telephone Consumer Protection Act, the CAN-SPAM Act of 2003, the Fair Credit Reporting Act, the Fair and Accurate Credit Transaction Act, all as may be amended, or any other federal, state or local statutory or common law that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information, or any rules or regulations promulgated thereunder.

## (C) Exclusions Applicable to INSURING AGREEMENT (C):

In addition to the Exclusions listed in EXCLUSION (D) below, no coverage will be available under INSURING AGREEMENT (C), and the Underwriter will not pay any **Loss** or **Defense Expenses,** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1) **Employee Benefit Wrongful Act** that happened before the **Retroactive Date**;

(2) **Advertising Injury**, **Bodily Injury**, **Personal Injury** or **Property Damage**;

(3) failure of performance by any insurer;

(4) failure of securities or other investments to perform as represented or advice given to an **Employee** to participate or not to participate in stock subscription or other benefit programs; provided, that for purposes of this EXCLUSION (C)(4), "security" means a security of any nature whatsoever including, without limitation, stocks, shares, bonds, debentures, options, derivatives, partnership interests, limited liability company interests, any other form of debt or equity instrument and any other forms of ownership interest;

(5) insufficiency of funds to meet any obligations of **Employee Benefit Programs**; or

(6) **Professional Services Wrongful Act**.

**(D) Exclusions Applicable to All INSURING AGREEMENTS:**

Except as otherwise expressly provided in this Policy, this Policy does not apply to, and the Underwriter will not pay **Loss** or **Defense Expenses**, for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1) act, error, omission or **Wrongful Act** if any **Insured**, on or before the Inception Date set forth in ITEM 2 of the Declarations, knew or reasonably could have foreseen that such act, error, omission or **Wrongful Act** might result in a **Claim**.

If, however, this Policy is a renewal of one or more policies previously issued by the Underwriter to the **First Named Insured**, and the coverage provided by the Underwriter to the **First Named Insured** was in effect, without interruption, for the entire time between the inception date of the first such other policy and the Inception Date of this Policy, the reference in this EXCLUSION (D)(1) to the Inception Date will be deemed to refer instead to the inception date of the first policy under which the Underwriter began to provide the **First Named Insured** with the continuous and uninterrupted coverage of which this Policy is a renewal;

(2) act, error, omission, **Wrongful Act**, event, suit or demand which was the subject of any notice given under:

(a) any medical professional liability or similar policy of insurance or plan or program of self-insurance, with respect to any **Claim** otherwise covered under INSURING AGREEMENT (A);

(b) any general liability or similar policy of insurance or plan or program of self-insurance, with respect to any **Claim** otherwise covered under INSURING AGREEMENT (B); or

(c) any employee benefit liability or similar policy of insurance or plan or program of self-insurance, with respect to any **Claim** otherwise covered under INSURING AGREEMENT (C);

in effect prior to the Inception Date set forth in ITEM 2 of the Declarations;

(3) violation of any federal, state or local antitrust, restraint of trade, unfair competition, or price-fixing law, or any rules or regulations promulgated thereunder, or any involvement in any agreement or conspiracy to restrain trade, except for any **Claim** otherwise covered under INSURING AGREEMENT (A) arising out of the rendering of, or failure to render, **Medical Services**;

(4)    dishonest, fraudulent, criminal or intentionally malicious act, error or omission by an **Insured**; any willful violation of law, statute, rule or regulation by an **Insured**; or the gaining of any profit, remuneration or advantage by an **Insured** to which such **Insured** was not legally entitled, including, but not limited to, health care fraud; provided, however, that no such act of one **Insured** will be imputed to any other **Insured** who was not aware of and did not participate in such act;

(5)    **Bodily Injury** or **Property Damage** arising out of the ownership, maintenance, use, operation or entrustment to others of any aircraft, **Auto** or watercraft or the loading or unloading thereof; except this EXCLUSION (D)(5) will not apply to any **Claim** for a **Professional Services Wrongful Act** in connection with the loading or unloading of any **Patient** from any aircraft or **Auto**;

(6)    obligation of an **Insured** pursuant to any  workers' compensation, unemployment compensation, disability benefits or similar law;

(7)    obligation which an **Insured** has assumed under a written or oral contract or agreement; except this EXCLUSION (D)(7) will not apply to:

    (a)    liability an **Insured** would have had in the absence of such contract or agreement; or

    (b)    liability assumed by the **Named Insured** under a **Covered Contract**;

(8)    **Claim** made by or for the benefit of, or in the name or right of, one current or former **Insured** against another current or former **Insured**; except this EXCLUSION (D)(8) will not apply to any **Claim** for:

    (a)    the rendering of, or failure to render, **Medical Services** otherwise covered under INSURING AGREEMENT (A) of this Policy; or

    (b)    any **Employee Benefit Wrongful Act** otherwise covered under INSURING AGREEMENT (C) of this Policy;

(9)    discrimination of any kind on any basis, including, but not limited to, discrimination, limitation, segregation or classification based on race, sex, marital status, ancestry, physical or mental handicaps, age, sexual preference, pregnancy, religion or other status that is protected under any applicable federal, state or local statute or ordinance, including any discrimination in the rendering of, or failure to render, **Professional Services**;

(10)    **Employment Practices**;

(11)    liability of any "Acquired Entity" described in GENERAL CONDITION (F) or its individual **Insureds** acting in their capacity as such for any **Claim**, **Occurrence**, fact, circumstance, situation, transaction, event or **Wrongful Act** or series of **Claims**, **Occurrences**, facts, circumstances, situations, transactions, events or **Wrongful Acts** happening before the date such entity became an "Acquired Entity;"

(12)    (a)    unauthorized, unlawful, or unintentional taking, obtaining, accessing, using, disclosing, distributing, disseminating, transmitting, gathering, collecting, acquiring, corrupting, damaging, destroying, deleting, or impairing of any information or data of any kind, including but not limited to any health care or other medical information or **Personally Identifiable Health Information**; provided, that this EXCLUSION (D)(12)(a) shall not apply to any **Claim** for a **Professional Services Wrongful Act** as defined in DEFINTION (LL)(3);

(b) failure or inability of any computer, computer component (including but not limited to any hardware, network, terminal device, data storage device, input and output device, or back up facility), application, program, software, code, or script of any kind (a "System") to perform or function as planned or intended, including but not limited to any failure or inability of any System to prevent any hack, virus, contaminant, worm, trojan horse, logic bomb, or unauthorized or unintended accessing or use involving any System; or

(c) creation, development, design, manufacture, programming, leasing, licensing, distribution, assembly, installation, alteration, modification, or sale of any computer, computer component (including but not limited to any hardware, network, terminal device, data storage device, input and output device, or back up facility), application, program, software, code, script, or data of any kind;

(13) liability of any individual or entity acting as an independent contractor for an **Insured**; except this EXCLUSION (D)(13) will not apply to any **Claim** otherwise covered under INSURING AGREEMENT (A) for the **Insured's** vicarious liability with regard to such independent contractor;

(14) infringement of any right of patent, service mark, trademark, copyright, title or slogan; except this EXCLUSION (D)(14) will not apply to liability of an **Insured** for infringement of copyright, trade dress or slogan in an **Advertisement**;

(15) liability of any **Insured** for **Managed Care Services**; except this EXCLUSION (D)(15) will not apply to liability of an **Insured** for **Professional Services**;

(16) evaluation of any provider of **Medical Services** by an **Insured** for purposes of selecting, employing, contracting with or credentialing such provider of **Medical Services**, if such **Claim** is made by or on behalf of any such provider of **Medical Services**;

(17) **Claim** made by or on behalf of any federal, state or local governmental or regulatory agency or entity, including but not limited to any **Claim** alleging health care fraud and abuse or violation of the Health Insurance Portability and Accountability Act of 1996 or the Health Information Technology for Economic and Clinical Health Act, all as may be amended, or any rules or regulations promulgated thereunder; or

(18) violation of the Employee Retirement Income Security Act of 1974 (ERISA), the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, all as may be amended, or any similar federal, state or local statutory or common law, or any rules or regulations promulgated thereunder; except this EXCLUSION (D)(18) will not apply to any **Claim** arising out of the rendering of, or failure to render, **Medical Services**, which is otherwise covered under INSURING AGREEMENT (A) of this Policy and for which reimbursement for such services was received from health care plans covered by such statutes, rules or regulations.


## IV. GENERAL CONDITIONS

## (A) Limits of Liability

(1) Insuring Agreement (A) – Professional Liability

(a) The "Each Claim" amount stated in ITEM 4.A. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (A).

(b) The "Aggregate for all Claims" amount stated in ITEM 4.A. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (A).

(2) Insuring Agreement (B) – General Liability

(a) The "Each Claim" amount stated in ITEM 4.B. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (B).

(b) The Underwriter's Limits of Liability for **Claims** alleging **Bodily Injury** or **Property Damage** included in the **Products and Completed Operations Hazard** shall be equal to, part of, and not in addition to, the "Each Claim" and "Aggregate for all Claims" amounts stated in ITEM 4.B. of the Declarations.

(c) The "Damage to Rented Premises" amount stated in ITEM 4.B. of the Declarations will be the Underwriter's maximum aggregate Limit of Liability for all (i) **Claims** for **Property Damage** resulting from any and all fires caused by the **Insured's** negligence and occurring on premises rented to the **Insured** or temporarily occupied by the **Insured** with the permission of the owner of such premises and (ii) **Claims** for **Property Damage** (other than damage caused by fire) to premises, including the contents of such premises, rented to the **Insured** for a period of seven (7) or fewer consecutive days. Such amount shall be part of, and not in addition to, the "Aggregate for all Claims" amount stated in ITEM 4.B. of the Declarations.

(d) The "Aggregate for all Claims" amount stated in ITEM 4.B. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (B).

(3) Insuring Agreement (C) – Employee Benefit Liability

(a) The "Each Claim" amount stated in ITEM 4.C. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (C).

(b) The "Aggregate for all Claims" amount stated in ITEM 4.C. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (C).

(4) Insuring Agreement (D) – Evacuation Expense

(a) The "Each Evacuation" amount stated in ITEM 4.D. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Evacuation** for which this Policy provides coverage under INSURING AGREEMENT (D).

(b) The "Aggregate for all Evacuations" amount stated in ITEM 4.D. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Evacuations** for which this Policy provides coverage under INSURING AGREEMENT (D).

(5) Insuring Agreement (E) – Legal/Media Expense

(a) The "Each Legal Defense Proceeding" amount stated in ITEM 4.E. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Legal Defense Proceeding** for which this Policy provides coverage under INSURING AGREEMENT (E).

(b) The "Aggregate for all Legal Defense Proceedings" amount stated in ITEM 4.E. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Legal Defense Proceedings** for which this Policy provides coverage under INSURING AGREEMENT (E).

(6) Each Limit of Liability described in paragraphs (1) through (5) above shall apply regardless of the time of payment by the Underwriter, the number of persons or entities included within the definition of **Insured,** or the number of claimants, and regardless of whether such **Claim** or **Related Claims** is/are first made during the **Policy Period** or during any Extended Reporting Period.

(7) (a) The **Insured** shall be responsible for payment in full of the applicable deductible or self-insured retention stated in ITEM 4 of the Declarations, and the Underwriter's obligation to pay **Loss** or **Defense Expenses** under this Policy shall be excess of such deductible or self-insured retention; provided, that no deductible or self-insured retention shall apply to (i) **Claims** for **Property Damage** resulting from any fire caused by the **Insured's** negligence and occurring on premises rented to the **Insured** or temporarily occupied by the **Insured** with the permission of the owner of such premises or (ii) **Claims** for **Property Damage** (other than damage caused by fire) to premises, including the contents of such premises, rented to the **Insured** for a period of seven (7) or fewer consecutive days, and which are subject to the "Damage to Rented Premises" Limit of Liability set forth in ITEM 4.B. of the Declarations.  The applicable deductible or self-insured retention shall apply to each **Claim** or **Related Claims** (subject to the applicable aggregate deductible or self-insured retention amount, if any), and shall be eroded (or exhausted) by the **Insured's** payment of **Loss** or **Defense Expenses**.  The Underwriter shall have no obligation whatsoever, either to the **Insured** or any other person or entity, to pay all or any portion of the applicable deductible or self-insured retention on behalf of the **Insured**. The Underwriter shall, however, at its sole discretion, have the right and option to do so, in which event the **Insured** will repay the Underwriter any amounts so paid.

(b) If  a "Deductible" is selected under any Insuring Agreement in ITEM 4 of the Declarations,  any amounts paid within such deductible will reduce, and may exhaust, the applicable Limits of Liability for such Insuring Agreement.

If  a "Self-Insured Retention" is selected under any Insuring Agreement in ITEM 4 of the Declarations,  any amounts paid within such self-insured retention will not reduce the applicable Limits of Liability for such Insuring Agreement.

(8) All **Insureds** under this Policy share the Limits of Liability. In no event will the number of **Insureds** involved in a **Claim** or **Related Claims** increase the applicable Limit of Liability.

(9) In the event a **Claim** under this Policy involves more than one (1) Insuring Agreement hereunder, it is understood and agreed that only one (1) deductible or self-insured retention and one (1) Limit of Liability will apply to such **Claim**, which shall be the highest applicable "Each Claim" Limit of Liability stated in ITEM 4 of the Declarations and the deductible or self-insured retention corresponding to such Limit of Liability.

(10) If any **Claim** made against the **Insureds** gives rise to coverage both under this Policy and under any other policy or policies issued by the Underwriter or any affiliate of the Underwriter, the Underwriter's and, if applicable, such affiliate's maximum aggregate limit of liability under all such

policies for all **Loss** in respect of such **Claim** will not exceed the largest single available limit of liability under any such policy, including this Policy. In no event will more than one policy issued by the Underwriter respond to a **Claim**.

**(B)    Related Claims Deemed Single Claim:**

All **Related Claims**, whenever made, shall be deemed to be a single **Claim**, regardless of:

(1)    the number of **Related Claims**;

(2)    the number or identity of claimants;

(3)    the number or identity of **Insureds** involved or against whom **Related Claims** have been or could be made;

(4)    whether the **Related Claims** are asserted in a class action or otherwise; and

(5)    the number and timing of the **Related Claims**, even if the **Related Claims** comprising such single **Claim** were made in more than one **Policy Period**.

All **Related Claims** will be treated as a single **Claim** made when the earliest of such **Related Claims** was first made, or when the earliest of such **Related Claims** is treated as having been made in accordance with GENERAL CONDITION (C)(2) below, whichever is earlier.

**(C)    Reporting of Claims, Occurrences and Circumstances:**

(1)    If, during the **Policy Period** or any Extended Reporting Period, any **Claim** for a **Wrongful Act** under INSURING AGREEMENT (A) or (C) is first made against an **Insured**, as a condition precedent to its right to any coverage under this Policy, the **Insured** shall give the Underwriter written notice of such **Claim** as soon as practicable thereafter, but in no event later than:

(a)    thirty (30) days after the Expiration Date or earlier cancellation date of this Policy; or

(b)    the expiration of any Extended Reporting Period.

