## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | |
|---|---|
| HOMELAND INSURANCE COMPANY OF NEW YORK, <br><br>      Plaintiff, <br><br> v. <br><br> CLINICAL PATHOLOGY LABORATORIES, INC., AND SONIC HEALTHCARE USA, INC., <br><br>      Defendants. | CIVIL ACTION NO.: 1-20-cv-783 |

## **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................... 3

    I.  CPL Participates in the Irish CervicalCheck Screening Program From 2010 to 2013.... 3

    II.  Defendants Purchase Continuous and Uninterrupted Coverage From Homeland; After Homeland Denies Coverage for the Ms. O I Claim, CPL Bargains for a Worldwide Territory Endorsement. .......................................................................................... 4

    III.  The Distinct and Different 2016 and 2017 Policies, Which May Only be Altered by Endorsement and Include Standard Misrepresentation Provisions................................. 5

    IV.  CPL Notifies Homeland of the Irish CervicalCheck Claims; Homeland Quickly Retains Outside Counsel and Purports to Investigate Coverage for the Claims.......................... 6

    V.  Homeland Asserts a Misrepresentation Defense After a Two-and-a-Half-Year Investigation, But Waives the Defense by Failing to Provide § 705.005 Notice. .......... 7

ARGUMENT ........................................................................................................................ 8

    I.  Homeland's Warranty and Reformation Claims Fail as a Matter of Law Because, Even After Repleading, Homeland Cannot Establish That the 2016 Letter Was Incorporated Into the Policies........................................................................................................ 8

        A.  This Court Already Correctly Held That the 2017 Policy Did Not Incorporate the 2016 Letter—and Nothing Has Changed.................................................................. 9

        B.  The Absence of Incorporation Language Was Not a Mistake, so Homeland's Reformation Claim Still Fails as a Matter of Law.................................................... 11

    II.  Homeland's Warranty Claim Fails as a Matter of Law for Additional Reasons. .......... 15

        A.  Homeland's Warranty Claim Fails Because the 2016 Letter Contains "Representations" and Not "Warranties." ..................................................................... 15

        B.  Homeland's Breach of Warranty Claim Also Fails Because Homeland Did Not Comply With its Statutory Notice Obligations...................................................... 16

    III.  Homeland's Promissory Estoppel Claim Fails as a Matter of Law. .............................. 18

    IV.  Several of Homeland's Contract Defenses Fail as a Matter of Law.............................. 20

        A.  The Prior Notice Exclusion Does Not Apply Because MedLab's Notice to Vero Does Not Trigger the Exclusion. ........................................................................... 20

        B.  Homeland's Prior Knowledge Defense Fails Because Homeland Does Not Allege CPL Should Have Known About the ICC Claims Before June 30, 2013. .............. 21

        C.  Homeland's Misrepresentation Defense Fails as a Matter of Law......................... 22

    V.  Defense Costs Incurred in the ICC Claims Do Not Erode the 2017 Policy's Limit...... 23

CONCLUSION..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albritton Props. v. Am. Empire*,
    No. 3:04-cv-2531, 2005 WL 975423 (N.D. Tex. April 25, 2005)..........................................23

*American Equip. Co. v. Turner Bros.*,
    No. 4:13-cv-2011, 2014 WL 3543720 (S.D. Tex. July 14, 2014) ..........................................23

*Balandran v. Safeco Ins.Co.*,
    972 S.W.2d 738 (Tex. 1998)..................................................................................................24

*BBX v. Am. Fluorite*,
    No. 09-19-00278-CV, 2021 WL 3196514 (Tex. App.—Beaumont July 29,
    2021, no pet. h.) ....................................................................................................................19

*Brookshire v. Bomer*,
    959 S.W.2d 673 (Tex. App.—Austin 1997, pet. denied)........................................................14

*Cherokee Water v. Forderhause*,
    741 S.W.2d 377 (Tex. 1987).............................................................................................12, 14

*Comiskey v. FH Partners*,
    373 S.W.3d 620 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) .................................14

*Doctors Hosp. v. Sambuca*,
    154 S.W.3d 634 (Tex. App.—Houston [14th Dist.] 2004, pet. abated) .................................19

*Doe Run v. Am. Guar.*,
    No. 10SL-CC01716, 2011 WL 13103983 (Mo. Cir. Nov. 07, 2011)....................................21

*Drought v. State Farm*,
    No. 07-cv-0068, 2009 WL 10701920 (W.D. Tex. Jan. 7, 2009) ............................................11

*Enserch Corp. v. Shand Morahan & Co.*,
    952 F.2d 1485 (5th Cir. 1992) ..............................................................................................16

*Exxon Mobil Corp. v. Ins. Co. of State*,
    568 S.W.3d 650 (Tex. 2019).............................................................................................10, 11

*Hall's Aero Spraying v. Underwriters at Lloyd's*,
    274 F.2d 527, 529 (5th Cir. 1960) ........................................................................................16

*Hardy v. Bennefield*,
    368 S.W.3d 643 (Tex. App.—Tyler 2012, no pet.) ...............................................................12

*Hoover Panel v. HAT*,
    819 F. App'x 190 (5th Cir. 2020) ...........................................................................18

*In re Deepwater Horizon*,
    470 S.W.3d 452, 460 (Tex. 2015).............................................................................9

*Ironshore Specialty Ins. v. Aspen Underwriting*,
    788 F.3d 456 (5th Cir. 2015) ....................................................................................9

*Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co.*,
    20 S.W.3d 692 (Tex. 2000)......................................................................................23

*Koral Indus. v. Sec.-Connecticut Life Ins.*,
    788 S.W.2d 136 (Tex. App.—Dallas 1990), writ denied sub nom.,
    802 S.W.2d 650 (Tex. 1990)....................................................................................17

*LasikPlus v. Mattioli*,
    418 S.W.3d 210 (Tex. App.—Houston [14th Dist.] 2013, no pet.).........................14

*Materials v. Mid-Continent Ins.*,
    519 F. App'x 228 (5th Cir. 2013) ............................................................................11

*Myers v. Mega Life*,
    No. 07-06-0233-cv, 2008 WL 1758640 (Tex. App.—Amarillo Apr. 17, 2008,
    pet. denied)..............................................................................................................17

*Nat'l Union Fire Ins. Co. v. CNA Ins. Cos.*,
    28 F.3d 29 (5th Cir. 1994) .......................................................................................24

*Nat'l Union Fire Ins. v. Clemtex*,
    807 S.W.2d 824 (Tex. App.—Houston [14th Dist.] 1991, writ denied)..................14

*Nat'l Union v. Hudson Energy*,
    811 S.W.2d 552 (Tex. 1991)...............................................................................20, 25

*Pathfinder v. Great W.*,
    574 S.W.3d 882 (Tex. 2019)....................................................................................15

*Qiuhong Liu v. Fid. & Guar. Life Ins. Co.*,
    No. 4:05-cv-313, 2006 WL 8441422 (E.D. Tex. June 28, 2006), *aff'd*,
    282 F. App'x 304 (5th Cir. 2008) ............................................................................16

*Qiuhong v. Fid. & Guar.*,
    282 F. App'x 304 (5th Cir. 2008) ............................................................................15

*Riner v. Allstate Life Ins.*,
    131 F.3d 530 (5th Cir. 1997) ...................................................................................15

*St. Paul Lloyd's Ins. Co. v. Fong Chun Huang*,
  808 S.W.2d 524, 527 (Tex. App.—Houston [14th Dist.] 1991, writ denied)..........................12

*S. Farm Bureau Cas. Ins. Co. v. Adams*,
  570 S.W.2d 567 (Tex. Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.) ............................24

*Thompson v. Diamond State Ins.*,
  No. 06-cv-154, 2008 WL 11344903 (E.D. Tex. May 2, 2008) ...............................................17

*Thompson v. Geico*,
  527 S.W.3d 641 (Tex. App.—Houston [14th Dist.] 2017, no pet.)........................................15

*Tremble v. Wells Fargo*,
  478 F. App'x 164 (5th Cir. 2012) ........................................................................................19

*Underwriters at Lloyd's v. Turtle Creek Partnership*,
  716 F. Supp. 2d 633 (S.D. Tex. 2010) ................................................................................16

*Vela Wood v. Associated Indus.*,
  485 F. Supp. 3d 704 (N.D. Tex. 2020) ................................................................................11

*Walbrook Ins. v. Spiegel*,
  No. 91-cv-1206, 1993 WL 580759 (C.D. Cal. Aug. 6, 1993) ..................................................9

*Wallingford Grp. v. Arch Ins.*,
  No. 18-cv-00946, 2020 WL 4464629 (D. Conn. May 11, 2020) ........................................9, 10

*Webb v. Reynolds*,
  949 S.W.2d 364 (Tex. App.—San Antonio 1997, no writ) ...................................................14

## Statutes

Texas Insurance Code § 705.005 ........................................................................... *passim*

## Other Authorities

1-1 New Appleman Law of Liability Insurance § 1.05 .......................................................24

Defendants Clinical Pathology Laboratories, Inc. ("CPL") and Sonic Healthcare USA, Inc. ("SHUSA") move for summary judgment on all claims and several defenses asserted by Plaintiff Homeland Insurance Co. of New York ("Homeland") in its Second Amended Complaint.