Timely and sufficient notice by one **Insured** of a **Claim** shall be deemed timely and sufficient notice for all **Insureds** involved in the **Claim**. Such notice shall give full particulars of the **Claim**, including, but not limited to: a description of the **Claim** and **Wrongful Act**; the identity of the patient, all potential claimants and the health care provider(s) and any **Insureds** involved; a description of the injury or damages that resulted from such **Wrongful Act**; information on the time, place and nature of the **Wrongful Act**; and the manner in which the **Insured** first became aware of such **Wrongful Act** .

(2)    If during the **Policy Period** an **Insured** first becomes aware of any **Wrongful Act** that may subsequently give rise to a **Claim** under INSURING AGREEMENT (A) or (C) and:

(a)    gives the Underwriter written notice of such **Wrongful Act** with full particulars as soon as practicable thereafter but in any event before the Expiration Date or earlier cancellation date of this Policy; and

(b)    requests coverage under INSURING AGREEMENT (A) or (C) of this Policy for any **Claim** subsequently arising from such **Wrongful Act**;

then any **Claim** not otherwise excluded by this Policy subsequently made against the **Insured** arising out of such **Wrongful Act** shall be treated as if it had been first made during the **Policy Period**. Full particulars shall include, but are not limited to: a description of the **Wrongful Act**;

the identity of the patient, all potential claimants and the health care provider(s) and any **Insureds** involved; information on the time, place and nature of the **Wrongful Act**; the manner in which the **Insured** first became aware of such **Wrongful Act**; and the reasons the **Insured** believes the **Wrongful Act** is likely to result in a **Claim**.

(3)    If any **Claim** alleging **Bodily Injury**, **Property Damage**, **Advertising Injury** or **Personal Injury** that is caused by an **Occurrence** under INSURING AGREEMENT (B) is first made against an **Insured**, as a condition precedent to its right to any coverage under this Policy, the **Insured** shall give the Underwriter written notice of such **Claim** as soon as practicable thereafter.  Timely and sufficient notice by one **Insured** of a **Claim** shall be deemed timely and sufficient notice for all **Insureds** involved in the **Claim**. Such notice shall give full particulars of the **Claim**, including, but not limited to: a description of the **Claim** and **Occurrence**; the identity of all potential claimants and any **Insureds** involved; a description of the injury or damages that resulted from such **Occurrence**; information on the time, place and nature of the **Occurrence**; and the manner in which the **Insured** first became aware of such **Occurrence.**

If an **Insured** becomes aware of an **Occurrence** that may subsequently give rise to a **Claim** under INSURING AGREEMENT (B), the **Insured** shall give the Underwriter written notice of such **Occurrence** as soon as practicable thereafter. Such notice shall include a description of the **Occurrence**; the identity of all potential claimants and any **Insureds** involved; a description of the injury or damages that resulted from such **Occurrence**; information on the time, place and nature of the **Occurrence**; the manner in which the **Insured** first became aware of such **Occurrence**; and the reasons the **Insured** believes such **Occurrence** is likely to result in a **Claim.**

(4)    As a condition precedent to its right to any reimbursement under INSURING AGREEMENT (D) of this Policy, the **Named Insured** shall provide the Underwriter written proof of payment of **Evacuation Expenses** as soon as practicable, but in no event later than sixty (60) days after the Expiration Date or earlier cancellation date of this Policy.

(5)    As a condition precedent to its right to any reimbursement under INSURING AGREEMENT (E) of this Policy:

(a)    the **Insured** shall provide the Underwriter written notice of any **Legal Defense Proceeding** as soon as practicable, but in no event later than thirty (30) days after the **Insured** first receives notice of such **Legal Defense Proceeding**; and

(b)    the **Named Insured** shall provide the Underwriter written proof of payment of **Legal/Media Expenses** in connection with such **Legal Defense Proceeding** within sixty (60) days of the **Insured's** payment of such **Legal/Media Expenses**.

**(D)    Defense and Settlement:**

(1)    No **Insured** shall, except at its own cost, incur any expense, make any payment, admit liability for, assume any obligation, or settle any **Claim** without the Underwriter's written consent. With respect to any **Claim,** the Underwriter will have the right to investigate, direct the defense, and conduct settlement negotiations it deems appropriate. The Underwriter may make any settlement of any **Claim** which it deems appropriate.

(2)    The Underwriter will have no obligation to pay **Loss** or **Defense Expenses**, or continue to direct the defense of any **Insured**, after the applicable Limit of Liability has been exhausted by the payment of **Loss**.

(3)    If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred, either because a **Claim** made against the **Insureds** includes both covered and uncovered matters, or because a **Claim** is made against both **Insureds** and others not included within the definition of

"**Insured**" set forth in DEFINITION (S) above, the **Insureds** and the Underwriter agree to use their best efforts to determine a fair and proper allocation of all such amounts. The Underwriter's obligation to pay **Loss** under this Policy shall relate only to those sums allocated to the **Insureds**. In making such determination, the parties shall take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim** by the **Insureds** and others. In the event that the Underwriter and the **Insureds** do not reach an agreement with respect to an allocation, then the Underwriter shall be obligated to make an interim payment of the amount of **Loss** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

**(E)    Territory:**

This Policy applies to **Wrongful Acts** or **Occurrences** taking place anywhere in the world. **Claim** or suit must be made against an **Insured**, however, in the United States of America, including its territories or possessions, Puerto Rico, or Canada.

**(F)    Mergers, Acquisitions or Newly Created Entities:**

If, during the **Policy Period,** the **Named Insured** acquires or creates another entity or subsidiary or becomes a member of a joint venture or partner in a partnership, or if the **Named Insured** merges or consolidates with another entity such that the **Named Insured** is the surviving entity (any such acquired, created, merged or consolidated entity an "Acquired Entity"), then for a period of sixty (60) days after the effective date of the transaction, such Acquired Entity shall be included within the term "**Named Insured**" with respect to **Wrongful Acts** or **Occurrences** happening after the effective date of the transaction. Upon the expiration of the sixty (60) day period, there will be no coverage under this Policy for any **Claim** in any way involving the Acquired Entity or its **Insureds** unless within such sixty (60) day period:

(1)    the **Named Insured** gives the Underwriter such information regarding the transaction as the Underwriter requests; and

(2)    the Underwriter has specifically agreed by written endorsement to this Policy to provide coverage with respect to such Acquired Entity and its **Insureds**, and the **Named Insured** accepts any terms, conditions, exclusions or limitations, including payment of additional premium, as the Underwriter, in its sole discretion, imposes in connection with the transaction.

For purposes of this GENERAL CONDITION (F), "subsidiary" means any entity for which the **Named Insured** owns or possesses fifty percent (50%) of the issued and outstanding capital stock, or has or controls the right to elect or appoint more than fifty percent (50%) of the directors or trustees.

**(G)    Sales or Dissolution of Insured Entities; Cessation of Business:**

(1)    If, during the **Policy Period**:

(a)    the **First Named Insured** is dissolved, sold, acquired by, merged into, or consolidated with another entity such that the **First Named Insured** is not the surviving entity; or

(b)    any person, entity, or affiliated group of persons or entities obtains:

(i)    ownership or possession of fifty percent (50%) or more of the issued and outstanding capital stock of the **First Named Insured**; or

(ii)    the right to elect or appoint more than fifty percent (50%) of the **First Named Insured's** directors or trustees; or

(c)      the **First Named Insured** ceases to do business for any reason;

(any of which events is referred to as a "Transaction" in this GENERAL CONDITION (G)) coverage under this Policy shall continue in full force and effect until the Expiration Date or any earlier cancellation date, but this Policy shall apply only to **Occurrences** or **Wrongful Acts** happening before the effective date of such Transaction. This Policy will not apply to, and the Underwriter will not pay any **Loss** or **Defense Expenses** for, any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any **Occurrence** or **Wrongful Act** happening on or after the effective date of such Transaction. It is further understood and agreed that if such a Transaction occurs during the **Policy Period**, then no coverage will be available for any **Evacuation** that occurs on or after the effective date of such Transaction or any **Legal Defense Proceeding** that is first brought against an **Insured** on or after the effective date of such Transaction.

(2)      If, during the **Policy Period**, any **Named Insured**, other than the **First Named Insured**, is involved in an event described in paragraph (1) above, then solely with respect to such **Named Insured** and its **Insureds**, coverage under this Policy for **Occurrences** or **Wrongful Acts** happening before the effective date of such event shall continue in full force and effect until the Expiration Date or any earlier cancellation date and this Policy will not apply to, and the Underwriter will not pay any **Loss** or **Defense Expenses** for, any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any **Occurrence** or **Wrongful Act** happening on or after the effective date of such event. It is further understood and agreed that if any **Named Insured**, other than the **First Named Insured**, is involved in an event described in paragraph (1) above during the **Policy Period**, then solely with respect to such **Named Insured** and its **Insureds**, no coverage will be available for any **Evacuation** that occurs on or after the effective date of such event or any **Legal Defense Proceeding** that is first brought against an **Insured** on or after the effective date of such event.

**(H)**    **Extended Reporting Period for INSURING AGREEMENTS (A) and (C):**

If this Policy is canceled for any reason other than fraud, misrepresentation or non-payment of premium or is not renewed by the Underwriter or the **First Named Insured**, an additional period of time during which **Claims** made under INSURING AGREEMENTS (A) and (C) of this Policy may be reported (an "Extended Reporting Period") shall be made available as described in this GENERAL CONDITION (H), but any such Extended Reporting Period shall apply only to **Claims** for **Wrongful Acts** committed or allegedly committed before the effective date of such cancellation or non-renewal (the "Termination Date") or the date of any conversion of coverage under GENERAL CONDITION (G), whichever is earlier. No Extended Reporting Period shall in any way increase the Underwriter's Limits of Liability as stated in ITEM 4 of the Declarations, and the Underwriter's Limit of Liability for **Claims** made during any Extended Reporting Period shall be part of, and not in addition to, the Limits of Liability stated in ITEM 4 of the Declarations. The Extended Reporting Period will apply as follows:

(1)      An Extended Reporting Period of sixty (60) days, beginning as of the Termination Date, will apply automatically and requires no additional premium; provided, that such Extended Reporting Period will remain in effect only as long as no other policy of insurance is in effect that would apply to any **Claim** made during such Extended Reporting Period.

(2)      The **First Named Insured** may purchase an additional Extended Reporting Period for one of the periods of time stated in ITEM 7 of the Declarations by notifying the Underwriter in writing of its intention to do so no later than thirty (30) days after the Termination Date. The additional premium for this additional Extended Reporting Period shall be equal to the applicable amount stated in ITEM 7 of the Declarations and must be paid no later than thirty (30) days after the Termination Date. Such additional premium shall be deemed fully earned upon inception of such Extended Reporting Period.

If no election to purchase an additional Extended Reporting Period is made as described in GENERAL CONDITION (H)(2) above, or if the additional premium for any such Extended Reporting Period is not paid within thirty (30) days after the Termination Date, there will be no right to purchase an additional Extended Reporting Period at any later time.

**(I)** **Cancellation; Non-Renewal:**

(1) The Underwriter may cancel this Policy by mailing written notice to the **First Named Insured** at the last known address shown on the Declarations stating when, not less than sixty (60) days thereafter (or such longer period of time as required by applicable law), such cancellation shall be effective; except that, in the event of cancellation for non-payment of premium, the Underwriter may make the cancellation effective upon notice of only ten (10) days (or such longer period of time as required by applicable law).  Notwithstanding the foregoing, if the Underwriter receives no premium whatsoever by the premium due date and no premium whatsoever is received by the last day of such ten (10) day notice period (or such longer period of time as required by applicable law), the Underwriter may cancel this Policy as of the Inception Date set forth in ITEM 2(a) of the Declarations.

(2) Except as set forth in GENERAL CONDITION (M), the **First Named Insured** may cancel this Policy by mailing the Underwriter written notice stating when, not later than the Expiration Date set forth in ITEM 2(b) of the Declarations, such cancellation will be effective. In such event, and subject at all times to GENERAL CONDITION (N), the earned premium will be computed in accordance with the customary short rate table and procedure.  Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

(3) The Underwriter will not be required to renew this Policy upon its expiration.

**(J)** **Assistance and Cooperation:**

In the event of a **Claim**, the **Insured** shall provide the Underwriter with all information, assistance and cooperation that the Underwriter reasonably requests. At the Underwriter's request, the **Insured** shall assist in: investigating, defending and settling **Claims**; enforcing any right of contribution or indemnity against another who may be liable to any **Insured**; the conduct of actions, suits, appeals or other proceedings, including, but not limited to, attending trials, hearings and depositions; securing and giving evidence; and obtaining the attendance of witnesses.

**(K)** **Subrogation:**

In the event of any payment hereunder, the Underwriter shall be subrogated to the extent of any payment to all of the rights of recovery of the **Insured**. The **Insured** shall execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the Underwriter effectively to bring suit in its name. The **Insured** shall do nothing that may prejudice the Underwriter's position or potential or actual rights of recovery. The obligations of the **Insured** under this GENERAL CONDITION (K) shall survive the expiration or termination of the Policy.

**(L)** **Other Insurance and Risk Transfer Arrangements:**

Any **Loss** or **Defense Expenses** resulting from any **Claim** insured under any other insurance or self-insurance policy or program or risk transfer instrument, including, but not limited to, self-insured retentions, deductibles, fronting arrangements, professional liability policies covering any **Insured**, or other alternative arrangements which apply to the **Loss** or **Defense Expenses** shall be paid first by those instruments, policies or other arrangements. It is the intent of this Policy to apply only to **Loss** or **Defense Expenses** that are more than the total limit of all deductibles, limits of liability, self-insured amounts or other insurance or risk transfer arrangements, whether primary, contributory, excess,

contingent, fronting or otherwise and whether or not collectible. These provisions do not apply to other insurance policies or risk transfer arrangements written as specific umbrella or excess insurance over the applicable Limits of Liability of this Policy. This Policy shall not be subject to the terms of any other policy of insurance or plan or program of self-insurance; and in no event will the Underwriter pay more than the applicable Limits of Liability set forth in ITEM 4 of the Declarations.

**(M)** **Exhaustion:**

If the Underwriter's applicable Aggregate Limit of Liability for any Insuring Agreement, as set forth in ITEM 4 of the Declarations, is exhausted by the payment of **Loss**, all obligations of the Underwriter under such Insuring Agreement will be completely fulfilled and exhausted, including any obligation to pay **Defense Expenses** or to continue to direct the defense of any **Insured**, and the Underwriter will have no further obligations of any kind or nature whatsoever under such Insuring Agreement.

If all of the Underwriter's applicable Limits of Liability are exhausted by the payment of **Loss**, the premium will be fully earned, all obligations of the Underwriter under this Policy will be completely fulfilled and exhausted, including any obligation to pay **Defense Expenses** or to continue to direct the defense of any **Insured**, and the Underwriter will have no further obligations of any kind or nature whatsoever under this Policy.

**(N)** **Minimum Earned Premium:**

The percentage set forth in ITEM 6.B. of the Declarations is the percentage of the Policy Premium set forth in ITEM 6.A. of the Declarations that shall be deemed fully earned as of the Inception Date set forth in ITEM 2(a) of the Declarations.

**(O)** **Risk Management:**

The Underwriter directly or indirectly may make available risk management services in connection with this Policy for the purpose of managing and reducing the risks covered under this Policy. Such risk management services may cease or change in the Underwriter's sole discretion at any time.