## PRELIMINARY STATEMENT

This case is nothing more than a typical insurance coverage dispute, and this Court has the opportunity to make that clear by dismissing, once and for all, Homeland's meritless affirmative claims and several of its misguided defenses.  Doing so will further streamline this case and propel it toward resolution by aligning it more closely with what it really is—an insurance case where CPL seeks the benefit of coverage it purchased from Homeland and statutory relief for Homeland's bad faith handling of its claim.

Having now filed its Second Amended Complaint [Dkt. 56], Homeland has had every opportunity to allege legally plausible affirmative claims—but it has none.  As the Court knows from Defendants' motions to dismiss, Homeland has tried mightily to craft affirmative claims out of its primary defense, which is that CPL is not entitled to coverage under the 2017 Policy because of alleged misrepresentations in the 2016 Letter.[1]  That defense fails as a matter of law, and it is certainly no basis for affirmative claims.  The Court has recognized as much already, dismissing Homeland's affirmative claims for breach of warranty, reformation, and negligent misrepresentation.  Noting the liberal bias in favor of the amendment of pleadings, the Court allowed Homeland an opportunity to replead its first two claims, and Homeland has since added to this contract case a "quasi-contract" claim for promissory estoppel.  Yet, Homeland's pleading deficiencies remain, and these claims should now be dismissed with prejudice as a matter of law for several independent reasons.

---

[1] All undefined capitalized terms are defined in the Court's Amended Order on Defs.' Motion to Dismiss [Dkt. 55].

The primary flaw in Homeland's theories is unchanged—the 2016 Letter wasn't incorporated into the 2017 Policy, so any misrepresentations in the letter are contractually irrelevant.  The Court properly held there was no incorporation here because Homeland did not bargain for language in the 2017 Policy incorporating materials submitted with prior applications, like the letter.  Nothing has changed there.  Homeland's new allegations do not fix the problem because they center on the 2016 Policy and extrinsic evidence regarding the negotiation of the 2016 Policy, but under Texas law the analysis starts and stops with the language of the 2017 Policy.  As the Court has already held, Homeland's breach of warranty claim fails for this reason alone.  These new allegations also do not save Homeland's reformation claim because there is no evidence (or allegation) that the parties agreed to endorse the 2017 Policy with the letter.

Even setting aside the incorporation issue, Homeland's warranty claim fails for additional, independent reasons.  First, the 2016 Letter—on its face and by its text—contains representations and not warranties.  Second, Homeland did not comply with Texas Insurance Code § 705.005, which requires insurers to notify their insureds of their intent to disclaim coverage within 90 days of discovering an alleged false representation.  Texas' statute is unique—California has nothing similar, for example—and an insurer's failure to comply defeats any claim where the insurer seeks to escape its coverage obligations based on an alleged misrepresentation, as Homeland does through its warranty claim (and its promissory estoppel claim and its misrepresentation defense).

Homeland's promissory estoppel claim fails before even getting to the notice issue.  Promissory estoppel is a quasi-contractual claim, meaning it does not apply in a case like this where the parties' dispute is governed by valid and enforceable contracts (the insurance policies).

 With Homeland's claims set aside, the Court may turn to Homeland's defenses, several of which fail as a matter of law and can be disposed of now.  First, Homeland cannot invoke the prior

notice exclusion based on notice from a different insured (MedLab) to a different insurer.  MedLab is not covered by the 2017 Policy for liability arising out of the Irish CervicalCheck program and therefore its notice does not trigger the exclusion.  Second, Homeland cannot invoke the prior knowledge exclusion because this defense centers on what CPL knew before June 30, 2013—and Homeland does not allege that CPL knew about the ICC Claims before that date.  Third, Homeland's misrepresentation defense fails because of the incorporation issue described above and because Homeland did not comply with its statutory notice obligations.[2]

Finally, if Homeland cannot defeat coverage entirely, it seeks to limit what it owes by arguing that defense costs incurred in the ICC Claims count against the 2017 Policy's limit.  That argument is incorrect per the language of the policy, which says the exact opposite.

In sum, Defendants bring this motion to streamline this case and to align it more closely with the typical insurance dispute that it is.  The Court has already whittled Homeland's case down, dismissing with prejudice three defendants and Homeland's negligent misrepresentation claim. Defendants respectfully submit that, under Texas law and the language of the policies, the Court may go further and dismiss the remainder of Homeland's claims and its primary defenses, while also issuing a ruling that the policies cover defense costs in addition to limits.

## FACTUAL BACKGROUND

## I.    CPL Participates in the Irish CervicalCheck Screening Program From 2010 to 2013.

CPL is an Austin-based provider of medical laboratory services.[3]  From 2010 to 2013, CPL provided such services in relation to Ireland's CervicalCheck program.[4]  CPL's job under the program was to screen pap smear slides for signs of cancer.[5]

---

[2] Because these three defenses fail, so does Homeland's declaratory judgment claim, as it hinges on those defenses.

[3] *See* Pl.'s Second Am. Compl. ¶¶ 5, 19 [Dkt. 56].

[4] *See id.* ¶ 19.

[5] *See id.*

II.    **Defendants Purchase Continuous and Uninterrupted Coverage From Homeland; After Homeland Denies Coverage for the Ms. O I Claim, CPL Bargains for a Worldwide Territory Endorsement.**

To protect themselves from a broad range of risks, Defendants and certain of their affiliates (the "insureds") purchased continuous and uninterrupted medical professional liability insurance from Homeland to cover annual periods between June 30, 2013 and June 30, 2018.[6]

In 2015, the survivors of Ms. O I, a CervicalCheck patient, sued CPL and other entities in Ireland for, among other things, medical negligence.[7] Yet Homeland denied CPL's request for coverage of this claim because the policy in-force at that time only covered claims made in the United States, Puerto Rico, or Canada.[8] After learning that fact, Defendants sought to secure worldwide coverage from Homeland starting with the 2016-17 policy period so that if similar claims arose in the future, they would be covered.[9] Homeland agreed to provide such coverage by issuing a Worldwide Territory Endorsement, which extended coverage for claims made abroad to domestic insureds.[10] It did not, however, extend coverage for international insureds, like MedLab, an affiliated Irish company who also participated in the CervicalCheck program.[11]

Homeland alleges that it required CPL to execute the 2016 Letter before it agreed to issue the Worldwide Territory Endorsement.[12] The 2016 Letter is dated July 27, 2016 and begins with the following statement—"The undersigned, on behalf of Sonic and any person proposed for coverage (the insureds) does hereby ***represent*** to OneBeacon Insurance and its writing company that"—and it goes on to provide that CPL's former President was, after a diligent inquiry:

---

[6] *See id.* ¶¶ 40, 54, 60; Van Houten Decl. ¶ 5, Ex. A-1 (Oct. 4, 2021) (filed contemporaneously with this motion).

[7] *See* Pl.'s Second Am. Compl. ¶¶ 42–49 [Dkt. 56].

[8] *See id.* ¶¶ 46, 52.

[9] *See id.* ¶ 53.

[10] *See id.* ¶ 211.

[11] *See id.*

[12] *See id.* ¶ 54.

"not aware of any claims against the insured(s) or any fact, circumstance, situation, transaction, event, act, error, or omission that may give rise to a claim against the insured(s) . . . as respect the cervical cytology laboratory screening services conducted between 8/1/2010 to 6/3/2013 and all claims, facts, circumstances, situations, transactions, events, acts, errors, or omissions against the insured(s) that may result in a claim have been reported to prior insurance carrier(s)."[13]

The last clause of the above representation—regarding information reported to prior insurance carriers—referenced the Ms. O I Claim, which had already been reported to Homeland.[14] At that time, CPL was not aware of any other pending or potential Irish CervicalCheck Claims.[15]

The 2016 Letter went on to provide that Homeland "will be issuing its policy in reliance upon the conditions and statements made in this letter and the application will be deemed to be a part of *the* policy"—*i.e.*, *the* 2016 Policy.[16]   The letter did not provide, however, that it would be an "endorsement" to the 2016 Policy.[17]

## III.   The Distinct and Different 2016 and 2017 Policies, Which May Only be Altered by Endorsement and Include Standard Misrepresentation Provisions.