**(P)** **Authorization and Notices:**

The **First Named Insured** will act on behalf of all **Insureds** with respect to: the giving or receiving of any notices under this Policy; the payment of premiums to, and receiving of return premiums from, the Underwriter; the receiving and acceptance of any endorsements issued to form a part of this Policy; and the exercising or declining to exercise any Extended Reporting Period.

**(Q)** **Conformance:**

Any terms of this Policy that are in conflict with the laws or regulations of the state in which this Policy is issued are amended to conform with such laws or regulations.

**(R)** **Representation; Incorporation of Application:**

The **Insureds** represent that the particulars and statements contained in the Application attached to this Policy are true, accurate and complete and agree that:

(1)     this Policy is issued and continued in force by the Underwriter in reliance upon the truth of such representation;

(2)     those particulars and statements are the basis of this Policy; and

(3)     the Application and those particulars and statements are incorporated in and form a part of this Policy.

No knowledge or information possessed by any **Insured** shall be imputed to any other **Insured**, except for material facts or information known to the person or persons who signed the Application. In the event of any material untruth, misrepresentation or omission in connection with any of the particulars or statements in the Application, this Policy shall be void with respect to any **Insured** who knew of such untruth, misrepresentation or omission or to whom such knowledge is imputed.

**(S)** **No Action against Underwriter:**

(1) No action shall be taken against the Underwriter by any **Insured** unless, as conditions precedent thereto, the **Insured** has fully complied with all of the terms of this Policy and the amount of the **Insured's** obligation to pay has been finally determined either by judgment against the **Insured** after adjudicatory proceedings or by written agreement of the **Insured**, the claimant and the Underwriter.

(2) No individual or entity shall have any right under this Policy to join the Underwriter as a party to any **Claim** to determine the liability of any **Insured**; nor shall the Underwriter be impleaded by an **Insured** or his, her, or its legal representative in any such **Claim**.

**(T)** **Notice:**

(1) Notice to any **Insured** shall be sent to the **First Named Insured** at the address designated in ITEM 1 of the Declarations.

(2) Notice to the Underwriter shall be sent to the address designated in ITEM 8 of the Declarations.

**(U)** **Changes:**

Notice to or knowledge possessed by any agent or other person acting on behalf of the Underwriter shall not effect a waiver or change in any part of this Policy or prevent or estop the Underwriter from asserting any right(s) under this Policy. This Policy can only be altered, waived, or changed by written endorsement issued to form a part of this Policy.

**(V)** **Insolvency of Insured:**

The Underwriter will not be relieved of any of its obligations under this Policy by the bankruptcy or insolvency of any **Insured** or his/her/its estate.

**(W)** **Inspections and Surveys:**

The Underwriter or its duly authorized agent has the right but is not obliged to:

(1) make inspections and surveys of the **Named Insured's** premises and operations at any time;

(2) provide the **Insured** with reports on the conditions found;

(3) recommend changes;

(4) conduct loss control and prevention activity.

Any inspections, surveys, reports, or recommendations relate only to insurability and the premium to be charged.

The Underwriter does not:

(a) make safety inspections;

(b)      undertake to perform the duty of any entity to provide for the health or safety of workers or the public; or

(c)      warrant that conditions:

      (i)      are safe or healthy; or

      (ii)      comply with laws, regulations or codes.

## (X)   Examination of Books and Records:

The Underwriter may examine and audit the books and records of the **Insured** as they relate to this Policy.

## (Y)   Service of Suit:

Pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Underwriter hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose by statute, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured**, or any beneficiary hereunder, arising out of this contract of insurance.

## (Z)   Assignment:

No assignment of interest under this Policy shall bind the Underwriter without its written consent issued as a written endorsement to form a part of this Policy.

## (AA)   Entire Agreement:

The **Insureds** agree that this Policy, including the Application and any endorsements, constitutes the entire agreement between them and the Underwriter or any of its agents relating to this insurance.

## (BB)   Headings:

The descriptions in the headings and sub-headings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.

**In witness whereof the Underwriter has caused this Policy to be executed by its authorized officers.**

## AMEND PRIOR KNOWLEDGE EXCLUSION (D)(1) ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of

| | |
|---|---|
| Policy No. | MFL-004062-0617 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged, Section III EXCLUSIONS (D)(1) of this Policy is amended to read in its entirety as follows:

(1)    act, error, omission or **Wrongful Act** if, on or before the Inception Date set forth in ITEM 2 of the Declarations, the

Risk Management Dept of Legal Dept or any Executive

of the **Named Insured** knew or reasonably could have foreseen that such act, error, omission, or **Wrongful Act** might result in a **Claim**.

If, however, this Policy is a renewal of one or more policies previously issued by the Underwriter to the **First Named Insured**, and the coverage provided by the Underwriter to the **First Named Insured** was in effect, without interruption, for the entire time between the inception date of the first such other policy and the Inception Date of this Policy, the reference in this EXCLUSION (D)(1) to the Inception Date will be deemed to refer instead to the inception date of the first policy under which the Underwriter began to provide the **First Named Insured** with the continuous and uninterrupted coverage of which this Policy is a renewal;

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 2

## AMEND CANCELLATION TO NINETY (90) DAYS ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of:

Policy No.     MFL-004062-0617
Issued by     Homeland Insurance Company of New York
Issued to     Sonic Healthcare Investments, G.P.

In consideration of the premium charged, paragraph (1) of Section IV GENERAL CONDITIONS (I) of this Policy is amended to read in its entirety as follows:

(1)      The Underwriter may cancel this Policy by mailing written notice to the **First Named Insured** at the last known address shown on the Declarations stating when, not less than ninety (90) days thereafter (or such longer period of time as required by applicable law), such cancellation shall be effective; except that, in the event of cancellation for non-payment of premium, the Underwriter may make the cancellation effective upon notice of only ten (10) days (or such longer period of time as required by applicable law).  Notwithstanding the foregoing, if the Underwriter receives no premium whatsoever by the premium due date and no premium whatsoever is received by the last day of such ten (10) day notice period (or such longer period of time as required by applicable law), the Underwriter may cancel this Policy as of the Inception Date set forth in ITEM 2(a) of the Declarations.

All other terms, conditions and limitations of the Policy shall remain unchanged.

## ADDITIONAL NAMED INSURED – RELATED TO ORIGINAL NAMED INSURED ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of:

| | |
|---|---|
| Policy No. | MFL-004062-0617 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged:

(1)     The term "**Named Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include the entity(ies) scheduled below (each an "Additional Named Insured"), but solely:

(a)     with respect to liability imposed or sought to be imposed on such Additional Named Insured that is based on or arises out of acts, errors or omissions committed or allegedly committed by such Additional Named Insured when and to the extent that, such Additional Named Insured is acting on behalf of, and within the capacity and scope of its duties for

Sonic Healthcare Investments, G.P.

; and

(b)     for **Wrongful Acts** happening on or after the Retroactive Date identified for each Additional Named Insured in the schedule below and **Occurrences** happening on or after the effective date of this endorsement:

SCHEDULE

| Additional Named Insured: | Retroactive Date: |
|---|---|
| Sonic Healthcare USA, Inc | February 05, 2007 |
| Sunrise Medical Laboratories, Inc | March 05, 1995 |
| Clinical Pathology Laboratories, Inc | October 01, 2000 |
| Mullins Pathology & Cytology Laboratory, Inc | April 30, 2007 |
| Woodbury Clincal Pathology, Inc | January 05, 1992 |
| Memphis Pathology Laboratory | January 07, 2007 |
| Clinical Laboratory Services, Inc | January 07, 2007 |
| Fairfax Medical Laboratories, Inc | June 19, 2006 |
| Pathology Laboratories, Inc dba Lima Pathology Laboratories | March 01, 1987 |
| Cognoscenti Health Institute, LLC | September 01, 2006 |
| DRL Labs, Ltd. Completely merged into Clinical Pathology as of 03/28/2003 | March 28, 2003 |
| American Esoteric Laboratories, Inc. Closed Lab in March 2007 - Continues | TBD |

| Additional Named Insured: | Retroactive Date: |
|---|---|
| as a holding company | |
| Piedmont Joint venture Laboratory, Inc | August 05, 2003 |
| American Clinical Services | February 01, 2004 |
| Clinical Pathology Laboratories Southwest, Inc | March 29, 2010 |
| Clinical Laboratories of Hawaii, LLP | August 01, 1985 |
| Pan Pacific Pathologists, LLC | August 01, 1985 |
| East Side Clinical Laboratory, Inc | June 30, 1990 |
| Physician's Automated Laboratory | June 01, 1989 |
| CBLPath Holdings Corp | May 01, 2004 |
| CBLPath  Inc | July 01, 2004 |
| CBLPath Transport | January 01, 2007 |
| Sonic Healthcare Limited | February 05, 2007 |
| Douglass Hanly Moir Pathology Pty Limited | February 05, 2007 |
| Sonic Healthcare Internatoinal Pty Ltd | February 05, 2007 |
| Sonic Healthcare Pathology Pty Ltd | February 05, 2007 |
| Sonic Reference Laboratory Inc | December 01, 2014 |
| Sonic Healthcare (Ireland) Limited (term date 06.30.2013) | August 01, 2010 |
| Medlab Pathology (term date 06.30.2013) | August 01, 2010 |
| Clinical Pathology Laboratories, Southeast, Inc | March 29, 2010 |
| Memphis Pathology Holdings, LLC | September 23, 2016 |
| BMHSI/AEL Microbiology Laboratory, GP | October 26, 2016 |

(2)    It is understood and agreed that the Additional Named Insured(s) share in the applicable Limits of Liability set forth in ITEM 4 of the Declarations.

(3)    ITEM 3 of the Declarations shall be deemed amended to the extent necessary to effect the purpose and intent of this endorsement.


All other terms, conditions and limitations of the Policy shall remain unchanged.

## NOTICE OF CANCELLATION TO SCHEDULED PARTY ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of:

| | |
|---|---|
| Policy No. | MFL-004062-0617 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged:

(1)  If the Underwriter cancels this Policy for any reason other than non-payment of premium, the Underwriter will endeavor to provide notice of such cancellation to the individual(s) or entity(ies) identified in the schedule below (each a "Scheduled Party"), at the address set forth next to the Scheduled Party's name, when notice of cancellation is sent to the **First Named Insured**. In no event will the timing of notice to a Scheduled Party exceed the timing of notice to the **First Named Insured**. It is understood and agreed that notice of cancellation to a Scheduled Party is provided solely as a courtesy for the convenience of the **First Named Insured** and does not constitute a prerequisite to effective policy cancellation.

(2)  Failure to provide notice of cancellation to a Scheduled Party shall impose no liability of any kind or nature whatsoever on the Underwriter and shall not amend or extend the effective date of policy cancellation or invalidate the cancellation.

| Scheduled Party: | Scheduled Party Address: |
|---|---|
| State of Hawaii, Department of Public Safety, ASO-Purchasing and Contracts Staff | 919 Ala Moana Boulevard, Honolulu, Hawaii 96814 |
| County of Kern Public Health Services Department | 1800 Mount Vernon Avenue, 3rd Floor, Bakersfield, CA 93306-3302 |
| MediGold, Provider Credentialing | 6150 East Broad Street, Columbus, Ohio 43213 |

All other terms, conditions and limitations of the Policy shall remain unchanged.

## SCHEDULE OF INSURED PHYSICIANS AND LOCUM TENENS ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of:

> Policy No.   MFL-004062-0617
> Issued by   Homeland Insurance Company of New York
> Issued to   Sonic Healthcare Investments, G.P.

In consideration of the premium charged:

(1)   Notwithstanding anything to the contrary contained in this Policy or any endorsement thereto, the term "**Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include the physician(s) scheduled below, but only while rendering **Professional Services** on behalf of, and within the scope and capacity of his or her duties for, the **Named Insured**.

> SCHEDULE
>
> | Name | Retroactive Date | Specialty |
> |---|---|---|
> | On file with company | August 01, 2012 | Physician |

(2)   The term "**Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include any **Locum Tenens**, but only when such **Locum Tenens** is acting within the capacity and scope of his or her duties as such.  Coverage for any **Locum Tenens** shall only extend for up to sixty (60) days during the **Policy Period** per **Insured** physician for whom such **Locum Tenens** is serving as a substitute.

(3)   Section II DEFINITIONS of this Policy is amended to include the following term:
"**Locum Tenens**" means any physician who is temporarily serving as a substitute physician for an **Insured** physician scheduled in paragraph (1) above while such **Insured** physician is temporarily absent from professional practice.

(4)   No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Professional Services Wrongful Act** committed or allegedly committed by any **Insured** physician scheduled in paragraph (1) above:

(a)   prior to the Retroactive Date set forth opposite such **Insured** physician's name; or

(b)   on or after (i) the date such **Insured** physician ceased to be an employee of the **Named Insured** or (ii) the termination date of the contract or agreement under which such **Insured** physician was rendering **Professional Services** on behalf of the **Named Insured**.

(5)   It is understood and agreed that the **Insured** physicians scheduled in paragraph (1) above and any **Locum Tenens** share in the applicable Limits of Liability set forth in ITEM 4 of the Declarations.

All other terms, conditions and limitations of this Policy shall remain unchanged.

# ENDORSEMENT NO. 6

## DEDUCTIBLE/SELF-INSURED RETENTION – INDEMNITY ONLY ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of:

| | |
|---|---|
| Policy No. | MFL-004062-0617 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged, subparagraph (a) of Section IV GENERAL CONDITIONS (A)(7) of this Policy is amended to read in its entirety as follows:

(a)     The **Insured** shall be responsible for payment in full of the applicable deductible or self-insured retention stated in ITEM 4 of the Declarations, and the Underwriter's obligation to pay **Loss** under this Policy shall be excess of such deductible or self-insured retention; provided, that no deductible or self-insured retention shall apply to (i) **Claims** for **Property Damage** resulting from any fire caused by the **Insured's** negligence and occurring on premises rented to the **Insured** or temporarily occupied by the **Insured** with the permission of the owner of such premises or (ii) **Claims** for **Property Damage** (other than damage caused by fire) to premises, including the contents of such premises, rented to the **Insured** for a period of seven (7) or fewer consecutive days, and which are subject to the "Damage to Rented Premises" Limit of Liability set forth in ITEM 4.B. of the Declarations.  The applicable deductible or self-insured retention shall apply to each **Claim** or **Related Claims** (subject to the applicable aggregate deductible or self-insured retention amount, if any), and shall be eroded (or exhausted) by the **Insured's** payment of **Loss**.  The Underwriter shall have no obligation whatsoever, either to the **Insured** or any other person or entity, to pay all or any portion of the applicable deductible or self-insured retention on behalf of the **Insured**. The Underwriter shall, however, at its sole discretion, have the right and option to do so, in which event the **Insured** will repay the Underwriter any amounts so paid.

All other terms, conditions and limitations of this Policy shall remain unchanged.

## PEER REVIEW COVERAGE ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on June 30, 2017_____, forms part of:

| | |
|---|---|
| Policy No. | MFL-004062-0617 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged:

(1) Subparagraph (3) of the term "**Professional Services**," as defined in Section II DEFINITIONS of this Policy, is amended to read in its entirety as follows:

    (3) the activities of an **Insured** as a member of a board or committee of the **Named Insured**, or as a member of any committee of the medical or professional staff of the **Named Insured**, when engaged in **Peer Review** or **Utilization Review**;

(2) Section II DEFINITIONS of this Policy is amended to include the following term:

    "**Peer Review**" means the process of evaluating, by members of a formal, duly constituted professional review board or committee of the **Named Insured**, any individual or entity for purposes of selecting, employing, contracting with or credentialing current or prospective providers of **Medical Services.**

(3) Section III EXCLUSIONS (D)(8) of this Policy will not apply to any **Claim** for **Peer Review** activities otherwise covered under INSURING AGREEMENT (A) of this Policy.