*The 2016 Policy.*   The 2016 Policy covers June 30, 2016 to June 30, 2017.[18]   It provides that "it may only be altered, waived, or changed by written endorsement issued to form a part of this Policy."[19]   It is endorsed with fifteen individually-numbered and identically-structured endorsements, none of which are the 2016 Letter.[20]

The 2016 Policy includes a standard provision on the effect of alleged misrepresentations in the application process, providing that "[i]n the event of any material untruth, misrepresentation

---

[13] *Id.*

[14] *See id.* ¶ 57.

[15] *See id.*

[16] *Id.* at Ex. 1 (the 2016 Letter) (p. 61 of 241) (emphasis added).

[17] *See id.*

[18] *See id.* ¶ 54.

[19] *See id.* at Ex. 2 (the 2016 Policy) (p. 99 of 241).

[20] *See id.* (pp. 101-119 of 241).

5

or omission in connection with any of the particulars or statements in the Application, this Policy shall be void with respect to any Insured who knew of such untruth, misrepresentation or omission or to whom such knowledge is imputed."[21] The same provision further provides that "[n]o knowledge or information possessed by any Insured shall be imputed to any other Insured . . . ."[22]

*The 2017 Policy*.  Homeland issued and Defendants purchased the 2017 Policy to cover June 30, 2017 to June 30, 2018.[23]  Homeland did not ask CPL or any other insured to provide anything like the 2016 Letter during the 2017 application process—instead, Homeland had CPL complete a separate and new application for the independently-negotiated 2017 Policy.[24]

The 2017 Policy and 2016 Policy are similar in that neither mention, incorporate, or are endorsed with the 2016 Letter.[25]  They are also similar insofar as the 2017 Policy has the same misrepresentation provision and also provides that "it may only be altered, waived, or changed by written endorsement issued to form a part of this Policy."[26]  However, the two policies also differ in many material respects; for example, the 2017 Policy has different endorsements for rate stabilization, sexual misconduct coverage, general liability and employee benefit liability coverage, cancellation, additional insureds, and non-medical errors and omissions coverage.[27]

## IV.   CPL Notifies Homeland of the Irish CervicalCheck Claims; Homeland Quickly Retains Outside Counsel and Purports to Investigate Coverage for the Claims.

Homeland alleges that, on February 12, 2018, MedLab connected with CPL regarding the Ms. C I claim, a claim that had been pending against MedLab but not CPL.[28]  Homeland further

---

[21] *See id.* (p. 99 of 241).

[22] *See id.*

[23] *See id.* ¶ 190.

[24] *See id.* at Ex. 4 (the 2017 Policy) (p. 178 of 241) (referring to "the Application" completed for the 2017 Policy).

[25] *See generally id.* at Ex. 2 (the 2016 Policy) (pp. 63–119 of 241) & Ex. 4 (the 2017 Policy) (pp. 145–220 of 241).

[26] *See id.* at Ex. 4 (the 2017 Policy) (p. 179 of 241).

[27] *Compare id.* at Ex. 2 (the 2016 Policy) (pp. 63–119 of 241) *with* Ex. 4 (the 2017 Policy) (pp. 145–220 of 241).

[28] *See id.* ¶ 112.

alleges that, on that date, MedLab disclosed to CPL for the first time that (1) the results of cancer audit reviews might be disclosed to patients, (2) another claim—the Ms. Phelan claim—was accelerating, and (3) Ms. Phelan was likely to name CPL as a defendant.[29]

Shortly after that call, CPL tendered the Ms. C I and Ms. Phelan claims to Homeland under the 2017 Policy.[30]  Instead of issuing a prompt coverage determination, Homeland quickly retained outside counsel who then quarterbacked Homeland's two-and-a-half-year "investigation."[31]

## V.    Homeland Asserts a Misrepresentation Defense After a Two-and-a-Half-Year Investigation, But Waives the Defense by Failing to Provide § 705.005 Notice.

Homeland did not deny coverage for any of the ICC Claims until July 10, 2020, which is when it sent CPL a letter denying coverage for the Ms. Swift claim because of, among other reasons, an alleged misrepresentation in the 2016 Letter.[32]  Until then, Homeland had never stated that it had denied coverage for any of the ICC Claims on any basis, including because of an alleged misrepresentation; instead, Homeland had said that it was still "investigating" coverage.[33]

However, a close review of Homeland's July 10, 2020 letter shows that Homeland's misrepresentation defense was predicated on information that Homeland possessed at least seventeen months prior, as the misrepresentation section of the letter mirrored the misrepresentation section of an earlier Homeland letter dated February 4, 2019 (and in subsequent

---

[29] *See id.* ¶¶ 112–13.

Homeland alleges that MedLab knew of this change of protocol by February 3, 2016.  *See id.* ¶ 63.  Homeland also alleges that, on March 17, 2016, MedLab provided to its insurer, Vero, "a list of 58 women (and related information) whose slides might have been misread and who thus might make a claim."  *Id.* ¶ 83.

[30] *See id.* ¶ 114.

[31] *See id.* ¶¶ 114 (marking February 12, 2018 as the start of Homeland's investigation), 143 (noting that Homeland first denied coverage for the *Swift* claim approximately two-and-a-half years later, on July 10, 2020).

[32] *Compare* Van Houten Decl. at Ex. A-2 (Ltr. from J. Brooks, Outside Counsel for Homeland, to M. Beaman, Outside Counsel for CPL, dated July 10, 2020) (denying coverage for the *Swift* claim) *with* Van Houten Decl. at Ex. A-3 (Ltr. from J. Brooks, Outside Counsel for Homeland, to M. Beaman, Outside Counsel for CPL, dated May 26, 2020) (stating that Homeland "continues to conduct its claim investigation under a full reservation of rights").

[33] *See, e.g.*, Van Houten Decl. at Ex. A-3 (Ltr. from J. Brooks, Outside Counsel for Homeland, to M. Beaman, Outside Counsel for CPL, dated May 26, 2020) (stating that Homeland "continues to conduct its claim investigation under a full reservation of rights").

letters dated May 31, 2019, October 14, 2019, and November 11, 2019).[34]   Both letters trumpet
the same two allegations:   (1) that, at the time the 2016 Letter was signed, MedLab knew of
circumstances that may give rise to the ICC Claims and that it was not plausible that other insureds
(like CPL) didn't know about those same circumstances, and (2) even assuming that only MedLab
possessed that knowledge, Mr. Shumpert, the signor of the 2016 Letter, did not conduct the
"diligent inquiry" he had represented he conducted in the 2016 Letter.[35]

Under Texas Insurance Code § 705.005, Homeland was required to notify CPL of its intent
to disclaim coverage because of an alleged misrepresentation within 90 days of discovering the
alleged misrepresentation.[36]   Homeland did not do so—it instead sat on its misrepresentation
theory and strung CPL along for a years-long investigation—and, despite filing three complaints,
Homeland has never pled that it satisfied its § 705.005 notice obligation (because it didn't).[37]

## ARGUMENT

I.   **Homeland's Warranty and Reformation Claims Fail as a Matter of Law Because,
Even After Repleading, Homeland Cannot Establish That the 2016 Letter Was
Incorporated Into the Policies.**

This Court already dismissed Homeland's claims for breach of warranty and reformation,
though it did so without prejudice.   [*See* Order, Dkt. 55 at 11–12].   At the heart of that decision
were determinations that the 2016 Letter was not incorporated into the policies and that there was

---

[34] *Compare* Van Houten Decl. at Ex. A-2 (Ltr. from J. Brooks, Outside Counsel for Homeland, to M. Beaman, Outside
Counsel for CPL, dated July 10, 2020) *with* Van Houten Decl. at Exs. A-4 (Ltr. from J. Brooks, Outside Counsel for
Homeland, to M. Beaman, Outside Counsel for CPL, dated Feb. 4, 2019), A-5 (same but dated May 31, 2019), A-6
(Ltr. from M. Ringland, on behalf of Homeland, to S. Foster, SVP with SHUSA, dated Oct. 14, 2019), and A-7 (Ltr.
from J. Brooks, Outside Counsel for Homeland, to M. Beaman, Outside Counsel for CPL, dated Nov. 11, 2019).