(4) Section III EXCLUSIONS (D)(16) of this Policy is deleted in its entirety.

All other terms, conditions and limitations of this Policy shall remain unchanged.

# ENDORSEMENT NO. 8

## HIPAA VIOLATION REIMBURSEMENT COVERAGE ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of

Policy No.     MFL-004062-0617
Issued by     Homeland Insurance Company of New York
Issued to     Sonic Healthcare Investments, G.P.


In consideration of the premium charged:

(1)      In addition to the coverage afforded under all INSURING AGREEMENTS of this Policy, upon satisfactory proof of payment by the **Named Insured**, the Underwriter will reimburse the **Named Insured**, up to the Limit of Liability set forth in paragraph (4) below, for **HIPAA Fines and Penalties** actually paid by the **Named Insured** resulting from a **HIPAA Violation** that occurs during the **Policy Period**.

(2)      Section II DEFINITIONS of this Policy is amended to include the following terms:

         **"HIPAA Fines and Penalties"** means any civil fines or penalties imposed upon an **Insured** for violation of Title II of the Health Insurance Portability and Accountability Act of 1996.

         **"HIPAA Violation**" means any violation by an **Insured** of Title II of the Health Insurance Portability and Accountability Act of 1996.

(3)      Solely with respect to the coverage afforded under paragraph (1) above, clause (c) of the term "**Loss,**" as defined in Section II DEFINITIONS of this Policy, is amended to read in its entirety as follows:

         (c)      fines, penalties, sanctions, fees, government payments or taxes, except **HIPAA Fines and Penalties**;

(4)      The Underwriter's maximum aggregate Limit of Liability for all **HIPAA Fines and Penalties** resulting from all **HIPAA Violations** reimbursed under paragraph (1) above shall be $▉▉▉▉▉▉▉▉▉. Payment of such maximum aggregate Limit of Liability shall terminate the Underwriter's obligation to reimburse any further **HIPAA Fines and Penalties** under this Policy.

(5)      If, during the **Policy Period**, a **HIPAA Violation** occurs, as a condition precedent to its right to reimbursement under paragraph (1) above, the **Named Insured** shall give the Underwriter written notice of such **HIPAA Violation** as soon as practicable thereafter, but in no event later than thirty (30) days after the Expiration Date or earlier cancellation date of this Policy.


All other terms, conditions and limitations of this Policy shall remain unchanged.

# DELETE GENERAL LIABILITY AND EMPLOYEE BENEFIT LIABILITY COVERAGES WITH PRODUCT EXCLUSION ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of:

|  |  |
|---|---|
| Policy No. | MFL-004062-0617 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged, it is understood and agreed that:

(1)    No coverage will be available under this Policy for any General Liability coverage or Employee Benefit Liability coverage.  Accordingly:

    (a)    INSURING AGREEMENTS (B) and (C) of this Policy are deleted in their entirety.  Any and all references in this Policy to INSURING AGREEMENT (B) or (C) are deleted.

    (b)    Section III EXCLUSIONS (B) and (C) of this Policy are deleted in their entirety.

    (c)    Each of ITEMS 3 and 4 of the Declarations is amended by deleting clauses "B" and "C" therefrom.

(2)    No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency or inadequacy in the design or manufacture of such product.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 10

**FRONTED DEDUCTIBLE ENDORSEMENT**

This Endorsement, effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of

      Policy No.     MFL-004062-0617
      Issued by     Homeland Insurance Company of New York
      Issued to     Sonic Healthcare Investments, G.P.

In consideration of the premium charged, in accordance with Section IV GENERAL CONDITIONS (A)(7)(a) of this Policy, the Underwriter has agreed to pay the applicable deductible on behalf of the **Insured**; provided, that the **Insured** understands and agrees that he/she/it shall repay the Underwriter any amounts so paid as soon as practicable upon demand of the Underwriter.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 11

## SEXUAL MISCONDUCT/PHYSICAL ABUSE INSURING AGREEMENT ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of

| | |
|---|---|
| Policy No. | MFL-004062-0617 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged:

(1)     ITEM 3 of the Declarations is amended to include the following:

| **Coverage** | **Type** | **Retroactive Date** |
|---|---|---|
| F.   Sexual Misconduct/Physical Abuse Liability | Claims Made | 02.05.2007 |

(2)     ITEM 4 of the Declarations is amended to include the following at the end thereof:

F.      Sexual Misconduct/Physical Abuse Liability
         Each Claim................................................$▮▮▮▮
         Aggregate for all Claims..........................$▮▮▮▮
         Deductible ×    Self-Insured Retention
                  Per Claim...........................................$▮▮▮▮
                  Aggregate...........................................N/A

(3)     Section I INSURING AGREEMENTS (F) of this Policy is amended to read in its entirety as follows:

> **(F)     Defense and Supplementary Payments:**
>
> The Underwriter has the right and duty to defend any **Claim** that is covered by INSURING AGREEMENTS (A), (B), (C) and (G) of this Policy, even if any of the allegations of such **Claim** are groundless, false or fraudulent.  In addition to the Limits of Liability for INSURING AGREEMENTS (A), (B), and (C), and as part of and not in addition to the Limits of Liability for INSURING AGREEMENT (G), the Underwriter will pay **Defense Expenses** and will:
>
> (1)      pay the premium on any bond to release attachments for an amount not in excess of the Limits of Liability for INSURING AGREEMENTS (A), (B), (C) and (G) of this Policy and the premium on any appeal bond required in any defended suit, provided, that the Underwriter will not be obligated to apply for or furnish any such bond;
>
> (2)      pay all costs imposed against the **Insured** in any such suit;
>
> (3)      provide a legal defense and pay **Defense Expenses** for any arbitration, mediation or other alternative dispute proceeding if:

(a)     the dispute at issue is a **Claim** covered by this Policy, and

(b)     the **Insured** provides notice of the proceeding as required by GENERAL CONDITION (C) of this Policy; and

(4)   pay reasonable expenses, plus loss of earnings due to time off from work, incurred by an **Insured** as a result of being a defendant or co-defendant in a **Claim** or at the Underwriter's request, but not to exceed:

(a)     ▮▮▮▮ per day per **Insured**; and

(b)     ▮▮▮▮▮▮ per **Claim**.

(4)   Section I INSURING AGREEMENTS of this Policy is amended to include the following at the end thereof:

**(G)     Claims Made Sexual Misconduct/Physical Abuse Liability Insurance:**

The Underwriter will pay up to the applicable Limit of Liability shown in ITEM 4.F. of the Declarations on behalf of the **Insured** any **Loss** and **Defense Expenses** which the **Insured** is legally obligated to pay as a result of a covered **Claim** for a **Sexual Misconduct/Physical Abuse Wrongful Act** happening on or after the **Retroactive Date**; provided, that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable Extended Reporting Period and reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

(5)   Subparagraph (1) of the term **"Loss,"** as defined in Section II DEFINITIONS of this Policy, is amended to read in its entirety as follows:

(1)     for the purposes of INSURING AGREEMENTS (A), (B), (C) and (G), any damages, settlements, judgments or other amounts (including punitive or exemplary damages if insurable under the applicable law most favorable to the insurability thereof) in excess of the applicable deductible or self-insured retention, if any, stated in ITEM 4 of the Declarations which an **Insured** is legally obligated to pay as a result of a **Claim**;

(6)   The term "**Wrongful Act**," as defined in Section II DEFINITIONS of this Policy, is amended to include any **Sexual Misconduct/Physical Abuse Wrongful Act**.

(7)   The following term shall have the meaning set forth below and Section II DEFINITIONS of this Policy shall be deemed amended to include such term:

"**Sexual Misconduct/Physical Abuse Wrongful Act**" means:

(1)     any alleged welcome or unwelcome conduct, physical acts, gestures or spoken or written words of a sexual nature, including without limitation sexual intimacy (even if consensual), sexual molestation, sexual assault, sexual battery, sexual abuse, sexual harassment, sexual exploitation or any sexual act, ("Sexual Misconduct") by an **Insured**;

<ol start="2" type="1">
<li>any alleged or threatened physical abuse of any person ("Physical Abuse") by an **Insured**;</li>
</ol>

<ol start="3" type="1">
<li>the failure of any **Insured**, or of any person for whom the **Insured** is legally responsible, to prevent or suppress the conduct described in subparagraph (1) or (2) above;</li>
</ol>

<ol start="4" type="1">
<li>the negligent employment, investigation, supervision, retention, or reporting to the proper authorities (or failing to so report) of any person whose conduct is described in subparagraph (1) or (2) above by an **Insured**; or</li>
</ol>

<ol start="5" type="1">
<li>any "Sexual Misconduct" or "Physical Abuse" by a person, other than an **Insured**, for whose actions the **Named Insured** is legally responsible. In no event shall this Policy provide coverage for the direct liability of any person other than an **Insured** for "Sexual Misconduct" or "Physical Abuse."</li>
</ol>

(8) Solely with respect to INSURING AGREEMENT (G) of this Policy, Section III EXCLUSIONS (D)(2) of this Policy is amended to read in its entirety as follows:

(2) act, error, omission, **Wrongful Act**, event, suit or demand which was the subject of any notice given under any policy of insurance or plan or program of self-insurance in effect prior to the Inception Date set forth in ITEM 2 of the Declarations;

(9) Section III EXCLUSIONS (D)(4) of this Policy will not apply to **Defense Expenses** incurred in connection with any civil **Claim** otherwise covered under INSURING AGREEMENT (G) of this Policy unless the dishonest, fraudulent, criminal or intentionally malicious act, error or omission or willful violation of law, statute, rule or regulation by an **Insured**, or the gaining of any profit, remuneration or advantage by an **Insured** to which such **Insured** was not legally entitled, has been established by an admission or final adjudication in any judicial, administrative or alternative dispute resolution proceeding.

(10) In addition to, and not in limitation of, the EXCLUSIONS set forth in Section III EXCLUSIONS of this Policy, no coverage will be available under INSURING AGREEMENT (A), (B) or (C) of this Policy for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Sexual Misconduct/Physical Abuse Wrongful Act**.

(11) In addition to, and not in limitation of, the EXCLUSIONS set forth in Section III EXCLUSIONS of this Policy, no coverage will be available under INSURING AGREEMENT (G) of this Policy for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(a) **Sexual Misconduct/Physical Abuse Wrongful Act** that happened before the **Retroactive Date**;

(b) **Professional Services Wrongful Act**, except to the extent such **Professional Services Wrongful Act** is alleged in connection with a **Sexual Misconduct/Physical Abuse Wrongful Act**;

(c) **Bodily Injury**, **Property Damage**, **Advertising Injury** or **Personal Injury**,

except to the extent such **Bodily Injury**, **Property Damage**, **Advertising Injury** or **Personal Injury** is alleged in connection with a **Sexual Misconduct/Physical Abuse Wrongful Act**;

(d)     **Employee Benefit Wrongful Act**; or

(e)     **Sexual Misconduct/Physical Abuse Wrongful Act** with respect to any **Insured** who knew about such **Sexual Misconduct/Physical Abuse Wrongful Act** and failed to prevent or stop it or knew that the **Insured** who allegedly committed such **Sexual Misconduct/Physical Abuse Wrongful Act** had a prior history of actually or allegedly committing **Sexual Misconduct/Physical Abuse Wrongful Acts**.

(12)    Section IV GENERAL CONDITIONS (A) of this Policy is amended to read in its entirety as follows:

**(A)     Limits of Liability**

(1)     Insuring Agreement (A) – Professional Liability

(a)     The "Each Claim" amount stated in ITEM 4.A. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (A).

(b)     The "Aggregate for all Claims" amount stated in ITEM 4.A. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (A).

(2)     Insuring Agreement (B) – General Liability

(a)     The "Each Claim" amount stated in ITEM 4.B. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (B).

(b)     The Underwriter's Limits of Liability for **Claims** alleging **Bodily Injury** or **Property Damage** included in the **Products and Completed Operations Hazard** shall be equal to, part of, and not in addition to, the "Each Claim" and "Aggregate for all Claims" amounts stated in ITEM 4.B. of the Declarations.

(c)     The "Damage to Rented Premises" amount stated in ITEM 4.B. of the Declarations will be the Underwriter's maximum aggregate Limit of Liability for all (i) **Claims** for **Property Damage** resulting from any and all fires caused by the **Insured's** negligence and occurring on premises rented to the **Insured** or temporarily occupied by the **Insured** with the permission of the owner of such premises and (ii) **Claims** for **Property Damage** (other than damage caused by fire) to premises, including the contents of such premises, rented to the **Insured** for a period of seven (7) or fewer

consecutive days. Such amount shall be part of, and not in addition to, the "Aggregate for all Claims" amount stated in ITEM 4.B. of the Declarations.

(d) The "Aggregate for all Claims" amount stated in ITEM 4.B. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (B).

(3) Insuring Agreement (C) – Employee Benefit Liability

(a) The "Each Claim" amount stated in ITEM 4.C. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (C).

(b) The "Aggregate for all Claims" amount stated in ITEM 4.C. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (C).

(4) Insuring Agreement (D) – Evacuation Expense

(a) The "Each Evacuation" amount stated in ITEM 4.D. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Evacuation** for which this Policy provides coverage under INSURING AGREEMENT (D).

(b) The "Aggregate for all Evacuations" amount stated in ITEM 4.D. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Evacuations** for which this Policy provides coverage under INSURING AGREEMENT (D).

(5) Insuring Agreement (E) – Legal/Media Expense

(a) The "Each Legal Defense Proceeding" amount stated in ITEM 4.E. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Legal Defense Proceeding** for which this Policy provides coverage under INSURING AGREEMENT (E).

(b) The "Aggregate for all Legal Defense Proceedings" amount stated in ITEM 4.E. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Legal Defense Proceedings** for which this Policy provides coverage under INSURING AGREEMENT (E).

(6) Insuring Agreement (G) – Sexual Misconduct/Physical Abuse Liability

(a) The "Each Claim" amount stated in ITEM 4.F. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss**

and **Defense Expenses** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (G).

(b) The "Aggregate for all Claims" amount stated in ITEM 4.F. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** and **Defense Expenses** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (G).

(7) Each Limit of Liability described in paragraphs (1) through (6) above shall apply regardless of the time of payment by the Underwriter, the number of persons or entities included within the definition of **Insured,** or the number of claimants, and regardless of whether such **Claim** or **Related Claims** is/are first made during the **Policy Period** or during any Extended Reporting Period.