Some of the misrepresentation allegations in the July 10, 2020 even appear in a September 19, 2018 letter from
Homeland.  *See* Van Houten Decl. at Ex. A-8 (Ltr. from J. Brooks, Outside Counsel for Homeland, to M. Beaman,
Outside Counsel for CPL, dated Sept. 19, 2018).

[35] *Compare* Van Houten Decl. at Ex. A-2 (Ltr. from J. Brooks, Outside Counsel for Homeland, to M. Beaman, Outside
Counsel for CPL, dated July 10, 2020) *with* Van Houten Decl. at Exs. A-4 (Ltr. from J. Brooks, Outside Counsel for
Homeland, to M. Beaman, Outside Counsel for CPL, dated Feb. 4, 2019).

[36] *See* Tex. Ins. Code § 705.005.

[37] *See, e.g.*, Pl.'s Second Am. Compl. [Dkt. 56].

nothing to reform because the parties had not made a mistake in the execution of the policies. Homeland subsequently amended its pleading, but these claims still fail as a matter of law and should be dismissed with prejudice.

### A.   This Court Already Correctly Held That the 2017 Policy Did Not Incorporate the 2016 Letter—and Nothing Has Changed.

The Court dismissed Homeland's breach of warranty claim because it seeks to void the 2017 Policy based upon a letter that the policy "did not incorporate into its terms." [*See* Order, Dkt. 55 at 11]. Under Texas law, extrinsic documents are not incorporated into insurance policies "[u]nless obligated to do so by the terms of the policy." [Order, Dkt. 54 at 2 (citing *In re Deepwater Horizon*, 470 S.W.3d 452, 460 (Tex. 2015); *Ironshore Specialty Ins. v. Aspen Underwriting*, 788 F.3d 456, 460 (5th Cir. 2015)]. That rule tracks the text of the 2017 Policy, which provides that "it may only be altered, waived, or changed by written endorsement *issued to form a part of this Policy*."[38] Because the 2017 Policy does not mention or attach the 2016 Letter, the letter is not part of the policy, and Homeland's breach of warranty claim fails. [*See* Order, Dkt. 55 at 11].

Although Homeland cannot change the language of the 2017 Policy, the Court allowed it to replead to potentially address this issue. [Order, Dkt. 54 at 5]. There are several ways that, theoretically, an insurance company can allege incorporation of an extrinsic document—but any such fix would have to come from the policy. Provisions exist in the marketplace to incorporate extrinsic documents.[39] Yet Homeland alleged no such provision here because it didn't bargain for

---

[38] Pl.'s Second Am. Compl. at Ex. 4 (the 2017 Policy) (p. 179 of 241) [Dkt. 56] (emphasis added).

[39] *See, e.g., Wallingford Grp. v. Arch Ins.*, No. 18-cv-00946, 2020 WL 4464629, at *2 (D. Conn. May 11, 2020) (involving the following policy provision: "the application and any application for insurance of which this Policy is a renewal, and any supplemental materials submitted therewith, are deemed incorporated into and made a part of this Policy"); *see also Walbrook Ins. v. Spiegel*, No. 91-cv-1206, 1993 WL 580759, at *2 (C.D. Cal. Aug. 6, 1993) (policy provided that "[i]t is warranted that the particulars and statements contained in the application for this Policy or contained in the application for any policy issued by Underwriters of which this Policy is a renewal thereof . . . are to be considered as incorporated into and constituting a part of this Policy").

one.  So, Homeland is right back where it started, with no language in the 2017 Policy—the only policy that matters—to support its incorporation argument.

Left with no other choice, Homeland retreats to a three-step syllogism that fails at every step.  Homeland says that:  (1) the 2016 Policy incorporates the 2016 Letter; (2) the 2017 Policy is a renewal of the 2016 Policy; and thus (3) the 2016 Letter leaps into the 2017 Policy.[40]  As a preliminary matter, this Court already held that the 2016 Policy, like the 2017 Policy, does not incorporate the 2016 Letter because there is no "language in either insurance policy that incorporated the 2016 Letter."  [Order, Dkt. 55 at 9].  That fact hasn't changed, so Homeland's argument doesn't even get off the ground.  The Court can stop here.

But, even if the 2016 Policy somehow incorporated the 2016 Letter, that would have no bearing on the 2017 Policy.  The 2016 Policy does not control what is incorporated into the 2017 Policy, only the 2017 Policy does.  *See Exxon Mobil Corp. v. Ins. Co. of State*, 568 S.W.3d 650, 657 (Tex. 2019) ("an extrinsic document may not be considered unless *the policy* clearly manifests an intent to incorporate") (emphasis added).  That's not just what the law says, it's also what the 2017 Policy says: it may "only be altered, waived, or changed by written endorsement issued to form a part of *this Policy*."[41]  And there is no endorsement that incorporates the 2016 Letter into the 2017 Policy.

The fact that Homeland now alleges that the 2017 Policy was a "renewal" also changes nothing.  A renewal does not incorporate the same terms, endorsements, and incorporated

---

[40] *See* Pl.'s Second Am. Compl. ¶ 60 [Dkt. 56].

[41] *Id.* at Ex. 4 (the 2017 Policy) (p. 179 of 241) (emphasis added).

This is also why the 2016 Policy's rate stabilization endorsement does not propel the 2016 Letter into the 2017 Policy.  Only the 2017 Policy controls what it is in the 2017 Policy.  In any event, the idea that a rate stabilization endorsement has such an effect is absurd.  The purpose of a rate stabilization endorsement, by its text, is to ensure a *stable* premium *rate*, not to transport every term, condition, endorsement, and incorporated document into future policies.  *See id.* at Ex. 2 (the 2016 Policy) (p. 113 of 241).  There is a mechanism for carrying terms, conditions, endorsements, and documents into another policy, and it is the language discussed in *Wallingford* above that is not in the 2017 Policy.

documents as the expiring policy. *Drought v. State Farm*, No. 07-cv-0068, 2009 WL 10701920, at *4 (W.D. Tex. Jan. 7, 2009) (finding that the "terms of a renewal policy may be different from the terms of an expiring policy").[42] The reality is just the opposite here: the 2016 and 2017 Policies differ in many material respects. For example, they have different endorsements for rate stabilization, sexual misconduct coverage, general liability and employee benefit coverage, cancellation, additional insureds, and non-medical errors and omissions coverage.[43] Moreover, the 2016 and 2017 Policies were negotiated separately and required different applications.[44] So, the idea that Homeland can retroactively incorporate the 2016 Letter into the 2017 Policy simply because the latter may be a "renewal" is unsupported by law, the text of the policies, basic fundamentals of insurance, and the Texas Supreme Court's ruling that "an extrinsic document may *not* be considered unless *the policy* clearly manifests an intent to incorporate its terms." *Exxon*, 568 S.W.3d at 657 (emphasis added).[45]

> **B.    The Absence of Incorporation Language Was Not a Mistake, so Homeland's Reformation Claim Still Fails as a Matter of Law.**

Without any language incorporating the 2016 Letter into the Policies, Homeland claims that the parties *meant* to include such language and asks the Court to reform the Policies accordingly. This claim comes in two flavors. First, Homeland seeks to reform the 2016 and 2017 Policies based on alleged mistakes in the 2016 Letter. Second, Homeland seeks to reform the 2016 and 2017 Policies to incorporate the 2016 Letter because, according to Homeland, it was a mistake

---

[42] *See also Materials v. Mid-Continent Ins.*, 519 F. App'x 228, 235 (5th Cir. 2013) ("Although the 2003 policy is a renewal policy, it cannot be characterized as a renewal on the same terms as the 2002 policy when considered in light of other language in the 2003 policy."); *Vela Wood v. Associated Indus.*, 485 F. Supp. 3d 704, 711 (N.D. Tex. 2020) ("A renewal need not be upon the same terms as a prior policy").

[43] *Compare* Pl.'s Second Am. Compl. at Ex. 2 (the 2016 Policy) (pp. 63–119 of 241) [Dkt. 56] *with* Pl.'s Second Am. Compl. at Ex. 4 (the 2017 Policy) (pp. 145–220 of 241) [Dkt. 56].

[44] *See id.* at Ex. 4 (the 2017 Policy) (pp. 178–79 of 241) (discussing "the Application" for the 2017 Policy).