(8) (a) The **Insured** shall be responsible for payment in full of the applicable deductible or self-insured retention stated in ITEM 4 of the Declarations, and the Underwriter's obligation to pay **Loss** or **Defense Expenses** under this Policy shall be excess of such deductible or self-insured retention; provided, that no deductible or self-insured retention shall apply to (i) **Claims** for **Property Damage** resulting from any fire caused by the **Insured's** negligence and occurring on premises rented to the **Insured** or temporarily occupied by the **Insured** with the permission of the owner of such premises or (ii) **Claims** for **Property Damage** (other than damage caused by fire) to premises, including the contents of such premises, rented to the **Insured** for a period of seven (7) or fewer consecutive days, and which are subject to the "Damage to Rented Premises" Limit of Liability set forth in ITEM 4.B. of the Declarations. The applicable deductible or self-insured retention shall apply to each **Claim** or **Related Claims** (subject to the applicable aggregate deductible or self-insured retention amount, if any), and shall be eroded (or exhausted) by the **Insured's** payment of **Loss** or **Defense Expenses**. The Underwriter shall have no obligation whatsoever, either to the **Insured** or any other person or entity, to pay all or any portion of the applicable deductible or self-insured retention on behalf of the **Insured**. The Underwriter shall, however, at its sole discretion, have the right and option to do so, in which event the **Insured** will repay the Underwriter any amounts so paid.

(b) If a "Deductible" is selected under any Insuring Agreement in ITEM 4 of the Declarations, any amounts paid within such deductible will reduce, and may exhaust, the applicable Limits of Liability for such Insuring Agreement.

If a "Self-Insured Retention" is selected under any Insuring Agreement in ITEM 4 of the Declarations, any amounts paid within such self-insured retention will not reduce the applicable Limits of Liability for such Insuring Agreement.

(9) All **Insureds** under this Policy share the Limits of Liability. In no event will the number of **Insureds** involved in a **Claim** or **Related Claims** increase the applicable Limit of Liability.

(10) In the event a **Claim** under this Policy involves more than one (1) Insuring Agreement hereunder, it is understood and agreed that only one (1) deductible or self-insured retention and one (1) Limit of Liability will apply to such **Claim**, which shall be the highest applicable "Each Claim" Limit of Liability stated in ITEM 4 of the Declarations and the deductible or self-insured retention corresponding to such Limit of Liability.

(11) In the event any **Claim** covered under INSURING AGREEMENT (G) of this Policy also contains allegations of **Professional Services Wrongful Acts**, **Bodily Injury**, **Property Damage**, **Advertising Injury** or **Personal Injury** caused by **Occurrences**, or **Employee Benefit Wrongful Acts**, it is understood and agreed that *only* the deductible or self-insured retention and Limits of Liability stated in ITEM 4.F. of the Declarations will apply to such **Claims**.

(12) If any **Claim** made against the **Insureds** gives rise to coverage both under this Policy and under any other policy or policies issued by the Underwriter or any affiliate of the Underwriter, the Underwriter's and, if applicable, such affiliate's maximum aggregate limit of liability under all such policies for all **Loss** in respect of such **Claim** will not exceed the largest single available limit of liability under any such policy, including this Policy. In no event will more than one policy issued by the Underwriter respond to a **Claim**.

(13) Each reference to the phrase "INSURING AGREEMENT (A) or (C)" in Section IV GENERAL CONDITIONS (C)(1) and (C)(2) of this Policy is replaced with the phrase "INSURING AGREEMENT (A), (C) or (G)".

(14) Solely with respect to INSURING AGREEMENT (G) of this Policy, Section IV GENERAL CONDITIONS (D)(2) of this Policy is amended to read in its entirety as follows:

(2) The Underwriter will have no obligation to pay **Loss** or **Defense Expenses**, or continue to direct the defense of any **Insured**, after the applicable Limit of Liability has been exhausted by the payment of **Loss** and/or **Defense Expenses**.

(15) Each reference to the phrase "INSURING AGREEMENT (A) and (C)" in Section IV GENERAL CONDITIONS (H) of this Policy is replaced with the phrase "INSURING AGREEMENT (A), (C) and (G)".

(16) Section IV GENERAL CONDITIONS (M) of this Policy is amended to read in its entirety as follows:

**(M)** **Exhaustion:**

If the Underwriter's applicable Aggregate Limit of Liability for INSURING AGREEMENTS (A), (B) or (C) of this Policy, as set forth in ITEM 4 of the Declarations, is exhausted by the payment of **Loss**, all obligations of the Underwriter under such INSURING AGREEMENT will be completely fulfilled

and exhausted, including any obligation to pay **Defense Expenses** or to continue to direct the defense of any **Insured**, and the Underwriter will have no further obligations of any kind or nature whatsoever under such INSURING AGREEMENT.

If the Underwriter's Aggregate Limit of Liability for INSURING AGREEMENT (G) of this Policy, as set forth in ITEM 4.F. of the Declarations, is exhausted by the payment of **Loss** and/or **Defense Expenses**, all obligations of the Underwriter under such INSURING AGREEMENT will be completely fulfilled and exhausted, including any obligation to continue to direct the defense of any **Insured**, and the Underwriter will have no further obligations of any kind or nature whatsoever under such INSURING AGREEMENT.

If all of the Underwriter's applicable Limits of Liability are exhausted by the payment of **Loss** and/or **Defense Expenses**, as applicable, the premium will be fully earned, all obligations of the Underwriter under this Policy will be completely fulfilled and exhausted, including any obligation to pay **Defense Expenses** or to continue to direct the defense of any **Insured**, and the Underwriter will have no further obligations of any kind or nature whatsoever under this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

## ENDORSEMENT NO. 12

## RATE STABILIZATION ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of

      Policy No.    MFL-004062-0617
      Issued by    Homeland Insurance Company of New York
      Issued to    Sonic Healthcare Investments, G.P.

In consideration of the premium charged:

(1)      It is understood and agreed that, unless there is a **Material Change In Exposure** or a **Material Change in Loss Picture**, as such terms are defined below, the Underwriter agrees to renew this Policy, upon the same terms, conditions, limits and retention(s), at a rate that shall not exceed the rate used to determine the premium charged for this Policy.

(2)      For purposes of this endorsement, the term "**Material Change In Exposure**" means:

      (a)      any material change in the operations of the **First Named Insured** or any other **Named Insured**;

      (b)      during the **Policy Period**, any material change in the type, character, scope or extent of the services rendered by the **First Named Insured** or any other **Named Insured** from the type, character, scope or extent of the services described in the application(s) and any additional information submitted with such application(s) by the **Named Insured** in connection with this Policy;

      (c)      during the **Policy Period**, any change in the ownership, control or management of the **First Named Insured** or any other **Named Insured**; or

      (d)      the total number of tests (i) performed by the **Insured**, and (ii) projected to be performed by the **Insured**, during the **Policy Period** is more than ten percent (10%) greater than 112,386,536.

(3)      It is understood and agreed that in the event the **Named Insured** acquires any entity during the **Policy Period**, such acquisition shall not constitute a **Material Change in Exposure** and any entity so acquired shall be afforded the same policy rate as the rate used to compute the premium charged for this Policy; provided, that any entity so acquired is located in similar geographic areas and conducts substantially similar operations as the **First Named Insured** or any other **Named Insured**.

      In the event the **Named Insured** acquires any entity during the **Policy Period** that is not located in similar geographic areas or does not conduct substantially similar operations as the **First Named Insured** or any other **Named Insured**, then any such acquisition shall constitute a **Material Change in Exposure**.

(4)      For purposes of this endorsement, the term "**Material Change in Loss Picture**" means a "net incurred loss ratio" of greater than forty percent (40%) under this Policy and all policies issued by the Underwriter of which this Policy is a direct or indirect renewal.  For purposes of this endorsement, "net incurred loss ratio" means the ratio of all paid and reserved losses (indemnity and loss adjustment expenses) under this Policy and all

policies issued by the Underwriter of which this Policy is a direct or indirect renewal, net of any deductible(s), divided by the total amount of written premium for this Policy and all policies issued by the Underwriter of which this Policy is a direct or indirect renewal.

(5)     In order to determine whether there has been a **Material Change in Loss Picture**, the Underwriter will use its paid and reserved losses under this Policy and all policies issued by the Underwriter of which this Policy is a direct or indirect renewal, valued as of April 30, 2017.

(6)     If:

     (a)     there is a **Material Change in Exposure**; or

     (b)     there is a **Material Change in Loss Picture,**

it is understood and agreed that the Underwriter:

     (i)     will have no obligation to renew this Policy upon its expiration with the same terms, conditions, limits and retention(s), or using a rate that is no higher than the rate used to calculate the premium charged for this Policy; and

     (ii)     in its sole discretion, may offer to renew this Policy upon terms, conditions and limitations, and for such premium, as the Underwriter deems appropriate.

(7)     Nothing in this endorsement is intended, nor shall it be construed, to affect the Underwriter's right to cancel or non-renew coverage in accordance with Section IV GENERAL CONDITIONS (I) of this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 13

**AMEND GENERAL CONDITION (E) WORLDWIDE TERRITORY ENDORSEMENT**

This Endorsement, effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of

Policy No.      MFL-004062-0617
Issued by       Homeland Insurance Company of New York
Issued to       Sonic Healthcare Investments, G.P.


In consideration of the premium charged:

(1)      Subject to paragraph (2) below and solely for the purposes of the coverage afforded under INSURING AGREEMENT (A) of this Policy, Section IV GENERAL CONDITIONS (E) of this Policy is amended to add the following at the end thereof:

      (1)      Subject to the further provisions of this GENERAL CONDITION (E), if a **Claim** is made against an **Insured** outside the United States of America, including its territories or possessions, Puerto Rico or Canada, the Underwriter will have the right but not the duty to defend, investigate or settle such **Claim**.  If the Underwriter elects not to defend, investigate or settle such **Claim**, the **Insured** shall be obligated to initiate such defense and investigation as is reasonably necessary and, subject to the Underwriter's prior written consent, may effect settlement. The Underwriter will reimburse the **Insured,** up to the applicable Limit of Liability, for reasonable **Defense Expenses** and **Loss,** subject to the deductible or self-insured retention set forth in ITEM 4.A. of the Declarations and all other provisions of this Policy.

      (2)      All monetary terms in this Policy are in U.S. dollars.  In the event the **Insured** incurs **Loss** or **Defense Expenses** in currency other than U.S. dollars, the Underwriter will reimburse the **Insured** for such amounts in U.S. dollars at the prevailing exchange rate at the time such **Loss** or **Defense Expenses** were incurred.

      (3)      No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** made against an **Insured** in any country or jurisdiction which is the subject of trade or economic sanctions or embargo imposed by the laws or regulations of the United States of America to the extent such sanctions or embargo prohibit or limit this insurance.

(2)      It is understood and agreed that the amendment to Section IV GENERAL CONDITION (E) set forth in paragraph (1) above does not apply to **Claims** made against any **Named Insured** that is domiciled outside the United States of America, including its territories or possessions, Puerto Rico or Canada.  Accordingly, no coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** made outside the United States of America, including its territories or possessions, Puerto Rico or Canada against any **Named Insured** that is domiciled outside the United States of America, including its territories or possessions, Puerto Rico or Canada.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 14

**DELETE ENDORSEMENT**

This Endorsement, effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of

      Policy No.     MFL-004062-0617
      Issued by     Homeland Insurance Company of New York
      Issued to     Sonic Healthcare Investments, G.P.


In consideration of the premium charged, Endorsement No.

12    HPE-3SONIC-08-16       Rate Stabilization

to this Policy is deleted in its entirety and shall be of no force or effect from and after the effective date of this Endorsement.


All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 15

## RATE STABILIZATION ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on June 30, 2017, forms part of

      Policy No.     MFL-004062-0617
      Issued by     Homeland Insurance Company of New York
      Issued to     Sonic Healthcare Investments, G.P.

In consideration of the premium charged:

(1)     It is understood and agreed that, unless there is a **Material Change In Exposure** or a **Material Change in Loss Picture**, as such terms are defined below, the Underwriter agrees to renew this Policy, upon the same terms, conditions, limits and retention(s), at a rate that shall not exceed the rate used to determine the premium charged for this Policy.

(2)     For purposes of this endorsement, the term "**Material Change In Exposure**" means:

     (a)     any material change in the operations of the **First Named Insured** or any other **Named Insured**;

     (b)     during the **Policy Period**, any material change in the type, character, scope or extent of the services rendered by the **First Named Insured** or any other **Named Insured** from the type, character, scope or extent of the services described in the application(s) and any additional information submitted with such application(s) by the **Named Insured** in connection with this Policy;

     (c)     during the **Policy Period**, any change in the ownership, control or management of the **First Named Insured** or any other **Named Insured**; or

     (d)     the total number of tests (i) performed by the **Insured**, and (ii) projected to be performed by the **Insured**, during the **Policy Period** is more than ten percent (10%) greater than 156,488,074.

(3)     It is understood and agreed that in the event the **Named Insured** acquires any entity during the **Policy Period**, such acquisition shall not constitute a **Material Change in Exposure** and any entity so acquired shall be afforded the same policy rate as the rate used to compute the premium charged for this Policy; provided, that any entity so acquired is located in similar geographic areas and conducts substantially similar operations as the **First Named Insured** or any other **Named Insured**.

In the event the **Named Insured** acquires any entity during the **Policy Period** that is not located in similar geographic areas or does not conduct substantially similar operations as the **First Named Insured** or any other **Named Insured**, then any such acquisition shall constitute a **Material Change in Exposure**.

(4)     For purposes of this endorsement, the term "**Material Change in Loss Picture**" means a "net incurred loss ratio" of greater than forty percent (40%) under this Policy and all policies issued by the Underwriter of which this Policy is a direct or indirect renewal.  For purposes of this endorsement, "net incurred loss ratio" means the ratio of all paid and reserved losses (indemnity and loss adjustment expenses) under this Policy and all

policies issued by the Underwriter of which this Policy is a direct or indirect renewal, net of any deductible(s), divided by the total amount of written premium for this Policy and all policies issued by the Underwriter of which this Policy is a direct or indirect renewal.

(5)     In order to determine whether there has been a **Material Change in Loss Picture**, the Underwriter will use its paid and reserved losses under this Policy and all policies issued by the Underwriter of which this Policy is a direct or indirect renewal, valued as of April 30, 2018.

(6)     If:

     (a)     there is a **Material Change in Exposure**; or

     (b)     there is a **Material Change in Loss Picture,**

it is understood and agreed that the Underwriter:

     (i)     will have no obligation to renew this Policy upon its expiration with the same terms, conditions, limits and retention(s), or using a rate that is no higher than the rate used to calculate the premium charged for this Policy; and

     (ii)     in its sole discretion, may offer to renew this Policy upon terms, conditions and limitations, and for such premium, as the Underwriter deems appropriate.

(7)     Nothing in this endorsement is intended, nor shall it be construed, to affect the Underwriter's right to cancel or non-renew coverage in accordance with Section IV GENERAL CONDITIONS (I) of this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 16

## DELETE ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on <u>July 19, 2017</u>, forms part of:

Policy No.     MFL-004062-0617
Issued by     Homeland Insurance Company of New York
Issued to     Sonic Healthcare Investments, G.P.

In consideration of the premium charged, Endorsement No.