[45] It is for this reason, too, that Homeland's reformation argument doesn't change anything. Even if the 2016 Policy were reformed to incorporate the 2016 Letter—and it should not be—that does *not* mean that the 2016 Letter then jumps forward to the 2017 Policy.

not to incorporate the letter.   Both flavors fail—and summary judgment is appropriate on Homeland's reformation claim—for the following reasons.

*First*, the Court has already held that any mistakes in the 2016 Letter are irrelevant to reformation because "the alleged mistake must be in the document that the party seeks to reform." [Order, Dkt. 55 at 12 (citing *St. Paul Lloyd's Ins. Co. v. Fong Chun Huang*, 808 S.W.2d 524, 527 (Tex. App.—Houston [14th Dist.] 1991, writ denied)].   As the Court noted, "Homeland alleges that there was a mistake in the 2016 Letter, the *original agreement*, not that there was a mistake in the creation of the 2017 Policy, the subsequent written agreement."   [*Id.* (emphasis in original)]. Because "[s]uch an allegation does not fit the elements of reformation," the Court properly "dismisse[d] Homeland's claim for reformation."   [*Id.*].   Nothing has changed regarding this aspect of Homeland's reformation claim, so it still fails as a matter of law.

*Second*, the 2016 Policy cannot be reformed because Homeland has not alleged—and cannot prove—that the parties agreed to *endorse* the 2016 Policy with the 2016 Letter.   As this Court has recognized, the 2016 Policy "can only be altered, waived or changed by written endorsement issued to form a part of th[e] Policy."   [Order, Dkt. 54 at 2].   This Court has also recognized that "imposing the 2016 Letter onto the terms of the 2016 Policy would . . . be altering, waiving, or changing, the 2016 Policy."   [*Id.* at 3].   Thus, to reform the 2016 Policy to include the 2016 Letter, Homeland would have to allege "clear, exact and satisfactory evidence" that there was "an original agreement" to endorse the 2016 Policy with the 2016 Letter, and then a "mutual mistake" in reducing that agreement to writing.   *Cherokee Water v. Forderhause*, 741 S.W.2d 377, 379 (Tex. 1987) ("[R]eformation requires two elements: (1) an original agreement and (2) a mutual mistake, made after the original agreement, in reducing the original agreement to writing."); *Hardy*

*v. Bennefield*, 368 S.W.3d 643, 650 (Tex. App.—Tyler 2012, no pet.) (articulating the "clear, exact and satisfactory evidence" standard).  Homeland has not and cannot make such an allegation.

Homeland instead points to the portion of the 2016 Letter that provides that it will be "deemed to be a part of the policy."[46]  But that language doesn't mean the parties agreed to *endorse* the 2016 Policy with the letter.  Homeland itself argued as much in a September 19, 2018 letter to CPL, where it asserted that the "deemed to be a part of the policy" language meant that it could try to use the 2016 Letter to void coverage under the misrepresentation clause in the policies, which otherwise calls for voiding coverage only upon a misrepresentation "in the Application attached to this Policy."[47]  Homeland never argued that the 2016 Letter was an "endorsement."[48]

An endorsement is a very specific instrument:  all of the endorsements to the 2016 Policy are numbered, attached to the policy, have an identical structure, and include a consideration statement.[49]  Homeland has not alleged that the parties bargained for something like that with respect to the 2016 Letter, has not proffered a draft endorsement or language the parties agreed would be included in an endorsement, and cannot engage in revisionist history to assert that "deemed to be a party of the policy" means "will be an endorsement to the policy."[50]  As one Texas appellate court has remarked, "[t]he doctrine of mutual mistake must not routinely be available to

---

[46] Pl.'s Second Am. Compl. ¶ 185 [Dkt. 56].

[47] *See* Van Houten Decl. at Ex. A-7 (Ltr. from J. Brooks, Outside Counsel for Homeland, to M. Beaman, Outside Counsel for CPL, dated Sept. 19, 2018).

The Court rejected a similar argument to reach its holding that "Homeland has not plausibly pleaded that the 2016 Letter was incorporated into the 2016 or 2017 Policy."  [Order, Dkt. 55 at 9].  The Court reasoned that there is no "language in either insurance policy that incorporated the 2016 Letter," and instead "both policies refer only to an 'Application.'"  [*See id.*].  The Court added that "Homeland does not contest that no application materials were attached to either policy."  [*See id.* at 10].  Because no application materials were attached to either policy, no application materials were incorporated into either policy.  [*See id.* at 9–10].  The same can be said for the 2016 letter, which also was not attached to either policy.  [*See id.*].

[48] *See* Van Houten Decl. at Ex. A-7 (Ltr. from J. Brooks, Outside Counsel for Homeland, to M. Beaman, Outside Counsel for CPL, dated Sept. 19, 2018).

[49] *See* Pl.'s Second Am. Compl. at Ex. 2 (the 2016 Policy) (pp. 101–19 of 241) [Dkt. 56].

[50] *See generally id.*

avoid the result of an unhappy bargain." *LasikPlus v. Mattioli*, 418 S.W.3d 210, 221 (Tex. App.—Houston [14th Dist.] 2013, no pet.).  Homeland's reformation claim fails for this reason alone.[51]

*Third*, and in any event, the 2016 Policy cannot be reformed to include the 2016 Letter because Homeland has not alleged that the letter was executed prior to the drafting of the policy. Under Texas law, "mutual mistake concerns an actual agreement reached prior to the *drafting* of the written instrument." *Comiskey v. FH Partners*, 373 S.W.3d 620, 634 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (citing *Cherokee Water*, 741 S.W.2d at 379) (emphasis in original). Here, Homeland has not alleged that the 2016 Letter, which was executed on July 27, 2016, was executed prior to the drafting of the 2016 Policy, which covered June 30, 2016 to June 30, 2017.[52] Without such an allegation, Homeland has no viable claim to reform the 2016 Policy.

*Fourth*, even if Homeland could somehow reform the 2016 Policy, it has not and cannot plead a viable claim to reform the 2017 Policy to incorporate the 2016 Letter.  Again, Homeland does not allege that there was an "original agreement" to incorporate the 2016 Letter into the 2017 Policy.[53]  Homeland's lack of such an allegation makes sense because, as of July 2016—when the parties executed the 2016 Letter—Defendants had not yet agreed to purchase the 2017 Policy.  That purchase was up in the air until the 2017 Policy was issued on June 26, 2017. Knowing as much, Homeland relies on the same "renewal" arguments to try to carry the

---

[51] Homeland may wish that it had negotiated an endorsement to the 2016 Policy and may feel that it was a mistake not to do so, but that is not the kind of mistake that supports reformation. *See, e.g.*, *Webb v. Reynolds*, 949 S.W.2d 364, 367 (Tex. App.—San Antonio 1997, no writ) ("If the absence of the endorsement is simply a mistake of the insurer, then the insurer as the author of the adhesive contract of insurance should have to bear the burden of the mistake."); *Brookshire v. Bomer*, 959 S.W.2d 673, 678 (Tex. App.—Austin 1997, pet. denied) (citing *Webb* and holding that an agreement was not incorporated into a policy when it was not attached to the policy as an endorsement and the policy specifically provided that it "can be amended or waived only by endorsement issued by us and made a part of this policy"); *Nat'l Union Fire Ins. v. Clemtex*, 807 S.W.2d 824, 826 (Tex. App.—Houston [14th Dist.] 1991, writ denied) ("We hold that the insurer should bear the burden when such an endorsement is not included with the initial policy.").

[52] Although the 2016 Policy was signed on August 30, 2016, it is "the time of drafting [that] is the key and not the time of execution." *Comiskey*, 373 S.W.3d at n.12.

[53] *See generally* Pl.'s Second Am. Compl. [Dkt. 56].

2016 Letter forward into the 2017 Policy, but those arguments fail for the reasons discussed above in § I.A.  In sum, because Homeland has not alleged that there was an "original agreement" to incorporate the 2016 Letter into the 2017 Policy, its attempt to reform the 2017 Policy to incorporate the letter also fails as a matter of law.

## II.   Homeland's Warranty Claim Fails as a Matter of Law for Additional Reasons.

Even setting aside the incorporation issues addressed above—which are fatal to Homeland's warranty claim—the Court can and should dismiss Homeland's warranty claim for two additional, independent reasons.