4      HPE-00064-07-11          Notice of Cancellation to Scheduled Party

to this Policy is deleted in its entirety and shall be of no force or effect from and after the effective date of this Endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

## NOTICE OF CANCELLATION TO SCHEDULED PARTY ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on July 19, 2017_____, forms part of:

| | |
|---|---|
| Policy No. | MFL-004062-0617 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged:

(1)    If the Underwriter cancels this Policy for any reason other than non-payment of premium, the Underwriter will endeavor to provide notice of such cancellation to the individual(s) or entity(ies) identified in the schedule below (each a "Scheduled Party"), at the address set forth next to the Scheduled Party's name, when notice of cancellation is sent to the **First Named Insured**. In no event will the timing of notice to a Scheduled Party exceed the timing of notice to the **First Named Insured**. It is understood and agreed that notice of cancellation to a Scheduled Party is provided solely as a courtesy for the convenience of the **First Named Insured** and does not constitute a prerequisite to effective policy cancellation.

(2)    Failure to provide notice of cancellation to a Scheduled Party shall impose no liability of any kind or nature whatsoever on the Underwriter and shall not amend or extend the effective date of policy cancellation or invalidate the cancellation.

| Scheduled Party: | Scheduled Party Address: |
|---|---|
| State of Hawaii, Department of Public Safety, ASO-Purchasing and Contracts Staff | 919 Ala Moana Boulevard, Honolulu, Hawaii 96814 |
| County of Kern Public Health Services Department | 1800 Mount Vernon Avenue, 3rd Floor, Bakersfield, CA 93306-3302 |
| MediGold, Provider Credentialing | 6150 East Broad Street, Columbus, Ohio 43213 |
| City of Dallas, Business Development & Procurement Services, Project Number: 274201 | c/o CertFocus, PO Box 140528, Kansas City, MO 64114 |

All other terms, conditions and limitations of the Policy shall remain unchanged.

ENDORSEMENT NO. 18

## DELETE ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of:

Policy No.     MFL-004062-0617
Issued by      Homeland Insurance Company of New York
Issued to      Sonic Healthcare Investments, G.P.

In consideration of the premium charged, Endorsement No.

| 5 | HPE-30017A-02-10 | Schedule of Insured Physicians and Locum Tenens |
| 1 | HPE-00023-03-13 | Amend Prior Knowledge Exclusion (D)(1) |

to this Policy is deleted in its entirety and shall be of no force or effect from and after the effective date of this Endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 19

## AMEND PRIOR KNOWLEDGE EXCLUSION (D)(1) ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of

     Policy No.    MFL-004062-0617
     Issued by    Homeland Insurance Company of New York
     Issued to    Sonic Healthcare Investments, G.P.

In consideration of the premium charged, Section III EXCLUSIONS (D)(1) of this Policy is amended to read in its entirety as follows:

(1)    act, error, omission or **Wrongful Act** if, on or before the Inception Date set forth in ITEM 2 of the Declarations, the

Risk Management Dept or Legal Dept or any Executive

of the **Named Insured** knew or reasonably could have foreseen that such act, error, omission, or **Wrongful Act** might result in a **Claim**.

If, however, this Policy is a renewal of one or more policies previously issued by the Underwriter to the **First Named Insured**, and the coverage provided by the Underwriter to the **First Named Insured** was in effect, without interruption, for the entire time between the inception date of the first such other policy and the Inception Date of this Policy, the reference in this EXCLUSION (D)(1) to the Inception Date will be deemed to refer instead to the inception date of the first policy under which the Underwriter began to provide the **First Named Insured** with the continuous and uninterrupted coverage of which this Policy is a renewal;

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 20

**SCHEDULE OF INSURED PHYSICIANS AND LOCUM TENENS ENDORSEMENT**

This Endorsement, effective at 12:01 a.m. on June 30, 2017, forms part of

| | |
|---|---|
| Policy No. | MFL-004062-0617 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged:

(1) Notwithstanding anything to the contrary contained in this Policy or any endorsement thereto, the term "**Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include the physician(s) scheduled below, but only while rendering **Professional Services** on behalf of, and within the scope and capacity of his or her duties for, the **Named Insured**.

SCHEDULE

| Name | Retroactive Date | Specialty |
|---|---|---|
| On File with Company | Date of Hire | Physicians |

(2) The term "**Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include any **Locum Tenens**, but only when such **Locum Tenens** is acting within the capacity and scope of his or her duties as such. Coverage for any **Locum Tenens** shall only extend for up to sixty (60) days during the **Policy Period** per **Insured** physician for whom such **Locum Tenens** is serving as a substitute.

(3) Section II DEFINITIONS of this Policy is amended to include the following term:

"**Locum Tenens**" means any physician who is temporarily serving as a substitute physician for an **Insured** physician scheduled in paragraph (1) above while such **Insured** physician is temporarily absent from professional practice.

(4) No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Professional Services Wrongful Act** committed or allegedly committed by any **Insured** physician scheduled in paragraph (1) above:

(a) prior to the Retroactive Date set forth opposite such **Insured** physician's name; or

(b) on or after (i) the date such **Insured** physician ceased to be an employee of the **Named Insured** or (ii) the termination date of the contract or agreement under which such **Insured** physician was rendering **Professional Services** on behalf of the **Named Insured**.

(5) It is understood and agreed that the **Insured** physicians scheduled in paragraph (1) above and any **Locum Tenens** share in the applicable Limits of Liability set forth in ITEM 4 of the Declarations.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 21

# **DELETE ENDORSEMENT**

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of:

Policy No.     MFL-004062-0617
Issued by     Homeland Insurance Company of New York
Issued to     Sonic Healthcare Investments, G.P.


In consideration of the premium charged, Endorsement No.


3      HPE-00063-04-11         Additional Named Insured - Related to Original Named Insured


to this Policy is deleted in its entirety and shall be of no force or effect from and after the effective date of this Endorsement.


All other terms, conditions and limitations of this Policy shall remain unchanged.

## ADDITIONAL NAMED INSURED – RELATED TO ORIGINAL NAMED INSURED ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of:

| | |
|---|---|
| Policy No. | MFL-004062-0617 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged:

(1)    The term "**Named Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include the entity(ies) scheduled below (each an "Additional Named Insured"), but solely:

    (a)    with respect to liability imposed or sought to be imposed on such Additional Named Insured that is based on or arises out of acts, errors or omissions committed or allegedly committed by such Additional Named Insured when and to the extent that, such Additional Named Insured is acting on behalf of, and within the capacity and scope of its duties for

        Sonic Healthcare Investments, G.P.

        ; and

    (b)    for **Wrongful Acts** happening on or after the Retroactive Date identified for each Additional Named Insured in the schedule below and **Occurrences** happening on or after the effective date of this endorsement:

    <u>SCHEDULE</u>

| Additional Named Insured: | Retroactive Date: |
|---|---|
| Sonic Healthcare USA, Inc | February 05, 2007 |
| Sunrise Medical Laboratories, Inc | March 05, 1995 |
| Clinical Pathology Laboratories, Inc | October 01, 2000 |
| Mullins Pathology & Cytology Laboratory, Inc | April 30, 2007 |
| Woodbury Clincal Pathology, Inc | January 05, 1992 |
| Memphis Pathology Laboratory | January 07, 2007 |
| Clinical Laboratory Services, Inc | January 07, 2007 |
| Fairfax Medical Laboratories, Inc | June 19, 2006 |
| Pathology Laboratories, Inc dba Lima Pathology Laboratories | March 01, 1987 |
| Cognoscenti Health Institute, LLC | September 01, 2006 |
| DRL Labs, Ltd. Completely merged into Clinical Pathology as of 03/28/2003 | March 28, 2003 |
| American Esoteric Laboratories, Inc. Closed Lab in March 2007 - Continues | TBD |

HPE-00063-04-11

Page 1 of 2

| Additional Named Insured: | Retroactive Date: |
|---|---|
| as a holding company | |
| Piedmont Joint venture Laboratory, Inc | August 05, 2003 |
| American Clinical Services | February 01, 2004 |
| Clinical Pathology Laboratories Southwest, Inc | March 29, 2010 |
| Clinical Laboratories of Hawaii, LLP | August 01, 1985 |
| Pan Pacific Pathologists, LLC | August 01, 1985 |
| East Side Clinical Laboratory, Inc | June 30, 1990 |
| Physician's Automated Laboratory, Inc. | June 01, 1989 |
| CBLPath Holdings Corp | May 01, 2004 |
| CBLPath  Inc | July 01, 2004 |
| CBLPath Transport, Inc. | January 01, 2007 |
| Sonic Healthcare Limited | February 05, 2007 |
| Douglass Hanly Moir Pathology Pty Limited | February 05, 2007 |
| Sonic Healthcare Internatoinal Pty Ltd | February 05, 2007 |
| Sonic Healthcare Pathology Pty Ltd | February 05, 2007 |
| Sonic Reference Laboratory Inc | December 01, 2014 |
| Sonic Healthcare (Ireland) Limited (term date 06.30.2013) | August 01, 2010 |
| Medlab Pathology (term date 06.30.2013) | August 01, 2010 |
| Clinical Pathology Laboratories, Southeast, Inc | March 29, 2010 |
| Memphis Pathology Holdings, LLC | September 23, 2016 |
| BMHSI/AEL Microbiology Laboratory, GP | October 26, 2016 |
| Sonic Hawaii Holdings, Inc. | July 14, 2008 |
| Sonic USA Holdings, Inc. | July 14, 2008 |
| MPL Holdings, Inc. | January 08, 2007 |
| AEL of Memphis, LLC | January 08, 2007 |
| Sonic Pathology Group, Inc. | August 12, 2015 |
| Connecticut Laboratory Partnership | December 22, 2016 |

(2)     It is understood and agreed that the Additional Named Insured(s) share in the applicable Limits of Liability set forth in ITEM 4 of the Declarations.

(3)     ITEM 3 of the Declarations shall be deemed amended to the extent necessary to effect the purpose and intent of this endorsement.


All other terms, conditions and limitations of the Policy shall remain unchanged.

ENDORSEMENT NO. 23

**DELETE ENDORSEMENT**

This Endorsement, which is effective at 12:01 a.m. on <u>February 13, 2018</u>, forms part of:

Policy No.    MFL-004062-0617
Issued by    Homeland Insurance Company of New York
Issued to    Sonic Healthcare Investments, G.P.

In consideration of the premium charged, Endorsement No.

22    HPE-00063-04-11    Additional Named Insured - Related to Original Named Insured

to this Policy is deleted in its entirety and shall be of no force or effect from and after the effective date of this Endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

## ADDITIONAL NAMED INSURED — RELATED TO ORIGINAL NAMED INSURED ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on <u>February 13, 2018</u>, forms part of:

Policy No.     MFL-004062-0617
Issued by     Homeland Insurance Company of New York
Issued to     Sonic Healthcare Investments, G.P.

In consideration of the premium charged:

(1)     The term "**Named Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include the entity(ies) scheduled below (each an "Additional Named Insured"), but solely:

    (a)     with respect to liability imposed or sought to be imposed on such Additional Named Insured that is based on or arises out of acts, errors or omissions committed or allegedly committed by such Additional Named Insured when and to the extent that, such Additional Named Insured is acting on behalf of, and within the capacity and scope of its duties for

       Sonic Healthcare Investments, G.P.

       ; and

    (b)     for **Wrongful Acts** happening on or after the Retroactive Date identified for each Additional Named Insured in the schedule below and **Occurrences** happening on or after the effective date of this endorsement:

SCHEDULE

| Additional Named Insured: | Retroactive Date: |
|---|---|
| Sonic Healthcare USA, Inc | February 05, 2007 |
| Sunrise Medical Laboratories, Inc | March 05, 1995 |
| Clinical Pathology Laboratories, Inc | October 01, 2000 |
| Mullins Pathology & Cytology Laboratory, Inc | April 30, 2007 |
| Woodbury Clincal Pathology, Inc | January 05, 1992 |
| Memphis Pathology Laboratory | January 07, 2007 |
| Clinical Laboratory Services, Inc | January 07, 2007 |
| Fairfax Medical Laboratories, Inc | June 19, 2006 |
| Pathology Laboratories, Inc dba Lima Pathology Laboratories | March 01, 1987 |
| Cognoscenti Health Institute, LLC | September 01, 2006 |
| DRL Labs, Ltd. Completely merged into Clinical Pathology as of 03/28/2003 | March 28, 2003 |
| American Esoteric Laboratories, Inc. Closed Lab in March 2007 - Continues as a holding company | TBD |

| Additional Named Insured: | Retroactive Date: |
|---|---|
| Piedmont Joint venture Laboratory, Inc | August 05, 2003 |
| American Clinical Services | February 01, 2004 |
| Clinical Pathology Laboratories Southwest, Inc | March 29, 2010 |
| Clinical Laboratories of Hawaii, LLP | August 01, 1985 |
| Pan Pacific Pathologists, LLC | August 01, 1985 |
| East Side Clinical Laboratory, Inc | June 30, 1990 |
| Physician's Automated Laboratory, Inc. | June 01, 1989 |
| CBLPath Holdings Corp | May 01, 2004 |
| CBLPath  Inc | July 01, 2004 |
| CBLPath Transport, Inc. | January 01, 2007 |
| Sonic Healthcare Limited | February 05, 2007 |
| Douglass Hanly Moir Pathology Pty Limited | February 05, 2007 |
| Sonic Healthcare Internatoinal Pty Ltd | February 05, 2007 |
| Sonic Healthcare Pathology Pty Ltd | February 05, 2007 |
| Sonic Reference Laboratory Inc | December 01, 2014 |
| Sonic Healthcare (Ireland) Limited (term date 06.30.2013) | August 01, 2010 |
| Medlab Pathology (term date 06.30.2013) | August 01, 2010 |
| Clinical Pathology Laboratories, Southeast, Inc | March 29, 2010 |
| Memphis Pathology Holdings, LLC | September 23, 2016 |
| BMHSI/AEL Microbiology Laboratory, GP | October 26, 2016 |
| Sonic Hawaii Holdings, Inc. | July 14, 2008 |
| Sonic USA Holdings, Inc. | July 14, 2008 |
| MPL Holdings, Inc. | January 08, 2007 |
| AEL of Memphis, LLC | January 08, 2007 |
| Sonic Pathology Group, Inc. | August 12, 2015 |
| Connecticut Laboratory Partnership, LLC | December 22, 2016 |

(2)     It is understood and agreed that the Additional Named Insured(s) share in the applicable Limits of Liability set forth in ITEM 4 of the Declarations.

(3)     ITEM 3 of the Declarations shall be deemed amended to the extent necessary to effect the purpose and intent of this endorsement.


All other terms, conditions and limitations of the Policy shall remain unchanged.

## NON-MEDICAL ERRORS AND OMISSIONS WITH RETROACTIVE DATE AND DEFENSE WITHIN LIMITS SUBLIMIT ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on <u>March 13, 2018</u>, forms part of

| | |
|---|---|
| Policy No. | MFL-004062-0617 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged of ▮▮▮▮, solely with respect to the coverage afforded under Section I INSURING AGREEMENTS (A) of this Policy:

(1)     The term "**Professional Services**," as defined in Section II DEFINITIONS (KK) of this Policy, is amended to include the following at the end thereof:

> (6)     <u>Laboratory-based testing of medical marijuana and manufactured medical marijuana products for content, contamination, and consistency pursuant to HRS 329D-8 but only when performed by AEOS Labs, Inc.,</u> which services are provided by the **Insured** on or after <u>03.13.2018</u> to others for a fee and require such **Insured's** specialized training, knowledge and skill.