### A.   Homeland's Warranty Claim Fails Because the 2016 Letter Contains "Representations" and Not "Warranties."

First, the 2016 Letter does not support a breach of warranty claim because it contains "representations" not "warranties."  Whether a document contains representations or warranties is determined "in accordance with the usual rules of contract construction." *Qiuhong v. Fid. & Guar.*, 282 F. App'x 304, 307 (5th Cir. 2008). That means courts review "the four corners . . . to see what [it] states without considering what the parties allegedly meant."  *Thompson v. Geico*, 527 S.W.3d 641, 644 (Tex. App.—Houston [14th Dist.] 2017, no pet.).[54]   If the language constitutes a representation, then there can be no breach of warranty claim—only a misrepresentation defense.

So it was here.  The 2016 Letter begins with:  "The undersigned . . . does hereby ***represent*** . . . ."[55]  The 2016 Letter does *not* use the word "warrant" or "warranty."[56]  A plain reading of that language demonstrates that the letter contains representations.  That's especially true because "Texas law strongly disfavors warranties in insurance applications, and Texas courts reject even fairly obvious attempts to create warranties in the application process."  *Riner v. Allstate Life Ins.*,

---

[54] *See also Pathfinder v. Great W.*, 574 S.W.3d 882, 888 (Tex. 2019) ("[A] contract's plain language controls . . . .").

[55] Pl.'s Second Am. Compl. ¶ 54 [Dkt. 56].

[56] *See id.*

131 F.3d 530, 537, n.7 (5th Cir. 1997).  Indeed, courts applying Texas law routinely reject insurers' attempts to cast statements made by policyholders as "warranties," even when they are expressly called "warranties."  For example, in *Hall's Aero Spraying v. Underwriters at Lloyd's*, the Fifth Circuit held that "[t]he use of the word 'warranty' does not necessarily render a statement made in an application or policy a warranty." 274 F.2d 527, 529 (5th Cir. 1960); *see also Underwriters at Lloyd's v. Turtle Creek Partnership*, 716 F. Supp. 2d 633, 638 (S.D. Tex. 2010) (holding that a "provision [that] begins with 'Flood Warranty'" was not in fact a "warranty").  The language here isn't nearly as strong—so the result should be the same.

At best for Homeland, the 2016 Letter may be ambiguous as to whether it contains representations or warranties.  But if that's true, the language must be construed in favor of the insured—as a representation.  *See Enserch Corp. v. Shand Morahan & Co.*, 952 F.2d 1485, 1497 (5th Cir. 1992) (noting that "[t]he different effects of representations and warranties are well known," and that "[t]o subject its potential insureds to the legal effects of a warranty, an insurer should make the terms of that warranty unambiguous and clear"); *see also Qiuhong Liu v. Fid. & Guar. Life Ins. Co.*, No. 4:05-cv-313, 2006 WL 8441422, at *5 (E.D. Tex. June 28, 2006), *aff'd*, 282 F. App'x 304 (5th Cir. 2008) (holding that, in light of reference to representations in the policy, if the "language in the Application is considered a warranty, an ambiguity is created, and in such an instance, the policy should be construed in favor of the insured to avoid exclusion of coverage").  Homeland's breach of warranty claim thus fails because the 2016 Letter contains no warranties.

### B.    Homeland's Breach of Warranty Claim Also Fails Because Homeland Did Not Comply With its Statutory Notice Obligations.

Homeland's breach of warranty claim also fails because Homeland did not plead and cannot plead that it complied with Texas Insurance Code § 705.005.  The statute provides that an insurer "may use as a defense a misrepresentation made in the application for or in obtaining an

insurance policy only if [it] shows at trial that before the 91st day after the date the [insurer] discovered the falsity of the representation, the [insurer] gave notice that [it] refused to be bound by the policy." Tex. Ins. Code § 705.005.

Insurers have the "burden of pleading and proving" compliance with the statute, which applies, in the words of Homeland, when an insurer seeks to, among other things, "void the policy" because of an alleged misrepresentation. *See Myers v. Mega Life*, No. 07-06-0233-cv, 2008 WL 1758640, at *3 (Tex. App.—Amarillo Apr. 17, 2008, pet. denied) (articulating the pleading standard); [Pl.'s Opp. to Defs.' Cross-Motion, Dkt. 45 at 7 (arguing that the statute applies when an insurer "seek[s] to rescind or void the policy" based on a misrepresentation)].[57] Here, despite seeking a ruling under its warranty claim that the policies are "void as to Defendants with respect to the Irish CervicalCheck claims," Homeland—who has now had the benefit of filing three complaints—did not plead compliance with the notice statute.[58] The Court can stop here.[59]

Going further, letter correspondence from Homeland confirms that Homeland cannot fix its critical pleading. Under § 705.005, Homeland was required to notify CPL of its intent to disclaim coverage because of an alleged misrepresentation within 90 days of discovering the alleged misrepresentation.[60] Yet, a July 10, 2020 letter from Homeland—its first letter denying

---

[57] *See also Thompson v. Diamond State Ins.*, No. 06-cv-154, 2008 WL 11344903, at *3 (E.D. Tex. May 2, 2008) (applying the statute when insurer denied claim, and therefore refused to be "bound by the policy," because of an alleged misrepresentation); *Koral Indus. v. Sec.-Connecticut Life Ins.*, 788 S.W.2d 136, 137, 148–49 (Tex. App.—Dallas 1990), writ denied sub nom., 802 S.W.2d 650 (Tex. 1990) (applying the statute when insurer "counterclaimed for a declaratory judgment rescinding the policy").

[58] *See* Pl.'s Second Am. Compl. ¶ 232 [Dkt. 56].

[59] The Court has reserved its decision on the application of the statute to claims like this. In its Order on Defendants' Motion to Dismiss, the Court declined to dismiss Homeland's negligent misrepresentation claim and held that § 705.005 did not apply to Homeland's "affirmative claim for negligent misrepresentation." [Dkt. 28 at 15]. Defendants subsequently moved for reconsideration, including on the application of the statute. [Dkt. 36]. The Court granted Defendants' motion and dismissed Homeland's negligent misrepresentation claim, but on other grounds. [Dkt. 54 at 4]. It expressly did "not reach the issue of whether Homeland met the notice requirement in Texas Insurance Code § 705.005." [*Id.*]. Thus, the application of § 705.005 is still an open issue.

[60] *See* Tex. Ins. Code § 705.005.

coverage for an ICC Claim—made clear that Homeland's misrepresentation defense is predicated on information Homeland first possessed by February 4, 2019.[61]   That is because the misrepresentation section of Homeland's July 10, 2020 letter simply repeated what Homeland had said in a reservation of rights letter dated February 4, 2019 (and in subsequent letters dated May 31, 2019, October 14, 2019, and November 11, 2019).[62]

Assuming Homeland first discovered the underpinnings of its alleged misrepresentation defense on February 4, 2019—a generous assumption because Homeland's February 4, 2019 letter purportedly hinged on materials CPL sent it on December 14, 2018—Homeland would have had 90 days to inform CPL that it was disclaiming coverage based upon a misrepresentation.[63] Homeland didn't meet that 90-day requirement; it instead strung CPL along for a years-long investigation.  For this reason, too, Homeland's breach of warranty claim fails as a matter of law.

## III.   Homeland's Promissory Estoppel Claim Fails as a Matter of Law.

In its most recent pleading, Homeland included a promissory estoppel claim.[64]  This claim fails for the same reason as Homeland's recently-dismissed claim for negligent misrepresentation—because there is a valid contract between the parties.  [*See* Order, Dkt. 54 at 3–4].[65]  Promissory estoppel sounds in "quasi-contract," and, as result, it is not available when "a valid contract covers the subject matter of [the] dispute."  *Hoover Panel v. HAT*, 819 F. App'x

---

[61] *Compare* Van Houten Decl. at Ex. A-2 (Ltr. from J. Brooks, Outside Counsel for Homeland, to M. Beaman, Outside Counsel for CPL, dated July 10, 2020) *with* Van Houten Decl. at Ex. A-4 (Ltr. from J. Brooks, Outside Counsel for Homeland, to M. Beaman, Outside Counsel for CPL, dated Feb. 4, 2019).

[62] *See supra* note 34.

[63] *See* Van Houten Decl. at Ex. A-4 (Ltr. from J. Brooks, Outside Counsel for Homeland, to M. Beaman, Outside Counsel for CPL, dated Feb. 4, 2019).

[64] *See* Pl.'s Second Am. Compl. ¶¶ 237–41 [Dkt. 56].

[65] The Court held that "[b]ecause Homeland's negligent misrepresentation claim depends on the existence and enforceability of the 2017 Policy, it revolves around the insurance policy between the parties and is thus barred by the economic loss rule."  Order, at 4 [Dkt. 54].