(2)     No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any:

> (a)     **Professional Services Wrongful Act** committed or allegedly committed by an **Insured** prior to <u>03.13.2018</u> in the rendering of, or failure to render, **Professional Services**, as such term is defined in Section II DEFINITIONS (KK)(6) of this Policy;
>
> (b)     actual or alleged legal services provided by an **Insured** as a lawyer or a notary public;
>
> (c)     actual or alleged act, error or omission involving any architectural or engineering services;
>
> (d)     fee disputes;
>
> (e)     actual or alleged act, error, omission or assumption committed or allegedly committed by an **Insured** in the performance of, or failure to perform, actuarial services;
>
> (f)     actual or alleged inaccurate, inadequate, or incomplete description of the price of goods, products or services; or the **Insured's** cost guarantees, cost representations, contract price, or estimates of probable costs or cost estimates being exceeded;
>
> (g)     future royalties or future profits, restitution, or disgorgement of profits by any **Insured**; or

(h)     return or offset of fees, charges, or commissions for goods or services already provided or contracted to be provided.

(3)     Section III EXCLUSIONS (D)(15) of this Policy is amended to read in its entirety as follows:

(15)     liability of any **Insured** for **Managed Care Services**; except this EXCLUSION (D)(15) will not apply to liability of an **Insured** for **Professional Services**.  For purposes of this EXCLUSION (D)(15), the term "**Professional Services**" shall not include the definition ascribed to it in Section II DEFINITIONS (KK)(6) of this Policy;

(4)     In the event the **Insured** performs services in connection with any clinical trial, it is understood and agreed that, subject to the terms, conditions and limitations of this Policy, the coverage afforded under this Policy, if any, shall apply to any such clinical trial only if such clinical trial is performed in accordance with the United States Food and Drug Administration (FDA) protocols.

(5)     Notwithstanding anything to the contrary contained in this Policy, it is understood and agreed that, for the purposes of the coverage that may be provided under this endorsement, **Defense Expenses** are part of, and not in addition to, the Limits of Liability set forth in paragraph (6) below, and payment of **Defense Expenses** by the Underwriter will reduce, and may exhaust, such Limits of Liability.

(6)     Solely with respect to **Claims** for **Professional Services Wrongful Acts** committed or allegedly committed by an **Insured** in the rendering of, or failure to render, **Professional Services**, as such term is defined in Section II DEFINITIONS (KK)(6) of this Policy, it is understood and agreed that the Underwriter's maximum Limit of Liability for all **Loss** and **Defense Expenses** resulting from each such **Claim** shall be ███████, and the Underwriter's maximum aggregate Limit of Liability for all **Loss** and **Defense Expenses** resulting from all such **Claims** shall be ███████.  Such Limits of Liability shall be part of, and not in addition to, the "Aggregate for all Claims" Limit of Liability for INSURING AGREEMENT (A) of this Policy, as set forth in ITEM 4.A. of the Declarations.

(7)     This Policy shall be deemed amended to the extent necessary to effect the purpose and intent of this endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

# ENDORSEMENT NO. 26

## POLICY CHANGE ENDORSEMENT FOR ADMINISTRATIVE CHANGES

This Endorsement, which is effective at 12:01 a.m. on <u>April 09, 2018</u>, forms part of:

Policy No.     MFL-004062-0617
Issued by     Homeland Insurance Company of New York
Issued to     Sonic Healthcare Investments, G.P.

In consideration of the premium charged, the following item(s) on the Declarations to this Policy:

| [   ] | Policy Number |
| --- | --- |
| [   ] | ITEM 1. First Named Insured |
| [ X ] | ITEM 1. First Named Insured's Principal Address |
| [   ] | ITEM 2(a) Inception Date |
| [   ] | ITEM 2(b) Expiration Date |
| [   ] | ITEM 9. Policy Form and Endorsements Attached at Issuance |

is/are amended as follows:

12357-A Riata Trace Parkway, Suite 210
Austin, Texas 78727

Premium change for the above amendment(s):

[ X ] No change     [   ] Additional Premium $ <u>0</u>     [   ] Return Premium $ <u>0</u>

All other terms, conditions and limitations of this Policy shall remain unchanged.

# EXHIBIT 5



onebeaconhc.com

| RE: | Excess Medical Facilities Liability Coverage<br>Sonic Healthcare Investments, G.P. | Policy |
|---|---|---|
| 06.26.2017 | Account No: 34379    Policy No: MFX-002013-0617 | |

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

 © ISO Properties, Inc., 2004

INSURED
223

**Homeland Insurance Company of New York**
1000 Woodbury Road, Suite 403
Woodbury, NY 11797

**Policy Number:** MFX-002013-0617

# DECLARATIONS

## FOLLOW FORM EXCESS POLICY

**NOTICE: PORTIONS OF THIS POLICY APPLY ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE UNDERWRITER DURING THE POLICY PERIOD.** *PLEASE READ THIS POLICY CAREFULLY.*

| | |
|---|---|
| ITEM 1. | **NAMED INSURED**<br>Name and Principal Address:<br><br>Sonic Healthcare Investments, G.P.<br>9737 Great Hills Trl Ste 100<br>Austin, TX 78759-6449 |
| ITEM 2. | **POLICY PERIOD:**<br><br>(a) Inception Date: June 30, 2017<br>(b) Expiration Date: June 30, 2018<br>Both dates at 12:01 a.m. at the Principal Address in ITEM 1. |
| ITEM 3. | **LIMIT(S) OF LIABILITY** (subject to Section IV and inclusive of **Defense Expenses**):<br><br>██████ Per Claim<br>██████ Aggregate |

ITEM 4.  **UNDERLYING INSURANCE:**

| **Carrier** | **Policy Number** | **Limits of Liability** | **Coverage** |
|---|---|---|---|
| See Schedule of Underlying Insurance Endorsement | | | |

ITEM 5.  **PREMIUM:** ██████

☐ *Gross Premium:* **The Underwriter will pay a percentage of the Premium shown above as brokerage commission. The Underwriter does not pay contingent or deferred commissions. Consult your broker for information concerning commission.**

☒ *Net Premium:* **The Premium shown above is net, and the Underwriter will pay no brokerage commission of any kind thereon.**

N/A   This Policy provides coverage for acts of terrorism as defined in the Terrorism Risk Insurance Act in accordance with all the terms and conditions of this Policy (including all endorsements attached hereto). The premium attributable to this coverage is $0

X   This Policy specifically excludes coverage for acts of terrorism in accordance with all of the terms and conditions of this Policy (including all endorsements attached hereto).

| ITEM 6. | **ALL NOTICES REQUIRED TO BE GIVEN TO THE UNDERWRITER UNDER SECTION VIII OF THE POLICY MUST BE ADDRESSED TO:** |
|---|---|
| | Claims<br>OneBeacon Insurance<br>199 Scott Swamp Road<br>Farmington, CT 06032<br>obiclaims@onebeacon.com |

| ITEM 7. | **POLICY FORM AND ENDORSEMENTS ATTACHED AT ISSUANCE:** |
|---|---|
| PF-0008-05-07 | Follow Form Excess Policy |
| AMP-00008-10-15 | Service of Suit |
| HPL-X-0004 | Minimum Earned Premium |
| HPL-X-0006 | Mold, Mildew And Other Fungi Exclusion |
| HPL-X-0009 | Schedule of Underlying Insurance |
| HPL-X-0029FF-06-07 | Grace Period for Notice of Claims Upon Renewal of Policy |
| HPL-X-0037 | Pollution Exclusion |
| HPL-X-0107FF-03-09 | Not Follow Form Of Sublimited Coverage(s) |
| HPL-X-0122FF | Network Security and Privacy Exclusion |

These Declarations, the completed signed Application, and the Policy (together with any and all endorsements thereto) shall constitute the entire agreement between the Underwriter and the Insured(s).

**Homeland Insurance Company of New York**
By:

| | |
|---|---|
| _(signature)_ | 06.26.2017 |
| Its Authorized Representative | Date |

**THIS IS A CLAIMS MADE POLICY WHICH APPLIES ONLY TO ANY CLAIM FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD.  THE LIMITS OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY PAYMENT OF DEFENSE EXPENSES.**

## Homeland Insurance Company of New York

## FOLLOW FORM EXCESS POLICY

**In consideration of the payment of the premium, and in reliance on all statements made and information furnished to  Homeland Insurance Company of New York  (hereinafter called the "Underwriter") and to the Insurer(s) of the Underlying Insurance, and subject to all of the terms, conditions and endorsements of this Policy, the Underwriter and the Insured agree as follows:**

**I.    INSURING AGREEMENT**

(A)    The Underwriter shall provide the **Insured** with insurance excess of the **Underlying Insurance** set forth in ITEM 4 of the Declarations, provided that the **Underlying Insurance** also applies and has been exhausted by actual payment thereunder, or would apply but for the exhaustion of the applicable limit(s) of liability thereunder.

(B)    With respect to any coverage provided by the **Underlying Insurance** on a claims-made basis, this Policy applies only to **Claims** first made against the **Insured** during the **Policy Period**.  In all events, Professional Liability coverage shall be deemed to apply on a claims-made basis.

(C)    With respect to any coverage (other than Professional Liability coverage) provided by the **Underlying Insurance** on an occurrence basis, this Policy applies only to **Claims** arising out of an occurrence during the **Policy Period**.

(D    This Policy will apply in conformance with, and will follow the form of, the terms, conditions, agreements, exclusions, definitions and endorsements of the **Underlying Insurance,** except:

(1)    the Underwriter will have no obligation under this Policy with respect to any **Claim** that is settled without the Underwriter's written consent;

(2)    with respect to any provisions to the contrary contained in this Policy;

(3)    the applicable limit of liability of the **Underlying Insurance** shall be deemed to be reduced or exhausted solely as a result of payments for loss or damages (including costs, charges and expenses) that are covered under this Policy; and

(4)    the coverage provided by this Policy shall not be broader than any **Underlying Insurance** unless expressly provided herein, including any endorsement hereto.

(E)    The Underwriter will not have any obligation to make any payment hereunder unless and until the full amount of the applicable limit of liability of the **Underlying Insurance** has been paid by the issuer(s) of

the **Underlying Insurance,** the **Insured** or by another party on behalf, or for the benefit, of the **Insured** or the issuer(s) of the **Underlying Insurance**.

## II.  DEFINITIONS

(A)  "**Application**" means the application attached to and forming part of this Policy, including any materials submitted in connection with such application, all of which are on file with the Underwriter and are a part of the Policy, as if physically attached.

(B)  "**Claim**" has the meaning ascribed to it (or similar term) in the **Underlying Insurance**.

(C)  "**Defense Expenses**" has the meaning ascribed to it (or similar term) in the **Underlying Insurance**.

(D)  "**Insured**" means the persons or organizations insured under the **Underlying Insurance**.

(E)  "**Policy Period**" means the period from the inception date to the expiration date in ITEM 2 of the Declarations, or to any earlier cancellation date.

(F)  "**Primary Policy**" means the policy scheduled as such in ITEM 4 of the Declarations.

(G)  "**Underlying Insurance**" means all insurance policies or risk transfer instruments (including, but not limited to, self-insured retentions or other alternative arrangements) scheduled in ITEM 4 of the Declarations and any policies or risk transfer arrangements renewing or replacing them.

## III.  UNDERLYING INSURANCE

(A)  All of the **Underlying Insurance** scheduled in ITEM 4 of the Declarations shall be maintained during the **Policy Period** in full force and effect, except for any reduction of the limits of liability available under the **Underlying Insurance** solely by reason of actual payment of **Claims** or losses thereunder.  Subject at all times to clause (D) of this SECTION III, this Policy shall not be invalidated solely by reason of any failure of the **Insured** to comply with the foregoing, but under no circumstances shall the Underwriter be liable under this Policy earlier, or to any greater extent, than it would have been if the **Insured** had complied with this provision.

(B)  Without prejudice to any rights of the Underwriter, in the event of any actual or alleged (1) failure by the **Insured** to give any notice or to exercise any extensions under any **Underlying Insurance**, or (2) misrepresentation or breach of warranty by the **Insured** with respect to any **Underlying Insurance**, the Underwriter will not be liable under this Policy earlier or to any greater extent than it would have been in the absence of such actual or alleged failure, misrepresentation or breach of warranty.

(C)  No amendment or modification to any **Underlying Insurance** shall be binding upon the Underwriter or effective in extending the coverage or limits of liability afforded by this Policy without the express written agreement of the Underwriter.

(D)  Notwithstanding anything to the contrary contained in this Policy, this Policy shall terminate immediately upon the rescission of any **Underlying Insurance**.

## IV.  LIMIT OF LIABILITY

The amount stated in ITEM 3 of the Declarations is the limit of the Underwriter's liability under this Policy, and shall be the maximum amount, including **Defense Expenses**, payable by the Underwriter under this Policy. The limit of liability available to pay damages or settlements shall be reduced, and may be exhausted, by the payment of **Defense Expenses.**

## V.     DEFENSE EXPENSES AND SETTLEMENTS

In the event a **Claim** is made which involves the coverage afforded by this Policy, no **Defense Expenses** shall be incurred without the Underwriter's prior written consent, which consent shall not be unreasonably withheld.

The **Insured** shall not admit liability for, or settle or offer to settle any **Claim** for, any amount that would involve the coverage afforded by this Policy without the Underwriter's prior written consent.

## VI.    CLAIM PARTICIPATION

The Underwriter may, at its sole discretion, elect to associate in the investigation, settlement or defense of any **Claim** against the **Insured,** even if the **Underlying Insurance** has not been exhausted.  If the Underwriter so elects, the **Insured** will cooperate with the Underwriter and will make available all such information and records as the Underwriter may reasonably require.

## VII.   SUBROGATION AND RECOVERIES

In the event of any payment under this Policy, the Underwriter will be subrogated to all the **Insured's** rights of recovery against any person or entity, and the **Insured** shall execute and deliver all instruments and papers and do whatever else is necessary to secure such rights. The **Insured** shall do nothing that may prejudice the Underwriter's position or potential or actual right of recovery. The obligations of the **Insured** under this provision shall survive the expiration or termination of this Policy. The expenses of all such recovery proceedings shall be first subtracted from the amount of any recovery and the remaining amount so recovered shall be apportioned in the inverse order of payment to the extent of actual payment.

## VIII.  NOTICE

As a condition precedent to any right to payment of the **Insured** under this Policy, and in accordance with ITEM 6 of the Declarations, the **Insured** shall give the Underwriter's Claims Department written notice of:

(A)     any **Claim** under the **Underlying Insurance** as soon as possible, and in any event within the time period set forth by the **Underlying Insurance** with respect to notice of **Claims**; and

(B)     any matter with respect to which notice has been provided under any **Underlying Insurance.**

With respect to Underlying Insurance written on a claims-made basis, if the **Insured** exercises the right under the **Underlying Insurance** to report a Notice of Circumstance (as defined below), then the **Insured** must also report such Notice of Circumstance to the Underwriter prior to the expiration of the **Policy Period**, and in such event any **Claim** that subsequently may arise out of such circumstance shall be deemed to have been made during the **Policy Period** in which such Notice of Circumstance first was reported.

As used herein, the term "Notice of Circumstance" means written notice of specific facts or circumstances of which the **Insured** becomes aware during the **Policy Period** that may subsequently give rise to a **Claim**.

**IX.     ALTERATION**

No change in or modification of this Policy shall be effective unless made by endorsement signed by an authorized employee or agent of the Underwriter.