190, 199 (5th Cir. 2020).[66]  Indeed, "promissory estoppel becomes available to a claimant only *in the absence of* a valid and enforceable contract."  *Tremble v. Wells Fargo*, 478 F. App'x 164, 166 (5th Cir. 2012) (emphasis added).[67]

There's no question here that two valid and enforceable contracts govern the parties' disputes (the 2016 and 2017 Policies).  That undisputed fact is fatal to Homeland's new promissory estoppel claim.  Rather than running from it, Homeland's pleadings confirm that it seeks relief under the contracts as part of its promissory estoppel claim:  it alleges that Defendants "made [false] representations . . . in the [2016] Letter" and that, as a result, "Defendants should . . . be estopped from arguing or otherwise contending that the [2016 Letter] was not incorporated into the ***operative policies***."[68]  That's not how the law works.  If Defendants made false representations, Homeland's remedy lies in pursuing relief under the misrepresentation provision that the parties included in the operative policies.[69]  Homeland has no claim for promissory estoppel.

Yet even if it did, Homeland's promissory estoppel claim would also fail because Homeland did not comply with Insurance Code § 705.005, as discussed above in § II.B.  Those arguments apply just the same here because Homeland again seeks to use Defendants' alleged misrepresentations to deny coverage on grounds of promissory estoppel.[70]  For either of these reasons, summary judgment is appropriate on Homeland's promissory estoppel claim.

---

[66] *See also BBX v. Am. Fluorite*, No. 09-19-00278-CV, 2021 WL 3196514, at *17 (Tex. App.—Beaumont July 29, 2021, no pet. h.) ("[Plaintiff's] promissory estoppel claim is barred as a matter of law because an express contract governs the subject matter of the parties' dispute.").

[67] *See also Doctors Hosp. v. Sambuca*, 154 S.W.3d 634, 636–37 (Tex. App.—Houston [14th Dist.] 2004, pet. abated) ("For many years, Texas courts have held that promissory estoppel becomes available to a claimant only in the absence of a valid and enforceable contract.").

[68] *See* Pl.'s Second Am. Compl. ¶¶ 238–41 [Dkt. 56] (emphasis added).

[69] *See id.* at Ex. 4 (the 2017 Policy) (p. 179 of 241).

[70] *See id.* ¶¶ 237–41.

IV.    **Several of Homeland's Contract Defenses Fail as a Matter of Law.**

With Homeland's affirmative claims dismissed, this case can proceed as the insurance coverage dispute that it is—Homeland says the 2017 Policy does not cover the ICC claims for various reasons, Defendants say it does and that Homeland acted in bad faith in denying coverage. Although trial will likely be necessary for Defendants' bad faith claims (which are not at issue in this motion), several of Homeland's coverage defenses fail as a matter of law and can be disposed of now to streamline the case.

A.    **The Prior Notice Exclusion Does Not Apply Because MedLab's Notice to Vero Does Not Trigger the Exclusion.**

First, Homeland argues that the "prior notice" exclusion in the 2017 Policy applies here to defeat coverage based on MedLab's 2016 notice to Vero.[71]  Yet this claim fails a matter of law because MedLab is not covered by the 2017 Policy for any liability it may have arising out of the Irish CervicalCheck program.

The prior notice exclusion, which must be "strictly construed" against Homeland, bars coverage for claims arising out of any act, error, or omission that "was the subject of any notice given under . . . any medical professional liability or similar policy of insurance . . . with respect to any Claim **otherwise covered under Insuring Agreement (A)**."  *See* Pl.'s Second Am. Compl. at Ex. 4 (the 2017 Policy) (p. 168 of 241) [Dkt. 56] (emphasis added); *Nat'l Union v. Hudson Energy*, 811 S.W.2d 552, 555 (Tex. 1991) (holding that "exceptions or limitations on liability are strictly construed against the insurer and in favor of the insured.").  Homeland alleges MedLab's notice of its potential CervicalCheck liability to its insurer, Vero, triggers the exclusion, but MedLab is *not* "covered under Insuring Agreement (A)" for claims arising out of the

---

[71] *See id.* ¶¶ 141, 155, 182; *see also* Pl.'s Answer to Def.'s First Am. Compl. at 45 [Dkt. 53].

CervicalCheck program.[72]  That is because such claims arise in Ireland and foreign insureds like MedLab are only covered for claims made in the United States, Puerto Rico, or Canada.[73]  So, MedLab's notice to Vero does not trigger the exclusion.

This result is entirely consistent with the purpose behind prior notice exclusions:  to prevent double recoveries.  *See Doe Run v. Am. Guar.*, No. 10SL-CC01716, 2011 WL 13103983, at *4 (Mo. Cir. Nov. 07, 2011) (agreeing that "prior notice exclusions are meant to . . . prevent double recovery for claims noticed under a prior claims-made policy").  Homeland's argument that CPL is not covered by the 2017 Policy for the ICC Claims because MedLab—a separate entity—provided its insurer with notice of its own liabilities is antithetical to that purpose.  Homeland's argument also makes no sense where, as here, CPL is not covered by MedLab's insurer for the ICC Claims at-issue in this case, and thus there is no risk of a double recovery.  In sum, the prior notice exclusion does not apply.

### B.   Homeland's Prior Knowledge Defense Fails Because Homeland Does Not Allege CPL Should Have Known About the ICC Claims Before June 30, 2013.

Second, Homeland argues the "prior knowledge" exclusion bars coverage for at least some of the ICC Claims.[74]  That defense fails as a matter of law because Homeland does not and cannot allege that CPL knew or should have known about the ICC Claims before June 30, 2013.

The "prior knowledge" exclusion bars coverage for claims arising out of an "act, error, omission or Wrongful Act if, on or before the *Inception Date* . . . the Risk Management Dept or Legal Dept or any Executive . . . knew or reasonably could have foreseen that such act, error, omission or Wrongful Act might result in a Claim."[75]  "Inception Date" is defined as "the inception

---

[72] *See id.* ¶¶ 141, 155, 182; *see also* Pl.'s Answer to Def.'s First Am. Compl. at 45 [Dkt. 53].

[73] *See* Pl.'s Second Am. Compl. at Ex. 4 (the 2017 Policy) (p. 202 of 241) [Dkt. 56].

[74] Pl.'s Answer to Def.'s First Am. Compl. at 44 [Dkt. 53]; Van Houten Decl. Ex. A-9 (Pl.'s Responses to Def.'s First Set of Interrogatories) at 24.

[75] *See* Pl.'s Second Am. Compl. at Ex. 4 (the 2017 Policy) (p. 209 of 241) [Dkt. 56].

date of the first policy under which the Underwriter began to provide the First Named Insured with the continuous and uninterrupted coverage of which this Policy is a renewal."[76]

Homeland first issued Medical Facilities and Providers Professional Liability Insurance to CPL on June 30, 2013.[77]  Starting on June 30, 2013, CPL's coverage with Homeland was continuous and uninterrupted until the expiration of the 2017 Policy on June 30, 2018.[78]  Thus, the "Inception Date" for purposes of the prior knowledge exclusion is June 30, 2013, and the question is whether "the Risk Management Dept or Legal Dept or any Executive" at CPL knew or could have foreseen the ICC Claims before June 30, 2013.

Homeland makes no such allegation in its Second Amended Complaint, nor could it, and instead alleges that "in or around February 2016 . . . a protocol change . . . resulted in [cancer audit review] results being reported to the patients' treating physicians," and that, by that time, "at least *MedLab* was on notice that misreads in the CervicalCheck program discovered pursuant to CARs would potentially become the subject of lawsuits."[79]  Homeland then infers (though it does not allege) that CPL should have known the same thing around the same time.  But even that unpleaded inference misses the point.  Homeland does not allege that CPL knew or should have known about the potential for ICC Claims before June 30, 2013, the relevant date, and it has no evidence to that effect.[80]  As a result, Homeland's prior knowledge exclusion defense fails as a matter of law.

### C.     Homeland's Misrepresentation Defense Fails as a Matter of Law.

Third, Homeland alleges that Defendants made misrepresentations that void the coverage under the 2017 Policy. This defense is the heart of the case. There were no misrepresentations

---

[76] *Id.* (requiring "continuous and uninterrupted coverage," but *not* "continuous and uninterrupted *identical* coverage").

[77] *See* Van Houten Decl. at Ex. A-1 (the 2013 Policy) at 5 (noting an "Inception Date" of "June 30, 2013").