**X.      POLICY TERMINATION**

(A)     The **Insured** may cancel this Policy at any time by delivering by hand delivery or overnight mail service or by mailing registered, certified or other first-class mail, written notice stating when thereafter such cancellation is to be effective.

(B)     The Underwriter may cancel this Policy only in accordance with the terms and conditions of the **Underlying Insurance**.

(C)     The Underwriter will refund any unearned premium computed at its customary short rate if the Policy is canceled by the **Insured.**  Under all other circumstances, any unearned premium shall be computed pro rata.

(D)     The Underwriter will have no obligation to renew this Policy upon its expiration.

**XI.     REPRESENTATIONS; SEVERABILITY**

The **Insured** represents that the particulars and statements contained in the **Application** are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and to constitute a part of this Policy, are the basis of this Policy.  No knowledge or information possessed by any **Insured** will be imputed to any other **Insured** except for material facts or information known to the person or persons who signed the **Application**. In the event that any of the particulars or statements in the **Application** is untrue, this Policy will be void with respect to any **Insured** who knew of such untruth or to whom such knowledge is imputed.

**XII.    AUTHORIZATION AND NOTICES**

The person or entity first named in ITEM 1 of the Declarations shall be the sole agent, and shall act on behalf, of the **Insured** with respect to all matters under this Policy, including but not limited to giving and receiving notices and other communications, effecting or accepting any endorsements to or notice of cancellation of this Policy, the payment of premium and the receipt of any return premiums.


**In Witness Whereof, the Underwriter has caused this Policy to be executed by its authorized officers.**

ENDORSEMENT NO. 1

# SERVICE OF SUIT ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of:

| | |
|---|---|
| Policy No. | MFX-002013-0617 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged:

(1)     We designate and authorize the following person as our agent for service of process for any proceeding brought by or on behalf of the insured, or any beneficiary under this policy, and arising out of this policy of insurance.  Such service of process must be made by certified mail return receipt requested to:

> General Counsel
> OneBeacon Insurance Group - Legal Department
> 605 North Highway 169
> Suite 800
> Plymouth, MN 55441

(2)     If required by applicable statute, we also designate the Superintendent, Commissioner or Director of Insurance, or other officer or individual specified in the law of the jurisdiction in which this policy is issued, to receive on our behalf service of process for any proceeding brought by or on behalf of the insured, or any beneficiary under this policy, and arising out of this policy of insurance.  We authorize the Superintendent, Commissioner, Director or other officer or individual upon whom service is made to mail a copy of the process to the person identified in Paragraph 1. above.

(3)     In Rhode Island, we also designate and authorize the following person as our agent for service of process for any proceeding brought by or on behalf of the insured, or any beneficiary under this policy, and arising out of this policy of insurance:

> Sherry A. Goldin
> 10 Weybosset Street
> Providence, Rhode Island 02903

(4)     In Oregon, service of process for any proceeding brought by or on behalf of the insured, or any beneficiary under this policy, and arising out of this policy of insurance may be made upon the insurance producer in the courts for the county where the insurance producer who registered or delivered the policy resides or transacts business.

(5)     By agreeing to the service of process provisions above, we do not waive our right to commence an action in any court of competent jurisdiction in the United States, remove an action to a United States District Court or seek a transfer of a case to another court as permitted by the laws of the United States or of any state within the United States.

As used above, the word "insured" means any person or organization qualifying as an insured under the policy, and the words "we" and "our" refer to the company providing this insurance.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 2

## HEALTHCARE EXCESS INDEMNITY POLICY
## MINIMUM EARNED PREMIUM ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of:

Policy No.    MFX-002013-0617
Issued by    Homeland Insurance Company of New York
Issued to    Sonic Healthcare Investments, G.P.


In consideration of the premium charged:

It is understood and agreed that, for all purposes under the Policy, premium in the amount of $▮▮▮▮▮▮_____ will be deemed fully earned as of the Inception Date set forth in Item 2(a) of the Declarations.


All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 3

## HEALTHCARE EXCESS INDEMNITY POLICY
## MOLD, MILDEW AND OTHER FUNGI EXCLUSION

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of:

Policy No.     MFX-002013-0617
Issued by      Homeland Insurance Company of New York
Issued to      Sonic Healthcare Investments, G.P.

In consideration of the premium charged:

(1)    No coverage will be available under this Policy for

(a)    Claims for Bodily Injury, Property Damage, Personal Injury or Advertising Injury based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving exposure to, or the manifestation, release, dispersal, seepage, migration, discharge, appearance, presence, reproduction or growth of, mold, mildew, spores, mycotoxins, fungi, organic pathogens or other micro organisms of any type, nature or description whatsoever;

(b)    any cost, expense or charge to test for, monitor, clean up, remediate, mitigate, remove, contain, treat, detoxify, neutralize, rehabilitate, or in any other way respond to or assess the effect(s) of mold, mildew, spores, mycotoxins, fungi, organic pathogens or other micro organisms of any type, nature or description whatsoever; or

(c)    any cost, expense, charge, fine or penalty incurred, sustained or imposed by order, direction, request or agreement of any court, governmental agency, regulatory body or civil, public or military authority in connection with or in any way relating to mold, mildew, spores, mycotoxins, fungi, organic pathogens or other micro organisms of any type, nature or description whatsoever;

provided, however, that this exclusion shall not apply to any Claim based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the Insured's use of mold, mildew, spores, mycotoxins, fungi, organic pathogens or other micro organisms of any type, nature or description whatsoever in connection with the rendering of Medical Services, including medical research activities.

(2)    For the purposes of this endorsement:

(i)    "Advertising Injury" means injury arising out of one or more of the following offenses:

(a)    oral or written publication of material that slanders or libels a person or an organization or disparages a person's or an organization's goods, products or services;

(b)    oral or written publication of material that violates a person's right of privacy; or

(c)    misappropriation of advertising ideas or style of doing business.

(ii)    "Bodily Injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time; mental anguish; and mental injury.

(iii)    "Medical Services" means health care, medical care, or treatment provided to any individual.

(iv)    "Personal Injury" means injury, other than Bodily Injury, arising out of one or more of the following

offenses:

(a)  false arrest, detention or imprisonment;

(b)  malicious prosecution;

(c)  the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

(d)  oral or written publication of material that slanders or libels a person or an organization or disparages a person's or an organization's goods, products or services; or

(e)  oral or written publication of material that violates a person's right of privacy.

(v)  "Property Damage" means

(a)  physical injury to tangible property, including all resulting loss of use of that property; provided, that such loss of use shall be deemed to have occurred at the time of the physical injury that caused it; or

(b)  loss of use of tangible property that is not physically injured; provided, that such loss of use shall be deemed to occur at the time of the occurrence that caused it.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 4

## HEALTHCARE EXCESS INDEMNITY POLICY
## SCHEDULE OF UNDERLYING INSURANCE ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of:

| | |
|---|---|
| Policy No. | MFX-002013-0617 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged:

The term "Underlying Insurance," as used in the Policy shall mean the following:

| Carrier | Policy# | Limit | | Coverage |
|---|---|---|---|---|
| A OneBeacon Company | MFL-004062-0617 | ████████ | Each Claim | Professional Liability |
| | | ████████ | Aggregate | |

All other terms, conditions and limitations of this Policy shall remain unchanged.

## GRACE PERIOD FOR NOTICE OF CLAIMS UPON RENEWAL OF POLICY

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of:

| | |
|---|---|
| Policy No. | MFX-002013-0617 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged, in the event that this Policy is renewed by the Underwriter:

1. Clause (A) of Section VIII, NOTICE, of this Policy is amended to read in its entirety as follows:

    (A) any **Claim** under the **Underlying Insurance** as soon as possible, but in no event later than sixty (60) days after the expiration date set forth in ITEM 2(b) of the Declarations; and

2. The penultimate paragraph of Section VIII, NOTICE, of this Policy is amended to read in its entirety as follows:

    With respect to **Underlying Insurance** written on a claims-made basis, if the **Insured** exercises a right under the **Underlying Insurance** to provide Notice of Circumstance (as defined below), then the **Insured** must also provide such Notice of Circumstance to the Underwriter as soon as possible, but in no event later than sixty (60) days after the expiration date set forth in ITEM 2(b) of the Declarations, and in such event any **Claim** that subsequently may arise out of such circumstance shall be deemed to have been made during the **Policy Period**.

It is understood and agreed that the amendments set forth above shall apply *only* in the event this Policy is renewed by the Underwriter.  In the event that this Policy is not renewed by the Underwriter, Clause (A) of Section VIII, NOTICE, of this Policy shall remain unchanged, such that as a condition precedent to any right to payment of the **Insured** under this Policy, the **Insured** shall give the Underwriter written notice of any **Claim** under the **Underlying Insurance** as soon as possible, and in any event within the time period set forth by the **Underlying Insurance** with respect to notice of **Claims**.

No other provision of Section VIII, NOTICE of this Policy shall be deemed or construed to have been modified or amended in any way by reason of this endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

## HEALTHCARE EXCESS INDEMNITY POLICY
## POLLUTION EXCLUSION

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of:

| | |
|---|---|
| Policy No. | MFX-002013-0617 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged:

1. No coverage will be available under this Policy for any Claim based on, arising out of, directly or indirectly resulting from, or in any way involving any:

   (a) actual or alleged exposure to, or generation, storage, manifestation, transportation, discharge, emission, release, dispersal, seepage, migration, escape, appearance, presence, reproduction, growth, treatment, removal or disposal of, any Pollutant, except where such exposure, generation, storage, manifestation, transportation, discharge, emission, release, dispersal, seepage, migration, escape, appearance, presence, reproduction, growth, treatment, removal or disposal was caused by an unintentional fire or any heat, smoke or fumes issuing from such unintentional fire;

   (b) fee, cost, expense or charge to test for, monitor, clean up, remediate, mitigate, remove, contain, treat, detoxify, neutralize or rehabilitate any Pollutant;

   (c) fee, cost, expense, charge, fine or penalty incurred, sustained or imposed by order, direction, request or agreement of any court, governmental agency, regulatory body or civil, public or military authority in connection with or in any way relating to any Pollutant;

   except this exclusion will not apply to any Claim for Bodily Injury or Property Damage caused by heat, smoke or fumes from a Hostile Fire.

2. For the purposes of this endorsement:

   (a) The terms Bodily Injury and Property Damage shall have the meanings ascribed to them in the Underlying Insurance;

   (b) the term "Pollutant" means smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, medical waste, waste materials (including materials which are intended to be or have been recycled, reconditioned or reclaimed) or other irritants, pollutants or contaminants.  Pollutant does not include smoke, fumes, vapor or soot emanating from equipment used to heat or cool a building owned or operated by the Named Insured; and

   (c) the term "Hostile Fire" means a fire which becomes uncontrollable or breaks out from where it was intended to be contained; provided, that Hostile Fire does not include any fire that originates at any site operating as a waste disposal facility or waste storage facility.

All other terms, conditions and limitations of the Policy shall remain unchanged.

## NOT FOLLOW FORM OF SUBLIMITED COVERAGE(S) ENDORSEMENT
## (RECOGNITION OF UNDERLYING EROSION)

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2017</u>, forms part of:

| | |
|---|---|
| Policy No. | MFX-002013-0617 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged:

(1)    It is understood and agreed that notwithstanding any provision to the contrary in this Policy, no coverage will be available under this Policy for any **Claim** which is subject to a **Sublimit** (as defined below) in any **Underlying Insurance**.

(2)    Notwithstanding Section I INSURING AGREEMENT (D)(3) of this Policy and solely with respect to **Claims** which are subject to a **Sublimit** in any **Underlying Insurance**, for purposes of determining when coverage afforded under this Policy shall attach, it is understood and agreed that the applicable limit(s) of liability of any **Underlying Insurance** shall be deemed to have been reduced, and may be exhausted, by the payment of loss or damages (including **Defense Expenses**) in connection with any such **Claim**.

(3)    For purposes of this endorsement, the term "**Sublimit**" means any limit of liability of any **Underlying Insurance** which:

    (a)    applies only to a particular grant of coverage under such **Underlying Insurance**, and

    (b)    is part of, and not in addition to the otherwise applicable limits of liability of such **Underlying Insurance**.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 8

## NETWORK SECURITY AND PRIVACY EXCLUSION

This Endorsement, which is effective at 12:01 a.m. on <u>June 30, 2017,</u> forms part of:

| | |
|---|---|
| Policy No. | MFX-002013-0617 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged:

(1) No coverage will be available under this Policy for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(a) unauthorized, unlawful, or unintentional taking, obtaining, accessing, using, disclosing, distributing, disseminating, transmitting, gathering, collecting, acquiring, corrupting, damaging, destroying, deleting, or impairing of any information or data of any kind, including but not limited to any **Personally Identifiable Information**;

(b) failure or inability of any computer, computer component (including but not limited to any hardware, network, terminal device, data storage device, input and output device, or back up facility), application, program, software, code, or script of any kind (a "System") to perform or function as planned or intended, including but not limited to any failure or inability of any System to prevent any hack, virus, contaminant, worm, trojan horse, logic bomb, or unauthorized or unintended accessing or use involving any System; or

(c) creation, development, design, manufacture, programming, leasing, licensing, distribution, assembly, installation, alteration, modification, or sale of any computer, computer component (including but not limited to any hardware, network, terminal device, data storage device, input and output device, or back up facility), application, program, software, code, script, or data of any kind.

(2) For the purposes of this endorsement, the term "**Personally Identifiable Information**" means a natural person's name used in combination with one or more of the following:

(a) health care or other medical information, including "protected health information" as defined in the Health Insurance Portability and Accountability Act of 1996, as amended, or any rules or regulations promulgated thereunder;

(b) "non-public personal information" as defined in the Gramm-Leach Bliley Act of 1999, as amended, or any rules or regulations promulgated thereunder;

(c) social security, driver's license, or other state identification numbers or credit, debit, or other financial account numbers with their related security and access codes, passwords or pin numbers that provide access to the natural person's financial account information; or

HPL-X-0122FF (10/14 ed.)                                                                 Page 1 of 2

239

(d)     any other non-public personally identifiable information protected under any federal, state or local statutory or common law or any rules or regulations promulgated thereunder.

**Personally Identifiable Information** does not include information that is lawfully available to the general public, including but not limited to information from any federal, state or local governmental or regulatory agency or entity.

All other terms, conditions and limitations of this Policy shall remain unchanged.

HPL-X-0122FF (10/14 ed.)                                                                 Page 2 of 2

240

ENDORSEMENT NO. 9

## HEALTHCARE EXCESS INDEMNITY POLICY
## AMEND ITEM 1 OF DECLARATIONS

This Endorsement, which is effective at 12:01 a.m. on <u>April 09, 2018,</u> forms part of:

| | |
|---|---|
| Policy No. | MFX-002013-0617 |
| Issued by | Homeland Insurance Company of New York |
| Issued to | Sonic Healthcare Investments, G.P. |

In consideration of the premium charged:

Item 1. of the Declarations is amended to read in its entirety as follows:

ITEM 1. **NAMED INSURED**
Name and Principle Address:


Sonic Healthcare Investments, G.P.
12357-A Riata Trace Parkway, Suite 210
Austin, TX  78727



All other terms, conditions and limitations of this Policy shall remain unchanged.