[78] *See* Van Houten Decl. ¶ 6.

[79] *See* Pl.'s Second Am. Compl. ¶¶ 26–27 [Dkt. 56] (emphasis added).

[80] *See id.*; *see also* Van Houten Decl. at Ex. A-9 (Pl.'s Responses to Def.'s First Set of Interrogatories) at 24.

here, but the Court need not even reach that question to dismiss this defense as a matter of law. Homeland's misrepresentation defense fails for two independent reasons discussed above.

*First*, Homeland's misrepresentation defense alleges that the 2017 Policy is voided based on alleged misrepresentations in the 2016 Letter.[81]  But as discussed above in § I.A, the 2016 Letter was not incorporated into the 2017 Policy—which means that any misrepresentations in the Letter have no bearing on the viability of the 2017 Policy.

*Second*, Homeland's misrepresentation defense fails because Homeland did not comply with Insurance Code § 705.005.  This is the quintessential claim to which the statute applies.  And as discussed above in § II.B, Homeland failed to comply with its obligations as a matter of law. The Court can and should dispose of this defense now.[82]

## V.   Defense Costs Incurred in the ICC Claims Do Not Erode the 2017 Policy's Limit.

Finally, if Homeland cannot defeat coverage entirely, it seeks to limit what it owes by arguing that defense costs incurred by CPL in the ICC claims count against the limit of the 2017 Policy.[83]  That is incorrect as a matter of law, and the Court should find as much now.

One of the key features of primary-level liability insurance, and one of the reasons it is so expensive, is that it covers defense costs in addition to policy limits.  *See Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co.*, 20 S.W.3d 692, 700–01 (Tex. 2000) (noting that primary policies are

---

[81] Pl.'s Answer to Def.'s First Am. Countercl. at 45–46 [Dkt. 53].

[82] Because Homeland's prior notice, prior knowledge, and misrepresentation defenses fail, so does its declaratory judgment claim, as that claim relies solely on those defenses.  *See* Pl.'s Opp. to Defs.' Mot. to Dismiss at 16–18 [Dkt. 25] (explaining the bases for Homeland's declaratory judgment claim).  Homeland's declaratory judgment claim also fails because it is duplicative of CPL's breach of contract claim insofar as it seeks a declaration of no coverage upon certain defenses and CPL alleges Homeland breached the contract by denying coverage upon those same defenses. *See Albritton Props. v. Am. Empire*, No. 3:04-cv-2531, 2005 WL 975423, at *3 (N.D. Tex. April 25, 2005) (dismissing insurer's claim for declaratory judgment and explaining that "the Court must necessarily determine the parties' rights and duties under the Policy in order to decide the breach of contract action" and "a declaratory judgment would simply duplicate this determination"); *American Equip. Co. v. Turner Bros.*, No. 4:13-cv-2011, 2014 WL 3543720, at *4 (S.D. Tex. July 14, 2014) (collecting cases supporting the same proposition).

[83] *See* Pl.'s Answer to Def.'s First Am. Countercl. ¶ 33 [Dkt. 53] (denying that "Defense Expenses do *not* erode the limits").

generally much more expensive than excess policies because, although the "primary carrier generally provides a much lower amount of coverage, . . . [it] must provide a defense.").[84]

That is exactly the kind of coverage provided in the 2017 Policy, which covers defense costs "[i]n addition to the Limits of Liability."[85]  The policy also provides that the "applicable Limits of Liability are exhausted by the payment of Loss," which the policy defines as "damages, settlement, judgments or other amounts," but not defense costs.[86]  And the Limits of Liability section of the policy caps the amount Homeland must pay "for all *Loss* resulting from each Claim"—it does not cap payments for defenses costs.[87]  So, although the Worldwide Territory Endorsement at issue here requires Homeland to "reimburse the Insured, up to the *applicable* Limit of Liability, for reasonable Defense Expenses and Loss," there is no *applicable* Limit of Liability for defense costs incurred under the endorsement.[88]  For those reasons, defense costs incurred in the ICC Claims do *not* erode limits.

Interestingly, the policy's endorsement for medical marijuana testing coverage provides for a different arrangement.[89]  That endorsement provides that defense costs incurred in claims arising out of such testing "are part of, and *not* in addition to, the Limits of Liability."[90]  The policy

---

[84] *See also Nat'l Union Fire Ins. Co. v. CNA Ins. Cos.*, 28 F.3d 29, 31 (5th Cir. 1994) (noting that excess policies are generally less expensive than primary policies because the excess premium is "held down by the fact that the duty to defend rests primarily on the primary insurer"); 1-1 New Appleman Law of Liability Insurance § 1.05[2][f] (2015) ("Defense costs under most CGL policies are outside of the policy limits, meaning that payment of defense costs by an insurer does not reduce the amount available to pay judgments or settlements.").

[85] *See* Pl.'s Second Am. Compl. at Ex. 4 (the 2017 Policy) (p. 155 of 241) [Dkt. 56].

[86] *See* Pl.'s Second Am. Compl. at Ex. 4 (the 2017 Policy) (pp. 178, 159 of 241) [Dkt. 56].

[87] *See id.* (p. 170 of 241).

[88] *See id.* (p. 202 of 241) (emphasis added).

It is axiomatic that every word in an insurance policy—including the word "applicable" highlighted here—must be given meaning.  *See Balandran v. Safeco Ins.Co.,* 972 S.W.2d 738, 741 (Tex. 1998) (declaring that courts applying Texas law must "give meaning to every sentence, clause, and word to avoid rendering any portion inoperative"); *S. Farm Bureau Cas. Ins. Co. v. Adams*, 570 S.W.2d 567, 570 (Tex. Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.) (noting that "each word in the particular phrase in question is intended to have a meaning in and of itself").

[89] *See id.* (pp. 218–19 of 241).

[90] *See id.* (p. 219 of 241) (emphasis added).

further provides that "payment of Defense Expenses" in medical marijuana testing claims "will *reduce, and may exhaust*, such Limits of Liability."[91]

That language does not appear in the Worldwide Territory Endorsement.[92] If Homeland wanted defense costs incurred in the ICC Claims to erode limits it could have bargained for that language, but it did not, and it cannot receive the benefit of policy language that it did not bargain for.  *See Hudson Energy*, 811 S.W.2d at 555 (holding that if insurer wanted to exclude coverage, "then it was incumbent upon it to expressly and clearly state the exclusion in the policy.").  In sum, per the plain language of the 2017 Policy (specifically, its Worldwide Territory Endorsement), and in line with the typical primary-level policy, defense costs incurred in the ICC Claims *do not* erode the 2017 Policy's limits but rather are covered *in addition* to limits.

## CONCLUSION

Defendants respectfully submit that, under the language of the 2017 Policy and Texas law, Homeland's breach of warranty, reformation, promissory estoppel, and declaratory judgment claims should be dismissed with prejudice.  Homeland's prior notice, prior knowledge, and misrepresentation defenses, as well as its argument that defense costs incurred in the ICC Claims erode limits, also fail as a matter of law and can be disposed of now.

---

[91] *See id.* (emphasis added).
[92] *See id.* (p. 202 of 241).

Dated:  October 8, 2021

Respectfully submitted,


By: /s/ Ernest Martin
    Ernest Martin, Jr. [Bar No. 13063300]
    Greg Van Houten*
    HAYNES AND BOONE, LLP
    2323 Victory Avenue, Suite 700
    Dallas, TX 75219
    214-651-5651 Direct
    214-651-5000 Main
    214-200-0519 Fax
    ernest.martin@haynesboone.com
    greg.vanhouten@haynesboone.com
    *Admitted *Pro Hac Vice*

    -and-

    Mark T. Beaman [Bar No. 01955700]
    Ryan Bueche [Bar. No. 24064970]
    GERMER BEAMAN & BROWN PLLC
    One Barton Skyway
    1501 S Mopac Expy Suite A400
    Austin, TX 78746
    512-482-3504 Direct
    512-472-0288 Main
    512-472-0721 Fax
    mbeaman@germer-austin.com
    rbueche@germer-austin.com

    **ATTORNEYS FOR DEFENDANTS**

## **CERTIFICATE OF SERVICE**

I hereby certify that, consistent with Local Court Rule CV-5, a true and correct copy of the foregoing was sent to all parties of record pursuant to the Electronic Filing Procedures and the Federal Rules of Civil Procedure on this 8th day of October 2021.

/s/  Ernest Martin
Ernest Martin